# 24-1680

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

SEQUAN JACKSON, AKA SEALED DEFENDANT 2, ANTHONY MCGEE, AKA SEALED DEFENDANT 3, KAHEEN SMALL, AKA SEALED DEFENDANT 4, DAMON DORE, AKA SEALED DEFENDANT 5, HASIM SMITH, AKA SEALED DEFENDANT 6, RAHMIEK LACEWELL, AKA SEALED DEFENDANT 7, MANUEL PEREIRA, AKA SEALED DEFENDANT 8, OCTAVIO PERALTA, AKA SEALED DEFENDANT 9, CARL WALSH,

*Defendants,*

JATIEK SMITH, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

RUSSELL CAPONE
COOLEY LLP
55 Hudson Yards
New York, New York 10001
(212) 479-6580

*Attorney for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

JURISDICTIONAL STATEMENT ......................................................................2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................2

STATEMENT OF THE CASE.............................................................................3

    I.    The Offense Conduct ................................................................ 3

        A.    The Fire Restoration Industry ................................................ 3

        B.    Smith's Time at First Response................................................ 4

    II.    The Indictment and Relevant Proceedings ............................. 9

        A.    Pre-Arraignment............................................................... 9

        B.    Smith's Counsel................................................................ 10

        C.    Smith's Pretrial Motions .................................................. 13

        D.    Trial ............................................................................... 14

        E.    Co-Defendants' Pleas and Sentencing............................ 16

ARGUMENT ....................................................................................................17

    I.    The District Court Erred in Declining To Suppress the Evidence Obtained From the Illegal Search of Smith's Cellphone....................................................... 17

**TABLE OF CONTENTS**
(continued)

Page

A. The Government Unlawfully Seized Smith's Cellphone and Reviewed the Contents Prior To Obtaining a Warrant ................................................... 17

B. The Border Search Exception Does Not Allow a Warrantless Search and Seizure of a Mobile Device .................................................... 19

C. The District Court Correctly Found the Search of Smith's Phone Was Not Subject to the Border Exception ............................................. 23

D. The District Court Erred in Holding that the "Good Faith Exception" Applied to the Unlawful Search of Smith's Cellphone ............................. 28

E. The District Court Erred in Concluding the Provision of Smith's Password Was Non-Testimonial and Did Not Violate Smith's Fifth Amendment Rights ........................................................................ 37

II. Smith's Sixth Amendment Rights Were Violated by the District Court's Erroneous Decision To Allow a Majority of Smith's Defense Witnesses To Invoke their Fifth Amendment Right Without a Particularized Analysis as to Their Good Faith Basis For Doing So .................................................. 40

A. The District Court Allowed Five of Eight Defense Witnesses To Invoke the Fifth Amendment Based Solely on Advice of Their Counsel .......... 41

**TABLE OF CONTENTS**
**(continued)**

**Page**

B.   The District Court Erred in Allowing Defense Witnesses To Invoke the Fifth Amendment With Respect to All Questions Without a Particularized Inquiry ................................................................... 43

C.   The District Court's Error Deprived Smith of his Ability To Put on a Defense ........................................................................................ 46

III.  The District Court Erred in Denying Smith's Request To Appoint Counsel To Represent Smith at Trial ........................................................... 49

IV.  The District Court Erred in Sentencing Smith to a Term of Twelve Years of Imprisonment ..................................................................................... 54

CONCLUSION ............................................................................................60

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alasaad v. Mayorkas*,
   988 F.3d 8 (1st Cir. 2021).................................................................26

*Davis v. United States*,
   564 U.S. 229 (2011).......................................................................29

*In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*,
   670 F.3d 1335 (11th Cir. 2012) ...............................................38, 39

*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*,
   542 U.S. 177 (2004).......................................................................37

*Kimbrough v. United States*,
   552 U.S. 85 (2007).........................................................................55

*Lainfiesta v. Artuz*,
   253 F.3d 151 (2d Cir. 2001) .....................................................50, 54

*Lynumn v. Illinois*,
   372 U.S. 528 (1963).......................................................................38

*Riley v. California*,
   573 U.S. 373 (2014)...............................................................*passim*

*Roberts v. United States*,
   445 U.S. 552 (1980).......................................................................43

*Rogers v. United States*,
   340 U.S. 367 (1951).......................................................................43

*United States v. Aguiar*,
   737 F.3d 251 (2d Cir. 2013) .....................................................29, 33

*United States v. Aigbekaen*,
   943 F.3d 713 (4th Cir. 2019) ...................................................25, 31

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Al-Moayad,*
545 F.3d 139 (2d Cir. 2008) ........................................................................49

*United States v. Alisigwe,*
2023 WL 8275923 (S.D.N.Y Nov. 30, 2023).................................................28

*United States v. Anderson,*
929 F. 2d 96 (2d Cir. 1991) .........................................................................37

*United States v. Arias,*
404 F. App'x 554 (2d Cir. 2011) ..................................................................43

*United States v. Arvizu,*
534 U.S. 266 (2002)......................................................................................30

*United States v. Asbury,*
586 F.2d 973 (2d Cir. 1978) ........................................................................20

*United States v. Balsamo,*
No. 22-CR-212-3 (S.D.N.Y.).........................................................................57

*United States v. Bowe,*
698 F.2d 560 (2d Cir. 1983) ........................................................................43

*United States v. Calisi,*
No. 22-CR-212-2 (S.D.N.Y.)...........................................................56, 57, 58

*United States v. Cano,*
934 F.3d 1002 (9th Cir. 2019) ........................................................24, 25, 31

*United States v. Carpenter,*
2023 WL 358794 (N.D. Ill. Jan. 23, 2023)..................................................31

*United States v. Castillo,*
70 F.4th 894 (5th Cir.), *cert. denied,* 144 S. Ct. 410 (2023) .....................26

*United States v. Cavera,*
550 F.3d 180 (2d Cir. 2008) (en banc) ........................................................54

v

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Conyers*,
  No. 15-CR-537-01 (S.D.N.Y.)....................................................................55

*United States v. DiMaio*,
  255 F. App'x 537 (2d Cir. 2007) ...............................................................59

*United States v. Dorvee*,
  616 F.3d 174 (2d Cir. 2010) .....................................................................54

*United States v. Esposito*,
  No. 18-CR-14-01 (S.D.N.Y.).............................................................56, 58

*United States v. Ganias*,
  824 F.3d 199 (2d Cir. 2016) ...........................................................27, 32, 33

*United States v. Gavino*,
  2024 WL 85072 (E.D.N.Y. Jan. 7, 2024)...................................................28

*United States v. Giovinco*,
  No. 18-CR-14 (S.D.N.Y.).................................................................55, 56

*United States v. Gomez*,
  877 F.3d 76 (2d Cir. 2017) .......................................................................31

*United States v. Greenfield*,
  831 F.3d 106 (2d Cir. 2016) .....................................................................39

*United States v. Herron*,
  762 F. App'x 25 (2d Cir. 2019) ...........................................40, 44, 46, 47

*United States v. Hubbell*,
  530 U.S. 27 (2010).....................................................................................39

*United States v. Katzin*,
  769 F.3d 163 (3d Cir. 2014) .....................................................................29

*United States v. Kerr*,
  752 F.3d 206 (2d Cir. 2014) .....................................................................49

vi

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States. v. Lambus*,
  897 F.3d 368 (2d Cir. 2018) ...............................................................36

*United States v. Leon*,
  468 U.S. 897 (1984).............................................................................31

*United States v. Matthews*,
  No. 15-CR-537-14 (S.D.N.Y.)............................................................55

*United States v. Mendez*,
  103 F.4th 1303 (7th Cir. 2024) ..........................................................26

*United States v. Montoya de Hernandez*,
  473 U.S. 531 (1985)..........................................................20, 21, 28, 30

*United States v. Paroutian*,
  299 F.2d 486 (2d Cir. 1962) ...............................................................35

*United States v. Parrello*,
  2021 WL 242426 (S.D.N.Y. Jan. 25, 2021) .......................................57

*United States v. Ramsey*,
  431 U.S. 606 (1977).............................................................................20

*United States v. Raymonda*,
  780 F.3d 105 (2d Cir. 2015) ...............................................................17

*United States v. Reilly*,
  76 F.3d 1271 (2d Cir. 1996) ..........................................................32, 33

*United States v. Rodriguez*,
  706 F.2d 31 (2d Cir. 1983) .................................................................44

*United States v. Romano*,
  2022 WL 402394 (2d Cir. Feb. 10, 2022) ..........................................49

*United States v. Smith*,
  967 F.3d 198 (2d Cir. 2020) ....................................................27, 34, 35

vii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Stewart,*
    907 F.3d 677 (2d Cir. 2018) ...................................................................44

*United States v. Sultanov,*
    2024 WL 3520443 (E.D.N.Y. July 24, 2024)........................................28

*United States v. Touset,*
    890 F.3d 1227 (11th Cir. 2018) .......................................................26, 27

*United States v. White,*
    No. 20-CR-00660 (S.D.N.Y.)..................................................................55

*United States v. Xiang,*
    67 F.4th 895 (8th Cir. 2023) ...................................................................26

*United States v. Zappola,*
    646 F.2d 48 (2d Cir. 1981) .....................................................................43

*United States v. Zodhiates,*
    901 F.3d 137 (2d Cir. 2018) ...................................................................28

*Vernonia Sch. Dist. 47J v. Acton,*
    515 U.S. 646 (1995)................................................................................19

**Statutes**

18 U.S.C. § 1503 ...........................................................................................16

18 U.S.C. § 1512(c)(2)..................................................................................16

18 U.S.C. § 1951 .............................................................................................9

18 U.S.C. § 1962 .............................................................................................9

18 U.S.C. § 2518(1)(b)..................................................................................36

18 U.S.C. § 3231 .............................................................................................2

18 U.S.C. § 3553(a) ......................................................................................54

viii

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

18 U.S.C. § 3742(a) ...................................................................................2

28 U.S.C. § 1291 .......................................................................................2

**Other Authorities**

U.S. Const. amend. IV .......................................................................*passim*

U.S. Const. amend. V.........................................................................*passim*

U.S. Const. amend. VI .......................................................................*passim*

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant-Appellant Jatiek Smith was convicted of one count of conspiracy to violate RICO and one count of conspiracy to commit extortion after a ten-day bench trial before the Honorable Jed S. Rakoff. Smith was sentenced to a term of twelve (12) years' imprisonment.

On appeal, Smith raises four points of reversible error: *First*, the District Court erred in refusing to suppress evidence obtained from law enforcement's unconstitutional search of Smith's cellphone at Newark International Airport ("Newark"), violating Smith's rights under the Fourth and Fifth Amendment. While the District Court correctly found that the search and seizure were unlawful, it incorrectly relied on the "good faith" exception in refusing to suppress the fruits of that unlawful search, and incorrectly determined that Smith's provision of his phone password was non-testimonial.

*Second*, the District Court committed reversible error when it allowed a majority of relevant defense witnesses to invoke their Fifth Amendment right against self-incrimination with respect to all potential questions without inquiring into the good-faith basis of any witnesses' invocation. The District Court's refusal to do so violated Smith's rights under the Sixth Amendment.

*Third,* the District Court committed reversible error when it denied Smith's request to appoint counsel prior to trial, violating his Sixth Amendment rights. This

1

decision was predicated on an incorrect view of the circumstances and an erroneous belief that denial was required to prevent Smith from intimidating witnesses.

*Finally*, the District Court erred in imposing a term of imprisonment of 144 months (twelve years) upon Smith. Smith's sentence is substantively unreasonable and greater than required to meet the purposes of sentencing.

## JURISDICTIONAL STATEMENT

This appeal is from an Order of Judgment that the Honorable Jed S. Rakoff, Senior United States District Judge, Southern District of New York, entered on June 3, 2024, following Smith's conviction after a trial on two counts charged against him in Indictment 22-CR-352. A-81-93, SPA-166-72.[1] A timely notice of appeal was filed on June 21, 2024. A-2188. The District Court had jurisdiction over this action pursuant to 18 U.S.C. § 3231. This Court's jurisdiction is invoked under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred in declining to suppress evidence resulting from law enforcement's unlawful search of Smith's phone because (i) the agents' actions were subject to the "good faith exception"; and (ii) the forced provision of the password to the phone was nontestimonial.

---

[1] References to the Appendix are noted as A- followed by the page number(s), the Special Appendix are noted as SPA- followed by the page number(s), and the District Court Docket are noted as ECF- followed by the docket number.

2. Whether the District Court erred in allowing a majority of defense witnesses to invoke their privilege against self-incrimination with respect to all potential testimony without inquiring into the witnesses' good faith basis for invoking the Fifth Amendment.

3. Whether the District Court erred in denying the request by Smith, a pro se litigant, for appointment of counsel in advance of trial.

4. Whether the District Court's imposition of a sentence of twelve years was substantively unreasonable and greater than required considering that other defendants in this district received substantially shorter sentences for similar conduct.

## STATEMENT OF THE CASE

### I. The Offense Conduct

#### A. The Fire Restoration Industry

The fire restoration industry refers to businesses that repair properties that have suffered damage from fires or exposures to fires. Within this industry, fire restoration companies provide restoration, demolition, and construction services to damaged properties. A-993, 1113. Restoration companies employ "chasers," who solicit business from owners of fire-damaged properties directly. A-643-44. Chasers typically operate as independent contractors and are paid by restoration companies to sign up fires by arriving on scenes quickly. A-1215, 1542-43. The restoration

3

companies are paid out of the homeowner's insurance recovery, aided by "public adjusters" who represent the property owner in connection with her claim. A-655, 1110-12, 1284. First Response was a restoration company, operating primarily in Brooklyn, Queens, and Staten Island. A-1504.

**B.    Smith's Time at First Response**

Smith began working at First Response in 2019, following an interview with its owner, Carl Walsh. A-644-46, 1603-05. At the time he joined, the chasers for First Response reported to Michael Iaducci, a/k/a "Tugboat," who also managed the demolition aspect of the business. A-1532, 1606-07. Smith excelled due to his natural ability to connect with others, his drive, and his work ethic. A-1510, 1608-09. He was promoted to supervisor, then manager, and given a raise by Walsh. *Id*. As manager, Smith had principal responsibility for overseeing chasers, but did not have responsibility for other aspects of First Response, such as construction or the company's finances. A-1203, 1532, 1736.

Before Smith joined the industry, restoration companies fought each other violently, primarily instigated by American Emergency Services ("AES"). A-663, 835, 845, 848-49, 1157, 1375, 1510, 1546, 1575, 1606. Lou Trinchese and Eddie McKenzie were the bosses of AES. A-852.

On May 4, 2020, a dispute between First Response and AES culminated in a physical altercation, not including Smith. SPA-95-96. Sequan Jackson, a

4

cooperating witness who worked at First Response, struck an AES worker with a flashlight. A-667. A fight ensued, and someone from AES fired a gun at Jackson. A-668. No one from First Response fired a weapon. A-668-69.

The following day, Smith, with Jackson and others, went to an AES warehouse where Jackson and others punched members of AES management. A-673, 675. Smith subsequently demanded they put McKenzie on the phone. A-676, 1624. Later, Smith met McKenzie in a Wendy's parking lot. A-679. Smith testified McKenzie offered to pay him $100,000 to chase fires. A-1633. Jackson, who was present but did not overhear the conversation, testified Smith said he told McKenzie he was obligated to pay Smith this sum in order to continue chasing fires. A-680-81.

A few months later, Smith and McKenzie had another meeting. SPA-98-99. Also present were Jackson, Anthony McGee and Kaheen Small from First Response. *Id*. During the meeting, McGee pistol-whipped McKenzie, who ran away. A-685-87.

By approximately June 2020, AES was no longer a major participant. A-1788-89. The District Court attributed this to Smith and his co-conspirator's intimidation. SPA-100. Smith testified his actions were responses to AES's aggression, designed to protect himself and colleagues. A-1627, 1629-30, 1636-37.

5

Subsequently, Smith developed a "rotation system" to govern how certain restoration companies got business, with the stated aim of avoiding altercations at fires. A-1120-21, 1651-52, 1664. While it evolved over time, its essence was that each chaser from a participating company would be allocated one fire in consecutive, rotating order. If employees of one company signed a fire, but it was not their turn, they would either hold it for the competitor-company whose turn it was or sign it on that company's behalf. A-696-701, 1010, 1085. Under the system, restoration companies would sometimes pay the additional chasers who signed or held fires for them. A-1129-30. These included ServPro Upper West Side ("ServPro"), EFS, Flag Restoration ("Flag"), Upper Restoration, iFlood, Service Master, and ASAP. A-716, 730-36, 1647-53. Some companies continued to chase outside the system. A-699-700.

The District Court found Smith extorted certain competitors, including to join the rotation system, which the District Court found benefited First Response by directing a disproportionate amount of business to it. SPA-102. Specifically, the District Court found that Benjamin Vargas, the owner of ServPro, joined the rotation system and paid Smith to do so, under fear of violence. SPA-112-16. The District Court also found that EFS, another restoration company, was a victim of extortion—at a June 2020 meeting between Smith and Jordan Boryk, the owner of EFS, Smith used threats of violence to enforce the rules of the rotation, though he did not assault

6

anyone. SPA-116-19. Smith met with Boryk on other occasions, and the District Court found Boryk ultimately paid to participate in the rotation. A-731, SPA-119-20. The economic loss resulting from these incidents was limited. The District Court found Vargas (ServPro) paid defendants $141,000-$166,400 (SPA-114, 116), and Boryk (EFS), paid a total of $198,546.44. SPA-120.

Smith's testimony was that the payments from rotation members were made because Smith and his co-workers chased extra fires for them. A-1746. Smith also called Robert Sands, of Flag, who testified he was not threatened and voluntarily paid additional chasers to chase fires for Flag under the rotation system. A-1852, 1865, 1897. Smith also introduced evidence that other restoration companies pulled out of the rotation system without consequence. A-1147, 1723-24. Notwithstanding, the District Court found Smith used the rotation system to extort two other members of the industry (ServPro and EFS), as described above. SPA-144.

The Government also introduced evidence regarding certain assaults, all on public adjusters, perpetrated by members of First Response. First, prior to the rotation system's implementation, in March 2020, Jackson was at a fire scene with Phil Navarra, a public adjuster, when Navarra told Jackson that one of the First Response chasers could not sign fires anymore. A-655-61, 1694. A man nicknamed "Teo" was then directed to punch Navarra. A-661-62, 1138-39. Second, on September 15, 2020, McGee, with Smith's agreement, assaulted Thomas Muratore,

7

a public adjuster, after his employer kicked First Response off a fire they had signed. A-1139-40, 1193-94, 1691-92. Third, Richard McCormick, another public adjuster, was assaulted on November 13, 2020, by McGee at Smith's urging, for kicking rotation member ServPro off a fire. A-745, 1017-18, 1685-87. Fourth, Jimmy Johnson, a public adjuster, was slapped by Small at Smith's direction, which Smith testified he directed because Johnson refused to give First Response money it was owed. A-756-58, 1697-99. None of the assault victims suffered lasting injury, although Muratore required medical treatment consisting of a one-night hospitalization. SPA-107-08.

The assaults were not introduced or accepted as evidence of extortion, given the public adjusters at issue neither were asked to nor paid money to Smith or First Response. Rather, they were introduced as evidence of intimidation tactics "relate[d] to the Enterprise's core purpose of dominating the fire restoration industry." SPA-140-42.

The District Court also found that the Enterprise conspired to commit wire fraud by deceiving insurance companies, specifically by concealing pre-existing conditions that might otherwise lead to rejection of an insurance claim for the restoration work. SPA-158. While there was testimony members of the industry engaged in this, Smith's role was limited, at best, to knowledge such conduct was occurring at certain properties First Response restored. A-1672-74.

8

**II.** **The Indictment and Relevant Proceedings**

The Indictment was filed on June 23, 2022, charging Smith and eight co-defendants with (1) conspiracy to violate RICO, in violation of Title 18, United States Code, Section 1962 ("Count One"); and (2) conspiracy to commit extortion, in violation of Title 18, United States Code, Section 1951 ("Count Two"). A-81-93.

**A.** **Pre-Arraignment**

During the pendency of an investigation into Smith and his co-defendants, on March 2, 2021, as Smith returned to Newark from Jamacia, he was detained for more than an hour by agents from Customs and Border Protection ("CBP") and Homeland Security ("HSI"). A-307-08, 388-95. The agents took Smith's cellphone and told him to provide the password. A-308. After refusing, Smith was informed that if he continued to refuse, he could be arrested and charged, or held for as long as it took to open the device. *Id.* Smith still refused. *Id.* Only after agents informed Smith they were looking for child pornography, and would use a program that would search his device for that material only, did he provide his password. *Id.* Agents then took his phone and made a forensic copy. SPA-7. Smith's phone was not returned to him immediately, but instead retained by the agents for a period of time. A-308. Thirty-eight days after stopping Smith and seizing his phone, and having begun review of the forensic copy, the Government applied for and obtained a search warrant. SPA-7, A-255-66.

Smith was eventually arrested in Puerto Rico on June 28, 2022 where he was held until transportation to New York on September 7, 2022, ECF-134-3, and arraigned before Judge Rakoff on September 9, 2022. A-269-87. Smith pleaded not guilty and, against the advice of then-counsel, expressed his desire to invoke his Speedy Trial Act rights. A-271. Trial was set for October 17, 2022, and subsequently modified to November 28, 2022. A-101-02.

### B.     Smith's Counsel

Smith replaced his original counsel, Anthony LaPinta, with Michael Vitaliano on August 10, 2022. A-94. Both attorneys were retained. On November 14, 2022, two weeks before the originally scheduled trial date, Smith's then-counsel requested an adjournment to hire expert witnesses, and because conditions at the Metropolitan Detention Center ("MDC") have "made it a logistic[al] impossibility to prepare for trial." A-115. In particular, constant lockdowns, cancelled video and telephone conferences, and severe law library access limitations rendered Smith at a "serious disadvantage to prepare for trial." *Id*. Nonetheless, despite Vitaliano's request to adjourn the trial, he noted "Smith [] disregard[s] these disadvantages" and "completely objects to any postponement of his trial date." A-114.

At a November 17, 2022 Conference, the District Court granted the request due to the complexity of the case and discovery and adjourned trial until May 1, 2023 over Smith's objection. A-117-24.

On November 21, 2022, the Court held a conference during which Smith requested new counsel. After finding Smith financially unable to obtain adequate representation, the Court relieved Vitaliano and appointed Thomas Nooter as CJA counsel for Smith. A-130. On February 10, 2023, the Court approved a request for the appointment of Jill Shellow as co-counsel, as well as funding for a forensic paralegal. A-133-34, 268.

Between March and April 2023, health complications arose with then-counsel Nooter which eventually required adjournment of trial to August 14, 2023, again over Smith's objection, and the replacement of Nooter by Andrew Patel. A-322-23.

In July 2023, Shellow and Patel requested to be relieved from the case. A-54-56. The Court appointed CJA counsel John Buza on July 20, 2023, necessitating another delay of the trial date, again one not requested by Smith. A-397. At the September 18, 2023 Conference, the Court set a November 27, 2023 trial date. A-62. Buza subsequently submitted an *ex parte* motion to withdraw to the Court. A-63. On October 23, 2023, the Court held a Conference regarding Buza's motion to withdraw, and subsequently addressed Smith's motion to proceed to trial pro se and have standby counsel appointed for trial. A-63-64. The Court granted Smith's request to proceed pro se, and appointed CJA counsel Stanford Talkin as standby counsel, before replacing him with Russell Capone on October 25, 2023. A-398-99.

11

On October 31, 2023, Smith submitted a letter-motion noting, among other things, MDC's ongoing "consistent[] deni[al] [of] access to discovery materials." A-406. On November 14, 2023, Smith submitted a letter to the Court requesting Capone be appointed as defense counsel for trial considering the conditions that had "compromised" Smith's ability to prepare for trial. A-413. These included Smith's limited access to computers due to his confinement in the Special Housing Unit and repeated lockdowns at MDC. *Id.* Even on the rare days during which Smith was permitted to access a computer to review discovery material, his preparation was concluded for the day as soon as Smith needed to eat or use the restroom. A-414. Additionally, Smith had no access to a computer with law library capabilities. *Id.* Capone's willingness to be appointed counsel was contingent on a delay of the trial date so he would be able to adequately prepare to represent Smith, since he had only just been appointed. A-413. Smith "believe[d] that he will be significantly prejudiced—and that he would not receive the fair trial to which he is constitutionally entitled—should he be required to proceed to trial in two weeks pro se." A-415. Smith made clear, "[i]n all of these proceedings I have not once asked for more time. I come to you now and ask that I be granted more time to be able to defend myself[.]" A-416. If the Court were to deny the request for appointment of counsel, Smith requested a continuance nonetheless given the discovery access issues. A-415.

12

The Court granted Smith's separate request for a bench trial on November 15, 2023.  SPA-55-76.  In a footnote to that order, the Court denied Smith's request for the appointment of counsel and the continuance, adopting the Government's explanation that Smith's request was "nothing more than a continuation of a ploy that [Smith] has repeatedly used in the past to delay these proceedings, all the while expressing a desire for a speedy trial."  SPA-56.  The Court stated that Smith's request is "particularly sinister given his history of witness intimidation and the fact that it was made just after he received sensitive 3500 material regarding cooperating witnesses."  *Id*.

On November 20, 2023, Smith moved for reconsideration of the Court's denial of the adjournment—requesting an adjournment of two weeks in light of the "continuing and significant difficulties [he] is having accessing discovery and 3500 material to prepare his pro se defense."  A-441.  The Court denied this request on November 21, 2023, but permitted Smith preparation time in the courtroom in between direct and cross examination for each substantive trial witness.  SPA-78-79.

## C.    Smith's Pretrial Motions

In February 2023, Smith and his co-defendants filed numerous pretrial motions.  Jackson moved to suppress the Title III wiretap evidence of Smith and Jackson's phones on February 12, 2023.  ECF-138, 140.  Smith moved to dismiss

the indictment and to suppress the border search phone extraction on February 15, 2023.  ECF-158, 161.  Each was denied.  SPA-1, 3-53.

At a conference on March 7, 2023, the District Court noted a "substantial issue" under *Riley v. California*, 573 U.S. 373 (2014), pertaining to Smith's motion to suppress the cellphone search.  A-314.  On May 11, 2023, in a written opinion, the District Court concluded the agents' "warrantless search of Smith's cell phone was unreasonable under the Fourth Amendment."  SPA-29.  However, the Court refused to suppress the unlawfully obtained extraction under the good faith exception to the exclusionary rule.  SPA-34-44.

**D.     Trial**

From November 27, 2023 to December 11, 2023, Smith proceeded to a bench trial pro se, aided by standby counsel.  A-68-69.  The Government presented 19 witnesses, including three cooperating witnesses.  A-471, 498, 518, 535, 557, 561-62, 565, 575-76, 587, 630, 984-85, 990, 1108, 1241-42, 1277-78, 1284, 1309, 1321, 1435.

Smith initially listed 31 witnesses.  A-711.  After receiving Smith's witness list, the Government alerted the District Court that it believed that some "may have potential exposure."  A-1151.  The Government did not specify its perceived basis of any specific witnesses' exposure, or which potential defense witnesses it thought were implicated.  *Id*.

14

Smith's list was ultimately pared to ten witnesses, when the Government again notified the District Court that "[q]uite a few" of the witnesses had "an exposure problem." A-1486. Smith, via standby counsel, asked the District Court whether it would inquire into the "good-faith basis" of a defense witness's invocation of the Fifth Amendment before allowing that witness to invoke the privilege. A-1487. Standby counsel informed the District Court that attorneys for two separate defense witnesses had contacted him to communicate that, while their client wanted to testify and "wouldn't testify to anything criminal," they would advise their client to take the Fifth Amendment based on the fact "the [G]overnment doesn't believe [their client], and [the client's lawyer therefore] think[s] that will give [their client] exposure." *Id*. Standby counsel also reiterated to the District Court that the witnesses were "important to [Smith's] defense." *Id.* Ultimately, the District Court declined to conduct any inquiry into the basis for any witness's invocation of the Fifth Amendment. A-1487-88.

In total, Smith called eight witnesses in his defense, and also took the stand himself. Five of those eight witnesses—Arturo Nunez, Cynthia Fonseca, Elvin Mata, Geraldo Curcio, and Iaducci—stated their intention to invoke their Fifth Amendment privilege with respect to all questions and were excused only after confirming that the witness conferred with counsel concerning their decision. A-1826-31.

15

On February 14, 2024, the District Court issued its findings of fact, conclusions of law, and verdict, finding Smith guilty of both Counts. SPA-90-165. With respect to Count One, the District Court found Smith participated in predicate acts of extortion and fraud, but that neither Smith nor the Enterprise committed or conspired to obstruct justice, which was one of the charged predicate acts to the RICO Count.[2] SPA-162. Following the close of evidence and Smith's timely Rule 29 motion, the Court also found that Smith did not commit (and the Enterprise did not involve) the charged predicate act of conspiracy to commit evidence and witness tampering. SPA-80-81, A-85.

### E. Co-Defendants' Pleas and Sentencing

On March 6, 2023, co-defendant McGee pleaded guilty. A-41. Subsequently, co-defendants Hasim Smith, Small, Rahmiek Lacewell, and Damon Dore changed their pleas to guilty. A-42-44, 46. Cooperating witnesses Manuel Pereira, Octavio Peralta, and Jackson pleaded guilty on November 4, 2022, November 22, 2022, and April 14, 2023, respectively. A-28, 32, 47. McGee was sentenced to 60 months, Hasim Smith to 30 months, Small to 24 months, Lacewell to 24 months, Dore to 14 months, and cooperators Jackson, Peralta, and Pereira to time served. A-57-59, 63, 77, 79. Cooperating witness Walsh was charged via a sealed superseding

---

[2] Following trial, the Government abandoned its charged predicate act based on 18 U.S.C. § 1503 as duplicative of 18 U.S.C. § 1512(c)(2). SPA-155.

16

information on November 18, 2022.  A-74.  He pleaded guilty and was also sentenced to time served.  A-79.

## ARGUMENT

**I.    The District Court Erred in Declining To Suppress the Evidence Obtained From the Illegal Search of Smith's Cellphone**

This Court reviews the District Court's decision on whether to suppress evidence de novo.  *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) ("On appeal from a district court's ruling on a motion to suppress, we review the court's factual findings for clear error.  We review the court's legal determinations, including the existence of probable cause and the good faith of officers relying on a search warrant, de novo.") (cleaned up).

**A.    The Government Unlawfully Seized Smith's Cellphone and Reviewed the Contents Prior To Obtaining a Warrant**

Smith attempted to travel from Newark to Jamacia on March 2, 2021, but was denied entry upon arrival in Jamaica.  SPA-5.  He was subsequently sent back to Newark the same day.  *Id.*  Without seeking or obtaining a warrant, FBI and HSI agents requested CBP agents search Smith when he returned to Newark.  SPA-6. The CBP agents were made aware that there was no warrant for the search.  *Id.*  Upon searching Smith's bag, law enforcement seized his phone and demanded his password.  *Id.*  Smith did not consent, instead providing his passcode only after he was told "[i]f [he] did not open the phone [he] could be held without charge for as

17

long as it took to open the phone," and the officers would only be examining his phone for child pornography via an automatic computer program. *Id.*, A-308. After receiving the passcode, HSI agents who were on scene took Smith's device and made a forensic copy of the phone. SPA-7, A-308, 381. Smith informed the District Court that law enforcement did not return the phone to him for several days. A-308. In the following days, both HSI agents and FBI agents reviewed the forensic copy of Smith's cellphone. SPA-7.

"Thirty-eight days later (well into multiple law enforcement agencies' review of the digital copy), the Government applied for a warrant to search the forensic copy." SPA-7. The declaration supporting this application relied in part on evidence from the forensic copy. SPA-8. Based on this declaration, Magistrate Judge Aaron issued a warrant to review Smith's phone. *Id.*

Smith and Jackson sought to suppress evidence obtained as a result of the search. SPA-3. As described in more detail below, the District Court agreed a Fourth Amendment violation had occurred, correctly concluding binding Supreme Court precedent obligated law enforcement to obtain a warrant to search a cellular device at the border. SPA-19, 23. However, the District Court ultimately declined to suppress the results of the unconstitutional search, finding that the good faith exception applied. SPA-34-44. In a footnote, the District Court also found that, while Smith had not argued that compelling him to provide his phone password

18

violated his Fifth Amendment right against self-incrimination, that argument would also be rejected. SPA-6-7. Smith then moved for reconsideration, making this argument, which the District Court denied. ECF-226, 227; SPA-54, 82-89. This was reversible error, as described below.

**B.** **The Border Search Exception Does Not Allow a Warrantless Search and Seizure of a Mobile Device**

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amdt. IV. "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). This "ensures that the inferences to support a search are drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Riley*, 573 U.S. at 382 (cleaned up). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.*

19

The Supreme Court established a limited exception to the Fourth Amendment's warrant requirement "pursuant to the long-standing right of the sovereign to protect itself," providing that searches of "persons and property crossing into this country [] are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). The border exception is "grounded in the recognized right to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *Id.* at 619-20.

But the exception does not equip law enforcement with an unlimited right to search individuals at border crossings. Rather, law enforcement action must still be judged by "by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). To that end, Courts have consistently recognized that the "border exception" becomes more limited the more intrusive the search conducted is. *See, e.g., Montoya*, 437 U.S. at 541 (requiring reasonable suspicion to detain someone at the border suspected to be "smuggling contraband" internally for long enough for it to leave the individual's body); *United States v. Asbury*, 586 F.2d 973, 975 (2d Cir. 1978) (requiring reasonable suspicion before conducting "more personally offensive searches" including strip searches). Thus, even at the border, the Supreme Court has made clear that "[t]he Fourth

20

Amendment commands that searches and seizures be reasonable." *Montoya*, 473 U.S. at 537.

In *Riley*, the Supreme Court held that because searches of modern smartphones are, without question, personally intrusive, they generally require a warrant even where phones are first lawfully *seized* without a warrant. 573 U.S. at 375, 401 (A warrant is "generally required, before such a search, even when a cell phone is seized incident to arrest" as "cell phones differ in both a quantitative and qualitative sense from other objects that might be carried on an arrestee's person"). As the *Riley* Court noted, "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of [other physical objects.]" *Id.* at 393.

In so holding, the Supreme Court provided a roadmap for evaluating the boundaries of other exceptions to the warrant requirement as applied to cellphones. It began by examining the purpose of the search incident to lawful arrest exception, which it defined as (1) to secure "the officer's safety" and (2) to "prevent…concealment or destruction [of evidence]." *Id.* at 386. The test was "whether application of the search incident to arrest doctrine to [cellphones] would 'untether the rule from the justifications underlying the…exceptions.'" *Id.* Thus, the Supreme Court conducted a balancing of interests, "assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the

21

other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id*. at 385-86 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). The balancing allows warrantless searches of an arrestee's person and pockets to achieve the aims underlying the exception itself in light of the arrestee's "reduced privacy interests upon being taken into police custody." *Id.* at 391.

But where the goals of the exception do not apply, and where an individual has a greater expectation of privacy, warrantless searches are not permitted, because they would represent "a substantial invasion [of privacy] beyond the arrest itself." *Id.* at 392. Because "[d]igital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape," nor can evidence be destroyed while law enforcement obtains a warrant, the Supreme Court concluded the exception should not apply. *Id.* at 387, 390-91. The Court noted a "cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: [a] phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." *Id.* at 396-97. Nor did the Court view this decision as close—it called the Government's argument "that a search of all data stored on a cell phone is 'materially indistinguishable' from searches of…physical items…like saying a ride on horseback is materially indistinguishable from a flight to the moon." *Id* at 393.

22

**C.** **The District Court Correctly Found the Search of Smith's Phone Was Not Subject to the Border Exception**

The District Court correctly concluded the Supreme Court's decision in *Riley* compels law enforcement to obtain a warrant to search phones, even at the border. As directed by *Riley*, the District Court weighed the intrusion on an individual's privacy interest represented by a search of phone data against "the degree to which it is needed for the promotion of legitimate governmental interests." 573 U.S. at 385-86; SPA-17-18. Considering the "rationales supporting the border search exception," the District Court concluded "none of the rationales…justifies applying it to searches of digital information contained on a traveler's cell phone, and the magnitude of the privacy invasion caused by such searches dwarfs that historically posed by border searches and would allow the Government to extend its border search authority well beyond the border itself." SPA-18-19.

As the District Court correctly reasoned, none of the Government's legitimate interests at the border justify searching a traveler's phone. Because data on a phone is not located solely on the device itself, but also on servers potentially anywhere in the world, preventing a phone from entering the country would not stop any of the information contained on it from entering the country. SPA-20. Thus, even assuming a phone contains some "digital contraband," "the exact same digital contraband is already stored outside the device and available to its owner and others

23

within the country" and therefore the Government's interest in stopping a device from entering the country is not "genuinely comparable to the Government's interest in interdicting physical contraband." SPA-21.

The District Court also considered the significantly-heightened privacy interest an individual has in the data on his or her phone:

> "[J]ust as in *Riley* . . . [t]echnological and cultural changes now mean that nearly all travelers carry with them, in addition to any physical items, a digital record of more information than could likely be found through a thorough search of that person's home, car, office, mail, and phone, financial and medical records, and more besides. No traveler would reasonably expect to forfeit privacy interests in all this simply by carrying a cell phone when returning home from an international trip." SPA-22.

Weighing the Government's "relatively weak" interest in conducting a search of a person's phone at the border against the significantly heightened privacy interest an individual has in the data on it, the District Court correctly concluded that binding precedent, particularly *Riley*, compels law enforcement officers to obtain a warrant for all border cellphone searches, absent exigent circumstances not present here. SPA-18-23.

While to date none of the Courts of Appeals to consider the specific question has held the manual or forensic search of a cellphone at the border *per se* requires a warrant absent exigent circumstances, none change that *Riley* compels this result, and only one would conclude the forensic search here was not violative of Smith's rights. In *United States v. Cano*, the Ninth Circuit applied *Riley's* analysis to the

24

purpose of the border search exception, namely to protect the border from contraband, and held warrantless cellphone searches at the border can be justified *only* for the purpose of searching for contraband. 934 F.3d 1002, 1018 (9th Cir. 2019). Therefore where, as in *Cano,* contraband was suspected, border agents may open the phone and conduct a manual search for contraband only, but may not search for evidence of crimes, nor photograph or record information from the device without a warrant. *Id.* at 2018-19. An intrusive "forensic" search for evidence, the Ninth Circuit reasoned, goes beyond the scope of a border search, which does not "include the power to search for *evidence* of contraband that is *not* present at the border." *Id.* at 1018.

Similarly, the Fourth Circuit applied *Riley* to hold "an intrusive and nonroutine search under the border search exception," including of a phone, can only be justified by reasonable suspicion "of an offense that bears some nexus to the border search exception's purpose" and not by the Government's "generalized interest in law enforcement and combatting crime." *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019). "A warrant exception will not excuse a warrantless search where applying the exception 'would untether the rule from the justifications underlying [it].'" *Id.* at 720 (quoting *Riley*, 573 U.S. at 386).

The First, Fifth, and Seventh Circuits declined to reach the question of whether a warrantless forensic search for evidence of a non-border crime, like the

25

one conducted of Smith's device, is permissible under the border search exception, holding only manual searches at the border are permissible without a warrant. *See Alasaad v. Mayorkas*, 988 F.3d 8, 19 (1st Cir. 2021); *United States v. Castillo*, 70 F.4th 894, 898 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 410 (2023); *United States v. Mendez*, 103 F.4th 1303, 1310 (7th Cir. 2024).

The Eighth Circuit has required, in the context of an investigation into theft of trade secrets, that "a seizure at the port of entry, followed by a forensic or 'advanced' search, particularly if time consuming and conducted away from the port of entry, becomes a non-routine border searches requiring some level of reasonable, individualized suspicion, but not probable cause or a warrant." *United States v. Xiang*, 67 F.4th 895, 900–01 (8th Cir. 2023). In so holding, the Eighth Circuit distinguished *Riley* on the conclusory basis that it "involved a different Fourth Amendment exception" without analyzing, as required, the logic of *Riley* and why it would not apply in the border context. *Id.* at 900.

Only the Eleventh Circuit has gone so far as to hold warrantless border searches are permissible for all personal property, including phones, without any degree of individualized suspicion. In *United States v. Touset*, the Eleventh Circuit dismissed *Riley* and the Supreme Court's directive that cellphone searches implicate unique privacy considerations by saying "it does not make sense to say that electronic devices should receive special treatment because so many people now

26

own them or because they can store vast quantities of records or effects," since "[t]he same could be said for a recreational vehicle filled with personal effects or a tractor-trailer loaded with boxes of documents." 890 F.3d 1227, 1233 (11th Cir. 2018). As the District Court correctly concluded: "this analogy seems weak on its face: relatively few travelers cross the border in an RV or truck with all their personal possessions and documents in store, while this Court surmises that most travelers carry a cell phone." SPA-28. As the District Court further noted, the Supreme Court made clear that "the storage capacity and the pervasive use of cell phones in every aspect of users' lives make them qualitatively and quantitatively different from the sort of possessions or records a person might carry with her." *Id*.

The holding and logic of *Riley* compel affirming the District Court's decision that the warrantless border search of Smith's cellphone violated the Fourth Amendment. This Court has previously recognized the extraordinary privacy concerns implicated by searches of electronic devices. *See United States v. Smith*, 967 F.3d 198, 208 (2d Cir. 2020). In *United States v. Ganias*, 824 F.3d 199, 217 (2d Cir. 2016), this Court noted that searching a person's device can give the Government access to "a vast trove of personal information about the person to whom the [device] belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure." Because the search "intrude[d] upon [Smith's] privacy" in a manner that well exceeded the need for the "promotion of legitimate

27

governmental interests" at the border, *Montoya*, 473 U.S. at 537, it was impermissible. Indeed, a growing body of caselaw among district courts in this Circuit addressing post-*Riley* border searches of cellphones have agreed, concluding such searches are subject to the warrant requirement, or, at minimum, always intrusive, nonroutine border searches requiring a heightened degree of individualized suspicion, if not probable cause and a warrant. *See, e.g.*, *United States v. Sultanov*, 2024 WL 3520443, at \*22 (E.D.N.Y. July 24, 2024); *United States v. Gavino*, 2024 WL 85072, at \*4 (E.D.N.Y. Jan. 7, 2024); *United States v. Alisigwe*, 2023 WL 8275923, at \*5 (S.D.N.Y Nov. 30, 2023).

**D. The District Court Erred in Holding that the "Good Faith Exception" Applied to the Unlawful Search of Smith's Cellphone**

While the District Court correctly applied the Supreme Court's directives in *Riley* to determine that Smith's Fourth Amendment rights had been violated, the District Court erred in concluding that suppression was unwarranted because the good faith exception applied.

The good faith exception permits unlawfully-obtained evidence to be used at trial "when the Government acts with an objectively reasonable good-faith belief that their conduct is lawful." *United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018) (cleaned up). The Government is therefore permitted to rely on unlawfully obtained evidence where "the police conduct a search in objectively reasonable

28

reliance on a warrant later held invalid," or where "the police conduct a search in objectively reasonable reliance on binding judicial precedent" which "specifically authorizes a particular police practice." *Davis v. United States*, 564 U.S. 229, 239-40 (2011). Ultimately, the District Court concluded the good faith exception applied both because the initial border search was conducted in reliance on existing precedent, and also because the Government later relied on a warrant issued by Magistrate Judge Aaron that effectively immunized their Fourth Amendment violation. SPA-34-44. Neither finding was correct.

With respect to the border search agents' ostensible reliance on "binding judicial precedent," the Third Circuit has noted that suppression will not be warranted "when the conduct under consideration clearly falls well within rationale espoused in binding appellate precedent." *United States v. Katzin*, 769 F.3d 163, 176 (3d Cir. 2014). Here, the reverse is true. "'Binding precedent' refers to the precedent of this Circuit and the Supreme Court." *United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013). At the time of the search at issue, no precedent in either this Circuit or the Third Circuit (where the phone was seized) permitted the warrantless search and forensic copying of cellphones at the border and, at best, Courts of Appeals in other circuits were split on this issue.[3]

---

[3] *See supra* I.C.

29

By contrast, as discussed at length *supra*, the Supreme Court had made clear in *Riley* that individuals have an extremely high privacy interest in their cellphone, such that a warrant is required unless those privacy concerns are outweighed by an applicable law enforcement exception. *Riley*, 573 U.S. at 375. Perhaps even less so than in *Riley*–where the search incident to arrest exception did not trump the defendant's privacy interests–did the need to search Smith's cellphone at the border implicate any legitimate law enforcement interest outweighing his expectation of privacy. *See Riley*, 573 U.S. at 385-86; *Montoya*, 473 U.S. at 537-38 (identical balancing test for border search exception). *Riley* thus plainly precluded the Government from searching Smith's phone without a warrant. The District Court itself did not find this a close call: "[i]n holding that warrants are required for cell phone searches at the border, the Court believes it is applying in straightforward fashion the logic and analysis of *Riley* to the border context." SPA-23.[4]

---

[4] Nor can officers' reliance on CBP Directive No. 3340-049A immunize the actions here and prevent suppression. The imaging of Smith's entire device for later examination by multiple law enforcement agencies was certainly, at best, an "advanced search" under the directive's edict, which requires "reasonable suspicion of activity in violation of the laws enforced or administered by CBP, or in which there is a national security concern." A-299. While the District Court found that reasonable suspicion may have been present, the "standard for appellate review of reasonable-suspicion determinations should be de novo." *United States v. Arvizu*, 534 U.S. 266, 275 (2002). Here, Smith was not under reasonable suspicion of any crime connected to the Government's interest in preventing contraband from entering the country or threatening national security, and his "advanced" search was

30

The District Court reasoned that authority from *outside* this Circuit permitting warrantless phone searches at the border, coupled with the "historic[al] breadth of the 'border search exception,'" rendered the border agents' search in good faith. SPA-35. But again, the good faith exception is not satisfied where Supreme Court precedent compels the opposite result. *See United States v. Gomez*, 877 F.3d 76, 94 (2d Cir. 2017) ("[S]earches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."). Nor should the amorphous context of a "historically broad" blank check for border agents itself be a reason to permit unsanctioned conduct in face of "binding judicial precedent" compelling the opposite conclusion.

Nor did Magistrate Judge Aaron's after-the-fact warrant supply a good faith basis to search Smith's phone. True, the good faith exception applies where the Government reasonably relies on a duly-issued warrant, *United States v. Leon*, 468 U.S. 897, 913-18 (1984), but the circumstances here take that ex-post reliance on a

---

therefore not authorized by the guidance. *See, Cano*, 934 F.3d at 1018; *Aigbekaen*, 943 F.3d at 720-21. In any event internal agency guidance that conflicts with the Constitution as interpreted by the Supreme Court cannot render constitutional otherwise unconstitutional behavior. *See, e.g., United States v. Carpenter*, 2023 WL 358794, at *7 (N.D. Ill. Jan. 23, 2023) ("Executive agencies cannot use regulation to shield evidence gathered from unconstitutional searches against suppression"). Furthermore, HSI agents seized and searched Smith's phone. A-381. Therefore, the guidance of CBP, a separate sub-agency of the Department of Homeland Security, would not govern the agents' conduct.

31

warrant—issued 38 days after the phone was seized and based solely on evidence obtained from a warrantless search of that phone—outside the realm of reasonableness. Where law enforcement agents fail to disclose relevant facts to the magistrate, or have independent reason to know their actions were unconstitutional, a later-obtained warrant will not establish good faith. *See United States v. Reilly*, 76 F.3d 1271, 1281 (2d Cir. 1996). Only where "the agents have no significant reason to believe that their [pre-warrant search] was unconstitutional….and the issuing magistrate was apprised of the relevant conduct, so that the magistrate was able to determine whether any predicate illegality precluded issuance of the warrant," does reliance on a warrant become "objectively reasonable" such that "suppression is inappropriate." *Ganias*, 824 F.3d at 223. The warrant here fails to meet these requirements.

*First*, contrary to the District Court's finding that "there is no suggestion that government agents concealed any relevant facts from Magistrate Judge Aaron," the government agents did *not* disclose all of the relevant facts. SPA-40. Rather, as even the District Court noted, the application did not disclose that Smith did not consent to the search by voluntarily providing his phone password. *See* SPA-6 ("the Government more cryptically represents that 'Special Agents . . . requested Smith's passcode, which Smith eventually provided.'"). Nowhere did the warrant application disclose that Smith refused to provide his passcode, and relented only

32

after he was informed he would otherwise be "held without charge for as long as it took to open his phone" and falsely promised that agents were only running a computer program over his photos, which would identify child pornography. *Compare* A-308, *with* A-260. The warrant application also failed to disclose that Smith's phone was seized and retained by law enforcement while the forensic copy was being made, after Smith entered the country, and weeks before law enforcement sought a warrant. *Compare* A-308, *with* A-260.

*Second*, reliance on a subsequently-issued warrant where law enforcement "could not fail to have known" that the search was unconstitutional will not suffice to prevent suppression. *Reilly*, 76 F.3d at 1281; *see also Ganias*, 824 F.3d at 223 (suppression is unwarranted only where "the agents have no significant reason to believe that their [pre-warrant search] was [] unconstitutional"). While the District Court concluded reliance on the warrant was reasonable because "no court in this circuit had held that phone searches at the border were unconstitutional," SPA-40-41, as noted above, the Supreme Court's binding interpretations of the Constitution in *Riley* existed at the time and provided more than "significant reason" for the agents to believe the pre-warrant search was unconstitutional. *Ganias*, 824 F.3d at 223. Magistrate Judge Aaron, like the agents in question, is obligated to follow the Supreme Court's directives. *Aguiar*, 737 F.3d at 261. That neither did in this case does not render the violation of Smith's constitutional rights permissible.

33

*Third*, the inexcusable delay between the seizure and forensic search of Smith's cellphone and the date the Government sought a warrant renders reliance on the warrant insufficient to immunize the unconstitutional conduct. If law enforcement seizes personal property before obtaining a warrant and seeks a warrant after the fact, it must act "with diligence [in] apply[ing] for the warrant." *Smith*, 967 F.3d at 205. "[E]xpediency in obtaining a search warrant to search seized evidence" is required "in order to avoid interfering with a continuing possessory interest for longer than reasonably necessary," and because "unnecessary delays [] undermine the criminal justice process in a more general way [by] prevent[ing] the judiciary from promptly evaluating and correcting improper seizures." *Id.* In determining whether a particular delay between a seizure and the issuance of a warrant is reasonable, this Court has directed consideration of "[1] the length of the delay, [2] the importance of the seized property to the defendant, [3] whether the defendant had a reduced property interest in the seized item, and [4] the strength of the state's justification for the delay." *Id.* at 206. The Government's delay here both in returning Smith's physical device, and in waiting to seek a warrant until 38 days after Smith was stopped at the border, was plainly significant, since this Court has already held a one-month delay "well exceeds what is ordinarily reasonable." *Id.* at 207.

34

While the District Court dismissed this argument, it did so based on the erroneous assertion that "Smith was not actually deprived of his use of his phone or the data stored on it, since the Government returned the original to him after it copied its contents." SPA-42. But this copying was not instantaneous—or at least the record did not reflect as much—as Smith maintained he was in fact deprived of his phone for a period of time. A-308. Moreover, the requirement that warrants be sought on a timely basis is premised on the notion that "unnecessary delays [] undermine the criminal justice process in a more general way," an interest that was plainly jeopardized by the 38-day delay here. *Smith,* 967 F.3d at 205. This is especially so considering the lack of justification for the delay in obtaining a warrant, other than to permit multiple law enforcement agencies to review the illegally-obtained data and capitalize on that very data to articulate probable cause for the warrant.

*Finally,* because the District Court incorrectly held the good faith exception applied to the unlawful seizure and search of Smith's phone, it also incorrectly declined to suppress the "fruits" of that unconstitutional search, including the evidence subsequently obtained via wiretaps issued in reliance on the results of that unconstitutional search. SPA-44. "An unlawful search taints all evidence obtained at the search or through leads uncovered by the search." *United States v. Paroutian*, 299 F.2d 486, 489 (2d Cir. 1962).

35

The Government relied on the forensic download of Smith's phone in obtaining a Title III Interception warrant ("Title III Warrant"),[5] and evidence obtained from that wiretap should also be suppressed. A Title III Warrant must be supported by probable cause that an "individual connected with the requested communications [] is committing" a crime and that the "particular communications concerning that offense will be obtained through such interception." 18 U.S.C. § 2518(1)(b); *United States. v. Lambus*, 897 F.3d 368, 393-94 (2d Cir. 2018).

To establish probable cause, the Government submitted an affidavit by HSI Special Agent William Clark replete with references to information obtained from the forensic download of Smith's phone, including references to audio and video recordings, text message conversations, and a "WhatsApp" encrypted messaging application found on the device. A-211-12, 215-16, 221-33, 243. Indeed, the only text messages and recordings cited in the affidavit came from Smith's unlawfully seized and searched phone. A-221-33. Without the information from the illegal search, the affidavit would not have been sufficient to support the issuance of the Title III Warrant.

---

[5] The Government also obtained extensions of the warrant, which similarly rely on the unlawful search of Smith's phone and should be suppressed. "Title III Warrant" therefore refers to the initial applications and the subsequent extensions.

**E.** **The District Court Erred in Concluding the Provision of Smith's Password Was Non-Testimonial and Did Not Violate Smith's Fifth Amendment Rights**

The District Court also erred in concluding law enforcement did not violate Smith's Fifth Amendment rights when they coerced Smith into providing his phone password during the unlawful border search. A communication is entitled to the Fifth Amendment privilege where it is (1) testimonial; (2) incriminating; and (3) compelled. *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 189 (2004). As the District Court correctly found, "[t]he privilege also protects against compelled incriminating acts that themselves have some 'communicative aspects of [their] own.'" SPA-84 (citing *Fisher v. United States*, 425 U.S. 391, 410 (1976)). This is referred to as the "act of production." SPA-85.

The District Court declined to reach the question of whether Smith was compelled to turn over his password because it erroneously found, relying on the "foregone conclusion" doctrine, which is an exception to the "act of production" doctrine, that Smith's act of providing his password was neither testimonial nor incriminating.[6] SPA-83-88. Applying that doctrine, the District Court concluded,

---

[6] While the District Court failed to reach this issue, Smith's provision of his password was clearly compelled. Determining whether a statement is voluntary or coerced requires a "careful evaluation of the totality of [] the surrounding circumstances." *United States v. Anderson*, 929 F. 2d 96, 99 (2d Cir. 1991). The critical issue is whether law enforcement officers obtained Smith's compliance by "overbearing" his will, a standard clearly met here—Smith was not free to leave at

37

"if the Government can independently show the phone belonged to the defendant and that the defendant knew the password….[then the] Fifth Amendment is not violated by the act of compelled decryption." SPA-88.

The District Court's holding was erroneous for several reasons. *First*, the District Court improperly applied the foregone conclusion doctrine—a doctrine which this Court has never applied "in the context of compelled decryption of an electronic device." SPA-86. Under that doctrine, the Fifth Amendment privilege is *not* violated by the act of producing where the Government can demonstrate that: "(a) the subpoenaed documents exist, (b) [] the defendant controls the documents, and (c) [] the documents are authentic" because the "testimonial aspect of the defendant's production is not incriminating." SPA-86 (citing *Fisher*, 425 U.S. at 411).

As the only Circuit to apply the foregone conclusion doctrine in the context of forced decryption of a device has held, the doctrine applies *only where* the Government is able to "show with 'reasonable particularity' that, at the time it sought to compel the act of production, it already knew [] the materials" on the device existed. *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d

---

the time, and not only did law enforcement tell Smith he would be held for as long as it took to turn over his password, they also falsely told him the purpose of the search was to identify child pornography. *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963); A-308.

1335, 1346 (11th Cir. 2012). Here, nothing in the record suggests the Government had "any knowledge of the existence of documents [on Smith's phone], other than a mere suspicion that documents likely existed," when law enforcement forced Smith to provide his password to unlock the device, making the foregone conclusion doctrine inapplicable. *Id.* at 1345 (discussing *United States v. Hubbell*, 530 U.S. 27, 44-45 (2010)); A-260-61.

Moreover, the Court's ruling ignores that "the Fifth Amendment privilege has been found to extend not only to answers that are directly incriminatory but also to those that, while not themselves inculpatory, 'would furnish a link in the chain of evidence needed to prosecute the claimant.'" *United States v. Greenfield,* 831 F.3d 106, 114 (2d Cir. 2016) (quoting *Ohio v. Reiner,* 532 U.S. 17, 20 (2001)). Smith's eventual oral response providing his password is exactly such a link, and therefore is incriminating.

Finally, and as discussed at length *supra*, the District Court's holding ignores that the Supreme Court has mandated that special care be taken in the context of devices like Smith's phone, which are importantly distinct from records or documents to which the foregone conclusion doctrine has typically been applied. *See Greenfield*, 831 F.3d at 116 (holding a subpoena must describe the location and existence of the documents sought with "reasonable particularity," such that the subpoena strips the act of compliance of its incriminating, testimonial character)

39

(cleaned up). This is more significant where, as here, the "act of production" was committed not in response to a subpoena, warrant, or any formal process.

For these reasons, this Court should reverse the District Court's decision not to suppress the evidence obtained as a result of the illegal search of Smith's phone.

**II. Smith's Sixth Amendment Rights Were Violated by the District Court's Erroneous Decision To Allow a Majority of Smith's Defense Witnesses To Invoke their Fifth Amendment Right Without a Particularized Analysis as to Their Good Faith Basis For Doing So**

The District Court erred in preventing Smith from adequately presenting a defense by excusing the vast majority of defense witnesses on the basis of a blanket Fifth Amendment assertion and failing to conduct any particularized inquiry into any witness's good faith basis for doing so.

In order to establish a Sixth Amendment violation, Smith must show "he was deprived of the opportunity to present a witness who would have provided testimony that was both material and favorable to his defense . . . in ways not merely cumulative to the testimony of available witnesses." *United States v. Herron*, 762 F. App'x 25, 29 (2d Cir. 2019) (summary order) (cleaned up). This Court reviews Smith's "constitutional claim *de novo*, but accept[s] the district court's factual findings unless they are clearly erroneous." *Id.*

**A.** **The District Court Allowed Five of Eight Defense Witnesses To Invoke the Fifth Amendment Based Solely on Advice of Their Counsel**

In advance of trial, Smith initially listed thirty-one witnesses that he intended to call in his defense before agreeing to narrow it. A-711. The Government then alerted the Court that it believed that some of Smith's witnesses "may have potential exposure" and asked the District Court how it wanted to proceed with respect to appointing counsel to advise those witness. A-1151-52. The Government did not specify its perceived basis of any specific witnesses' exposure, or which potential defense witnesses were implicated. *Id.*

Smith's list was ultimately pared to ten defense witnesses.[7] The Government again notified the District Court that "[q]uite a few" of the defense witnesses had "an exposure problem." A-1486. Certain of them had counsel, and the Government arranged for others to be appointed counsel. A-1151-52.

Smith, via standby counsel, asked the District Court whether it would inquire into the "good-faith basis" of a defense witness's invocation of the Fifth Amendment before allowing that witness to invoke the privilege on the stand. A-1487. Standby counsel informed the District Court that attorneys for two separate defense witnesses

---

[7] Smith voluntarily withdrew nineteen of the thirty-one witnesses from his witness list, and the District Court struck two remaining witnesses on relevancy grounds, leaving ten defense witnesses (excluding Smith). A-1465-70, 1477, 1480-88.

41

had contacted him to communicate that, while their client wanted to testify and "wouldn't testify to anything criminal," they would advise their client to take the Fifth Amendment based on the fact that "the [G]overnment doesn't believe [their client], and [the client's lawyer therefore] think[s] that will give [their client] exposure." *Id.* Standby counsel also reiterated that the witnesses were "important to [Smith's] defense." *Id.*

At first, the District Court indicated that the Court "might want to inquire from the Government about" the fact that the defense witnesses, and their lawyers, did not believe the witnesses would testify to anything criminal. A-1487. However, it decided against doing so, holding instead if the defense witness was represented by counsel who was "satisfied[] they have a Fifth Amendment right, that's good enough for me." A-1488.

Ultimately, in total, Smith called eight witnesses in his defense, and took the stand himself. A-1492, 1597, 1826, 1828, 1829, 1831, 1832, 1843, 1848. Five of those eight witnesses—Arturo Nunez, Cynthia Fonseca, Elvin Mata, Geraldo Curcio, and Michael Iaducci—invoked their Fifth Amendment privilege with respect to all questions. The District Court allowed the witnesses to invoke the Fifth Amendment with respect to all questions after confirming that the witness conferred with counsel concerning their decision. A-1826-31, 1843-44.

42

**B.** **The District Court Erred in Allowing Defense Witnesses To Invoke the Fifth Amendment With Respect to All Questions Without a Particularized Inquiry**

The Supreme Court has explained, "it is the duty of a court to determine the legitimacy of a witness' reliance upon the Fifth Amendment." *Roberts v. United States*, 445 U.S. 552, 560 n.7 (1980). "As to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a 'real danger' of further incrimination." *Rogers v. United States*, 340 U.S. 367, 374 (1951). "[O]nly questions which might elicit incriminatory answers are barred by a proper fifth amendment claim." *United States v. Bowe*, 698 F.2d 560, 566 (2d Cir. 1983). A District Court errs where it "simply accept[s]…[the] blanket assertion of the fifth amendment privilege….and [does] not undertake a particularized inquiry to determine whether the assertion was founded on a reasonable fear of prosecution as to each of the posed questions." *United States v. Zappola*, 646 F.2d 48, 53 (2d Cir. 1981); *see also United States v. Arias*, 404 F. App'x 554, 556 (2d Cir. 2011) ("Fifth Amendment privilege claims should be closely scrutinized because allowing a witness not to testify compromises the Sixth Amendment right of an accused to have compulsory process for obtaining witnesses in his favor.") (cleaned up).

A district court has been found to satisfy its obligation where, for example, it "discussed [issues further] with [witness's] counsel *in camera*" and where the

"government made clear that it believed [the witness] had engaged in additional [specific crimes] for which he had not been charged." *United States v. Stewart*, 907 F.3d 677, 684 (2d Cir. 2018).

No particularized inquiry happened here. Instead, the District Court determined it would *not* perform an inquiry since each of the witnesses was represented by counsel. A-1487-88. But Smith has found no authority for the proposition that a District Court can, like here, outsource its responsibility to perform a particularized assessment by relying upon the witness's counsel's determination that the claim is proper. This is especially true where, as here, the District Court was informed that at least two of the witnesses' counsel did not believe, separate from the Government's notification to that effect, their clients would testify to anything criminal. A-1487-88.

Nor was there "sufficient evidence" in the record to otherwise support the conclusion these five witnesses had a valid basis for invoking the privilege, as the Government never offered any facts regarding the purported liability sufficient to allow a particularized determination. *United States v. Rodriguez*, 706 F.2d 31, 37-38 (2d Cir. 1983); *Herron*, 762 F. App'x at 29 (evidence in record was sufficient to support invocation of Fifth Amendment where, among other things, there was evidence that the witness was the "gang's top leader" and the defendant was a "general" underneath him).

44

Indeed, for many of the witnesses, the District Court had heard almost nothing about them prior to opining that their "potential…criminal exposure would be obvious." A-1846. In particular, the limited testimony about these witnesses established nothing more than the following:

- **Mata**. The District Court heard testimony that Mata: was a chaser at Servpro who worked in the rotation system because his boss required him to; was paid by Vargas for his work chasing fires for ServPro; worked with First Response prior to the implementation of the rotation system; and had attended a meeting with Vargas and Smith where Smith threatened ServPro and conveyed the rules of the rotation. A-1084-85, 1106, 1158, 1325-27, 1402-03, 1422. *If* anything, these facts tended to suggest—per the Government's view of the evidence—that Mata was a victim of the charged offense, and not a perpetrator.

- **Curcio**. The District Court heard testimony that (i) Curcio, the owner of a "Board Up" company,[8] had told Smith and Jackson he was visited by law enforcement, and that Curcio had told law enforcement that he was *not* being extorted by Smith, SPA-125; (ii) Smith gave Curcio a toast at a dinner which Smith intended to be a threat but which the District Court later found was not a threat; and (iii) Curcio attended a meeting with Smith and others discussing Johnson. A-790, 1696-97, SPA-126, 162.

- **Iaducci** ("Tugboat"). The District Court heard testimony that Iaducci: was First Response's demolition manager; was Walsh's "go-to guy" at points; Smith reported to him at points and communicated with him as such attended a meeting with Smith and Muratore; and was responsible for training Lacewell at First Response. A-928, 966-67, 1295, 1532, 1536, 1606-07, 1610. There was no testimony at trial about Iaducci's involvement in any criminal episode.

- **Fonseca**. The District Court heard testimony that she was a chaser who worked at First Response at the same time as Smith, but did not hear

---

[8] A "Board Up" company secures the damaged property after the fire was extinguished. A-1113.

about her perpetration of any criminal conduct. A-659-60, 840-41, 928, 1506-07, 1605, 1708.

**C.      The District Court's Error Deprived Smith of his Ability To Put on a Defense**

The District Court's failure to inquire into the good-faith basis of defense witnesses' invocation of their Fifth Amendment violated Smith's Sixth Amendment right to put on a defense for at least two reasons.

*First*, Smith's witnesses were relevant. With respect to four of the five witnesses, the Government did not even attempt to dispute their relevancy during the relevancy proffer, and with respect to the remaining witness, Nunez, the District Court overruled the Government's relevancy objection. A-1465-68, 1484-86. Each was at least present for various episodes described at trial, worked with Smith at First Response, and plainly had relevant testimony to offer.

Moreover, while the District Court's error limited the available evidence concerning the potential value of each witness's testimony, what evidence exists suggests these witnesses would have testified materially and favorably in Smith's defense. *Herron*, 762 F. App'x at 29. For example, Mata submitted a letter in support of Smith's sentencing, where he articulated his belief Smith "only brought positivity to the forefront" of the fire mitigation industry and was also someone who "always helped me when I needed help." A-2104. Mata's testimony would have been especially helpful to rebut the testimony of co-defendant and Government

46

cooperator Vargas, for whom Mata worked, that Smith extorted Vargas. Indeed, Mata was present at the meeting between Smith and Vargas at which Vargas claimed Smith intimidated him into joining the rotation. Vargas—the only rotation member the Government called to testify—reported that Smith told him "he wasn't there to negotiate anything," relayed the "rules" of the rotation system, and made him feel "scared." A-1325-27. Mata, by contrast, described Smith as an "advocate in the industry" who was "able to have all the guys work together & also respect each other." A-2104.

*Second*, Smith's excluded witnesses would have offered testimony that was *not* "merely cumulative to the testimony of available witnesses." *Herron*, 762 F. App'x at 29. As described *supra,* Mata would have testified rebutting Vargas' account that Smith extorted Vargas. Similarly, as he told federal agents when they approached him, Curcio would have provided testimony that he was not extorted or threatened by Smith. And Iaducci and Fonseca would have offered non-cumulative testimony concerning First Response potentially helpful to Smith; unlike the other employees who testified in the case, neither were cooperating co-defendants.[9] The exclusion of these witnesses was especially harmful because it impacted five of eight

---

[9] While Morello was not a cooperating defendant, she worked in the office of First Response and therefore could not testify as to what occurred at any fire site. A-1482-83.

defense witnesses, leaving Smith with only three witnesses (excluding himself), one of whom—Walsh—was a cooperating witness whom the Government had elected not to call.

Thus, the Court's failure to conduct any analysis whatsoever of the witnesses' good faith basis for invoking the Fifth Amendment hampered Smith's right to put on a defense. What is more, it empowered the Government—in this and future cases— to substantially paralyze the defense merely by raising the vague and unsubstantiated specter of "exposure." Indeed, the only witness with supposed exposure who ignored the Government's warnings and did testify (Sands) illustrates precisely how the District Court's approach enabled the Government to unfairly neutralize Smith's defense. Sands testified he joined the rotation voluntarily and was not extorted, contradicting the Government's position that the rotation was a vehicle for Smith to extort his competition. A-1854-55, 1857-58. On cross examination, Sands was not asked any questions by the Government that suggested he was in peril of incriminating himself. A-1871-92. That the Government nearly successfully precluded Sands' testimony with apparently toothless references to "exposure" suggests that its successful efforts regarding the witnesses who did take the Fifth Amendment served to prejudice Smith.

Under these circumstances, failure to inquire into the witnesses' good faith basis for invoking the Fifth Amendment was cumulative, harmful error that impacted

48

Smith's ability to present a defense. *See United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008).

## III. The District Court Erred in Denying Smith's Request To Appoint Counsel To Represent Smith at Trial

The District Court further erred in denying Smith's request for appointment of counsel, forcing him to proceed to trial pro se.[10] This denial was based on an erroneous view of the circumstances of the request and premised on preventing Smith from intimidating witnesses, of which there was ultimately no evidence.

While the determination of whether to grant or deny a request for counsel after an individual elects to proceed pro se is within the discretion of the Court, *United States v. Kerr*, 752 F.3d 206, 220-21 (2d Cir. 2014), this Court "generally require[s] a district court faced with a post-waiver motion for new counsel to inquire into the defendant's reasons for the request and fully explain on the record the grounds for its ultimate decision." *United States v. Romano*, 2022 WL 402394, at *4 (2d Cir. Feb. 10, 2022). "[V]iolations of the Sixth Amendment right to counsel are *per se* reversible [] when they amount to an [a]ctual or constructive denial of the assistance of counsel altogether…or when counsel was prevented from assisting the accused

---

[10] It is particularly problematic when considered in the context of Smith's "mental health challenges," which the District Court acknowledged are "a genuine disability." SPA-65.

49

during a critical stage of the proceeding." *Lainfiesta v. Artuz*, 253 F.3d 151, 157 (2d Cir. 2001) (cleaned up).

The District Court erred in denying Smith's November 2023 request to appoint Capone as his counsel, rather than standby counsel, for trial. On November 14, 2023, Smith submitted a letter requesting Capone be appointed as defense counsel for trial. A-413-17. The letter noted Capone would only be able to fully represent Smith were the Court to grant an adjournment, given Capone had only been appointed standby counsel three weeks prior and therefore had limited facility with the facts underlying the complex case. A-413. The letter further noted that Smith "believe[d] that he w[ould] be significantly prejudiced—and that he would not receive the fair trial to which he is constitutionally entitled—should he be required to proceed to trial in two weeks pro se." A-415. In the alternative, Smith sought a continuance nonetheless given the discovery-access issues he described in the letter. *Id.*

The District Court denied Smith's request for appointment of counsel and continuance. SPA-56. The District Court adopted, without analysis, the Government's explanation that Smith's request is "nothing more than a continuation of a ploy that the defendant has repeatedly used in the past to delay these proceedings, all the while expressing a desire for a speedy trial." *Id.* The District Court stated that the adjournment request was "particularly sinister given [Smith's]

50

history of witness intimidation and the fact that it was made just after he received sensitive 3500 material regarding cooperating witnesses." *Id.*

The District Court abused its discretion in making this determination, which was plainly contradicted by the record. *First*, it was never Smith who sought to delay the proceedings, but rather other factors which forced adjournments, over his objections. Trial was first delayed at the request of then-counsel, Vitaliano, who noted Smith's "complete[] object[ion] to any postponement of his trial date." A-114. Vitaliano sought delay to hire expert witnesses and because MDC conditions had "made it a logistic[al] impossibility to prepare for trial." A-115. On November 17, 2022, the District Court granted this request, adjourning trial until May 1, 2023 *over Smith's objection*. A-117-24. Then, trial was again delayed only because of then-counsel's health issues, *again* with Smith expressing strong objection. A-322-23. In July 2023, Smith's then counsel sought to withdraw, necessitating the appointment of Buza on July 20, and again requiring a delay not at Smith's request. A-58, 62, 397. Buza subsequently withdrew, and the District Court granted Smith's motion to proceed pro se and have standby counsel appointed. A-63-64, 398. Capone was ultimately appointed standby counsel on October 24, 2023. A-64, 399.

*Second*, the District Court erred by ignoring that Smith's request was, in part, motivated by the fact that he had not been able to access a wealth of discovery materials, including the 3500 material, most of which he had not seen at the time he

51

renewed his request for appointment of counsel. A-413-17. Smith had not yet been able to access 3500 material for every substantive Government trial witness, as well as voluminous other discovery that had only very recently been de-designated from a confidentiality status that had previously precluded him from being able to possess it.[11] A-414. Due to logistical difficulties with the MDC, Smith had not received much of this de-designated material, let alone been able to review it, just two weeks prior to trial. *Id.* Smith was, at the time, confined to the Special Housing Unit, which does not permit attorneys to bring power cords during legal visits, and lacks outlets in visitation rooms. A-413-14. In order for Smith to view any of this material, standby counsel was required to visit him in person with the material on their laptop, and only able facilitate review for the length of time their computer battery would last. *Id.* During this time, MDC also continued to be plagued by frequent lockdowns preventing Smith access to either the discovery or law library computer. *Id.* When Smith was permitted to access discovery, he was frequently unable to open the actual evidence due to technological limitations with available computers. A-415.

---

[11] Following Smith's initial decision to proceed pro se, the Government agreed to de-designate certain materials marked "Sensitive" or "AEO" (Attorneys' Eyes Only), understanding the need for Smith to access these materials in order to represent himself. A-414.

52

To the extent Smith was to be representing *himself*, unrestrained access to that material was critical to trial preparation. On the other hand, had the District Court permitted Capone to represent Smith, these limitations—while still regrettable—would have been of lesser consequence, because it would be counsel's responsibility to review such material and be prepared for trial. Consistent with this reality, Smith's November 14 letter requesting Capone's appointment explained he would "be significantly prejudiced—and [] would not receive the fair trial to which he is constitutionally entitled—should he be required to proceed to trial in two weeks pro se." A-415. Moreover, far from being related solely to "sensitive 3500 material regarding his cooperating witnesses" as the District Court found, Smith was clear that issues at MDC had prevented him from accessing both the 3500 material and other discovery. *Id.*

Finally, the District Court erred by resting its decision on a concern that Smith sought a delay to enable him to intimidate witnesses whose 3500 material he had just been given access to. SPA-56. The District Court did not support this concern with any factual underpinnings aside from referencing allegations of witness intimidation the Government had made at points during the proceedings. *Id.* What is more, this concern proved unfounded at trial. In fact, after hearing the paucity of evidence of alleged witness tampering, the District Court did not find a single instance of witness intimidation. SPA-161-65.

53

The District Court's decision therefore amounted to a prevention "from assisting the accused during a critical stage of the proceeding" without a legitimate basis, rendering its decision per se reversible and warranting a new trial. *Lainfiesta*, 253 F.3d at 157.

## IV. The District Court Erred in Sentencing Smith to a Term of Twelve Years of Imprisonment

Criminal sentences are reviewed for "reasonableness," a concept encompassing both procedures used in selecting the sentence and the length of the sentence itself. *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). This Court must "patrol the boundaries of reasonableness," and consider, among other things, "whether the factor [relied upon by the sentencing court] can bear the weight assigned to it under the totality of the circumstances." *Id.* at 191. Moreover, even a substantively reasonable sentence requires application of the parsimony clause. *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010). That is, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the specific purposes set forth" in 18 U.S.C. § 3553(a). *Id*.

Smith's sentence of 144 months (twelve years) is substantively unreasonable under the circumstances and greater than required to meet the purposes of sentencing. Most glaringly, it failed to "avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

*First*, Smith's sentence was disproportionately longer than sentences imposed on other defendants in this District for similar conduct. While Smith was convicted of participating in a RICO conspiracy, his sentence was commensurate with sentences imposed in RICO cases involving extreme and often gang-related violence, including murders, and/or significant financial losses, which were wholly absent from this case. *See United States v. White*, 20-CR-00660, ECF 70 (S.D.N.Y. May 21, 2021) (defendant sentenced to 180 months for racketeering conspiracy and related crimes for having committed several violent acts, including shooting a victim in the head); *see also United States v. Matthews*, 15-CR-537-14, ECF 1037 (S.D.N.Y. Jun. 7, 2017) (defendant sentenced to 144 months for his participation in racketeering conspiracy after participating in an attempted murder and drug dealing); *United States v. Conyers,* 15-CR-537-01, ECF 1194 (S.D.N.Y. Oct. 20, 2017) (high-ranking member of a gang sentenced to 180 months having participated in two attempted murders in furtherance of an extortion conspiracy).

By contrast, RICO cases lacking in extreme violence, including RICO extortion cases in which victims were not seriously or permanently injured—as here—typically result in sentences well below the sentence received by Smith. For example, in *United States v. Giovinco*, Giovinco was sentenced to a term of

55

imprisonment of four years after being convicted at trial of RICO and extortion conspiracy charges related to a sixteen-year scheme by the Genovese Family to extort and defraud a labor union. *See United States v. Giovinco*, 18-CR-14, ECF 372 at 2-3 (S.D.N.Y. Jun. 15, 2020). Further, the leader of that conspiracy, Esposito, was sentenced to a term of imprisonment of only two years. *United States v. Esposito*, 18-CR-14-01, ECF 271 at 36 (S.D.N.Y. Aug. 27, 2019).

In *Giovinco* and *Esposito*, the conduct at issue involved Giovinco threatening individuals with the loss of funds, their economic livelihood, and the risk of violence. *Id.* at 4; *Giovinco*, ECF 372 at 7 (S.D.N.Y. June 15, 2020). Esposito was the son of former Genovese crime boss and himself was accused of "being a leader of a longstanding criminal scheme that, through acts of fraud, physical force, threats, coercion, and kickbacks extorted payments from officials of a union."[12] *Esposito*, ECF 271 at 36 (S.D.N.Y. Aug. 27, 2019). The Government alleged Esposito was involved in this conspiracy for *at least 16 years* and reaped more than $3.8 million in profits. *Id.* at 38-39.

Similarly, in *United States v. Calisi*, the Court imposed a sentence of 24 months on Nicholas Calisi, a captain in the Genovese Family who pleaded guilty to

---

[12] By contrast, the Court found Smith's potential profit was far more limited. The Court identified four extortion victims with a loss amount totaling $379,946.44. SPA-116, 120-21, 135.

a racketeering conspiracy spanning "10-plus year[s]" and involving an "agreement that other members of the conspiracy would use threats or economic harm to obtain property from others." *See United States v. Calisi*, 22-CR-212-2, ECF 170 at 4 (S.D.N.Y. June 20, 2023) (internal citations omitted); *Calisi*, ECF 197 at 21 (S.D.N.Y. July 18, 2023). In the same case, the court also sentenced defendant Ralph Balsamo, a solider in the Genovese Family who was elevated to the rank of Acting Captain, and who also had a significant criminal history, to 34 months for, among other things, extortion. *United States v. Balsamo*, 22-CR-212-3, ECF 194 at 8 (S.D.N.Y. July 14, 2023); *see also United States v. Parrello*, 2021 WL 242426, at *1-2 (S.D.N.Y. Jan. 25, 2021) (referencing defendant Parrello's 84-month sentence for conspiracy to extort payment for gambling debt where Parrello ordered associates to threaten debtors with physical injury or death if they failed to make prompt payments, on one occasion instructing a co-conspirator to "actually choke the [victim] and tell him 'Listen to me[:] next time I'm not gonna stop choking[]' [and] . . . [a]nother time ordering that a victim's tires be punctured with an ice pick, so that the coconspirators could 'surround' the victim and induce him to pay up").

Like the defendants in these cases, Smith was convicted of RICO conspiracy and extortion conspiracy and, as the District Court found, engaged in threats of violence for financial gain. And the level of physical force in this case bore far more similarity to these mob-related extortion conspiracies than gang-related ones

57

referenced above: aside from one instance in which another member of the Enterprise pistol-whipped McKenzie (SPA-99), neither Smith nor anyone at First Response ever used weapons against anyone or took action that could have risked life-threatening injury. In fact, the principal similarity between Smith and the defendants in the mob-related extortion cases referenced above is *their conduct*, *i.e.*, obtaining money in a particular industry by threatening others in the industry with fear of violence and economic harm. By contrast, as Smith respectfully pointed out in advocating for a lower sentence, the principal similarity between Smith and defendants in gang-related RICO cases involving higher sentences is the color of their skin.[13] A-2061-62. The District Court unreasonably sentenced Smith in parity with the latter set of defendants and not the former.

*Second,* the sentence imposed on Smith was disproportionate in comparison to the sentences imposed on Smith's co-defendants, including the individuals who

_____

[13] While Smith may have a higher criminal history score than some of the mob defendants described above, the Government has recognized that in these types of cases, "rap sheets" and criminal history category are not reflective of the defendant's actual criminal history or recidivism likelihood. *See, e.g.*, *Calisi*, ECF 197 at 14 (Government explaining, even though Calisi's "arrest record [] does not reflect" his significant criminal history, to become a captain of the Genovese Family "is not a brief stint of a crime" and instead involves "over a decade" of "racketeering activity"); *see also Esposito*, ECF 264 at 38-39 (S.D.N.Y. Aug. 21, 2019) (Judge Marrero observing that "qualifying for membership in a crime family does not happen overnight" and that it is "decidedly not the case . . . that the criminal activities for which Esposito pled guilty represents but a 'small slice' of his life.)".

used physical violence to further the conspiracy. *See United States v. DiMaio*, 255 F. App'x 537, 538 (2d Cir. 2007) (district court can consider disparity in codefendant sentencing). As described *supra*, excluding cooperating witnesses, Smith's codefendants were sentenced to a range of two to five years of imprisonment, significantly less than the twelve years Smith received. Indeed, the average sentence imposed on Smith's non-cooperating co-defendants was approximately three years, and Smith received a sentence that was greater than the sentences of all eight co-defendants in the case combined.

This significant disparity in sentencing is not supported by the evidentiary record, which shows Smith's co-defendants engaged in similar and often greater misconduct and violence. *See* SPA-110 (Small assaulted public-adjuster Johnson); SPA-95 (Hasim Smith, Jackson, Jay, and Perez participated in the physical altercation with AES); SPA-107 (McGee assaulted public-adjuster Muratore); SPA-108-9 (McGee assaulted public-adjuster McCormick). While there was testimony that some of these assaults were instigated by Smith, and even accounting for the Government's position that Smith bears greater culpability than his co-defendants, a four-fold multiplier between Smith's period of incarceration and his average co-defendant reflects a significantly greater disparity than warranted.

For these reasons, this Court should vacate the sentence imposed.

## **CONCLUSION**

For the foregoing reasons, this Court should vacate the District Court's conviction and sentence of Smith.

Dated:        November 22, 2024          Respectfully submitted,

*/s/ Russell Capone*
Russell Capone, Bar No. 4408324
COOLEY LLP
55 Hudson Yards
New York, NY  10001-2157
Telephone: +1 212 479 6000
Facsimile:  +1 212 479 6275
rcapone@cooley.com

*Attorney for Defendant-Appellant*
*Jatiek Smith*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) and Second Circuit Local Rule 32.1(a)(4) because this brief contains 13,955 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, double-spaced, Times New Roman font.

Dated:      November 22, 2024          */s/ Russell Capone*
            New York, NY               Russell Capone

                                       *Attorney for Defendant-Appellant*
                                       *Jatiek Smith*

# SPECIAL APPENDIX

**TABLE OF CONTENTS**

PAGE

Order Dated March 17, 2023 Denying Pretrial Motions, including
    Motions to Suppress and Dismiss (ECF 183) ..................... SPA-1

Opinion and Order Dated May 11, 2023 Denying Motions to Suppress
    and Dismiss (ECF 219) ........................................ SPA-3

Order Dated November 6, 2023 Denying Reconsideration of Motion
    to Suppress (ECF 302) ........................................ SPA-54

Memorandum Order Dated November 15, 2023 Granting Bench Trial
    and Denying Appointment of Counsel and Adjournment
    (ECF 311)..................................................... SPA-55

Erratum Dated November 16, 2023 Correcting Typographical Error
    (ECF 312)..................................................... SPA-77

Order Dated November 21, 2023 Denying Reconsideration of
    Adjournment Request and Granting Trial Accommodations
    (ECF 317)..................................................... SPA-78

Order Dated December 12, 2023 Denying Motion for Acquittal and
    Dismissing Predicate Act of Conspiracy to Violate 18 U.S.C.
    1512(c)(1) (ECF 322) ......................................... SPA-80

Opinion Dated December 13, 2023 Denying Reconsideration of
    Motion to Suppress (ECF 323) ................................. SPA-82

Findings of Fact, Conclusions of Law, and Verdict
    Dated February 14, 2024 (ECF 354) ........................... SPA-90

Judgment Dated June 11, 2024 as to Jatiek Smith in a Criminal Case
    (ECF 386).................................................... SPA-166

U.S. Const. amend. IV ......................................... SPA-173

U.S. Const. amend. V .......................................... SPA-174

ii

PAGE

U.S. Const. amend. VI ......................................... SPA-175

18 U.S.C. Section 3553......................................... SPA-176

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -v- | 22-cr-352 (JSR) |
| JATIEK SMITH, ET AL. | ORDER |
| Defendants. | |

JED S. RAKOFF, U.S.D.J.:

Following full briefing, an all-defendant conference on 3/7/23 and supplemental briefing as to Jatiek Smith's motion to suppress, the Court hereby denies: (1) defendant Sequan Jackson's motion to suppress evidence obtained from Title III wiretaps of his and co-defendant Jatiek Smith's phone (Dkt. 138); (2) defendants Damon Dore and Rahmiek Lacewell's[1] motion to sever their trial from co-defendant Jatiek Smith's trial (Dkt. 142); and (3) defendant Jatiek Smith's motion to suppress the results of a search of his phone and to dismiss the indictment against him (Dkt. 158). The Clerk is directed to close these motions on the docket. An opinion explaining the rationale for denying these motions will issue in due course.[2]

---

[1] This motion was originally jointly filed by defendants Anthony McGee and Kaheen Small, who have since entered guilty pleas. See Minute entries dated 3/6/23 and 3/7/23. This motion was also initially joined by defendant Sequan Jackson, although he has since withdrawn from this motion. See Letter dated 3/2/23, Dkt. 169.

[2] Several defendants also filed motions in limine arguing for the exclusion of evidence of gang affiliation (Dkt. 145), of certain cell site evidence (Dkt. 148), and for motion for advance notice of materials to be offered under Federal Rules of Evidence 404(b) and 801(d)(2)(E) (Dkt. 149). Since filing, the parties requested the opportunity to delay any consideration of motions in limine, so

1

SO ORDERED.

New York, NY
March 16, 2023

_____
JED S. RAKOFF, U.S.D.J.

---

defendants could file further motions in limine or refile these
motions by 3/31/23 and the Government respond by 4/14/23. See Minute
Entry dated 2/23/23. As such, the Court expresses no view on these
motions at the present juncture.

# SPA-3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         -v-<br><br>JATIEK SMITH, ET AL.<br><br>          Defendants. | 22-cr-352 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

By "bottom line" Order dated 3/17/23, the Court denied certain pretrial motions filed by several defendants in this case. See Order, Dkt. 183. This Opinion and Order reaffirms those rulings and sets forth the reasons therefor.

The most significant motion was the motion to suppress evidence filed by defendant Jatiek Smith. By way of background, on March 2, 2021, agents of the federal bureau of Customs and Border Protection ("CBP")[1] detained defendant Jatiek Smith as he returned to Newark airport from Jamaica and forced him to turn over his cellphone and its password. They reviewed the phone manually and created and saved an electronic copy of it as it existed as of that date and time -- all without a search warrant. Weeks later (after they had already begun reviewing the electronic copy), the Government applied for and obtained a search warrant.

---

[1] All capitalized terms here used refer to the definitions set forth in this Opinion and Order, unless otherwise specified. Also, unless otherwise noted, all internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

**SPA-4**

Smith argues, first, that this search violated his Fourth Amendment rights. To this much of his motion, the Court agrees. While border agents have very substantial latitude to search a person's body and effects without a warrant or probable cause during a border crossing, the Supreme Court has now made clear that searching the data contained on a person's cell phone is not like searching his body or pockets. Rather, searching a cell phone will often allow law enforcement to learn all there is to know about its owner's past movements, communications, and transactions -- reams of information that differ quantitatively and qualitatively from the sorts of information a person could ever have carried with him before the advent of modern "smart" phones. See Riley v. California, 573 U.S. 373 (2014). Moreover, the vast majority of such information will likely have no connection to the traveler's reasons for crossing the border on a given day. Furthermore, unlike a traveler's luggage or cargo -- which, quite obviously, is not yet in the country at the time the traveler presents herself for inspection at the border and can therefore be stopped from coming in -- the information on that traveler's phone most likely already exists *outside* the phone (in cloud storage or other backups), such that a border search is far less likely to actually prevent anything unwanted from entering or leaving the country.

For these reasons, copying and searching a traveler's phone during a border crossing bears little resemblance to traditional physical border searches historically permitted without probable cause

2

## SPA-5

under the Fourth Amendment's "border search exception." Rather, such searches extend the Government's reach far beyond the person and luggage of the border-crosser -- as if the fact of a border crossing somehow entitled the Government to search that traveler's home, car, and office. The border search exception does not extend so far.

Nonetheless, that still leaves the question whether to suppress the evidence from such an unlawful search. Here, the Court determines that the "good faith" exception precludes suppression, both because at the time of the search, the agents conducting the search had an objectively reasonable basis for believing that there was legal authority binding on them that authorized such a search and also because the Government ultimately obtained a search warrant to search the phone copy, disclosing all relevant details of the search to a neutral magistrate. For these reasons, further elaborated below, the Court reaffirms its prior denial of Smith's motion to suppress.

### I.   Factual Background

Smith sought to travel from Newark airport to Jamaica on March 2, 2021, where he was denied entry and sent back to the Newark the same day. Gov't Opp. Ex. A, Affidavit of Special Agent Clark ("Clark Decl.") ¶ 14; Declaration of Jatiek Smith ("Smith Decl.") ¶ 3, Dkt. 160. Homeland Security Investigations ("HSI") agents, along with agents of the Federal Bureau of Investigations ("FBI"), were at this time investigating Smith for his and others' alleged role in a putative conspiracy to control the New York area emergency mitigation services

("EMS") industry[2] through an EMS company called "First Response". Clark Decl. ¶¶ 7-8; see also Indictment ¶¶ 2-10, Dkt. 2. Without seeking a warrant, HSI and FBI agents requested CPB agents to search Smith upon his return to Newark Airport "pursuant to [their] border search authority." Clark Decl. ¶ 14. There, border agents searched Smith's bag (in which Smith was carrying just under $10,000 in cash), seized Smith's phone, and demanded his password. Id. Smith claims he repeatedly refused to give his password, relenting only after he was told that "[i]f [he] did not open the phone [he] could be held without charge for as long as it took to open the phone." Smith Decl. ¶ 4. The Government more cryptically represents that "Special Agents . . . requested Smith's passcode, which Smith eventually provided."[3] Clark Decl. ¶ 14.

---

[2] The "EMS industry" refers to companies that provide clean-up services following fires and often also play a role in referring "adjusters" who process fire-related insurance claims. Indictment ¶¶ 1-4.

[3] Smith has not argued that the Government, in holding him at the airport until he turned over his phone password, subjected him to a custodial interrogation under Miranda v. Arizona, 384 U.S. 436 (1966). Even if Smith had made a Miranda argument, however, the Court concludes it would not have mattered. Assuming Smith's interrogation was custodial -- something the Court cannot easily determine on this limited record -- Miranda does not require the exclusion of physical evidence obtained based on a suspect's unwarned but voluntary statements. See United States v. Patane, 542 U.S. 630, 637-42 (2004) (plurality opinion); id. at 644-45 (Kennedy, J., concurring in the judgment). Further still, even if one assumes that Smith's divulging his password was not just unwarned but also coerced, that would still likely not require suppression. Although courts and commentators have taken varying views on the matter, see Orin Kerr, Compelled Decryption and the Privilege against Self-Incrimination, 97 Tex. L. Rev. 767 (2019), the Court holds the view that being made to produce a phone password -- at least, where, as here, there is no real dispute that

## SPA-7

After receiving Smith's passcode, HSI agents made a forensic copy of the phone and returned the original to Smith. Id. In subsequent days, HSI agents began to review the digital copy -- finding, for instance, "communications in which the user of the phone identifies himself as a member of the Bloods and discusses Bloods gang activity," as well as "discussions of Smith's work with First Response, including communications in which he discusses his remuneration arrangement and the 'rules' about responding to fires, as well as communications with what appeared to be either insureds or public adjusters about submitting fraudulent insurance claims." Id. ¶ 15. They also turned over the digital copy to a different group of HSI agents who, in partnership with the FBI, also began reviewing it. Gov't Opp. at 3, Dkt. 168.

Thirty-eight days later (well into multiple law enforcement agencies' review of the digital copy), the Government applied for a warrant to search the forensic copy. See generally Clark Decl.; Gov't Opp. at 3-4. The declaration supporting its application described the airport border search, including that the phone was seized without a warrant "pursuant to HSI's border search authority," and that HSI

_____

the person in fact owns the phone and knows its password -- does not violate the Fifth Amendment's guarantee against self-incriminating testimony. Id. This is because the Fifth Amendment does not prevent compelled production of previously created incriminating evidence where the act of production does not itself involve any incriminating testimony, or where any implicit testimony included in such act of production -- such as acknowledgement of ownership -- can be proved independently. Fisher v. United States, 425 U.S. 391, 411 (1976).

## SPA-8

agents copied the phone's contents and had already begun actively reviewing them. Clark Decl. ¶ 14-15. The declaration also relied in part on evidence from this review -- describing, for example, Smith's communications discussing 'rules' imposed on other EMS companies or the submission of false insurance claims. Id. The declaration also included other evidence that might support a search of the phone, such as witness descriptions of a person named "Teak" (whose description corresponded to Mr. Jatiek Smith's) taking over an EMS company named First Response and proceeding to use violence to set up a "rotation" system through which job assignment in the EMS industry would be shared between companies. Id. ¶ 10. Based on this declaration, Magistrate Judge Aaron issued a search warrant. Clark Decl. at 10 (USAO-000332). The Government's review of the digital copy of Smith's phone continued following the issuance of that warrant. Gov't Opp. at 5.

Six months later, the Government applied for a Title III wiretap on Smith's phone (the same one that had been copied at the border and later searched pursuant to Magistrate Judge Aaron's warrant), as well as the phone of Smith's co-defendant Sequan Jackson. The affidavit in support of the wiretap included evidence from the search of Smith's cellphone, such as excerpts from a WhatsApp conversation between Smith and several of his co-defendants explicitly discussing the "rules" imposed on the industry and the need to discipline other EMS companies that did not follow the "rules". Jackson Ex. A, Clark Affidavit in Support of Wiretap Application ("Clark Wiretap App.") at 15-19. It also included "extensive information provided by witnesses, including

accounts from four victims who had been assaulted and/or extorted by First Response," "toll analyses showing that the conspirators communicated with each other, and with victims, by using cell phones," "information from a confidential source," "results from a warrant on Smith's Facebook account, which showed that Smith was publicly advertising his membership in the Bloods gang," and "analyses of financial records, which showed how some of the defendants were paid (either directly or to related corporations) by First Response." Gov't Opp. at 5; Gov't Ex. B at 20-24, 38-42, 47-48, 51-52. Judge Liman, sitting in Part I, authorized the wiretap of Smith's cellphone as well as of his co-defendant Sequan Jackson, which was then extended for one month following a second application and affidavit detailing, among other things, results from the wiretap so far. Gov't Opp. at 5-6; Gov't Ex. C.

## II.  Smith's Motion to Suppress

Smith moved to suppress both the phone search and the wiretap, on the grounds that they resulted from the border search. That search, Smith contended, violated his Fourth Amendment rights.

### A. Probable Cause Was Required to Search Smith's Phone

The Fourth Amendment provides: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amdt. IV. As its text

# SPA-10

makes clear, the "ultimate touchstone . . . is reasonableness[.]" Brigham City v. Stuart, 547 U.S. 398, 403 (2006). "[W]here a search is undertaken by law enforcement to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant." Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 653 (1995). This "ensures that the inferences to support a search are drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." Riley v. California, 573 U.S. 373, 382 (2014). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." Id.

Smith argues that the warrantless search of his cell phone at Newark airport violated his Fourth Amendment rights. To evaluate this argument, this Court must weigh two different strands of precedent: one that gives the Government exceptionally broad authority to effect warrantless searches or seizures at the border (usually without any kind of heightened suspicion), see II.B.1, infra, and a newer line of cases concerning one's Fourth Amendment rights applicable to the vast quantities of sensitive data stored on electronic devices such as cell phones, see II.B.2, infra. The Court summarizes each line of cases, before analyzing how they interact here. See I.B.3, infra.[4]

---

[4] Smith also argues that the border search exception is not even implicated because, since he was denied entry to Jamaica, he did not actually cross any border. Smith Mem. 9, Dkt. 161. The Court disagrees. The fact that Smith was denied entry to Jamaica does not change the fact that the search occurred after Smith had just arrived on a plane from Jamaica and was seeking to reenter the United States. Whether

### 1) The Border Search Exception

One "exception" to the ordinary requirement that the Government first obtain a warrant before conducting a search relates to border searches. Such searches, "pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border . . . ." United States v. Ramsey, 431 U.S. 606, 616 (1977). Citing a customs statute passed by the First Congress that granted customs inspectors the "full power and authority" to search "any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed," id. at 616 (quoting the Act of July 31, 1789, c. 5, 1 Stat. 29), the Ramsey Court reasoned that "[b]order searches, then, from before the adoption of the Fourth Amendment, have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." Id. at 619. "The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." Id. at 620.

The border-search exception is not, however, entirely unlimited. For instance, the Supreme Court has applied the "reasonable suspicion" standard to the question of whether the Government may detain someone

---

Smith was admitted to Jamaica does not change the fact that he plainly left the United States, such that his return involved a border crossing.

at the border suspected to be "smuggling contraband in her alimentary canal" for long enough for that contraband to be passed. United States v. Montoya de Hernandez, 473 U.S. 531, 541 (1985). Further, in this and several other circuits, reasonable suspicion is required before the Government may conduct "more personally offensive searches" such as strip searches. United States v. Asbury, 586 F.2d 973, 976 (2d Cir. 1978).

Importantly, these cases make clear that the border is not a totally Fourth Amendment-free zone. Rather, even at the border, "[t]he Fourth Amendment commands that searches and seizures be reasonable," and "[t]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Montoya, 473 U.S. at 537. What differs at the border is the standard of reasonableness, which plays out in a "qualitatively different" way "at the international border [versus] the interior." Id. at 538.

### 2) Cell Phones and Riley v. California

Neither the Second Circuit nor the Supreme Court has addressed how, if at all, the border search exception applies to the content of a person's digital cell phone.[5] However, the Supreme Court has provided

---

[5] By "cell phone," the Court means the digital "smartphones" owned by 85% of U.S. adults. Pew Research Center, Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/. That such devices act as conventional telephones is almost incidental. They are pocket-size computers that many adults (and non-adults) carry with them at all times and through which they send texts and emails, buy products, navigate to and from destinations, watch entertainment, consume news, participate in social media, search the Internet, take

guidance as to how to think about the problem. Specifically, Riley v. California, 573 U.S. 373 (2014), in considering the warrant exception allowing warrantless searches pursuant to a lawful arrest, the Supreme Court did not automatically extend the exception to searches of cell phones' digital data. It instead analyzed whether the logic behind the warrant exception applied to cell phone searches. Id. In so doing, the Court made clear its awareness that modern cell phones are materially different from the other types of objects a person might carry because they contain huge quantities of often highly personal data that could not previously have been contained in a pocketable object. Id. at 393.

Specifically, to determine whether the rationale for the search-incident-to-arrest exception in fact applied to cell phone searches, the Supreme Court "assess[ed], on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Id. at 385 (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)). This "balancing of interests" (which forms the basis for the search-incident-to-arrest exception itself, id. at 386.[6]) allows warrantless searches of an arrestee's person and pockets so as to ensure officer safety, prevent escape, and safeguard evidence in light of the arrestee's "reduced privacy interests upon being taken

_____

and post photographs and videos, and -- occasionally -- make phone calls.

[6] The same "balancing of interests" underlies the border search exception. See II.B.1, supra; Montoya, 473 U.S. at 537-38.

into police custody." Id. at 391. However, this same balancing had long meant that the exception did not permit warrantless searches of the arrestee's house, which did not implicate the same state interests and would represent "a substantial invasion [of privacy] beyond the arrest itself . . . ." Id. at 392 (citing Chimel v. California, 395 U.S. 752, 766-67 (1969)).

So too with cell phones. The Court in Riley held that the arresting officer's interest in searching an arrestee to remove dangerous items did not apply to cell phones because "[d]igital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape." Id. at 387. Similarly, the government's interest in preventing the destruction of evidence did not support allowing warrantless cell phone searches because, instead, law enforcement could prevent any destruction of digital evidence by turning off the phone, disconnecting it from networks, or placing it in a device meant to secure it from remote wiping until a warrant could be obtained. Id. at 390-91. Further, and perhaps most crucially, an individual's privacy interest in his cell phone differed fundamentally from that same individual's privacy interests with respect to his person or the contents of his bags or pockets. Id. at 393. This was because "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of" the other sorts of physical items a person might carry in her pocket. Id. Indeed, the Court treated with near scorn the Government's argument "that a search of all data stored on a cell

12

phone is 'materially indistinguishable' from searches of these sorts of physical items," calling that argument "like saying a ride on horseback is materially indistinguishable from a flight to the moon." Id. Instead, the Court made clear that "[a] conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom." Id.

Such an extension, the Court held, failed because the data contained on an arrestee's phone "differ[s] in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." Id. at 393. While "[m]ost people cannot lug around every piece of mail they have received for the past several months, every picture they have taken, or every book or article they have read[,] nor would they have any reason to attempt to do so . . . the possible intrusion on privacy is not physically limited in the same way when it comes to cell phones." Id. at 393-94. Further, "a cell phone collects in one place many distinct types of information -- an address, a note, a prescription, a bank statement, a video -- that reveal much more in combination than any isolated record." Id. at 394. And cell phones' enormous storage capacity "allows even just one type of information to convey far more than previously possible," such that "[t]he sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved

ones tucked into a wallet." Id. Moreover, "the data on a phone can date back to the purchase of the phone, or even earlier," including records of calls and written communications dating back months or years that almost certainly would never be contained in non-digital papers found on a person. Id. And "[f]inally, there is an element of pervasiveness that characterizes cell phones but not physical records." While "[p]rior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day," it is now "the person who is not carrying a cell phone, with all that it contains, who is the exception." Id.

Further still, the kinds of data stored on a cell phone makes them "qualitatively different" from the sorts of physical records or objects a person might carry with them. Id. A person's "Internet search and browsing history" might "reveal an individual's private interests or concerns," such as private medical details. Id. at 395-96. Also, "[h]istoric location information is a standard feature on many smart phones and can reconstruct someone's specific movements down to the minute, not only around town but also within a particular building." Id. at 396. These were just some of the many kinds of highly private data many or most users might have stored on their phone. Id.

Lest there be any doubt, the Court in Riley noted that while it had previously echoed Judge Learned Hand's 1926 observation "that it is 'a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him' . . . [i]f his pockets contain a cellphone,

14

however that is no longer true." Id. Instead, a "cell phone search would typically expose to the government far more than the most exhaustive search of a house: [a] phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form -- unless the phone is." Id. at 396-97.

### 3) Cell Phones at the Border

Although Riley itself concerned searches incident to lawful arrests, its logic would seem to apply to cell phone searches at the border. Specifically, as in Riley, a court should decide "whether to exempt a given type of search from the warrant requirement 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"[7] Id.

_____

[7] Riley did include a potential caveat to any need for such a balancing inquiry: specifically, where there is "precise guidance from the founding era," such guidance might resolve the need for a warrant. Id. at 385. See also United States v. Jones, 565 U.S. 400, 406-07 (2012) (looking to the original understanding of the Fourth Amendment to determine whether the physical trespass involved in placing a GPS device on a person's car constituted a search or seizure). It is certainly true that courts have grounded the border search exception in historical understanding. Ramsey, 431 U.S. at 616 (discussing a customs statute passed by the First Congress as probative of the Fourth Amendment's application to border searches). However, as discussed above, Riley made clear that courts could not simply extend historical acceptance of warrantless searches of physical items at a particular time or place to phones; rather, the unique qualitative and quantitative differences between the sort of information contained on cell phones and that contained in physical records requires consideration of whether the logic behind a historically grounded exception applies to cell phones. Riley, 573 U.S. at 393-403. See also Orin Kerr, *Foreword: Accounting for Technological Change*, 36 Harv. J.L. & Pub. Pol'y 403 (2013) (arguing for "[t]he need for different

15

at 385. In conducting this analysis, courts should not automatically presume that a balance previously struck as to a certain kind of physical search automatically extends to a search of the data contained on a person's cell phone. Id. at 393. Rather, courts should independently evaluate whether the governmental interests thought to support a warrant exception actually apply to cell phone searches, and whether the intrusion on privacy posed by a physical search is relevantly comparable to that posed by a search of cell phone data. See id. at 385-403. See also United States v. Aigbekaen, 943 F.3d 713, 720 (4th Cir. 2019) ("[A] warrant exception will not excuse a warrantless search where applying the exception would untether the rule from the justifications underlying it."). Application of Riley at least this far should prove uncontroversial, as the Supreme Court has indicated that the border search exception is itself the product of precisely this kind of balancing of interests. Montoya, 473 U.S. at 538-39.

Applying this balancing framework to phone searches at the border yields the same result as in Riley. None of the rationales supporting the border search exception justifies applying it to searches of digital information contained on a traveler's cell phone, and the

---

rules governing digital devices"); Note, *The Border Search Muddle*, 132 Harv. L. Rev. 2278, 2287-99 (2019) (arguing that it remains unclear how the founding generation thought about border searches as applied to a person's papers, such that applying the border search exception to the contents of a cellphone necessarily requires legal reasoning beyond historical description).

magnitude of the privacy invasion caused by such searches dwarfs that historically posed by border searches and would allow the Government to extend its border search authority well beyond the border itself. As such, the Court concludes that the Government may not copy and search an American citizen's[8] cell phone at the border without a warrant absent exigent circumstances.

In reaching this conclusion, the Court first considers, as in Riley, the governmental interests previously relied upon to support the warrant exception urged here. Border-search cases often refer at a fairly general level to the Government's interest in "the protection of the integrity of the border," which of course includes the Government's interests in preventing the introduction into this country of illicit substances or contraband. Montoya, 473 U.S. at 536-38. The Government's interests also include apprehending persons who may pose a threat or who lack authorization to be present in this country, United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976), in inspecting goods to ensure appropriate customs tax is paid, Ramsey, 431 U.S at 616, and more generally "protecting this Nation from entrants who may bring anything harmful into this country, whether that be communicable diseases, narcotics, or explosives." Montoya, 473

---

[8] The Court need not here address whether the same result would hold for a non-resident or non-citizen. Cf. United States v. Verdugo-Urquidez, 494 U.S. 259, 261 (1990) (holding that the Fourth Amendment does not protect property held in Mexico by a Mexican resident and citizen against search or seizure by the U.S. Government).

**SPA-20**

U.S. at 544. In other words, the Government has a very strong interest in preventing unwanted persons or items from entering the country.

But despite the strength of this interest, it is hard to see how it applies to searches of the digital data contained on a traveler's cell phone. When the Government interdicts contraband, identifies goods subject to customs tax, or prevents someone from entering the country without authorization, it successfully stops a person or thing outside the country from unlawfully coming into it. But data stored on a cell phone is not like that -- it instead can and very likely does exist not just on the phone device itself, but also on faraway computer servers potentially located within the country. And, wherever the servers are located, the owner of a cell phone can generally access or share part or all of the data on it with anyone else in the world so long as both parties have an internet connection. Stopping the cell phone from entering the country would not, in other words, mean stopping the data contained on it from entering the country. See, e.g., Orin Kerr & Robert Wisberg, *Searching Computers at the Border* (Stanford Law School Zoom Event, 3/3/22), https://www.youtube.com/watch?v=WflaKYW1jUI. See also Jennifer Daskal, *The Un-Territoriality of Data*, 125 Yale L.J. 326, 365-77 (2015) (discussing the challenges the diffusion of data poses to firm concepts of territoriality).

Some courts have suggested that cell phones might contain so-called "digital contraband" such as explicit images involving the sexual abuse of children. See, e.g., United States v. Cano, 934 F.3d

18

1002, 1014 (9th Cir. 2019) (reasoning that "because cell phones may ultimately be released into the interior . . . the United States has a strong interest in preventing the entry of such material."). Given what the Court has just discussed about how digital data exists separate and apart from the physical cell phone on which it is stored, the Court doubts that the Government's interest in interdicting such "digital contraband" as it exists on a specific device -- when the exact same digital contraband likely is already stored outside the device and available to its owner and others within this country -- is genuinely comparable to the Government's interest in interdicting physical contraband. Physical contraband, once interdicted, will not enter the country, whereas digital contraband easily could and very likely already has. But, in any event, no party seriously contends that the search of Smith's phone in this case was for "digital contraband," so the Court need not definitively resolve the precise extent of the Government's interest in interdicting digital contraband. Cf. id. at 1019-21 (reasoning that while border agents could conduct warrantless forensic searches of phones for digital contraband with reasonable suspicion, they could not conduct warrantless phone searches for anything other than digital contraband). Therefore, while the Court acknowledges the Government's strong interest in searching persons or physical objects at the border, any corresponding interest in searching the digital data "contained" on a particular physical device located at the border is relatively weak. Kerr & Wisberg, supra at 18:00-20:00.

19

The Court weighs against this relatively weak governmental interest a citizen's privacy interests in her cell phone data at the time she presents herself at a U.S. border. Just as in <u>Riley</u>, the cell phone likely contains huge quantities of highly sensitive information -- including copies of that person's past communications, records of their physical movements, potential transaction histories, Internet browsing histories, medical details, and more -- that this Court has already addressed at some length. Section II.B.2, <u>supra</u>; <u>Riley</u>, 573 U.S. at 394-97. To be sure, an individual who presents herself at a border crossing has diminished privacy interests because she should reasonably expect that her person or possessions may be subject to search. <u>Montoya</u>, 473 U.S. at 539-40. Similarly, an individual subject to arrest and impending detention has substantially "reduced privacy interest[s] upon being taken into police custody." <u>Riley</u>, 573 U.S. at 391. But, just as in <u>Riley</u>, this kind of reduced privacy interest has always been understood with respect to the physical things a person carried with her -- whether at the time of the arrest or, as here, at the time of a border crossing. Technological and cultural changes now mean that nearly all travelers carry with them, in additional to any physical items, a digital record of more information than could likely be found through a thorough search of that person's home, car, office, mail, and phone, financial and medical records, and more besides. No traveler would reasonably expect to forfeit privacy interests in all this simply by carrying a cell phone when returning home from an international trip. Because the government's interests in a

20

warrantless search of a cell phone's data are thus much weaker than its interests in warrantless searches of physical items, and a traveler's privacy interests in her cell phone's data are much stronger than her privacy interests in her baggage, the Court concludes that the same balancing test that yields the border search exception cannot support its extension to warrantless cell phone searches at the border.[9]

In holding that warrants are required for cell phone searches at the border, the Court believes it is applying in straightforward fashion the logic and analysis of <u>Riley</u> to the border context. Importantly, however, the Court recognizes that of the five federal courts of appeals to consider the question, none has gone quite this far (although the Ninth Circuit has come close). But it is clear that both the Ninth Circuit and the Fourth Circuit would have required a warrant for the search conducted here.

Specifically, the Ninth Circuit held in 2019 that border officials may conduct warrantless searches of cell phones "only to determine whether the phone contains contraband," such as explicit images of child sexual abuse. <u>Cano</u>, 934 F.3d at 1018. Searches for evidence

---

[9] This of course does not mean that under exigent circumstances, the Government could not conduct warrantless phone searches or seizures at the border. <u>Kentucky v. King</u>, 563 U.S. 452, 460 (2011). The Court need not here address whether circumstances that might not qualify as exigent within the country could qualify in the border context. The Court likewise need not address whether the Government may have relatively greater leeway at the border than elsewhere to temporarily seize or copy a phone until it is able to apply for a warrant.

relating to a crime (such as the search here) require a warrant, because the Government's interest in obtaining evidence -- as opposed to interdicting contraband or other unwanted items or persons -- is not materially different at the border than elsewhere. Id. at 1016-19.

As there is no dispute that the search here was not for digital contraband, applying Cano's logic would lead to the same result in this case that the Court independently reaches: that the warrantless search and copying of Smith's phone was unlawful. As to Cano's other holding -- that warrantless searches for digital contraband are permissible, whether without any heightened suspicion in the case of "manual" searches (scrolling through someone's phone), or with reasonable suspicion in the case of more thorough "forensic" searches, id. at 1012-16 -- the Court doubts that the Government's interest in interdicting so-called "digital" contraband is genuinely comparable to its historically grounded interest in interdicting physical contraband, since, as discussed above, digital data is rarely stored uniquely on a cell phone such that seizing such a phone with unwanted data really would mean preventing that data from "entering" the country. However, the Court need not definitively resolve that question, since there is no question that the search here was not for digital contraband.

Applying similar logic to Cano, the Fourth Circuit in United States v. Kolsuz, 890 F.3d 133 (4th Cir. 2018) likewise reasoned that a warrantless search of a cell phone at the border is impermissible

22

absent some nexus between the Government's interests in protecting the border and the search. Id. at 143. However, unlike the Court in Cano, the Fourth Circuit reasoned that such a "nexus" could be satisfied not just by the phone containing actual digital contraband but also by its containing evidence of a border related violation (such as, as in Kolsuz, suspected smuggling of firearms). Id.

As noted by the Cano court, this reasoning effectively enlarges the border search exception, by transforming a warrant-exception based on the Government's interest in preventing the introduction of unwanted persons or things into an interest in "search[ing] for *evidence* of contraband that is *not* present at the border." Cano, 934 F.3d at 1018. Of course, whether at the border or elsewhere, the Government has a strong interest in obtaining evidence of illegality, including illegality that may occur at the border. But, just as that interest cannot support the Government's conducting a warrantless search of a person's house simply because it believes it may contain evidence of a crime, it does not support allowing the Government to conduct warrantless searches of cell phones for evidence of border-related crimes. Id. However, notwithstanding this Court's disagreement with the Fourth Circuit's approach, the Court notes that even under that approach, the warrantless phone search conducted here for evidence of crimes having nothing to do with the border would not have been permissible. See United States v. Aigbekaen, 943 F.3d 713, 720-21 (4th Cir. 2019) ("[T]he Government may not invoke the border exception on

behalf of its generalized interest in law enforcement and combatting crime.").

It is important to note, however, that two other circuit courts to address the question have held that the Government may search cell phones at the border without a warrant and without any heightened requirement of nexus between the search and the Government's interests in preventing the entry of unwanted persons or items. See Alasaad v. Mayorkas, 988 F.3d 8, 21 (1st Cir. 2021); United States v. Touset, 890 F.3d 1227, 1223 (11th Cir. 2018). Additionally, the Eighth Circuit recently indicated its likely agreement with the First and Eleventh Circuits, although, since the Government's search in that case sought to uncover evidence of trade secrets being smuggled out of the country, the court declined to definitively resolve whether there is any nexus requirement. United States v. Xiang, 2023 WL 3263857, at *4-6 (8th Cir. 2023 May 5, 2023). In any event, none of these decisions is persuasive to this Court or binding upon it.

The First Circuit sought to distinguish Riley by stating that "[t]he search incident to arrest warrant exception [at issue in Riley] is premised on protecting officers and preventing evidence destruction, rather than on addressing border crime." Alasaad, 988 F.3d at 21. It further emphasized that the "border search exception's purpose is not limited to interdicting contraband; it serves to bar entry to those 'who may bring anything harmful into this country' . . . [including] 'communicable diseases, narcotics, or explosives.'" Id. at 20. This Court agrees that the governmental interest underlying the

## SPA-27

border search exception is <u>different</u> from that underlying the search-incident-to-arrest exception, and it acknowledges that the former extends to preventing a wide variety of harmful <u>things</u> from entering the country. But, as discussed above, "things" are different from "data", so it is hard to see why the interests underlying the border search exception extend to the data stored on a traveler's cell phone. To be sure, that data may contain information relevant to the Government's determination as to whether a person should be allowed entry, but the Government has little heightened interest in blocking entry of the information itself, which is the historical basis for the border search exception. The Government's more general investigative interest in data <u>about</u> the person or thing entering the country is entirely incidental to the fact of the cell phone being carried over the border, and could just as easily be relied upon to support searches of the person's home, records, or past mail far away from the border.

The Eleventh Circuit, meanwhile, relied heavily on the example previously discussed of "digital contraband" such as explicit sexual material involving minors (which is not surprising, since the case involved a search for such material). <u>Touset</u>, 890 F.3d at 1232-33. Putting aside this Court's previously expressed doubts as to the strength of the Government's interest in preventing the entry of a particular device containing such material -- which, more likely than not, is also stored outside the device and already accessible within this country -- any interest in seizing "digital contraband" would not justify warrantless searches for other purposes, as the Ninth Circuit

25

made clear in Cano. 934 F.3d at 1018. The Eleventh Circuit meanwhile brushed aside the Supreme Court's reasoning in Riley as concerns the unique privacy implications of cell phone searches, arguing that "it does not make sense to say that electronic devices should receive special treatment because so many people now own them or because they can store vast quantities of records or effects" since "[t]he same could be said for a recreational vehicle filled with personal effects or a tractor-trailer loaded with boxes of documents." Touset, 890 F.3d at 1233. The analogy seems weak on its face: relatively few travelers cross the border in an RV or truck with all their personal possessions and documents in store, while this Court surmises that most travelers carry a cell phone. More to the point, as the Supreme Court made clear in Riley, the storage capacity and pervasive use of cell phones in every aspect of users' lives make them qualitatively and quantitatively different from the sorts of possessions or records a person might carry with her. Riley, 573 U.S. at 393. True, the Riley court made that observation in the context of considering the kinds of objects a person might have on their person or perhaps in their car at the time of an arrest, while it might be likely that travelers at the border carry relatively more physical objects with them. But the basic point -- that a cell phone carries far more and far more sensitive information than would historically have been contained in carriable physical objects -- plainly applies at the border as well.

Finally, and quite recently (well after the search in this case), the Eighth Circuit distinguished Riley on the barebones basis that it

26

**SPA-29**

"involved a different Fourth Amendment exception, searches incident to arrest," without explaining why the logic of Riley does not apply in the border context. Xiang, 2023 WL 3263857, at *3. As already explained, the Court agrees that Riley does not extend automatically to the border search context, but the Court disagrees that this alone serves to distinguish it. Rather, courts should apply the methodology Riley laid out for evaluating when a warrant exception applies to the data contained on phone searches by balancing the governmental interests supporting the exception against the privacy interests implicated -- the same exact balancing test used to produce the underlying warrant exceptions, Riley, 573 U.S. at 386; Montoya, 473 U.S. at 538-39. Applying that methodology, it seems clear that the border search exception should not extend to warrantless searches of the data contained on cell phones. In any event, the Eighth Circuit did not definitively resolve whether a warrantless border search of a cell phone requires some nexus to a border-related rationale (as held by the Ninth and Fourth Circuits), since it reasoned that the search in that case -- for trade secrets the defendant was suspected of smuggling abroad -- plainly had such a nexus. Id.

For the foregoing reasons, the Court concludes that the warrantless search of Smith's cell phone was unreasonable under the Fourth Amendment. As discussed above, this Court's preferred rule -- that phone searches at the border generally require warrants outside exigent circumstances -- is somewhat more protective than the approach of any circuit court to consider the question. But even under the

27

## SPA-30

approaches of the Fourth and Ninth Circuits, a warrant would have been required to search Smith's phone since this was neither a search for digital contraband nor for evidence of physical contraband. Cano, 934 F.3d at 1018; Aigbekaen, 943 F.3d at 720-21. Thus, whether the Government must obtain a warrant for all border cell phone searches (absent exigent circumstances), or just those border phone searches not immediately connected with preventing unwanted persons or things from entering the country, a warrant was required here.

### B. Whether to Suppress the Phone Search

Deciding that the border search of Smith's cell phone was unlawful does not, however, answer whether the results of the search should be suppressed. After all, "[e]xclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search," but rather is meant "to deter future Fourth Amendment violations." Davis v. United States, 564 U.S. 229, 236-37 (2011). Accordingly, while courts will ordinarily exclude evidence obtained in violation of the Fourth Amendment, such evidence may still come in under various exceptions to the exclusionary rule. The Government argues that three such exceptions -- the independent source, inevitable discovery, and good faith exceptions -- are implicated here. The Court discusses each in turn.

### 1) The search of Smith's phone did not derive from an independent source

The Government first invokes the "independent source" exception, which allows the Government to rely at trial on evidence obtained in

violation of the Fourth Amendment in some circumstances if it can show that it would have obtained the evidence in any event pursuant to a later and lawfully obtained warrant. See Murray v. United States, 487 U.S. 533, 542 (1988). The Government argues that because Magistrate Judge Aaron ultimately issued a warrant to search the electronic copy of Smith's cell phone during the border search, and the affidavit filed in support of its warrant application included information beyond that already found on Smith's cell phone (such as witness accounts describing Smith's conduct), the ultimate search of Smith's phone was based on probable cause independent of the border search. Gov't Opp. at 17-18; Gov't Sur-Reply at 7, Dkt. 181.

The Court disagrees. For the independent source exception to apply, two conditions must hold. First, "the warrant must be supported by probable cause derived from sources independent of the illegal entry." United States v. Johnson, 994 F.2d 980, 987 (2d Cir. 1993). Second, "the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." Id. Neither condition is met here.

In this regard, the Court disagrees with the Government's claim that the warrant the Government ultimately obtained was "substantially based on information that was untethered to the cursory" search of the phone already performed at the time it sought the warrant. Gov't Opp. at 17. To be sure, the affidavit submitted in support of the Government's warrant application included significant independent evidence of Smith's potentially unlawful conduct, including the

29

**SPA-32**

results of witness interviews, information taken from Smith's social media page, and more. However, other than relatively conclusory assertions that evidence of the sort sought generally exists on cell phones, the only specific information indicating that evidence of illegality would likely be found on Smith's phone were descriptions of already-reviewed text messages that indicated Smith's membership in the Bloods gang as well as his role in enforcing "rules" on other emergency mitigation companies as to how to respond to fires. Clark Decl. ¶ 15. As such, the Court seriously doubts that the warrant application stood on its own in establishing probable cause absent the information it contained about the evidence stored on Smith's phone.

More fundamentally, the ultimate search of the forensic copy of Smith's phone <u>could not</u> have been "independent" of the initial unlawful search, because the forensic copy existed only <u>because</u> of that search. Even if the Government had independent probable cause to search Smith's cell phone at the time it obtained its warrant, the search it actually performed was of a copy of Smith's cell phone made during the border search -- a copy that almost certainly contained at least somewhat different data from the actual phone at the later moment when the Government obtained a warrant. Accordingly, the search was plainly not independent of the unlawful border search.

### 2) The cell phone search was not inevitable.

For similar reasons, the Government cannot rely on the "doctrine of inevitable discovery," which applies when the Government can "establish by a preponderance of the evidence that the information

ultimately or inevitably would have been discovered by lawful means." United States v. Eng, 971 F.2d 854, 859 (2d Cir. 1992). Once again, the difficulty is that because the Government searched a copy of Smith's phone made during the initial search, any later search of that forensic copy -- as opposed to a search of the data contained on Smith's phone at a later point in time -- would not probably have occurred but for the initial unlawful search. See, e.g., Orin Kerr, *The Fourth Amendment Limits of Internet Content Preservation*, 65 St. Lo. L.J. 753, 807 (2021) ("Applying the inevitable discovery exception leads to a simple outcome . . . [i]f the preservation copy is the fruit of an unconstitutional seizure, then it should not have existed and it cannot be used."). Since the copy of Smith's cell phone containing the data existing as of the date and time of the border search would not have existed but for the unlawful search -- and since the data contained on Smith's actual phone as of the time the warrant issued may have materially differed from the data contained on the copy -- the warranted search of the phone copy was not inevitable.

### 3) The Good Faith Exception

Finally, the Government argues that the good faith exception to the exclusionary rule applies. That exception allows unlawfully obtained evidence to be used at trial "when the Government acts with an objectively reasonable good-faith belief that their conduct is lawful." United States v. Zodhiates, 901 F.3d 137, 143 (2d Cir. 2018). The Government has therefore been allowed to rely on unlawfully obtained evidence where, for instance, "the police conduct a search

in objectively reasonable reliance on a warrant later held invalid," where "searches [are] conducted in reasonable reliance on subsequently invalidated statutes," or where "the police conduct a search in objectively reasonable reliance on binding judicial precedent." Davis v. United States, 564 U.S. 229, 239-40 (2011). Generally, exclusion is appropriate "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights [because] the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Id. at 238. However, "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" Id. at 238.

The Government here offers two good faith arguments: first, that the initial border search, even if unlawful, itself falls under the good faith exception, and second, that the Government's later reliance on Magistrate Judge Aaron's warrant falls under the good faith exception. The Court agrees with both arguments.

### i) The Government's initial border search falls under the good faith exception.

As to the first argument, the breadth of the "border search exception" was still largely in place at the time of the search. Indeed, two of four federal circuit courts of appeals that had addressed forensic searches of cell phones at the border had held that such seizures and searches were lawful without warrants independent

of any nexus between the search and a border-related rationale.[10] While two other circuit courts had indicated to the contrary, given the historic breadth of the "border search exception," a reasonable government agent could have a good faith belief that such a search as was conducted here was permissible absent Supreme Court or Third Circuit precedent to the contrary.

Furthermore, even if that were not enough, a reasonable border agent could have in good faith believed that the search conducted here was expressly warranted by a 2018 CBP directive, which purports to allow so-called "manual" phone searches at the border without any heightened standard of suspicion and "advanced search[es]" -- which entail "connect[ing] external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents" -- whenever "there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP"[11] or "when there is a national security concern. . . ." CBP Directive No. 3340-049A at 4-5, U.S. Customs and Border Protection (Jan. 4, 2018), Dkt. 159-1.

"Reasonable suspicion" is, of course, a modest standard requiring much less than the "probable cause" required for a warrant. The

_____

[10] The most applicable circuit (the Third, because the phone was seized at Newark airport) had not addressed the issue at all.

[11] The Government represents that Title 18 of the U.S. Code is one of almost 30 titles enforced in some capacity by CBP. Gov't Opp. at 13 (citing "Summary of Laws Enforced by CBP," *available at* https://www.cbp.gov/trade/rulings/summary-laws-enforced/us-code).

Government contends there was reasonable suspicion here either because of the information its investigation of Smith's domestic activities had already yielded, or because of the circumstances of Smith's arrival at Newark Airport from Jamaica in March 2021, when he had left Newark earlier that day and been denied entry in Jamaica and was carrying just under $10,000 in cash. Gov't Opp. at 15. At the very least, the information later presented to Magistrate Judge Aaron in obtaining a warrant clearly indicates that, even prior to the search, the Government had objectively reasonable suspicion of Smith's involvement in criminal activity. The border agents who searched Smith at the express request of the government agents conducting the underlying investigation thus had more than a good faith basis for believing that they were acting under the authority of the 2018 CBP directive in seizing and searching Smith's cell phone.[12]

This conclusion is further reinforced by the Second Circuit's decision in United States v. Levy, 803 F.3d 120 (2d Cir. 2015), in which it held that a CBP agent could search and copy the contents of a traveler's notebook based on reasonable suspicion of the traveler's

---

[12] Of course, law enforcement agencies cannot launder unconstitutional practices by promulgating internal guidance that does not itself demonstrate an objectively reasonable good faith effort to apply the law, as any "good faith" reliance by line officers on such guidance would depend on the bad faith of their superiors. Here, however, the CBP guidance document, which requires reasonable suspicion for forensic searches, was more protective than what some courts had held to be required, Touset, 890 F.3d at 1233, and reflects an objectively reasonable attempt to apply the law in this unsettled area.

involvement in financial crimes that other government law enforcement agencies were investigating. Id. at 122-24.[13] There, the Second Circuit rejected the traveler's argument "that border searches conducted by the CBP, even at the prompting of another federal agency, should at least be confined to crimes that a statute or regulation specifically authorizes CBP to investigate," and instead reasoned that "CBP officers are neither expected nor required to ignore tangible or documentary evidence of a federal crime." Id. at 124(stating that CBP agents "have the authority to search and review a traveler's documents and other items at the border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties"). While Levy is distinguishable from the instant case because it dealt with a physical notebook, rather than a cell phone (which, as discussed extensively above, poses unique privacy concerns, see II.A.2-3, supra), it nonetheless supports the contention that government agents considering the law as it existed at the time of the border search could reasonably believe they had a binding lawful basis for seizing and searching Smith's cell phone.

In short, because the agents who requested the search had objectively reasonable suspicion to so request and the agents who actually conducted the search had what they could have reasonably

_____

[13] Although the agents who carried out the search at Newark airport were directly subject to Third Circuit law, they were acting at the behest of the New York investigative agents, who were governed by Second Circuit law.

considered as binding authority to do so under the 2018 CBP Directive, the search meets the requirements for the good faith exception to the exclusionary rule.

**ii)   The Government properly relied on a later-issued warrant**

Independent of its conclusion that the good faith exception applies to the Government's initial unlawful phone search, the Court separately concludes that the good faith exception precludes suppression of the fruits of that search because the Government ultimately obtained a search warrant. The core good faith exception to the exclusionary rule applies where the Government reasonably relies on a duly issued search warrant, even if that warrant should never have issued. United States v. Leon, 468 U.S. 897, 913-18 (1984). Here, much (though not all) of the Government's actual search of the copy made of Smith's phone occurred after a search warrant was issued by Magistrate Judge Aaronson. Clark Decl. ¶ 14; Gov't Opp. at 3-4. True, the Government obtained that warrant after the initial search occurred, and in order to establish probable cause, the Government relied in its warrant application on information already obtained (in this Court's view, unlawfully) from Smith's phone. Clark Decl. ¶¶ 14-15. But it disclosed the relevant circumstances of the search -- including that CBP agents seized, copied, and began searching Smith's phone without a warrant at the border in order to further non-border related investigations of other government agencies -- to Magistrate Judge Aaron.

The Second Circuit has previously applied the good faith exception in similar circumstances to these. In United States v. Thomas, 757 F.2d 1359 (2d Cir. 1985), DEA agents used a dog to smell directly outside a suspect's apartment to determine whether drugs were inside. Id. at 1366. Based in significant part on the results of this "canine sniff," the Government applied for and obtained a search warrant to search the suspect's home. Id. The Second Circuit agreed with the defendant that the initial canine sniff was itself an unconstitutional search, conducted without a warrant or probable cause. Id. at 1366-67. It further agreed that -- without the results of the unconstitutional canine sniff -- there was no probable cause to search the defendant's home, such that no search warrant should have issued. Id. at 1367-68. But, notwithstanding that determination, the Second Circuit concluded that suppression would be inappropriate, because the Government "brought [its] evidence, including the positive 'alert' from the canine, to a neutral and detached magistrate," and "[t]hat magistrate determined that probable cause to search existed, and issued a search warrant." Id. at 1368. Since "[t]he magistrate, whose duty it is to interpret the law, determined that the canine sniff could form the basis for probable cause[,] it was reasonable for the officer to rely on this determination." Id.

This is not to say a later-issued warrant that relies for probable cause on unconstitutionally obtained information always suffices to establish good faith. Where law enforcement agents fail to disclose relevant facts to the magistrate, or have independent reason to know

their actions were unconstitutional, then a later obtained search warrant will not automatically establish good faith. See United States v. Reilly, 76 F.3d 1271, 1281 (2d Cir. 1996). But where "the issuing magistrate was apprised of the relevant conduct, so that the magistrate was able to determine whether any predicate illegality precluded issuance of the warrant . . . invoking the good faith doctrine does not launder the agents' prior unconstitutional behavior . . . [and instead] reaffirms Leon's basic lesson: that suppression is inappropriate where reliance on a warrant was objectively reasonable." United States v. Ganias, 824 F.3d 199, 223 (2d Cir. 2016) (en banc).

That precisely describes the situation here. There is no suggestion that government agents concealed any relevant facts from Magistrate Judge Aaron. To the contrary, they disclosed precisely those facts that now lead this Court to conclude the initial border search was unlawful in their application for a warrant. In nevertheless in issuing the warrant, the Magistrate Judge implicitly (if erroneously) found that the underlying border search that resulted in a copy of Smith's phone was lawful or, at the very least, that probable cause independent of that search existed to search the copy. Nor is this a case where law enforcement "could not fail to have known" that their search was unconstitutional. Reilly, 76 F.3d at 1281. Rather, like the law enforcement agents in Thomas, at the time of the search in this case, "no court in this Circuit had held that" phone searches

at the border "w[ere] unconstitutional." <u>Ganias</u>, 824 F.3d at 223.[14] Since the unconstitutionality of the search of Smith's phone was not obvious and law enforcement agents presented all relevant facts that might (and, in this Court's view, do) establish its unconstitutionality to a neutral magistrate, their subsequent reliance on the search warrant issued by that magistrate was objectively reasonable.

That does not quite settle the question, because of the significant length of time -- 38 days -- between the Government's March 2, 2021 search and copying of Smith's phone and its finally obtaining a warrant on April 9, 2021. In general, if law enforcement seizes personal property before obtaining a warrant and seeks a warrant after the fact, it must act "with diligence [in] apply[ing] for the warrant." <u>United States v. Smith</u>, 967 F.3d 198, 205 (2d Cir. 2020). Law enforcement must act with "expediency in obtaining a search warrant to search seized evidence in order to avoid interfering with a continuing possessory interest for longer than reasonably necessary," and because "unnecessary delays [] undermine the criminal justice process in a more general way [by] prevent[ing] the judiciary from promptly evaluating and correcting improper seizures." <u>Id.</u> Here, however, Smith makes no argument concerning the length of the delay between the copying of his phone's contents on March 2 and the Government's obtaining a warrant for it on April 9, so the issue is

---

[14] This was true both in the Second Circuit, where the warrant was requested, and in the Third Circuit where the earlier search took place.

plainly waived. And even if that were not the case, the Court would still conclude that the good faith exception entitles the Government to rely on the April warrant.

In determining whether a particular delay between a seizure and the issuance of a warrant is reasonable, the Second Circuit has held that courts should consider "the following four factors . . . [1] the length of the delay, [2] the importance of the seized property to the defendant, [3] whether the defendant had a reduced property interest in the seized item, and [4] the strength of the state's justification for the delay." Id. at 206. The Government's delay here was plainly significant, since the Second Circuit has already held that a one-month delay (which is slightly shorter than the delay at issue here) "well exceeds what is ordinarily reasonable." Id. at 206. However, unlike in the typical case of delay following a warrantless seizure, Smith was not actually deprived of his use of his phone or the data stored on it, since the Government returned the original to him after it copied its contents. That makes this a different case from the Second Circuit's decision in Smith, where the police had seized a suspect's iPad, thereby depriving its owner of its use. Id.

Moreover, as in Smith itself, finding that the Government waited too long to seek a warrant would not necessarily justify excluding the results of its post-warrant search of the seized contents. How to think about the storage of forensic copies of a device containing digital data -- and the extent of the intrusion on a person's privacy interests resulting from the storage of such copies -- is a relatively

40

novel question. In Ganias, the Second Circuit concluded that law enforcement acted in good faith where it obtained a warrant to seize and search a person's computer hard drives, made and retained forensic copies of the hard drives for several years, and ultimately searched those copies years later for information that was not responsive to the original warrant that led to the creation of the forensic copies. Ganias, 824 F.3d at 225. To be sure, there the Government was acting in reliance on a (years-earlier issued) warrant, id., whereas here the initial search and digital copying of the contents of Smith's phone was warrantless, but Ganias, which declined to settle whether the Government's actions violated the Fourth Amendment, emphasized the unsettled and evolving nature of the law when it comes to copying and preserving electronic copies of the data on an electronic device. Id. at 208-21.

Moreover, while the Second Circuit in Smith clarified that a month was too long to wait in order to seek a warrant for a previously seized electronic device no longer available to its owner, id., it did not address a situation such as the one here, where the Government returned the actual phone and kept and (for the most part) searched the electronic copy after the warrant was issued. As in Smith, therefore, the Court is "not convinced that an objectively reasonable officer would have known that the delay [in obtaining a warrant] amounted to a violation of the Fourth Amendment." 967 F.3d at 213.

Accordingly, for the foregoing reasons, the Court concludes that the good faith exception doubly applies here, so that while the

41

## SPA-44

Government's initial warrantless search of Smith's phone was unlawful, the results of that search (alongside the subsequent wiretap) should not be suppressed. Smith's motion to suppress is therefore denied.

### III. Smith's motion to dismiss

Smith also moves to dismiss the indictment, contending that the Government's prosecution of him and the other defendants in this case was discriminatory. Smith Mem. 13-15. In support, he notes that he is black, the other defendants charged in this case are all either black or brown skinned, and that the affidavits submitted in support of the Government's warrant and wiretap applications refer to putative connections between Smith and other defendants with the Bloods gang. Id.; Smith Decl. ¶¶ 8-15, Dkt. 160. Smith also contends that many EMS companies are owned by white men whom the Government has declined to prosecute. Smith Decl. ¶ 14-15.

Because prosecution decisions are the "special province of the Executive," a "presumption of regularity supports [its] prosecutorial decisions," such that "absen[t] clear evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Armstrong, 517 U.S. 456, 464 (1996). While that presumption may be overcome by evidence "that the decision whether to prosecute . . . [was] based on an unjustifiable standard such as race, religion, or other arbitrary classification," such evidence must be "clear" and demonstrate that the "prosecutorial policy had a discriminatory effect and . . . was motivated by a discriminatory purpose." Id. at 465-66. To establish a discriminatory effect based

42

on race, a defendant "must show that similarly situated individuals of a different race were not prosecuted." Id. at 465.

Smith plainly fails to make the requisite showing. Smith has alleged only in very general terms that "owners of [EMS companies] and the people who worked for them -- almost entirely white men" without any gang connection also "settled their differences . . . by using threats of violence, violent kickbacks, or other illegal conduct." Smith Decl. ¶ 14. But while the indictment in this case lays out quite detailed allegations about Smith and his co-defendants' participation in a criminal enterprise that sought, inter alia, to impose a system of rules and rotation upon other EMS companies and use force to enforce that system, Indictment ¶¶ 6-10, Dkt. 2, Smith has not come forward with actual evidence of similar conduct by similarly situated white industry participants whom the Government has declined to prosecute. Similarly, Smith's only evidence of discriminatory intent is that the warrant and wiretap applications in this case referred to his and other defendants' putative connections with Bloods, but membership in the Bloods is certainly not itself any kind of protected status, and Smith has not explained how the Government's references to his or other defendants' putative connections to the Bloods demonstrate discrimination based on race or some other protected status. Accordingly, Smith's motion to dismiss the indictment is denied.

## IV.  Sequan Jackson's Motion to Suppress

Defendant Sequan Jackson also moved to suppress the results of a Title III wiretap of his and Smith's phones. As with Smith's motions

to suppress and dismiss, the Court denied Jackson's motion by bottom-line order earlier this year. See Order, Dkt. 183.[15]

To obtain a Title III wiretap, the government must provide "a full and complete statement of the facts and circumstances relied upon by the application" to establish probable cause, and a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §§ 2518(1)(b)-(c). These restrictions aim "to guarantee that wiretapping or bugging occur[] only when there is a genuine need for it and only to the extent that it is needed." Dalia v. United States, 441 U.S. 238, 250 (1979). They require any "affidavit offered in support of a wiretap warrant [to] provide some basis for concluding that less intrusive investigative procedures are not feasible." United States v. Lilla, 699 F.2d 99, 103 (2d Cir. 1983). At the same time, they do not require "that any particular investigative procedures be exhausted before a wiretap may be authorized." Id. at 104. Rather, "the statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999). The Second Circuit has previously indicated that wiretaps will often prove necessary "in

_____

[15] Jackson has since pled guilty to certain charges. See Order, Dkt. 202.

complex and sprawling criminal cases involving large conspiracies," given the difficulties to obtaining evidence in such cases. United States v. Concepcion, 579 F.3d 214, 218 (2d Cir. 2009).

Jackson's primary argument is that the Government failed to establish that normal investigative procedures failed, would not succeed, or were too dangerous. Jackson Mem. 19-25, Dkt. 140. For instance, although the Government clearly gleaned extensive information from witness interviews (much of which formed the basis for its assertion there was probable cause for a wiretap), Clark Wiretap App. at 20-26, Jackson argued that the Government essentially stopped interviewing witnesses following the approval of the wiretap in order "to create the appearance of necessity" for its extension. Jackson Mem. 20. But just because the Government was able to make significant initial progress in its investigation with witness interviews does not mean that it could have continued to do so. As the Government cogently explained in support of its wiretap application, while its extensive witness interviews provided "important information" about how the alleged scheme was enforced as to victims, "victims have limited insight into the internal operations of the racketeering scheme . . . ." Clark Wiretap App. at 49. The Government further explained that because many of the victims it interviewed reasonably feared retaliation, their willingness to cooperate was often limited. Id. These explanations, along with the rest of the Government's wiretap explanation, more than satisfies the statutory requirement that the Government explain why further witness interviews

45

## SPA-48

"reasonably appear[ed] to be unlikely to succeed" in obtaining further evidence. 18 § 2518(1)(c).[16]

Jackson also points out that the Government was aware from its search of Smith's phone that First Response members communicated through an end-to-end encrypted WhatsApp chat which would not itself be observable through a wiretap. As such, Jackson suggests, that the Government should have sought cooperation from one of the many people included on one of the WhatsApp chats. But the wiretap application explains that while the Government obtained some information from cooperating witnesses, it was not aware of further confidential sources whom it believed would have relevant information and be willing to work with the Government. Clark Wiretap App. at 42-43. Of course, as Jackson notes, the Government could presumably have approached one of the participants in the WhatsApp group chats -- but such a move could just as easily have resulted in that participant tipping off Smith,

---

[16] Jackson also suggests that because the Government has provided Jencks Act material for over 40 witnesses, it ultimately was able to obtain evidence from substantially more witnesses than the 16 it interviewed when applying for a wiretap -- indicating that there was more to be gained from witness interviews. Jackson Mem. 20-21. The Court is not convinced. For one thing, the fact that the Government produced Jencks Act evidence for more witnesses than it had apparently interviewed before seeking a wiretap does not itself raise any inference as to the quality of information provided by the additional witnesses. Furthermore, the wiretap itself likely produced new lines of inquiry, and the Government represents that additional witnesses became willing to speak to law enforcement after the charges in this case were brought. Gov't Mem. 23 n.3, Dkt. 164. So the fact that the Government ultimately interviewed more witnesses hardly defeats its explanation as to why, at the time it sought a wiretap, it was unlikely to obtain the information it needed from further witness interviews alone.

Jackson, or the other targets of the investigation. Gov't Mem. at 23-24. Similarly, Jackson speculates that an undercover agent could potentially have gained access to the WhatsApp chats or otherwise obtained valuable information by appearing at the site of a fire and seeking to "blend" in with individuals from First Response as they showed up, Jackson Mem. 22, but that is pure speculation that would require undercover agents to show up at a moment's notice at the site of a fire, identify if EMS personnel who showed up were connected with First Response, and then somehow insinuate themselves into those persons' conversations. Such a speculative possibility is not enough to preclude issuance of a wiretap.[17]

The Court is similarly unpersuaded that there was anything deficient in the Government's representation in its warrant application that further physical surveillance would be insufficient, given the Government's description of its previous unsuccessful efforts to surveil the First Response office and monitor areas frequented by Smith and its explanation that because violence "occur[ed] at the site of fires or at other random locations," there

_____

[17] Jackson also implies that the Government's warrant application may not have been accurate because it describes an undercover HSI officer being sent to the scene of a fire in February 2021, Clark Wiretap Appl. at 41, even though the investigation that ultimately resulted in these charges was not formally opened until March 2021, id. at 14. Jackson Mem. 22 (arguing that "[t]his discrepancy raises the specter that there was, in fact, no actual use of an undercover officer"). But the Government explains that there were two overlapping investigations, and the February 2021 visit to the scene of a fire was conducted by officers associated with the earlier one. Gov't Mem. 26 n.5

was no practicable way to obtain needed evidence through physical surveillance. Clark Wiretap Application at 42-45.

Finally, Jackson argues that the wiretap never should have been approved because the Government knew from its search of Smith's phone that most of his text communications were sent by WhatsApp, and the Government's wiretapping technology allegedly would not allow it to pierce WhatsApp's end-to-end encryption. Jackson Mem. at 25-27. The Court is not persuaded. The fact that the majority of Smith's written messaging with large groups was through WhatsApp does not imply he used WhatsApp to make phone calls, and, indeed, the Government's wiretap application detailed several phone calls placed between Smith's cell phone and other suspects. Clark Wiretap App. at 38-41. Accordingly, the fact that Smith employed WhatsApp messaging did not mean the Government lacked reason to expect it would obtain valuable information from a wiretap.

The Court thus agrees with Judge Liman's determination that the Government adequately demonstrated that other investigative methods were not reasonably likely to succeed and that a wiretap was therefore necessary. Accordingly, Jackson's motion to suppress is denied.

### V.   Defendants' Dore and Lacewell's Motion to Sever

Finally, defendants Damon Dore and Rahmiek Lacewell moved under Fed. R. Crim. Proc. 14 to sever their trial from Jatiek Smith's.[18]

---

[18] Defendant Sequan Jackson originally joined this motion, although he subsequently withdrew from it. Dkt. 169. The motion was also joined by defendants Anthony McGee and Kaheen Small, who entered guilty pleas before the Court denied the motion. See Minute Entries

They argued that certain inculpatory evidence obtained during an interview Smith gave law enforcement might be admissible as to Smith but inadmissible as against them, that Smith is the most culpable of any defendant, and that Smith's pretrial behavior indicates he is likely to behave in a way during trial that will prejudice a jury against not just him but also moving defendants. See generally Mem. Supp. Mot. Sever, Dkt. 144. None of these arguments merit severance.

"A trial court has wide discretion in considering a motion to sever under Federal Rule of Criminal Procedure 14." United States v. Gallo, 863 F.2d 185, 194 (2d Cir. 1988); see Zafiro v. United States, 506 U.S. 534, 539 (1993). To succeed on a motion to sever, the defendant must demonstrate "substantial prejudice," United States v. Werner, 620 F.2d 922, 928 (2d Cir. 1980), such as might occur when evidence that would not be admissible as against the defendant seeking severance would be admissible against another and the evidence is of a sort that limiting instructions seem unlikely to cure any prejudice. Zafiro, 506 U.S at 539.

As to Smith's inculpatory statements, the Government argues that such statements are admissible against all defendants as co-conspirator statements, since, the Government contends, Smith gave the interview in question in order "to thwart law enforcement's investigation into those crimes by deflecting law enforcement's

_____

dated 3/6/23 and 3/14/23. Lacewell and Dore have also subsequently pled guilty, although their pleas came after the Court denied their motion to sever by bottom-line order. See Order, Dkt. 183.

attention away from First Response and onto other EMS companies." Gov't Mem. at 13, Dkt. 164. The Court sees no need to resolve whether these statements really would have been admissible against defendants other than Smith for two reasons. First, even assuming moving defendants were right that these statements would be admissible against Smith but not them, they have not pointed to any statements that would be so likely prejudicial that an appropriate limiting instruction would not adequately address their concerns. Further, the Government represents it has not even decided whether to seek to introduce any of these statements at trial, and that it would first resolve their admissibility via a motion in limine if it does choose to seek to introduce them.

As to defendants' argument that Smith is the most culpable defendant, the charges here -- racketeering and extortion conspiracy -- necessarily involve the actions of multiple individuals, with some likely more culpable than others. The Government represents that the evidence it intends to rely on to prove each defendant's participation in the conspiracy substantially overlaps. Even if moving defendants are right that their participation was less culpable than Smith's, the Court does not believe that such differential culpability does not by itself merits severance, absent some more particular showing that a joint trial is likely to prejudice a jury against moving defendants.

Finally, defendants' arguments about Smith's potential disruptiveness at trial are entirely speculative. They are based entirely on Smith's conduct in resisting arrest and in his refusal to

leave a court cell block and return to jail following a conference earlier in this case. Defs. Mem. at 12, Dkt. 144. Mr. Smith has appeared at several court conferences and behaved in all respects appropriately while in Court; his apparent resistance to being returned to jail after one of these court appearances does not demonstrate that Smith will behave at trial in a way likely to cause prejudice to other defendants (especially since Smith himself will have every incentive at trial to present himself favorably to the jury). Accordingly, defendants Dore and Lacewell's motion to sever is denied.

## VI. Conclusion

For the foregoing reasons, as indicated in its previous bottom-line order, the Court hereby reconfirms its denial of defendant Jatiek Smith's motion to suppress the results of the search of his phone and to dismiss the indictment, defendant Sequan Jackson's motion to suppress evidence obtained from Title III wiretaps, and defendants Dore and Lacewell's motion to sever their trial from Smith's.

SO ORDERED.

New York, NY
May 11, 2023

_____
JED S. RAKOFF, U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    -v-<br><br>JATIEK SMITH et al.,<br><br>            Defendants. | 22-cr-352 (JSR)<br><br>ORDER |

JED S. RAKOFF, U.S.D.J.:

On June 1, 2023, defendant Jatiek Smith filing a motion to reconsider the Order of the Court denying his motion to suppress evidence obtained from a warrantless search of his phone during a boarder stop at Newark International Airport on March 2, 2021. *See* Dkt. 226. After full consideration of the parties' written submissions, the Court hereby denies defendant's motion for reconsideration. An opinion setting forth the reasons for this ruling will issue in due course.

SO ORDERED.

New York, NY
November 6, 2023

_____
JED S. RAKOFF, U.S.D.J.

1

**SPA-55**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
UNITED STATES OF AMERICA,

     -v-                              22-cr-352 (JSR)

JATIEK SMITH et al.,                  MEMORANDUM ORDER

            Defendants.
```

JED S. RAKOFF, U.S.D.J.:

Before the Court is the motion of *pro se* defendant Jatiek Smith requesting a bench trial. *See* Dkt. 296. Federal Rule of Criminal Procedure 23(a) provides that "[i]f the defendant is entitled to a jury trial, the trial must be by jury unless: (1) the defendant waives a jury trial in writing; (2) the government consents; and (3) the court approves." The Court has indicated that it approves Smith's request, but the Government has refused to consent.

This, however, does not end the matter, for the Supreme Court has noted that, notwithstanding the language of Rule 23(a), there may be "circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial jury." *Singer v. United States*, 380 U.S. 24, 37 (1965). While subsequent precedent makes clear that a court should overrule the Government's objection to a bench trial only sparingly, the Court finds that this is just such an exceptional case. Several significant circumstances, including the need to try the defendant in shackles, the defendant's marked anger management issues and psychological

1

infirmities, and the defendant's apparent decision to proceed *pro se*,[1]
separately and collectively create a substantial and unavoidable risk
that defendant will be subject to undue prejudice if his case is tried
before a jury, while a bench trial would virtually eliminate this
prejudice. The Government's essentially inexplicable decision to
object to a bench trial effectively denies the defendant his due
process right to a fair trial. Accordingly, for the reasons set forth
below, the Court grants defendant's request for a bench trial over the
Government's objection.

I.

_____

[1]   Last night, as this Opinion was being finalized, the
defendant made a last-minute request (which has yet to be docketed)
for a further adjournment of his long-delayed trial, which was firmly
scheduled to begin on November 27, 2023. As the Government points out
in its opposition (which also was not docketed), this is nothing more
than a continuation of a ploy that the defendant has repeatedly used
in the past to delay these proceedings, all the while expressing a
desire for a speedy trial. His latest request for adjournment is
particularly sinister given his history of witness intimidation and
the fact that it was made just after he received sensitive 3500
material regarding cooperating witnesses. The defendant, who is
currently proceeding *pro se*, tries to buttress his adjournment request
by claiming that he now wants his "standby" counsel to be appointed
as his full-time counsel, with the understanding that such appointment
would necessitate a substantial adjournment so that such counsel could
get up to speed. As the Government points out, this is nothing but
gamesmanship. As detailed below, the defendant has repeatedly made
clear that he will not stick with any counsel who does not follow his
instructions to file frivolous motions, make frivolous objections, and
the like. So, this is nothing but a cover for continuing to proceed
*pro se*. In any event, defendant's last-minute request for adjournment
of the trial, appointment of full-time counsel, and the other relief
set forth in the defendant's letter of November 14, 2023 is hereby
denied in full.

On October 30, 2023, the defendant filed a multi-part motion seeking various forms of relief, including that the Court order that his case be tried before the Court, rather than a jury. *See* Dkt. 296. On October 31, 2023, the Court indicated to the parties that it was prepared to grant Smith's request, subject to the Government's consent. On the same day, however, the Government submitted a letter stating that "[a]fter carefully considering Smith's request for a bench trial, the Government does not consent," but providing no further explanation. Dkt. 298.

The Court then issued an Order on November 3, 2023, expressing concern that a bench trial was necessary to ensure Smith received a fair trial and directing the Government to explain why the Court should not overrule the Government's objection to a bench trial. *See* Dkt. 300. The Order explained that the Court's concerns were based on (at least) three factors: (1) the Marshals' informing the Court that defendant would need to be tried in shackles, (2) defendant's marked history of anger management issues, and (3) the substantial likelihood that defendant, who had at that point firmly elected to proceed *pro se*, would be subject to frequent reprimands before the jury because of his strongly held but frequently erroneous views of the law. *Id.*

The Government filed its response on November 7, 2023. *See* Gov't Opp. (Dkt. 306). In its response, the Government persisted in its objection to a bench trial, but still failed to offer any explanation for its refusal to provide consent. Instead, it simply argued that "[t]here are reasonable, appropriate, and well-established measures

3

[other than a bench trial] that can ensure that the defendant receives a fair and impartial trial." *Id.* at 5.

## II.

The United States Constitution provides that "[t]he Trial of all Crimes . . . shall be by Jury," U.S. Const. Art. III, § 2 cl.3, and grants criminal defendants "the right to a speedy and public trial, by an impartial jury," U.S. Const. amend. VI. The Supreme Court has recognized that these provisions were "clearly intended to protect the accused from oppression by the Government." *Singer v. United States*, 380 U.S. 24, 31 (1965). Accordingly, an accused can waive his right to a jury. *See Patton v. United States*, 281 U.S. 276, 312 (1930), *abrogated on other grounds by Williams v. Fla.*, 399 U.S. 78 (1970). And given the Supreme Court's clear statement that the historic purpose of these provisions is to protect the accused from governmental oppression, it follows that the Government's invocation of its Rule 23 "right" to refuse consent to a defendant's request for a bench trial has little to no constitutional backing. *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 574 n.13 (1977) ("[T]he prosecution has no constitutionally sanctioned interest in receiving a verdict from the jury . . . .").

Indeed, in *United States v. Singer*, where the defendant requested a bench trial but the Government, invoking Rule 23, refused to consent, the defendant went so far as to argue that Rule 23 was unconstitutional because a criminal defendant has "the right to waive a jury trial whenever he believes such action to be in his best interest, regardless

4

of whether the prosecution and the court are willing to acquiesce in the waiver." 380 U.S. at 25. The Supreme Court rejected such a broad proposition, finding "no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury -- the very thing that the Constitution guarantees him." *Id.* at 36. But the Court acknowledged that there may be "circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial trial." *Id.* at 37.

Based upon this language in *Singer*, a number of district courts have overruled the Government's refusal to consent to a defendant's request for a bench trial. *See United States v. Cohn*, 481 F.Supp.3d 122 (E.D.N.Y. 2020); *United States v. Schipani*, 44 F.R.D. 461, 463 (E.D.N.Y. 1968); *United States v. Lewis*, 638 F. Supp. 573, 579 (W.D. Mich. 1986); *United States v. Braunstein*, 474 F. Supp. 1, 17-18 (D.N.J. 1978); *United States v. Panteleakis*, 422 F. Supp. 247, 250 (D.R.I. 1976); *see also United States v. Moon*, 718 F.2d 1210, 1218 (2d Cir. 1983) ("Certainly we recognize, though, that there might be cases where the circumstances are so compelling that for the court to countenance the government's insistence on a jury trial over the defendant's request to be tried by a judge alone would deny the defendant a fair trial."). While, as might be expected, each of these cases is unique, what they have in common is a recognition that

5

*Singer*'s suggestion that a defendant may insist upon a bench trial over prosecutorial objection has real force.

To be sure, the case law also makes clear that a Court may not overrule the Government's objection to a bench trial where other remedial measures are sufficient to mitigate the risk of prejudice identified by a defendant. *See, e.g., United States v. U.S. Dist. Ct. for Eastern Dist. of Cal.*, 464 F.3d 1065, 1071 (9th Cir. 2006); *United States v. Caramadre*, 2012 WL 4762189, at *2-3 (D.R.I. Oct. 5, 2012). But to overcome the Government's objection, a defendant need not show that it would be impossible to receive an impartial jury trial; if that were the case, the defendant would simply be entitled to dismissal of the indictment, since the defendant has a constitutional right to insist on a jury trial, and the caveat in *Singer* would be meaningless. *See* Jon Fieldman, Singer v. United States *and the Misapprehended Source of the Nonconsensual Bench Trial*, 51 U. Chi. L. Rev. 222, 232-241 (1984). Rather, where a substantial and unavoidable risk of prejudice remains even after all reasonable measures are taken, a trial judge may, in its discretion, overrule the Government's objection. *See, e.g., Schipani,* 44 F.R.D. at 463 (overruling Government's objection where "[t]here [was] a substantial danger that the defendant will be severely prejudiced if he is tried before a jury"); *Panteleakis*, 422 F. Supp. at 250 (overruling Government's objection where "[t]he government ha[d] not attempted to rebut the inference that substantial prejudice is practically impossible to avoid under these circumstances").

**SPA-61**

### III.

Three independent circumstances make this the exceptional case where the Government's insistence upon a jury trial creates a substantial and unavoidable risk that defendant will be denied his right to a fair trial.

*First*, the United States Marshals have recommended that, for the safety of all concerned, defendant be shackled for the duration of the trial due to his propensity for violent outbursts (further described below), and the Government has expressly deferred to the Marshals' judgment in this regard. *See* Gov't Opp. (Dkt. 306), at 5 n.1. Indeed, the Government has itself repeatedly emphasized that Smith is violent and poses a substantial danger to the community,[2] and has underscored Smith's involvement in this very case in witness tampering and intimidation of victims.[3] The Court has also learned from the

---

[2]    *See, e.g.,* Gov't Opp. to Def's 1st Bail App. (Dkt. 91), at 1 ("Many of the defendants in this case pose a danger to the community, but the danger posed by Jatiek Smith surpasses each of them. He was the leader of this violent extortion crew, and for at least two years he used violence and threats to terrorize the fire restoration industry."); Gov't Opp. to Def's 2d Bail App. (Dkt. 162), at 17 ("[Smith] has a long and violent criminal history, and upon his most recent release from jail, he used violence, threats of violence, and intimidation to extort the fire mitigation industry, intimidate witnesses, and obstruct justice. This Court has twice held that Smith poses a danger to the community that cannot be addressed by even the most restrictive bail conditions.").

[3]    *See, e.g.,* Gov't Opp. to Def's 2d Bail App. (Dkt. 162), at 2 ("Smith has also solidified his control over the industry with witness tampering and obstruction of justice, threatening victims not to speak to the authorities about his violence."). This also raises the very real possibility that if there were to be a jury trial in this case, the Court would have to consider impaneling an anonymous jury, thus raising further constitutional problems. *See United States*

7

Government, the Marshals, and the prison authorities of the defendant's repeated resort to violence even while incarcerated (detailed below). It follows that the Court has no choice but to order the defendant shackled throughout his trial, and hereby so orders.

But if this is a jury trial, the likelihood that the jury will see defendant in shackles creates a problem of constitutional dimensions. The Supreme Court has held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005). "This rule has deep roots in the common law" and dates back to before the time of the founding. *Id.* at 626 ("The law has long forbidden routine use of visible shackles during the guilt phase . . . ."). The risk that a jury will be impermissibly swayed by such visible manifestations of incarceration conflicts with the "presumption of innocence" that is "a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503-04 (1976) (holding it unconstitutional to compel a criminal defendant to appear at trial in prison attire).

The Second Circuit has made clear that, even where a district court determines the use of restraints is necessary, "the Court must

---

*v. Thomas*, 757 F.2d 1359, 1363-65 (2d Cir. 1985). These problems can be fully resolved by a bench trial.

take steps to minimize any prejudice to the defendant from being tried in physical restraints." *United States v. Haynes*, 729 F.3d 178, 190 (2d Cir. 2013). Here, the most simple and effective measure to minimize the prejudice attendant upon the use of restraints would be to hold a bench trial. *See Comer v. Schriro*, 463 F.3d 934, 963 (9th Cir. 2006) (noting that "the risk of prejudice" from visible shackles "is lessened" where a judge sits as the trier of fact), on reh'g en banc, 480 F.3d 960 (9th Cir. 2007). The Government nevertheless insists that the risk of prejudice can be adequately addressed if draperies are placed around both tables such that the restraints would not be visible to the jury. Gov't Opp. (Dkt. 306), at 5. Even setting aside the real possibility that the jury, in moving between the jury room and the jury box, will still catch sight of the shackles, the Court finds the reliance on draperies to be inadequate here, given, *inter alia*, the defendant's tendency toward uncontrollable outbursts and his exercise of his constitutional right to proceed *pro se*, two factors to which Court now turns, that combine with Smith's violent tendencies not only to make it highly likely that the jury will see him in shackles, but that they will be independently prejudiced by these additional problems.

*Second*, Smith, though clearly competent to stand trial, has severe personality difficulties that make it challenging for him to regulate his behavior. As a result, the defendant has had multiple altercations with prison staff and the Marshals. For example, on August 16, 2023, the Court was forced to adjourn a pre-trial conference after Smith

refused to comply with the Marshals' instructions while in detention at the courthouse. *See* Dkt. 266. As subsequently described to the Court by the Marshals, five deputies were required to restrain Smith during this incident. On September 6, 2023, Smith refused to attend a pre-trial conference and the Court issued an order authorizing the use of force, *see* Dkt. 276, although the force order was later cancelled after the parties jointly requested that the pre-trial conference be adjourned, *see* Sept. 6, 2023, Minute Entry. During the telephonic conference requesting this adjournment, defendant's then-counsel described Smith as having what he believed to be a "psychotic episode," and more recently his current "standby" counsel has described him to the Court as having "bipolar disorder." Def's Reply (Dkt. 307), at 2 n.2. As recently as October 6, 2023, when the defendant was found to be in possession of a contraband cellphone by prison staff, Smith physically resisted their attempts to seize the phone, resulting in his being placed in solitary confinement. Based upon this history of Smith's violent and erratic behavior, the Marshals, in addition to requesting permission to shackle Smith during trial, have more recently also requested permission to use tasers on Smith in the event such outbursts occur during trial. The fact that the Marshals have, unsolicited, made such a request clearly evidences their belief that Smith poses a substantial risk of volatile outbursts. But one can only imagine how huge the prejudice would be if the jury saw Smith being tasered by the Marshals.

# SPA-65

The Court is convinced that Smith's behavioral challenges are the result of a genuine disability, rather than an "act" put on by the defendant. According to the Government, Smith has had "more than 20 contacts with" the psychological services at the jail where he is housed. Gov't Opp. to Oct. 30, 2023 Mot. (Dkt. 299), at 3. And Smith himself acknowledges his mental health challenges, having repeatedly averted to them in his filings with this Court demanding he be provided greater access to psychiatric services. *See, e.g.*, Def's Oct. 30, 2023 Mot. (Dkt. 296), at 3. Indeed, Smith expressly identifies the risk that a "jury might well view [Smith's] metal health condition unfavorably" as among the reasons the Court should grant a bench trial. *Id.* at 6; *see also* Def's Reply (Dkt. 307) (noting "the near certainty of juror prejudice due to Mr. Smith's mental illness").

Based upon the record in this case and the Court's experience dealing with defendant, the Court finds that there is a substantial likelihood that defendant will have angry, even violent outbursts during the course of any trial and the stress it imposes. It goes without saying that witnessing Smith become aggressive and be physically restrained (let alone tasered) would substantially prejudice the jury against him. Further, even a single such outburst will likely reveal Smith's shackles to the jury, undermining the effectiveness of the Government's proposal to conceal them.

The Government offers no real solution to the prejudice attendant on such outbursts. The Government suggests that a curative instruction to the jury might be sufficient, but as explained *infra* Section IV,

the cases upon which the Government relies are distinguishable on their face. The Government also argues that Smith should not benefit from his own past and prospective misconduct that would create the prejudicial conditions he would face in a jury trial. But this is doubly unpersuasive, first, because Smith's "demons" do not appear to be of his own planned making, but rather reflect personality disorders he cannot easily control; and, second, because no matter what the reasons for his violence and anger, he is still entitled to a fair trial.

*Third*, to complicate matters further, Smith has invoked his constitutional right to represent himself and proceed *pro se*. *See Faretta v. California*, 422 U.S. 806, 819-20 (1975). Smith elected to do so -- notwithstanding strong warnings from the Court as to the dangers of this choice -- because Smith has extremely strong views about what he believes to be the law and about how he should be allowed to conduct his defense. So strong are these views that they have already led to the excusing of no less than five prior attorneys for Smith in this case.[4] Indeed, even prior to electing to proceed *pro se*,

---

[4]      Mr. Smith was originally represented by two attorneys that he had retained, but he had a falling out with each, and CJA counsel was subsequently appointed. See Dkt. 58; November 21, 2022, Minute Entry. With the consent of Mr. Smith, the two subsequently appointed CJA attorneys appointed to represent Mr. Smith were also granted permission to withdraw following a breakdown in their relationship with Smith. *See* Dkt. 248. Smith's most recent attorney, Jonathan Buza, was granted leave to withdraw after Smith filed a formal grievance complaint against him. *See* Dkt. 289. And Smith's last-minute request to appoint his current standby counsel as his full-time counsel (in place of his current *pro se* status) is, as already discussed in

Smith repeatedly made submissions directly to the Court on his own behalf, even though the Court had admonished Smith on multiple occasions that his submissions could only be made through counsel. *See, e.g.*, Sept. 18, 2023, Hr. Tr. (Dkt. 290). Smith's most recent attorney, Jonathan Buza, Esq., was granted leave to withdraw after Smith filed a formal grievance complaint against him in both state and federal courts, alleging that Mr. Buza wrongfully refused to file a motion raising baseless arguments that the Court had already rejected. *See* Dkt. 289. And while the Court has appointed "standby" counsel to assist Smith's *pro se* representation in the upcoming trial, past experience strongly suggests such counsel will have no more success than prior counsel in restraining Smith from personally and belligerently asserting frivolous arguments.

Based upon the Court's experience dealing with this defendant, and the Court's substantial experience conducting trials with *pro se* defendants generally, the Court finds it is extremely likely that, if there were a jury trial, it would be necessary to repeatedly admonish the defendant in front of the jury in order to prevent and address defendant's violations of the law, the rules of evidence, and court-room procedure. While this is always a risk with *pro se* defendants, that risk is particularly acute here. Not only has the defendant exhibited a marked propensity to engage in such conduct abnormal even

---

footnote 1, *supra*, an obvious ploy to obtain an unwarranted adjournment and not a serious renunciation of his *pro se* status.

13

for a defendant who has elected to proceed *pro se*, but, given the Court's determination, *supra*, that the defendant must remain shackled throughout the trial, the Court will be unable to effectively resolve these issues through sidebars out of the presence of the jury, both because moving the defendant will be cumbersome and because doing so would expose the jury to defendant's restraints. The repeated public admonitions of defendant that will invariably result from a jury trial further risk prejudicing any jury against Smith.

The fact that Smith intends to represent himself personally at trial (as he has done, in effect, throughout this case, even when nominally represented by counsel) exacerbates the substantial risk of prejudice already attendant because of the two other issues discussed above. To begin with, the fact that Smith will be conducting his own defense makes it even more likely that the jury will be exposed to his temperamental demeanor and, conversely, his mental health challenges.

Furthermore, it is difficult to see how Smith will effectively conduct his own defense without alerting the jury to the fact that he is in restraints. The Government suggests that the restraints can remain concealed, even if Smith represents himself, if both Smith and the prosecution are required to conduct witness examinations from a seated position at counsel's table. *See* Gov't Opp. (Dkt. 306), at 5. The Court is doubtful that such an approach will prove practical – even if not seen when the jury moves in and out of the court room, it is hard to imagine that a canny juror will not get suspicious having never once seen defendant stand up during a two-week trial -- and more

14

fundamentally, the requirement that the defendant remain seated and constrained to counsel's table burdens his constitutional right to confront the witnesses against him. *Cf. Cohn*, 481 F. Supp. 3d at 131-32 (overruling Government's objection to bench trial based, in part, upon potential that COVID-19 precautions could burden defendant's constitutional right to testify on his own behalf during any jury trial). Further, if Smith's restraints are inadvertently revealed, it will be even more damaging to his defense than if he were represented by counsel. *See Lakin v. Stine*, 431 F.3d 959, 965 (6th Cir. 2005) ("When a shackled defendant represents himself, the jury is faced with a constant reminder that the defendant is shackled as he makes statements, questions witnesses, and introduces evidence. The presence of shackles on a man pleading his case is hard to ignore and creates a significant risk that he will be prejudged and can eviscerate the presumption of innocence guaranteed to all defendants.").

Though the Government vehemently opposes Smith's last-minute request to depart from the *pro se* election he previously made (in order to obtain an adjournment of trial), the Government inexplicably has also suggested that the Court might resolve the aforementioned concerns by simply terminating Smith's self-representation if his conduct during a jury trial proved disruptive. Gov't Opp. (Dkt. 306), at 3-4. It is true that the Court retains discretion to "terminate [the] self-representation [of] a defendant who deliberately engages in serious and obstructionist misconduct." *Faretta*, 422 U.S. at 834 n.46. But this caveat was meant to prevent "abuse [of] the dignity of

15

the courtroom," *id.*, not to preserve the Government's limited and defeasible "right" to a jury trial over the defendant's objection.[5] Smith's right to represent himself is constitutional in nature and flows directly from the Sixth and Fourteenth Amendments. *See Indiana v. Edwards*, 554 U.S. 164, 170-71, 178-79 (2008); *Faretta*, 422 U.S. at 819-20. The Government's interest in a jury trial, by contrast, arises solely from Rule 23(a) and has no constitutional underpinnings. *See Martin Linen Supply Co.*, 430 U.S. at 574 n.13 ("[T]he prosecution has no constitutionally sanctioned interest in receiving a verdict from the jury . . . ."). To the extent these interests clash, Smith's constitutional interest in representing himself plainly must prevail, notwithstanding the qualified nature of this right or Smith's own tactical equivocations. *See Cohn*, 481 F. Supp. 3d at 131 (noting that, in deciding whether to overrule the Government's objection to a bench trial, "[c]ourts have considered whether a government objection to nonjury trial results in an unfair infringement on the exercise of constitutional rights . . . ."); *cf. Lewis*, 638 F. Supp. at 579 (overruling Government's objection to bench trial where jury trial would violate defendant's First Amendment rights).

---

[5] Indeed, the case *Faretta* cited for this proposition, *Illinois v. Allen*, 397 U.S. 337 (1970), expressly acknowledged that "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case" and "[n]o one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." *Id.* at 343. In the exercise of its discretion, the Court believes the best way to manage defendant's "contumacious" behavior is to simply hold a bench trial.

Even were the Court permitted to override Smith's decision to represent himself on the grounds suggested by the Government (thereby occasioning the very delay that the Government elsewhere opposes), or accede to Smith's last-minute request to have his standby counsel appointed as his full-time counsel, it is doubtful that doing so would ensure that Smith receives a fair trial. As noted, Smith has demonstrated a marked inability to work effectively with appointed counsel, and it is thus unclear whether, even if the Court were to require the use of appointed counsel, Smith's counsel would be able to effectively conduct Smith's defense consistent with her or his ethical obligations. *See Faretta*, 422 U.S. at 834 ("[W]here the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him.").

In sum, each of the aforementioned factors -- a violent and mentally troubled defendant, prone to impermissible outbursts, who will need to be shackled and who will be representing himself (whether formally or in fact) -- is alone sufficient to justify overruling the Government's objection to a bench trial. And the confluence of these factors in this exceptional case creates a massive risk of prejudice that conducting a bench trial is uniquely capable of resolving. Accordingly, the Court finds that proceeding with a jury trial solely on the basis of the Government's unpersuasive objection to a bench

17

trial would create an exceptional and unavoidable risk that the defendant will be denied the right to a fair trial.

## IV.

A bench trial would substantially eliminate all of the above concerns. The Court is familiar with Smith's mental health issues and can simply disregard them, as will the Court disregard the existence of shackles. So why does the Government refuse its consent? The Government has declined to say, as is its right. *See Singer*, 380 U.S. at 37. Nonetheless, the absence of any justification for the Government's objection remains relevant to the analysis. Beyond the inadequate remedial measures proposed by the Government, addressed above, the Government appears to simply argue that any residual prejudice is insufficient to deny the defendant a fair trial. *See* Gov't Opp. (Dkt. 306) at 3-5. To support this contention, the Government cites a variety of cases where the court denied a defendant's request for a mistrial on facts the Government asserts were even more prejudicial than those here. *Id.*

The Government's argument fails, and the cases it cites are distinguishable, not only because most of these cases involved situations in which the defendant had demanded a jury trial, but also because, more generally, the determination of whether a defendant has received a fair trial necessarily depends upon the relief requested by the defendant and the availability of alternative procedures. "[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews*

18

*v. Eldridge*, 424 U.S. 319, 334-35 (1976) (internal quotation marks omitted). Rather, determining whether the dictates of due process are satisfied requires a weighing of both the public and private interests at stake. *See id.* ("[R]esolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected."); *Hamdi v. Rumsfeld*, 542 U.S. 507, 528-29 (2004) ("[T]he process due in any given instance is determined by weighing the private interest that will be affected by the official action against the Government's asserted interest, including the function involved and the burdens the Government would face in providing greater process." (internal quotation marks omitted)).

The Government cites several cases that "declined to grant mistrial applications following a defendant's outburst in front of a jury, even in cases where defendants had to be physically restrained by the Marshals or engaged in such sustained, disruptive behavior that they were removed from the courtroom." Gov't Opp. (Dkt. 306), at 4. But those cases do not stand for the broad proposition that, following such an outburst, a curative instruction directing the jury to ignore it is sufficient to eliminate the risk of prejudice. Rather, those cases -- which, it must again be emphasized, involved defendants who had declined to waive their right to a jury trial -- rest their holdings upon the absence of any better alternative. Where the defendant has elected a jury trial and then created the potential prejudice through his own conduct, granting the defendant's request

19

for a mistrial at best gives a defendant a free do-over of any trial the defendant believes is going poorly, and at worse effectively requires dismissal of the indictment if there is no way to prevent similar conduct at future trials. The Government thus has a substantial interest in allowing the trial to proceed in such circumstances, an interest that, in the instant case, is entirely obviated by allowing the case to proceed as a bench trial.

The lead case cited by the Government, *United States v. Bentvena*, 319 F.2d 916 (2d Cir 1963), neatly illustrates this point. In that case, one of the defendants engaged in repeated, disruptive conduct throughout the course of trial. "[T]he trial judge instructed the jury to ignore the outbursts each time they occurred" and took steps to prevent their repetition, but refused to declare a mistrial. *Id.* at 929-31. The Second Circuit affirmed, finding "[t]he judge did all in his power to minimize the[] effect" of these outburst. *Id.* This holding was not rooted in any conclusion that the curative instruction completely eliminated the prejudice, but instead was based on the finding that the judge, faced with defendant's election of a jury trial, did all he could under the circumstances. *See id.*[6]

---

[6] In addition to asking the court to declare a mistrial, certain of the defendants in *Bentvena* also asked that their case be severed from that of the particular defendant who was being disruptive. *Id.* at 930-31. However, the trial judge denied that request after finding that the disruptive conduct was "deliberate and calculated to disrupt the trial" to the benefit of all defendants. *Id.* at 932. Therefore, to the extent there was an alternative short of declaring a mistrial, this intentional conduct rendered it similarly unpalatable.

The due process balance shifts fundamentally where, as here, the defendant has agreed to waive his right to a trial by jury. In such circumstances, another method of avoiding the prejudice to defendant -- other than repeated and potentially fruitless do-overs -- becomes available, and the Government's stake in the controversy contracts to the far more limited interest in having a trial before a jury versus a judge.

The Government here has declined to articulate a specific interest in having a trial by jury in this case. While, as noted, they are not required to do so, *Singer*, 380 U.S. at 37, where it is crystal clear, as here, that a bench trial, rather than a jury trial, is the "most likely to produce a fair result," *id.* at 36, the Government's insistence upon the inferior form of adjudication violates defendant's due process rights.

## V.

The Court remains mystified why the Government has refused to consent to a bench trial in this case. It cannot be that the Government has a policy of never consenting to criminal bench trials; indeed, this judge has in recent years conducted such trials with the Government's consent,[7] as have his colleagues.[8] The Court is not yet

---

[7] *See United States v. Rosen*, 716 F.3d 691, 694 (2d Cir. 2013); *Steele v. United States*, 2005 WL 704868, at *3 (S.D.N.Y. Mar. 29, 2005).

[8] *See, e.g., United States v. Sialeu*, 524 F. App'x 734, 735 (2d Cir. 2013); *United States v. Pouryan*, 628 F. App'x 18, 20 (2d Cir. 2015); *United States v. Libous*, 645 F. App'x 78, 79 (2d Cir. 2016);

# SPA-76

forced to the conclusion that the Government simply wants to parade Mr. Smith, with all his troublesome tendencies, in front of a jury, knowing it will prejudice him and make conviction more likely. But even if this is not the case, the Court finds the Government's unexplained insistence upon a jury trial in this case both striking and troubling. *See generally United States v. Allen*, 644 F. Supp. 2d 422, 431 (S.D.N.Y. 2009) (noting the "special role" prosecutors have in our system of justice "not solely to advocate for the guilt of the defendant" but also to seek "truth and fairness"). In any case, it is the Court's duty to guarantee Mr. Smith a fair trial, and thus, for the forgoing reasons, the defendant's request for a bench trial is hereby granted, the Government's objection is overruled, the defendant's latest request for an adjournment is denied, and the trial will go forward, as scheduled, beginning on November 27, 2023 as a bench trial.

SO ORDERED.

New York, NY
November 15, 2023

JED S. RAKOFF, U.S.D.J.

---

*United States v. Mazza-Alaluf*, 2011 WL 308266, at *1 (S.D.N.Y. Jan. 27, 2011).

22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
 UNITED STATES OF AMERICA,

      -v-                                    22-cr-352 (JSR)

 JATIEK SMITH et al.,                        ERRATUM

            Defendants.
└─────────────────────────────────┘
```

JED S. RAKOFF, U.S.D.J.:

        Regarding the Memorandum Order in this case filed on November 15, 2023 (Dkt. 311), the word "metal" on page 11, line 10 is hereby corrected to read "mental".

        SO ORDERED.

New York, NY
November 16, 2023

_____
JED S. RAKOFF, U.S.D.J.

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| UNITED STATES OF AMERICA, |
| -v- |
| JATIEK SMITH et al., |
| Defendants. |

22-cr-352 (JSR)

ORDER

JED S. RAKOFF, U.S.D.J.:

Defendant Jatiek Smith, with the aid of standby counsel, has submitted the latest in his repeated requests for an adjournment of trial so that he can further review discovery material, most of which he has had access to for many months. *See* Dkt. 315. The Government opposes the two-week extension requested by Mr. Smith but consents to a three-day adjournment. *See* Dkt. 316.

The Court has a better solution. Most of the difficulties of which Smith complains relate to conditions in the MDC, but, if the trial goes forward as firmly scheduled on November 27, Mr. Smith will be in the courtroom from around 9:30 AM to 4:30 PM each day and therefore free of many of the problems he has encountered at the MDC (although he will remain at least partially shackled). Accordingly, while the request for adjournment is hereby denied and trial will commence as scheduled on November 27, the Court will accord Mr. Smith up to a two-hour break before each major witness so that Mr. Smith can further review, with the aid of standby counsel, the materials relevant to each such witness before the witness is called to testify.

1

To still further accommodate Mr. Smith's request, the trial this Monday will not commence until 10:30 AM, at which time the Government will give its 20-minute opening statement and announce who its first witness is. At that point, the Court will recess for up to two hours (or less if Mr. Smith so requests) so that Mr. Smith can review any previously unreviewed materials relating to said witness, either in the cell block room adjoining the courtroom or, if Mr. Smith prefers, in the courtroom itself (in which case, all prosecution personal will be excluded from the courtroom during the relevant period). After the trial recommences at approximately 1 PM, Mr. Smith may then give (if he so chooses) a 20 minute opening statement, after which the Government's first witness will then be called to testify, with the likelihood that, if the testimony extends past the afternoon close of court business, Mr. Smith will have a still further opportunity to review materials when he returns to the MDC for the evening.

SO ORDERED.

New York, NY
November 21, 2023

JED S. RAKOFF, U.S.D.J.

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

   -v-

JATIEK SMITH et al.,

        Defendants.

---

22-cr-352 (JSR)

ORDER

JED S. RAKOFF, U.S.D.J.:

Following conclusion yesterday of the taking of evidence in the bench trial of this criminal case, defendant Jatiek Smith timely moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Count I of the indictment charges Smith with racketeering conspiracy in violation of 18 U.S.C. § 1962(d) and Count II charges Smith with extortion conspiracy in violation of 18 U.S.C. § 1951. In support of Count I, the Government alleges the conspirators agreed to engage in a variety of predicate criminal acts, including, *inter alia*, evidence tampering in violation of 18 U.S.C. § 1512(c)(1), which makes it a crime to "corruptly . . . alter[], destroy[], mutilate[], or conceal[] a record, document, or other object, or attempt[] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding."

At the close of trial, the only evidence the Government had presented to support the predicate act of conspiracy to violate 18 U.S.C. § 1512(c)(1) was the alleged attempt by Smith to break one of his two cellphones when confronted by an FBI Agent with a warrant for its production. (Smith later turned over the phone). For the

1

reasons already largely stated on the record, *see* Dec. 11, 2023, Trial Tr., the Court concludes that no rational trier of fact could find beyond a reasonable doubt that the alleged attempt to break the phone (which Smith denies) was pursuant to an agreement between Mr. Smith and his alleged co-conspirators to engage in conduct of a kind that would constitute a violation of 18 U.S.C. § 1512(c)(1). *See United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). Accordingly, with respect to the alleged predicate act of conspiring to violate 18 U.S.C. § 1512(c)(1), the defendant's motion pursuant to Federal Rule of Criminal Procedure 29 is hereby granted. In all other respects, the defendant's motion is hereby denied.

New York, NY
December 12, 2023

_____
JED S. RAKOFF, U.S.D.J.

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -v- | 22-cr-352 (JSR) |
| JATIEK SMITH et al., | OPINION |
| Defendants. | |

JED S. RAKOFF, U.S.D.J.:

On March 2, 2021, defendant Jatiek Smith was stopped by federal agents at Newark International Airport while returning to the United States from Jamaica. The federal agents demanded that Smith turn over his cellphone and the password to unlock it. They then manually reviewed his phone and created an electronic copy of its entire contents, all without obtaining a search warrant. Earlier in this case, Smith filed a motion to suppress all evidence obtained from this search on the grounds that the search violated his Fourth Amendment rights. *See* Mot. to Suppress (Dkt 158). In an Opinion and Order filed on May 11, 2023, the Court agreed that this warrantless copying of the entire contents of Smith's phone did not fall within the "boarder search exception," and that accordingly Smith's Fourth Amendment rights were violated, but the Court nevertheless declined to suppress the evidence, concluding that the good faith exception applied. *See* March 17, 2023, Bottom-line Order (Dkt. 183); May 11, 2023, Opinion and Order (Dkt. 219).

In a footnote to the May 11 Opinion, the Court indicated that, while Smith had not raised a Fifth Amendment challenge, the Court

1

would likely have rejected such an argument. *See* May 11, 2023, Opinion and Order (Dkt. 219), at 4 n.3. In response, Smith moved for reconsideration of the May 11 Opinion, this time asserting that his Fifth Amendment rights were violated when federal agents allegedly forced him to turn over the password to his cellphone. *See* Mot. for Reconsideration (Dkt. 227). The Court denied Smith's motion for reconsideration by "bottom line" Order, dated November 6, 2023, Dkt. 302, but promised that a written explanation of that ruling would follow in due course. The instant Opinion sets forth the reasons for that ruling. The Court assumes familiarity with the facts of this stop, which are set forth in the Court's prior Opinion. *See* May 11, 2023, Opinion and Order (Dkt. 219), at 3-7.

*   *   *   *   *

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To qualify for the Fifth Amendment privilege, a communication must be [1] testimonial, [2] incriminating, and [3] compelled." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 189 (2004). The Court does not reach the question of whether Smith was in fact compelled to turn over his phone password, because it finds that the first two elements of the Fifth Amendment privilege -- that the act of providing the password was testimonial and incriminating -- are not satisfied.

For the privilege against self-incrimination to be implicated, there must be some communication or communicative act that is

2

"'testimonial' in character." *United States v. Hubbell*, 530 U.S. 27, 34 (2000) ("The word 'witness' in the constitutional text limits the relevant category of compelled incriminating communications to those that are 'testimonial' in character."). So, for example, the privilege does not extend "to the [compelled] giving of blood samples, to the giving of handwriting exemplars [or] voice exemplars, or to the donning of a blouse worn by the perpetrator." *Fisher v. United States*, 425 U.S. 391, 408 (1976). "The act of exhibiting such physical characteristics is not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief." *Hubbell*, 530 U.S. at 35. On the other hand, the Fifth Amendment privilege is not limited to speech as such. The privilege also protects against compelled incriminating acts that themselves have some "communicative aspects of [their] own." *Fisher*, 425 U.S. at 410. For example, if a criminal defendant is forced to sign a written confession, she is not literally testifying, but compelling the defendant to affix her signature to the document would nevertheless violate the Fifth Amendment.

The case law policing the line between testimonial and non-testimonial conduct has developed largely in the context of document subpoenas propounded upon criminal defendants. In *Fisher v. United States*, the Supreme Court held that the <u>contents</u> of incriminating <u>documents</u> sought through a subpoena -- which were created prior to the issuance of the subpoena -- were not themselves testimonial, but also noted that the <u>act</u> of compliance with a subpoena could be testimonial.

3

425 U.S. at 410 (noting that the act of identifying responsive documents "has communicative aspects of its own, wholly aside from the contents of the papers produced"). Specifically, by complying with a subpoena, a defendant "tacitly concedes the existence of the papers demanded," that the papers are in the "possession or control" of the defendant, and that the produced documents are, in fact, those requested in the subpoena (i.e. that they are authentic). *Id.* The *Fisher* Court thus found the compelled act of producing documents has some testimonial aspects and could raise Fifth Amendment concerns. *Id.; see also Hiibel* 542 U.S. at 189 ("[T]o be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." (quotation omitted)).

At the same time, the *Fisher* Court acknowledged a limitation on this so-called "act of production" doctrine, finding that, on the facts of that case, the defendant's Fifth Amendment rights had not been violated because "[t]he existence and location of the papers [were] a foregone conclusion and the [defendant] add[ed] little or nothing to the sum total of the Government's information by conceding that he in fact ha[d] the papers." *Fisher*, 425 U.S. at 411. "Thus, because these communicative elements -- (1) the existence of the documents, (2) the [defendant's] possession or control of the documents and (3) the authenticity of the documents -- were a foregone conclusion, compliance with the summons became a 'question . . . not of testimony but of surrender.'" *United States v. Greenfield*, 831 F.3d 106, 115 (2d Cir. 2016) (quoting *id.*).

4

# SPA-86

This limitation to the act-of-production protection, which has come to be known as the "foregone conclusion" doctrine, stems from the requirement that a communication not only be testimonial but also incriminating. "The Fifth Amendment prohibits only compelled testimony that is incriminating." *Hiibel*, 542 U.S. at 189. The bar for testimony to be incriminating is not high: "[T]he Fifth Amendment privilege has been found to extend not only to answers that are directly incriminatory but also to those that, while not themselves inculpatory, 'would furnish a link in the chain of evidence needed to prosecute the claimant.'" *Greenfield*, 831 F.3d at 114 (quoting *Ohio v. Reiner*, 532 U.S. 17, 20 (2001)). But where it is a "foregone conclusion" that (a) the subpoenaed documents exist, (b) that the defendant controls the documents, and (c) that the documents are authentic, the testimonial aspect of a defendant's act of production is not incriminating, and the defendant's Fifth Amendment privilege is not violated. *See Fisher*, 425 U.S. at 411 (suggesting that, where the act of production "adds little or nothing to the sum total of the Government's information," then "by enforcement of the summons no constitutional rights are touched" (internal quotation marks omitted)).

The Second Circuit has not addressed how the act of production and foregone conclusion doctrines apply in the context of compelled decryption of an electronic device. However, the Eleventh Circuit —— the only federal appellate court to rule on the question —— has suggested that for the foregone conclusion doctrine to apply to the compelled decryption of a hard drive, "the Government [must] show with

# SPA-87

'reasonable particularity' that, at the time it sought to compel the act of production, it already knew of the materials" on the electronic device. *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1346 (11th Cir. 2012). This "reasonable particularity" requirement comes from cases in the document subpoena context that hold that a subpoena must describe the location and existence of the documents sought with "reasonable particularity," such that the subpoena strips the act of compliance of its incriminating, testimonial character. *Greenfield*, 831 F.3d at 116 (quoting *In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, 1 F.3d 87, 93 (2d Cir. 1993)).

This Court respectfully disagrees with the Eleventh Circuit. Specifically, this Court finds that importing the "reasonable particularity" requirement from the document subpoena context to the compelled decryption context in this manner is inappropriate, in that it fails to account for the differing testimonial character of the act of decrypting a device. Unlike the act of responding to a subpoena, the act of physically unlocking a smartphone or providing the password does not communicate anything about what files exist on the phone, whether the files were created by the defendant, or whether the files are authentic. Rather, the testimonial significance of unlocking a cellphone or providing the password is the implied statement: "I am the person who knows the password for this phone." If the defendant's ownership of the phone or his possession of the password are in doubt, compelling the defendant to decrypt the device may be an incriminating

6

# SPA-88

testimonial act. But if the Government can independently show the phone belonged to the defendant and that the defendant knew the password, the foregone conclusion doctrine applies, and the Fifth Amendment is not violated by the act of compelled decryption. *See* Orin S. Kerr, *Compelled Decryption and the Privilege Against Self-Incrimination*, 97 TEX. L. REV. 767, 782-85 (2019) (persuasively arguing for such a rule). This approach is consistent with that adopted by the highest courts of Massachusetts and Illinois. *See People v. Sneed*, --- N.E.3d ---, 2023 IL 127968, ¶ 104 (Ill. 2023) ("[F]or the [foregone conclusion doctrine] to apply, the State must establish that, at the time it sought the act of production, it knew with reasonable particularity that (1) the passcode existed, (2) the passcode was within defendant's possession or control, and (3) the passcode was authentic."); *Commonwealth v. Jones*, 117 N.E.3d 702, 711 (Mass. 2019) ("The Commonwealth must therefore establish that a defendant knows the password to decrypt an electronic device before his or her knowledge of the password can be deemed a foregone conclusion under the Fifth Amendment."); *see also United States v. Spencer*, 2018 WL 1964588, at *3 (N.D. Cal. Apr. 26, 2018) ("[T]he government need only show it is a foregone conclusion that Spencer has the ability to decrypt the devices.").

Applying this rule here, it is clear that Smith's Fifth Amendment rights were not violated because the Government knew that Smith was

the owner of the phone and that Smith knew the password to unlock it.[1] The phone was on Smith's person at the time of the stop and there is no evidence that Smith attempted to deny ownership. This is consistent with a contemporaneous Department of Homeland Security report describing the incident. *See* Dkt. 230-2 ("SA Kew noticed SMITH's phone was on the counter in front of SMITH and detained it. SMITH got irate and began to yell asking why we're detaining his phone." (emphasis added)). As for Smith's knowledge of the password, Smith concedes in his motion and accompanying declaration that he used the cell phone in front of the CBP agents before they ever asked for the password, thereby admitting his knowledge of the password. Mot. for Reconsideration (Dkt. 227), at 3; Smith Decl. (Dkt. 226-2) ¶ 9(d). Therefore, the Court finds that the foregone conclusion doctrine applies, and Smith's Fifth Amendment rights were not violated.

SO ORDERED.

New York, NY
December 13, 2023

_____
JED S. RAKOFF, U.S.D.J.

---

[1] An open question under the foregone conclusion doctrine is the standard of proof the Government must satisfy. Some courts have adopted a preponderance of the evidence standard, whereas others require clear and convincing evidence. *See* Orin S. Kerr, *Compelled Decryption and the Privilege Against Self-Incrimination*, 97 Tex. L. Rev. 767, 789 (2019). The Court need not resolve this question because the parties do not address it and, on the facts of this case, both standards would be satisfied.

SPA-90

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -v- | 22-cr-352 (JSR) |
| JATIEK SMITH et al., | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND VERDICT |
| Defendants. | |

JED S. RAKOFF, U.S.D.J.:

*Pro se* defendant Jatiek Smith (also known as "Tiek") is charged with one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and one count of extortion conspiracy, in violation of 18 U.S.C. § 1951, arising out of allegations that Smith and his co-conspirators engaged in a pattern of extortionate conduct to dominate the fire restoration industry. Prior to trial, Smith elected to proceed *pro se* (but ably assisted by standby counsel, namely Russell Capone, esq.) and to be tried by the Court sitting as jury. *See* Nov. 11, 2023 Memorandum Order (Dkt. 311). Smith's case was tried in a ten-day bench trial between November 27, 2023 and December 11, 2023.

## I.  Findings of Fact

Based on the record presented at trial -- the transcript of which is hereinafter referred to as "Tr." -- and the Court's evaluation of the witnesses' credibility and demeanor -- the Court makes the following findings of fact:

1

A. **The Fire Restoration Industry**

1.   The "fire restoration industry" refers to the businesses that redress and repair properties that have suffered damage from fires or exposures to fires. Within this industry, "fire restoration companies" (sometimes referred to as "emergency mitigation services companies," or simply "fire mitigation companies" or "restoration companies") provide emergency mitigation services, demolition, and construction services to properties that have suffered such damages. Tr. 547, 667.

2.   Another group of participants in the fire restoration industry are the insurance adjusters, also referred to as "public adjusters." A public adjuster represents the property owners in their claims made against the insurance companies that insure their properties. Tr. 209, 664-66, 838.

3.   The term "chasing fires," as conventionally used in the industry, refers to a fire mitigation company's or public adjuster's efforts to solicit business from the owners of fire-damaged properties. Tr. 197-198, 668. Traditionally, there was an "open market" for chasing fires, with several companies in the fire restoration industry competing at the scene of the fire to solicit the business of the homeowner or owners. Tr. 198, 555, 681, 1294. A fire mitigation company has been "retained" when it signs a contract with a property owner, a process known as "signing a fire." Tr. 556.

4.   While public adjusters and restoration companies serve different roles within the industry, they are nevertheless in indirect

2

competition. Both public adjusters and restoration companies will chase fires in an attempt to be the first to sign any given fire. If a public adjuster is the first one to sign a fire, that adjuster will then often refer any restoration work to the adjuster's preferred restoration company, and while these recommendations to homeowners are not binding, as a matter of course they are frequently accepted. The same is true in reverse: when a restoration company is the first to sign a fire, they will frequently refer the homeowner to their preferred public adjuster. Tr. 380-81, 688-75.

B. **Smith's Rise Within First Response**

5.    "First Response" is a fire mitigation company at the center of this action. Tr. 186. While First Response primarily operates in Brooklyn, Queens, and Staten Island, it also does business in the Bronx and Manhattan. GX 1000D; Tr. 467-68, 1225. Insurance companies, which operate across the country, pay for First Response's services. Tr. 556, 666.

6.    Carl Walsh, the owner and founder of First Response, hired Jatiek Smith in approximately October 2019. Tr. 200, 1289. By early 2020, Smith had become a manager for First Response, Tr. 202; GX 206, 207, and in that role Smith assumed responsibility for substantial aspects of First Response's operations, including its hiring decisions, supervision of "chasers" (individuals who solicit business for fire restoration companies), and the selection of public adjusters and sub-contractors to use on a job. Tr. 203-04, 1118-23, 1291-93. While Walsh retained legal ownership of First Response, in practice

3

Smith effectively took control over many aspects of the business from Walsh and by early 2020 was understood to be its leader. Tr. 185, 203-04, 550, 960, 1086; GX 315D. Smith is a member of the Bloods street gang. Tr. 191-92; 1309-10, 1244.

7.   Upon gaining control over hiring decisions at First Response, Smith brought in several individuals who became part of his inner circle at the company. For example, Smith hired Sequan Jackson, another member of the Bloods, who became Smith's second-in-command. Tr. 186, 192, 1120. As early as March 2020 Smith also brought in two of his relatives, Hasim Smith ("Hasim"), also known as "Hoodie," and Jayquan Smith, also known as "Jay." Around the same time, he also hired Anthony McGee (a member of the Bloods), also known as "Touch," and Eric Perez, also known as "Indio." Still others Smith brought into First Response shortly thereafter were Kaheen Small, also known as "Biz" (by May 2020); Manny Pereira (by May 2020); Damon Dore, also known as "Demo" (by September 2020); and Rahmiek Lacewell, also known as "Ready" (by September 2020). Tr. 207, 222, 300, 343, 547-49, 583, 1119-1120, 1290-93; GX 301, 306, 319. Smith's inner circle also included Octavio Peralta, Smith's preferred public adjuster. Tr. 663-664.

8.   Smith, Jackson, McGee, Small, Hasim, Lacewell, Dore, Pereira, Jay, Perez, and Peralta constituted an association-in-fact enterprise (the "Enterprise"), which was a continuing unit although the precise membership of the Enterprise somewhat changed over time. The Enterprise closely overlapped with First Response, but the

4

Enterprise with its own rules, structures, and objectives, extended beyond this legal entity. For example, while Walsh was the legal owner of First Response, in practice Smith as the effective boss of the Enterprise not only ran many aspects of First Response's operations, but also dictated policy to Walsh. Tr. 185, 203-04, 550, 960, 1086; GX 315D. Further, in March 2022, when, as explained below, Walsh fired all of the aforementioned First Response employees, the Enterprise continued in existence, with Smith orchestrating a system whereby other fire restoration companies would hire former First Response chasers and continue to pay those chasers and Smith. Tr. 29-31, 290-95; GX 648. Smith then changed the name of First Response to "Fire Response," also referred to as "Before Tiek After Tiek" or "BTAT," and maintained an ongoing enterprise, also using the company name "Solid Smith." Tr. 294, 325-26.

9. The members of the Enterprise communicated regularly, including in a WhatsApp group chat. Tr. 211, 554; *see, e.g.*, GX 301, 313, 316, 319, 351, 353A-C, 357A-C, 378. They also frequently met in a parking lot on Knapp Street in Brooklyn, often wearing their red First Response jackets. Tr. 562; GX 326, 509-11. Several of these individuals traveled to Los Angeles together. Tr. 207; GX 204. In a June 2020 meeting, which Jackson, McGee, Hasim, Jay, Perez, and Pereira attended, Smith referred to these individuals as his "family." Tr. 188, 578-79; GX 311B. In a February 9, 2023 recording, Smith, in an apparent reference to these individuals, also stated: "Cause everybody was brothers and everybody was sticking together when we was in the

5

street. When the money was going and everybody was getting money, everybody was brothers." GX 454, GX 1215.

### C. Clash with AES

10. When Smith joined First Response, American Emergency Services ("AES") was First Response's primary competitor. Tr. 1128. It was understood that AES chasers would sometimes use threats and violence at the scene of fires in order to obtain business. Tr. 402–03, 1064, 1100, 1129. AES was particularly dominant when it came to chasing fires at night, as AES apparently felt more willing to exercise threats of violence when it was dark. Tr. 389-90. After Smith became a manager at First Response and hired more fire chasers for the company, tensions between First Response and AES began to escalate.

11. On May 4, 2020, the dispute between First Response and AES came to a head when, at the scene of a fire, several AES workers got into a physical altercation with several First Response employees, including Jackson, Hasim, Jay, and Perez. Tr. 219-23. Prior to the fight, Smith called Jackson and told Jackson to go to the site of the fire that AES had signed. Smith also directed Jackson to bring a gun. Tr. 221. Once Jackson arrived at the fire, Smith asked Jackson to give him the gun, and Jackson complied. Tr. 221. At one point, someone from AES told First Response, "Y'all Blood n*****s is pussy." Tr. 221. Jackson struck the AES worker with a large Husky flashlight. Tr. 221. A fight ensued, and someone from AES fired a gun at Jackson. Tr. 222. At the end of the fight, Smith returned to Jackson the gun Smith had obtained from Jackson, without it having been discharged. Tr. 222-23.

12.  On May 5, 2020, Smith, along with Jackson and three other members of the Enterprise, went to an AES warehouse to assault AES's owners in retaliation for the events of the prior day. Tr. 224-28; 1322-23. Prior to the assault, Smith and Jackson discussed "stak[ing]" out the warehouse and then "press[ing]" the AES bosses -- i.e., "assaulting them" and "threatening them." Tr. 224. Once they arrived, Smith and his crew waited for the AES bosses -- or the individuals who they thought were the bosses -- to be alone so that they could outnumber them. Tr. 226-27, 1336-37. Once the two individuals who they thought were the AES bosses were alone, Smith directed Jackson to get out of the car. Tr. 227. At Smith's signal, Jackson and other Enterprise members then began punching the AES employees. Tr. 227; GX 701 (video recording of assault).

13.  After assaulting these individuals, who turned out not to be the owners of AES, Smith and several other Enterprise members including Jackson drove to a construction site where AES workers were stationed, in search of the owners of AES. Tr. 227-30. Smith exited the car, walked to the AES workers, and demanded that they put their boss on the phone. The workers obliged. Once on the phone with Eddie McKenzie -- one of the AES owners -- Smith said, within earshot of the AES workers, "I'll beat your workers up right now." Tr. 230, 1178. Jackson and the remaining Enterprise members stood across the street to intimidate the AES workers. Tr. 231. Jackson testified that the

workers looked scared and that the purpose of the intimidation was to keep those workers from returning to work. Tr. 231.[1]

14.    On the evening of May 5, 2020, Smith recorded a conversation with an AES worker named Boggs. Tr. 1338; GX 315A - 315D. During this conversation, Smith effectively acknowledged that he had agreed with others to assault AES workers and that he knew the assaults were criminal. Tr. 1340-41; GX 315B ("They could give us gang assault. They could give us gang assault in the second degree, it was three of us. . . . No, yeah, but—but you see how far I thought? I know the charges. I know the penal laws to it. I know all of that. I know everything that comes with what I'm doing. Only thing that none of us will escape is the con—is the conspiracy. That's what none of—none of will escape the conspiracy. None of us."). Referencing the recent altercations with AES, Smith stated, in part: "If we'd have let that fucking tek go, if there wasn't a precinct around the corner from y'all shop -- if there wasn't a precinct we'd have let that tek go. We'd have let that tek go to send a message." GX 315B. A "tek" referred to an automatic weapon, such as a TEC-9 and the "precinct" referred to a police precinct. Tr. 530-31.[2] In other words, Smith told Boggs -- who worked for AES -- that he would have shot the AES employees "to send

---

[1]    Smith denies making any such threat to AES workers, but the Court finds Jackson's testimony to be more credible on this score. *See* Tr. 1179-80.

[2]    A New York City Police Department precinct was located around the corner of the AES warehouse where the aforementioned assault occurred. GX 523; Tr. 169.

a message" if there hadn't been a police station around the corner. During this call, Smith also told Boggs that Smith "beat the whole Service Master up," referring to an incident where Smith assaulted two chasers from another restoration company, A.J. and Mark, after they signed a fire on Staten Island which Smith viewed as his own territory. GX 315A, Tr. 248-49, 534; *see infra* ¶ 24.

15.  After the May 5, 2020 assault, Smith, Jackson, Jay, and Hasim met with McKenzie at a Wendy's parking lot. Tr. 233. Smith and McKenzie had a conversation in McKenzie's car. Tr. 234. Jackson observed McKenzie through the car window, and McKenzie appeared as if he was sobbing and scared. Tr. 234-35. After Smith's meeting with McKenzie, Smith told Jackson that he demanded $100,000 from McKenzie for AES to be able to chase fires moving forward. Tr. 234-35. If McKenzie did not pay the $100,000, Smith would not allow AES to work and would continue to use violence against them. Tr. 244.[3]

16.  A few months later, Smith arranged another meeting with McKenzie at the Knapp Street parking lot in Brooklyn. Tr. 235-236; GX 509. Prior to the meeting, Smith met with Jackson, McGee and Small. Tr. 242. Smith gave McGee his gun and told McGee not to kill McKenzie, but if he needed to shoot, only to shoot McKenzie in the leg. Tr. 242.

---

[3]     Smith claims that he never demanded money from McKenzie, but instead that it was McKenzie who offered Smith $100,000 to work for him. Tr. 1187. The Court finds Jackson's contrary testimony in this regard more credible. Further, the Court notes that, if McKenzie made this offer to Smith only after being repeatedly threatened -- as the record demonstrates he was -- that offer to pay Smith would nevertheless be extortionate given the surrounding circumstances.

# SPA-99

Small was directed to put McKenzie in the back of Small's truck and ride around with McKenzie to scare him. Tr. 242-43.

17.   When McKenzie arrived at the parking lot, he came with a driver/bodyguard named "Po." Tr. 238. Smith, who knew Po as a fellow member of the Bloods, chastised Po for working for McKenzie, at which point Po declined to assist McKenzie further. Tr. 239. Smith again demanded $100,000 from McKenzie, stating in substance, "Didn't I tell you to pay that bread? Like, didn't I tell you to pay that fucking money? You really think it's a game out here?" Tr. 239. McGee, at Smith's direction, emerged from behind a dumpster and cocked a gun. Tr. 239, 1342. McKenzie appeared scared and pleaded with Smith to take it easy. Tr. 239-40. McGee demanded that McKenzie sit down; when McKenzie did not, McGee pistol whipped him. Tr. 240. Smith again demanded money from McKenzie ("Yo, didn't I fucking tell y'all to make sure, make sure -- like I told you to pay that bread.") and directed Small to pull up to the parking lot and throw McKenzie in the back of the car. Tr. 240. McKenzie then ran away. Tr. 240-41.[4]

---

[4] The events outlined in this paragraph are based principally on the testimony of Jackson, who was present. Smith recounts a different version of these events wherein McGee and Small were only summoned after a car of four other individuals supporting McKenzie arrived. Smith claims that he never demanded money from McKenzie during this encounter, McKenzie was not pistol whipped and McKenzie ran away the moment he saw McGee brandishing a gun. Tr. 1192-95. Pereira recounted how he overheard Smith bragging about these events on a later occasion, which tends to corroborate Jackson's testimony. Tr. 585-87. To the extent it is material, the Court finds Jackson's version of events to be more credible, although the Court notes that even on Smith's telling, the purpose and effect of this encounter appears to have been to intimidate McKenzie and AES.

18. By approximately June 2020, as a result of Smith's intimidation, AES was no longer chasing fires. Tr. 1343; GX 311A (recording of Smith from June 2020 stating that "AES is not out here. Nobody -- if I'm not capitalizing, if I'm not capitalizing off it, nobody's capitalizing off it."). The Government put forward substantial evidence -- including the testimony of four independent witnesses -- that the reason AES ceased chasing fires was the threats and violence of Smith and co-conspirators. Tr. 219 (Jackson testifying "Q: Ultimately what, if anything, did Tiek do to AES? A: He got them out of the industry. He stopped them from chasing."), 234-235, 682-83 (Peralta testifying that "[t]he outcome of the whole situation [with AES] was that they [AES] were not allowed to come out."), Tr. 884 (Vargas, the owner of another restoration company, testifying he was told by Smith AES "weren't around anymore" because AES "didn't follow [Smith's] rules"), Tr 1128-29 (Walsh testifying he was told by Smith AES was no longer chasing fires because "There was a fight and they were scared to come back in the street"). The fact AES completely exited the industry is particularly striking given that, before May 2020, AES was the largest player in the industry. Tr. 929, 1073.

19. Smith offers a somewhat more complex account of First Response's feud with AES, seeking to characterize AES as the aggressor. For example, Smith and Walsh both testified that, between the first and second meetings with McKenzie described above, someone from AES threatened Smith and conveyed a list of "rules" First Response was required to follow. Tr. 1079, 1181, 1183-84. Smith further testified

11

that McKenzie hired at least two individuals to "stop" Smith, including one who was supposedly tasked with murdering Smith. Tr. 1190-91. Even if the Court were willing to credit this testimony (which it does not), the Court, as explained more fully in the Court's Conclusions of Law below, finds it to be largely immaterial to the legal questions at issue.

### D. The Enterprise Imposes Rules on the Industry

20.  After AES left the industry, Smith imposed a set of rules on fire restoration companies that had once competed. Tr. 209, 663, 682; GX 311B ("I make the policy"). These rules came to be known as the "rotation system." Tr. 250-55, 681-82. While the rotation system somewhat evolved over time, the essence of the system was that each fire chaser from each participating restoration company would be allocated one fire in consecutive, rotating order. If a company signed a fire, but it was not their turn in the rotation, they would either hold it for the competitor-company whose turn it was or simply sign the fire on the other company's behalf. Tr. 250-55, 564, 639.

21.  The strictures of the rotation system extended to public adjusters. Tr. 276-77, 684; GX 319. Under this system, public adjusters were supposed to check with Smith (or, later, Jackson once he began running the rotation at Smith's request) before hiring a restoration company. Tr. 278-79; GX 319 (Smith instructing Small to "have someone come slap" a public adjuster, Lou Ortega, in the face). In addition, First Response gave substantial business to Peralta, who received 75 percent to 80 percent of First Response's fires and made more money

12

through First Response than he had previously. Tr. 684. Furthermore, Smith changed the prevailing fee structure for public adjusters. By law, a public adjuster's fees are capped at 12.5 percent of the loss amount. Tr. 669-70. To get retained by the property owner, adjusters often negotiated a rate lower than 12.5 percent, such as at 4 to 6 percent. Tr. 669-70. However, prior to Smith's entry into the restoration industry, public adjusters routinely got up to 20 percent of the contract by getting a kickback from the restoration company that the adjuster hired. Tr. 669-70. As Smith gained greater control over fires, Smith limited a public adjuster's fee to that specified in the adjuster's contract (i.e., 12.5 percent or less), and kept the kickbacks for himself. Tr. 685.

22. Several features of the rotation system were designed so as to favor Smith and the Enterprise. *First*, fires would be allocated first to chasers from the Enterprise, and only after their quotas had been satisfied would fires be allocated to chasers from the various other participating restoration companies. Tr. 254-55, 564, 881, 1306.

23. *Second*, fires that occurred during the night (i.e., between 8 p.m. and 8 a.m.) belonged to the Enterprise. Tr. 246-47, 883, 1298-99; GX 311F; GX 311G. What this meant in practice appears to have changed over time. At first, after AES was forced out of the industry, First Response appears to have taken AES's place as the dominant force during the nighttime, engaging in intimidation tactics to monopolize nighttime fires. Tr. 247, 1298 (Smith testimony: "Q: But separately, the nighttime belonged to First Response, right? A. That was after the

AES situation."); GX 311F (Smith stating to EFS in June 2020, "Oh, but then listen, the nighttime belongs to us. Point blank. The nighttime belongs to us. Like we really shot it out for the nighttime. The overnight belongs to us."); GX 311G. Later on, once the rotation system became formalized and companies began paying Smith to be a part of the system, there is some evidence that the Enterprise began allocating some night fires through the rotation. Tr. 533, 1301. But critically, the Enterprise retained control over nighttime fires and used them as leverage to ensure members of the rotation system continued paying to participate. Tr. 533 (Jackson testifying: "We [First Response] were signing [fires] for [other restoration companies] because, one, if it was at night, [other restoration companies] wasn't coming out at night. That wasn't happening. So we would sign it for them because they either paid Tiek or had somebody else on the payroll for them that Tiek recommended.").[5]

24.  *Third*, fires that occurred on Staten Island also belonged to the Enterprise. Tr. 248. On one occasion, two chasers from Service Master, "A.J." and "Mark," signed a fire on Staten Island. Tr. 248-249. In response, Smith assaulted A.J. and Mark, and chased down another Service Master worker. Tr. 249. Hasim then signed the fire for First Response. Tr. 249-50; GX 315A (Smith stating: "I beat the whole

---

[5]    To the extent Smith denied monopolizing night fires during trial, his testimony was not credible. For example, when questioned on cross, Smith could offer no plausible explanation for the statement he made to EFS that "the nighttime belongs to us. Point blank. The nighttime belongs to us." GX 311F; *see* Tr. 1298-301.

ServiceMaster up. Me, by myself, I beat the entire ServiceMaster up, and I'm waiting—I'm waiting to catch Patty. I'm waiting—I'm lurking—I'm lurking to catch that n***a Patty. I'm lurking."). On another occasion, a chaser named "Sharif" signed a fire in Staten Island. After Smith threatened him, Sharif backed down and Smith signed the job. Tr. 248-49.

25.   Smith testified that Staten Island fires would be allocated through the rotation system as well. Tr. 1264. This contradicts Jackson's testimony, which the Court found to be more credible on this score. Further, Benjamin Vargas -- whose company was a member of the rotation system -- testified that he was never allocated a fire on Staten Island through the rotation system, which corroborates Jackson's testimony. Tr. 946-47.

26.  For a restoration company to be part of the Enterprise's rotation system, it had to pay Smith or one of his chasers. Tr. 253, 683-84. The companies that paid to be in the rotation system included ServPro Upper West Side ("ServPro"),[6] EFS, Flag, Upper Restoration ("Upper"), East Coast, Service Master and CPR. Tr. 270, 284-90, 1201-11, 1301; GX 649. Some of these payments were made via checks, but

---

[6]     As detailed more fully *infra*, ServPro is a national franchise, with franchise locations throughout New York and elsewhere. Here, however, unless otherwise indicated "ServPro" refers specifically to ServPro Upper West Side, owned by Benjamin Vargas.

many payments were made using cash and still other companies paid Smith by performing work on his family home. Tr. 284-90.[7]

27.   Companies that refused to make payments to participate would be removed from the rotation. Tr. 283, 291-92. Companies that refused to comply with the rules of the rotation system would be subject to threats and intimidation. Tr. 247-49, 283, 565. Restoration companies outside of the rotation system would be subjected to threats and intimidation by Enterprise members when they attempted to chase fires. Tr. 187, 191, 208-09, 252-54, 283. While other restoration companies still did chase outside of the rotation system, the Enterprise did not allow such outside companies to become a major presence. Tr. 253-54 (Jackson testifying that a chaser who came out only occasionally would not necessarily be threatened because "[i]t's only one fire"). As a result of the rules implemented by the Enterprise, and the intimidation tactics it used, the Enterprise signed the majority of fires for First Response. Tr. 252, 564.

### E. The Enterprise Enforces Its Rules Through Violence and Threats of Violence

28.   Jackson, who the Court found in general to be a highly credible witness, testified at a high level that Smith and Enterprise members used threats and intimidation against restoration companies

---

[7]   Smith points out that Upper restoration company was in the rotation system by at least November 2021, but the financial summaries of payments by Upper show the company did not start making payments via check until April 2022. Smith Summation at 18. However, Jackson testified that Upper paid Smith in cash, which fully explains this supposed discrepancy.

that refused to participate in the rotation system. Tr. 187, 191, 209, 252-54, 283. When Smith directed his crew members to engage in conduct he did not want to be easily traced back to First Response, he told them to wear black. Tr. 315-17, 738, 1131-32; GX 378. In addition to the clashes with AES described *supra* Section I.C, the assault on Service Master described *supra* paragraph 24, and the assault on Peter Rafferty described *infra* paragraphs 62-64, the Government has presented evidence of at least five other specific assaults carried out by members of the Enterprise.

a. Assault of Phil Navarra

29. Even before the creation of the rotation system, Smith and his co-conspirators began developing (indeed, cultivating) a reputation for violence. In March 2020, Jackson was at the scene of a fire with Phil Navarra, a public adjuster with New York Adjustments. Navarra refused to put First Response on a fire, after which Jackson and Navarra got into a verbal disagreement, which another member of First Response filmed. GX 301, 304; Tr. 209-15, 1248. Jackson relayed the disagreement to Smith. Smith then ordered an individual whom Smith knew named "Teo," a member of the Bloods, to assault Navarra.[8] The assault was recorded, and the video of the assault shows Teo repeatedly

---

[8] Smith testified that assaulting Navarra was Jackson's idea and that it was Jackson who ordered the assault be carried out. Tr. 1248-49. The Court finds Jackson's testimony on this score to be credible. Regardless, even Smith does not dispute that he was aware of, and acquiesced in, the assault before it occurred, and that he offered to share the video of the assault with other industry participants (presumably for its intimidating effect).

punching Navarra, who is seated in a car, in the head. Tr. 215-16, 692-93, GX 305. The reason for the assault, as recounted by Jackson at trial, was that "Phil was . . . trying to stop us from getting fires so . . . [Smith] was tired of it and [Smith] said I got something for him." Tr. 216. Smith acknowledged that he offered to show the video to industry participants, including in a meeting with EFS in June 2020 (discussed *infra*). Tr. 1318-19.

b. Assault of Thomas Muratore

30.   On September 15, 2020, Smith directed McGee to assault Thomas Muratore, a public adjuster who worked for Friedman Adjustments. Tr. 296-97, 527; GX 316. The assault was carried out at the direction of Smith. Tr. 296-97, 527, 747, 1131, 1245, 1247. McGee directed Pereira to film the assault, although Pereira did not arrive at the scene in time to do so. Tr. 577-78. The assault was carried out to retaliate against Muratore's employer, Jeff Friedman, after Friedman kicked First Response off of a fire. Tr. 693-94, 747-48, 1245-47.[9] Smith chastised Pereira for failing to record the assault and later deducted money from Pereira's paycheck. Tr. 578.

31.   Muratore was 67 years old at the time he was assaulted. Tr. 841. As a result of the assault, Muratore was hospitalized for a night, lost a tooth, cut his lip, and suffered a brain bleed. Tr. 841. In his

---

[9]   Smith disputes that he ordered the assault, testifying that Walsh was the driving force behind the assault. However, Smith concedes that he agreed that the assault should be carried out and that the assault occurred in retaliation for First Response being kicked off a fire. Tr. 1245-47.

18

34 years as a public adjuster, Muratore had never before been assaulted on the job. Tr. 841.

### c. Assault of Richard McCormick

32.   Richard McCormick is a public adjuster. Tr. 796. On November 13, 2020, McCormick signed a loss located at 505 East 93rd Street in Brooklyn. Tr. 569-70, 619; GX 313. Pereira approached McCormick and asked whether First Response could be retained as the restoration company. 797-98. McCormick said that he would not retain First Response because there was not enough damage to warrant the retention of a restoration company. Tr. 798. After Pereira told Smith that McCormick would not sign First Response, Smith told Pereira to get McCormick on the phone. Tr. 571. Smith insisted that ServPro would do the restoration work, in an apparent attempt to allocate the fire pursuant to the rotation system. Tr. 798. McCormick told Smith that the loss was too small to justify bringing in a fire restoration company. Tr. 571, 799.

33.   After Smith spoke to McCormick, Smith called Pereira. Tr. 571. Smith was angry and told Pereira to wait at the scene of the fire for McGee, who was on his way to assault McCormick. Tr. 571. Smith himself admitted at trial that he then told one of his co-defendants to "slap the shit out of" McCormick. Tr. 1242. After McGee arrived in a dark sweatshirt, McGee punched McCormick in the face. Tr. 299; 572. McCormick fell down, striking his face on a pillar. Tr. 572, 800; GX 703, 704. Pereira recorded the assault from the inside of his car at Smith's direction. Tr. 571-72; GX 312, 314. Smith was displeased with

19

the quality of the video; as a result, Pereira got in trouble. Tr. 573. Smith used the McCormick assault video to intimidate other industry participants. Tr. 322-23, 573.

34.  Smith testified that ServPro had already signed the fire that gave rise to this dispute, and that McCormick had in fact kicked ServPro off of the fire. Tr. 1239-41. This series of events is supported by what appears to be a signed retainer agreement dated November 12, 2020 -- the day before McCormick was assaulted -- between ServPro and the owner of this property. *See* DX 417; *see also* DX 200; Tr. 619-20. But even accepting Smith's testimony regarding this series of events (which is contradicted by both Pereira's and McCormick's testimony), that would not change the fundamental import of this assault, which was that McCormick was assaulted for denying a fire to a member of the rotation system.[10]

d. Assault of Jimmy Johnson

35.  Jimmy Johnson is a public adjuster who was assaulted at Smith's direction by Small. Tr. 310-12. Jackson and Smith both agree that the assault occurred, but offer conflicting reasons for it.

---

[10]   Smith testified that McCormick said he would work with First Response (or ServPro) only if Smith gave him an outsized percentage of the overall restoration work. Tr. 1241-42. To the extent it is material, the Court credits Pereira's and McCormick's description of these events, which were internally consistent and attributed McCormick's refusal exclusively to the size of the fire. However, even if the Court were to accept Smith's narrative, that would not excuse the assault.

## SPA-110

36. According to Jackson, the assault concerned Johnson's refusal to comply with the rotation system. Jackson testified that, prior to Johnson's assault, Johnson spoke with Jackson. Tr. 310. Jackson told Johnson to put a restoration company, Flag, on a particular job. Tr. 311. Johnson told Jackson that he did not want to put Flag on the job. Tr. 311. Smith then got on the phone and also told Johnson to put Flag on the fire. In response, Johnson hung up on Smith. Tr. 311-12. Smith then instructed Small to have someone assault Johnson, but in the end Small committed the assault himself. Tr. 311-12. Smith later told Small that he should have found someone else to assault Johnson because Small was extremely recognizable (Small stands about seven feet tall and is perhaps over 300 pounds). Tr. 312, 502.

37. Smith testified that the reason for the assault on Johnson had nothing to do with the rotation system. Rather, Smith testified, he overheard Johnson use a racial slur, and, separately, Johnson had given a homeowner a check that should have been given to First Response, and as a result First Response would need to sue the homeowner to recover the funds they were owed. Tr. 1250-53.

38. Having considered the demeanor, motives, and other factors related to the credibility of these two witnesses, the Court finds Jackson to be the more credible, on this score (as elsewhere). Moreover, the Court notes that even if Johnson were assaulted over a business dispute not specifically related to the rotation system (i.e. improperly giving a homeowner money owed to First Response), that would still tend to show the Enterprise's willingness to use violence

21

to achieve its objectives and would have still served as an "object lesson" for other industry participants in the future.

        e. <u>Reiss Lane Assault</u>

39. First Response had a construction job at a property located at 37 Reiss Lane on Staten Island. Tr. 312-13. Multiple issues arose during the course of construction, including delays and safety issues, and as a result the homeowner threatened to kick First Response off of the job. Tr. 518-19, 1254, 1392, 1394-95. When Smith attempted to address these issues with the construction crew, he apparently got into a dispute with the individuals working there, who were refusing to listen to his instructions. Tr. 1254.

40. On October 18, 2021, Smith directed Jackson to go to the property. Tr. 314. Lacewell and Dore were also at the property. Once Jackson arrived, Smith told Jackson that the construction workers were not respecting Smith and not listening to him. Tr. 320. Smith directed Jackson to take his First Response shirt off and put on his black clothing. Tr. 315, 320. Jackson and Lacewell both removed their First Response shirts and then returned to the construction site. Tr. 319; GX 706A. A van was parked in such a way to block the construction workers from leaving because Smith did not want the workers to be able to leave. Tr. 320-21. Smith pointed out to Jackson a particular construction worker, later identified by law enforcement as Juan Siguencia. Tr. 321. Jackson, in turn, smacked Siguencia with an open hand. Siguencia began to bleed and suffered a cut on his face. Tr. 321-22; Tr. 541-42.

22

41. Smith then demanded ID cards from the workers and photographed the cards. Tr. 322. A photograph of Siguencia's ID card was found on Smith's phone, with a creation date of October 18, 2021. GX 375, 1215. Jackson testified the purpose of taking the photos of these individuals' IDs was so that Smith knew where they lived and could (presumably) threaten them. Tr. 322. Smith, by contrast, testified that the sole purpose of taking these photos was to confirm whether all of the workers were OSHA certified. Tr. 1257. Smith's version of events is at least partially corroborated by Walsh, who testified First Response had issues with work-place accidents in the past and so was focused on ensuring OSHA compliance. Tr. 1087. The Court, however, need not resolve this factual dispute because it has minimal relevance to the case as a whole. Indeed, the only relevance of this entire Reiss Lane incident is that it tends to show the willingness of Smith and members of the Enterprise to use violence to achieve business objectives even with respect to First Response.

F. **The Enterprise Obtains Money and Business Contracts from Industry Participants Through Violence, Threats of Violence, and Economic Fear.**

42. The Government has also presented evidence that five specific individuals or entities were extorted by Smith and his co-conspirators. The Court addresses each in turn below.

a. Benjamin Vargas and ServPro Upper West Side

43. Benjamin Vargas is the owner of ServPro Upper West Side, a franchise of the national organization of ServPro. Vargas has been in the fire restoration industry for 13 years. Vargas's offices are in

23

Manhattan, and he solicits business in all New York City boroughs. The national organization of ServPro does business in Florida and New Jersey as well as New York. Tr. 876-77, 937-38; DX 213, at 48:00.

44.   In approximately 2020, Smith called Vargas and told Vargas to meet him outside a deli in Staten Island. Tr. 879. Vargas traveled to the meeting with two of his chasers. Tr. 879-80. Once he arrived, Vargas met Smith, who had brought approximately eight to nine people with him, including Jackson. Tr. 880-81. Smith proceeded to tell Vargas the "rules": Smith had all nighttime fires, and priority access to the initial daytime fires each month. Tr. 880-81. Smith further told Vargas that he would not negotiate. Tr. 880. Vargas understood Smith to mean that, if he did not follow Smith's rules, he would not be able to work. Tr. 880-81. Vargas was scared following this meeting. Tr. 881. He had never attended a meeting like this before, and no one had previously told him that he could not solicit fires at night. Tr. 881-82.

45.   Several months later, Smith directed Vargas to meet him at Peter Luger's Steakhouse. Tr. 882. During that meeting, Smith reiterated his rules and told Vargas that, if Vargas wanted to participate in the rotation system, he had to pay Smith $1,000 a week. Tr. 883. During the meeting, Smith told Vargas that if his rules were not followed, he would hurt families and children. Tr. 883-84. Smith offered up AES as an object lesson during this meeting, telling Vargas that AES was not around anymore because they did not follow Smith's rules. Tr. 884. Vargas was scared following the meeting. Tr. 884.

24

Vargas also testified that, in addition to physical fear, Vargas believed that if he did not accede to Smith's demand, it would negatively affect his business because he would be unable to chase fires. Tr. 969.

46.   Following this meeting, Vargas agreed to pay money to Smith, sometimes in cash. Tr. 286, 885-86.  Initially, he paid Smith weekly payments of $1,000. Tr. 883-84; GX 358, 1209. Vargas also paid Smith a commission on top of the weekly payments. Tr. 888; GX 358. Then, in late 2020 or early 2021, Smith demanded that Vargas increase weekly payments to $2,000. Tr. 890-91; GX 360, 361, 1209. Vargas agreed because he believed that he did not have a choice. Tr. 891. Vargas reasonably believed that if he tried to solicit fires without paying Smith, Smith would hurt him. Tr. 891-92. From November 13, 2020 to June 22, 2022, Vargas paid Smith through bank transfers 82 times, for a total of $141,000. GX 1209.

47.   The focus of the rotation system was Brooklyn, Queens and Staten Island. However, whenever a member of the Enterprise became aware that ServPro had signed a fire in Manhattan, it would be counted against ServPro's quota of fires for that month. Tr. 937-38.

48.   On or about January 14, 2021, there was a six-alarm fire[11] located in the vicinity of 244 Montrose Avenue, Brooklyn. GX 339, 351, 352; Tr. 904. Smith, Dore, Hasim, Jackson, and Pereira went to this

---

[11]   A six-alarm fire refers to a fire where six domiciles are affected. Tr. 581.

25

# SPA-115

fire. Tr. 588, 906. Smith told Vargas that there were multiple fires and that each EMS company could sign one loss. Tr. 905. Mike Rafael Navarro, one of Vargas's chasers (whose children, as discussed *infra*, Smith had previously threatened to kill), signed two contracts with one owner. Tr. 589, 906-07, 933. Smith became mad. Tr. 589, 907. Smith and a group of individuals took Navarro around the corner. Tr. 907. Vargas tried to calm down Smith, and Smith told Vargas, in substance and in part, "do you really think you are going to stop me?" Tr. 908. Sharif, a chaser for Upper Restoration, proceeded to punch and kick Navarro to the ground. Tr. 301, 589-90, 908-09. Smith told Navarro, in substance and in part, "Why would you play games when you know your family is in jeopardy?" Tr. 910. When the police came, several people ran; Sharif had indicated that he was "packing," i.e., carrying a gun. Tr. 909. After they ran away, Smith stated, in substance and in part, that he was a Blood for life, and that he had a bunch of kids ready to make a name for themselves. Tr. 909. Vargas understood Smith to mean that Smith could call someone to hurt anyone who crossed Smith. Tr. 909. After Navarro was assaulted, and at Smith's direction, Vargas ripped up a contract Navarro had signed on behalf of ServPro, and the loss was subsequently assigned to a different company. Tr. 910.[12]

---

[12] Smith denied any involvement in this fight, testifying that he was simply an observer of a dispute between other restoration companies and did not make any of the statements attributed to him above. Tr. 1258-60. The Court credits Vargas' testimony that Smith made threatening statements to Navarro, particularly given that doing so is consistent with other evidence that the rules of the rotation system were enforced through threats and violence. The Court agrees there is no direct evidence that Smith ordered the assault; however, the assault

49.  In approximately March 2022 (after Walsh fired Smith and others from First Response), Smith told Vargas that he had to pay for two First Response chasers, Jackson and a different Jay. Tr. 900-01. Vargas obliged. Tr. 900; GX 1210 ($1,400 per week for Jackson, for a total of $15,400); GX 1211 ($1,000 per week for Zheng Jiang Zhong, for a total of $10,000). Smith represented to Vargas when he hired these two chasers that they would only be signing fires for ServPro, but Vargas was quickly disappointed, as it became apparent they continued to sign fires for other companies. Tr. 940. Vargas did not believe that he had the option to refuse, because if he did, Smith or his crew would hurt him. Tr. 900.

50.  In addition to the amounts that Vargas paid Smith, Jackson, and Jay (approximately $166,400), Vargas further estimates that he lost between $500,000 to $600,000 in business income per year during the course of the rotation system. Tr. 903.

b. Jordan Boryk and EFS

51.  Jordan Boryk is the owner of EFS, a restoration company. Tr. 188. In approximately June 2020, Smith convened a meeting between EFS and First Response. GX 1215 (entry for GX 310); S6, GX 311A-H. Boryk and other EFS workers, including the same Mike Navarro who was later assaulted as described above, attended on behalf of EFS. Tr. 187-188. Smith brought Jackson, Hasim, Jay, Perez, and Pereira to the meeting.

was plainly carried out to further the broader goals of the conspiracy (i.e. to enforce the rotation system).

Tr. 188. During the meeting, which was held in a parking lot, Smith paced around in front of EFS, taking out his cellphones from his pockets and removing his watch, as if he was trying to get ready to fight or intimidate someone. Tr. 190.

52.   Smith himself recorded that meeting, during which he made the following threats:

a. "When anybody is ready to put on a vest and get a gun, they come on out and play, man. Come on out and play, man, like, but Santos don't you ever call and talk like that again, n***a. Santos. I will pick you up and slam you on your fucking head if you ever call me and talk to me like that again, B." GX 311A, 00:30-00:48.

b. "Get your fucking guns and come out and play because I ain't going to be diplomatic." GX 311A, 2:28-2:31.

c. "Y'all wanna fight it out or shoot it out?" GX 311A, 03:19-03:21.

d. "Mike [Navarro], did we not get your address, Mike? And I told Mike in his face I'll kill that n****'s kid. Y'all, n****s play with me, I'll kill one of your kids. I'll kill one of your kids just to send a message, B. To send a message. Who the fuck y'all n****s think y'all playing with? I'm not a sucker. Y'all n****s think this fire chasing business is something. I'm a gang member. I been gang banging for years, n****. I'll kill one of you n****s to send a message. That's the messages I send, man." GX 311A, 03:59-04:20.

28

# SPA-118

e. "Like I said, if a n***a wanna get busy, I am willing to get busy. Like, I'm willing to get busy. I'll willing to fight. Fuck that nobody n***a don't pick nobody -- I'm willing to fight, get it on, shoot it out, anything, myself, B." GX 311C.

f. "I got ego problems, and I—I don't pretend about it. I got ego problems. I'm willing to clash with anybody's ego to see who's bigger. I'm willing to do it. I'm willing to do it. I'm willing to take the risk. I did 16 years of prison time to show I'll take that risk." GX 311E.

53. During this meeting, Smith explicitly referenced the assault of Phil Navarra, discussed *supra*:

a. "Man, we sat there, and we solicited that shit for three hours and got it. All right. New York did what they did, but now we see New York is playing ball cause when I catch them old n****s, them old n****s gonna get it, too. Them old n****s gonna get it, too. Nobody's exempt from none of this, man." GX 311D, 00:20-00:33.

b. "Like who was there, you was there when we got Navarra beat up right? Phil Navarra?. . . I'll send you the video. Like, it's still reflect on ya'll. It will still reflect on ya'll if ya'll think like with that same shit where they caught the fire and kicked us off. We're not gonna do it. Let's not have that—let's not have that again." GX 311H, 01:45-02:04.

54. During this meeting, Smith acknowledged -- both directly and by implication -- that he had established rules for the industry that

EFS was required to comply with. Early in the conversation, Smith denied the allegation, apparently leveled by an EFS employee, that First Response prohibited EFS from getting *any* fires, thereby implicitly conceding that there were *some* restrictions on EFS obtaining fires. See GX. 311A. Smith repeatedly made clear that he was the one who made the rules. *See* GX 311B, at 1:30-34 ("For everyone standing here, whatever I say is gonna go. Whatever I say is gonna go."); GX 311B, at 1:45-51 ("None of them standing here makes policy. I make the policy, that's it."). And Smith explicitly referenced the rule that only First Response could chase fires at night. GX 311F ("Oh, but then listen, the nighttime belongs to us. Point blank. The nighttime belongs to us. Like we really shot it out for the nighttime. The overnight belongs to us."); GX 311G ("That is not a negotiation. That is not a talk. That is not a conversation. The night truly belongs to us . . . and we willing to make that understood. The night belongs to us.").

55.  EFS attendees looked shocked, scared, and nervous during the meeting. Tr. 192, 580, 1308. Furthermore, when testifying about this recording, Smith acknowledged that he used threats involving guns, his gang membership, and threats to kill children of industry participants. Tr. 1308-10, 1339; 1342; 1349-50. Smith acknowledged that he wanted EFS to understand that, if they upset Smith, there would be violent repercussions. Tr. 1309-11.

56.  In addition to the June 2020 meeting described above, Boryk was threatened by Smith on other occasions. Tr. 285. For example, Smith told Boryk, in substance and in part, "I'm not asking you,"

which Jackson understood to mean that Smith was demanding something from Boryk. Tr. 285. Jackson also stated that Boryk appeared scared during some of his interactions with Smith. Tr. 286. In addition, on one occasion, Smith screamed in front of Peralta, "go shoot Jordan [referring to Boryk]." Tr. 695-96.

57.    From October 2, 2020, to March 26, 2022, Boryk paid Smith on 82 occasions, for a total of $198,546.44. GX 1202. With some exceptions, these payments started as weekly payments of $1,000, which increased in or around January 8, 2021, to $2,000. Beginning on April 15, 2022 until June 25, 2022, EFS paid Anthony McGee weekly, for a total of $12,000. GX 1201.

c. Willon Charles

58.    Willon Charles is a public adjuster for Maximum Adjustments. Tr. 302-03. On the evening of May 24, 2021, Smith, Jackson, Small, Lacewell, Dore and others met Charles at the site of a fire in Queens located at 123-16 145th Street, Jamaica. GX 353A, 353C; Tr. 865-66. Smith wanted to approach Charles about money that Charles owed Smith for other fires. Charles owed Smith this money because Smith expected adjusters whom Smith had put on fires to give Smith a portion of the contract fee that adjusters traditionally negotiated for themselves. Tr. 306-07, 864-66. Furthermore, Smith was upset at Charles about the Queens fire because Charles had charged the maximum 12.5 percent fee. Tr. 306.

59.    Peter Rafferty, an employee of Charles, arrived at the scene during this confrontation between Smith and Charles. Rafferty

31

recalled that there was a large group of workers at the fire, whom he understood, based on their uniforms, to be affiliated with First Response. Tr. 865. When Rafferty got to the fire, he saw Charles standing outside the property in a circle with a smaller group.

60.   As Rafferty approached the group, the conversation between Charles and Smith had become heated. Tr. 308. Charles told Rafferty to go home. Tr. 308. Smith then proceeded to place Rafferty in a headlock. Tr. 308, 867. As Smith put Rafferty in a headlock, Smith said, "Nah, he [Rafferty] got to go nowhere. He's gonna hear the bullshit you about to say." Tr. 308. Smith also told Charles, in substance and in part, "I'll punch your fucking head off right now." Tr. 308. Rafferty, who did not recall the specific things that were said, was fearful and in shock. Tr. 868

61.   While Rafferty was in a headlock, Charles told Smith that he was going to pay Smith and give Smith a percentage of the fire at which they were currently present. Tr. 308-09. On April 25, 2022, a business account for 22 Maximum LLC paid Solid Smith $15,000. Payments from insurance companies take between weeks to months to years, explaining this delay. Tr. 309, 670-71.

> d. Queens Village Fire

62.   Public adjuster Richard McCormick went to a fire in Queens Village in approximately April 2021. Tr. 808. McCormick had been called in by a restoration company called iFlood. Tr. 808-09. The homeowner for the loss agreed to move forward with iFlood, and McCormick was speaking to the homeowner to sign as the public adjuster. Tr. 809.

Shortly thereafter, Jackson, Walsh, Smith, and many other First Response workers arrived. Tr. 809-12. Jackson told iFlood that iFlood needed to rescind its contract. Tr. 810. As a result, iFlood lost the job. Tr. 810. Shortly after this, McCormick approached Walsh to ask him what had happened with iFlood. Tr. 811. During this conversation, Smith approached McCormick and was hostile and angry. Tr. 1125. Smith told McCormick that Walsh was not in charge, and Walsh agreed that he was not. Tr. 812, 1125. Smith also told McCormick that the loss was Smith's. Tr. 1125. McCormick left the fire because he was feeling angina in his chest. Tr. 812.

e. The Mala Sangre Incident

63.   Pereira reported to a six-alarm fire that had multiple losses to sign. Tr. 581. Pereira did not sign any losses, and understood that a general contractor, who spoke Spanish, had control over assigning contracts for the restoration work. Tr. 581. Smith then arrived at the scene of the fire and spoke to the general contractor. Tr. 581. Smith, using intimidating and aggressive body language, asked the general contractor if the contractor knew who Smith was. Tr. 582. Then Smith proceeded to tell the contractor his gang name, Bad Blood, in Spanish -- mala sangre. Tr. 582. Pereira reported that the contractor appeared shaken, and that as a result the contractor assigned the contract for the loss to Smith. Tr. 581-82.

G. **Insurance Fraud**

64.   The vast majority of work performed by First Response and other restoration companies is paid for by insurance companies. If

33

# SPA-123

insurance companies do not pay for any restoration work, as a practical matter that work will frequently go uncompensated, as home owners are rarely in a position to pay. Restoration companies such as First Response therefore have a strong financial incentive to ensure any insurance claim is accepted. Tr. 331-32, 560, 677-78.

65. Typically, homeowner insurance policies have coverage exclusions pursuant to which an insurance claim for fire damage will be denied if certain prohibited or illegal conditions are present on the property. Tr. 331-32, 676-77, 722. For example, coverage might be denied if a homeowner had an illegal stove in the attic or basement, or if they had a second unit -- such as a rented-out furnished basement -- in what was supposed to be a single-family home. Tr. 331, 676-77. Such illegal conditions are frequently concealed from insurance carriers by, for example, removing the offending stove. Tr. 678, 1066. As a result of this practice, insurance carriers wind up paying money to homeowners to which the homeowners are not entitled, which also impacts the money received by the fire restoration companies serving these homeowners. Tr. 678.

66. When First Response, under Smith's leadership, saw illegal conditions in a property, at times it used the fact of those conditions as a tool to get Peralta retained. Tr. 677-78, 680; GX 108 (Peralta to Jackson: "You need Mariano to come down and close it, huh?").

67. When First Response, under Smith's leadership, saw an illegal condition that could interfere with an insurance claim, employees would remove or effectively cover-up that condition and

conceal it from the insurance carrier. Tr. 332-33, 677-78; GX 320, 321, 457, 458. First Response engaged in this fraudulent practice on multiple occasions. Tr. 333, 561; GX 457, 458. For example, photos of the property, with the stove removed, would be sent to the insurance companies, and deceptive claims would be filed. Tr. 561. Public adjusters who worked with First Response, such as Peralta, would communicate with insurance companies by email, fax, or private mail carrier. Tr. 666, 732-33.

68.   In one instance, a Chinese homeowner rented a home to a Muslim family. The policy did not permit rentals. Jackson concealed the problem by, for example, adding a Chinese calendar and adding photographs of the Chinese family to make it look as if the Chinese homeowners, instead of the Muslim family, lived there. The claim was paid by the insurance carrier. Tr. 333.

69.   Smith was aware of and, at least at times, involved in the covering up of illegal conditions. Tr. 332-33 (Jackson testifying he learned about covering up illegal conditions from Walsh and Smith); GX 320 (Smith texting Walsh stating "need the stove taken out of the basement"); GX 321 (similar); GX 457 (recorded conversation where Smith states: "They trying to say that we, that we tampered with, um, the conditions of a fire. That didn't happen every single fire, n***a. In a year, that was probably two fires. That's not a pattern. That is not a pattern."); GX 458 (recorded conversation where Smith states: "God forbid we blow trial to the wire fraud? Because I—I keep telling

everybody that is only thing I could truly see because n***as was moving stoves out.").

## H. Obstruction of Official Proceeding

70.  By November 11, 2021, a grand jury investigation was pending in the Southern District of New York. Tr. 132. In approximately November 2021, Smith and his crew learned that there was a federal investigation into their activities. Tr. 339-40; GX 116 (November 12, 2021 call where Jackson tells Lacewell "they tryin' to indict n****s").

71.  On November 10, 2021, Gerry Curcio, the owner of Cipco, a "board-up" company (a kind of restoration company), contacted Jackson. Tr. 339. At First, Curcio used an intermediary to call Jackson ("Gerry needs to talk to you in person and not over the phone and shit."), but then Curcio spoke to Jackson directly and told Jackson that he was "paid a visit" but didn't "want to talk on the phone." Tr. 339-40; GX 111, 112, 113. Curcio, Smith, and Jackson met later that day, and Curcio told them that federal law enforcement had visited Curcio. Tr. 339-341. Curcio had told law enforcement that he was not being extorted. Tr. 689.

72.  Smith requested to be interviewed by Detective Nick Geroulakis and voluntarily met with him. GX 1000A-D. During the interview, which took place on November 11, 2021, Smith indicated that there had previously been violence in the industry, but claimed that he had stopped the violence because other companies' tactics of intimidation did not work on him and that he was able to deter other companies' violent tactics through Smith's own reputation for

violence, including that he was a member of the Bloods. GX 1000B-C. With regard to the ongoing state of the industry, Smith specifically stated "There's no fighting no more" and "I stopped every single problem. There's no fights. There's no arguments. If you get there first now, you get there first and you go do your thing." GX 1000B.

73. Later in November, Smith hosted a dinner at Baci, a restaurant on Staten Island. Tr. 343. Several members of First Response, including Jackson, Jay, Hasim, and Dore attended, as did representatives of other companies in the industry, including Curcio from Cipco, Bobby Sands from Flag, and Vargas from ServPro. Tr. 343-44; 912-13. Attendance at the dinner was mandatory. Jackson also assisted Smith in organizing the dinner. Tr. 344. In front of these individuals, Smith toasted Curcio for "not lying," doing "some standup shit," and for "stepp[ing] up when the cops approached him [Curcio]" and "going back to tell him [Smith]." Tr. 344, 688-89, 912-13. No threats were exchanged during this dinner. Tr. 506 (Jackson testifying that he did not recall threats being exchanged at this meeting); Tr. 751 (Peralta testifying to same).

74. Sometime after the Baci dinner, Smith held another mandatory meeting in a parking lot outside a Toys "R" Us. Tr. 345, 918, GX 517. The attendees were told to leave their phones in their cars. 917-18. Beyond this, there is conflicting testimony about what occurred at this meeting. In Vargas' telling, Smith said, in an angry tone, "the only reason all of these guys were there was just to stop him [Smith] from killing one" of the meeting participants and that Smith referenced

having guns in connection with this threat. Tr. 917-18. Vargas testified he was nervous because, by that point, Vargas had already begun speaking with the FBI. Tr. 917. Vargas's testimony is at least partially corroborated by Jackson, who recalled that members of other mitigation companies looked shocked and nervous during the meeting. Tr. 347.

75. Vargas's testimony is inconsistent, however, with that of several other individuals who attended this meeting. Smith denies making this threat. Tr. 1271. Peralta testified that he did not hear Smith threaten anyone during this meeting. Tr. 751.[13] Sands -- who according to Jackson was present at the meeting -- testified that he had never been threatened by Smith or felt intimidated at any of these monthly meetings. Tr. 346, 1412-14. Jackson did not recall this threat being made; the only statements Jackson recalled from this meeting were Smith saying he did not know whom he could trust, and that Smith was going to pat down people at the meeting to see if they were

---

[13]    There is some ambiguity about whether Peralta is referring to the same meeting. In offering this testimony, Peralta did not refer to a meeting in a Toys "R" Us parking lot, but instead a meeting in May 2022, whereas Vargas and Jackson did not provide a specific date for the meeting, instead referring to it only by location. Several facts in the record support the inference that this was the same meeting, including (a) Peralta had testified earlier he had attended a meeting in a Toys "R" Us parking lot at some point, Tr. 689; (b) Peralta was a regular attendee at these monthly meetings Tr. 689, 742-43; (c) defendants were arrested in June 2022 and Vargas referred to this Toys R' Us meeting as the "last" meeting, Tr. 912; and (d) Smith testified the Toys "R" Us meeting occurred "a month before" the defendants arrest in June 2022, Tr. 1360. Accordingly, the Court concludes Peralta was referring to the same meeting.

cooperating with the government and wearing a wire. Tr. 346-47. Further, whereas Vargas said Smith brought "all of these guys" to restrain him, Jackson testified that he and Smith were the only members of First Response present at the meeting. Tr. 346, 918. Having reviewed the record as a whole, the Court finds the Government has failed to prove beyond a reasonable doubt that Smith made the threatening statements described by Vargas during the meeting at Toys "R" Us.

76. Smith and Jackson also discussed the investigation with Walsh. Before learning that Walsh was speaking with federal investigators, Smith directed Walsh to meet Smith in Smith's car. Tr. 1133-34. During this encounter, Smith did not speak to Walsh; rather, they communicated by typing out messages on a cellphone, which they passed back and forth. Walsh felt nervous during this meeting. Tr. 1133-34. Smith had previously told Walsh about times that Smith had been violent, including an instance where Smith claimed that he had assaulted one of Smith's ex-bosses. Tr. 1134.[14]

77. Smith eventually tricked Walsh into revealing that Walsh had spoken to law enforcement. Tr. 348-49. After learning this, Smith told Walsh that they "should stick together," which Walsh understood to mean that he should not speak with the FBI. Tr. 1095-96. However,

_____

[14] Smith testified that the fight with his ex-boss was actually a fight with his brother, who was his manager at Amazon at the time, and that the fight was the result of a purely interpersonal dispute. Tr. 1155-57. However, Walsh testified that he was unaware that the assault was against Smith's brother. Tr. 1142.

Smith did not threaten Walsh and did not tell Walsh to lie or exaggerate to the FBI. Tr. 1095-96.[15]

78.   On March 11, 2022, Jackson went to Walsh's home at Smith's direction. Tr. 349-50; GX 901. Their plan was to see if Walsh answered: if he did not, they thought there was a greater chance that Walsh was cooperating. Tr. 349-50; GX 901. Walsh was frightened by this incident, and temporarily moved his family out of their home. Tr. 1137-38.

79.   Jackson testified that he was told by Smith, while they were incarcerated together after being arrested in connection with the instant case, that if Walsh cooperated, members of the Bloods knew where Walsh lived and would go to his house, beat him up, or threaten him. Tr. 360. The record contains no indication that this threat was conveyed to Walsh, either before or after Jackson and Smith were arrested. The record similarly contains no indication that this plan was concocted before the arrest occurred.

80.   After Jackson and Smith were arrested, they were bunkmates at the Metropolitan Detention Center ("MDC"). Together they discussed their trial strategy. While at the MDC, Jackson and Smith prepared a timeline of fabricated events, which Smith instructed Jackson to study.

---

[15]   Walsh also recounted an incident where Smith grabbed Walsh's phone from Walsh's hand, and texted Walsh's lawyer that he should contact Smith's lawyer. Walsh testified this encounter made him feel nervous. Tr. 1135-36. As the Court noted on the record at trial, absent very unusual circumstances that are not present here, a request of one witness or suspect to have another witness's or suspect's lawyer talk with his lawyer is proper, and to suggest otherwise would chill a normal form of defense communication.

Jackson understood that he was instructed to study this fabricated timeline so that he could lie in court. Tr. 352-54; GX 461, 905. While drafting the timeline, Jackson would recount an event that actually occurred, and Smith would respond with an exaggerated and false version of the event for Jackson to write down. Tr. 355. Jackson understood the purpose of this false testimony was to minimize Smith's violence. Tr. 355.

81.   While at MDC, Smith told Jackson numerous lies that Smith intended to introduce at his trial. For example, for the Reiss Lane assault, Smith said he would argue that they took photographs of construction workers' IDs not for intimidation, but for OSHA purposes. Tr. 356. According to Jackson, this was not true: the photographs of ID cards were taken for intimidation. Tr. 356. With respect to the Muratore assault, Smith wanted to argue that Muratore was punched because Muratore had a gambling problem. Tr. 357. To that end, at the time of the assault, McGee told Muratore "Pay my fucking money," so that the assault seemed unrelated to First Response. Tr. 357. Jackson, however, did not believe that Muratore's assault had anything to do with a gambling problem. Instead, Jackson understood that Muratore was assaulted because he did not give First Response a fire. Tr. 296-97, 357. Regarding the McCormick assault, Smith intended to argue that Walsh, not Smith, sent a hit out for McCormick. Tr. 358. According to Jackson, this was not true, because Smith had ordered the assault on McCormick. Tr. 358. For the Jimmy Johnson assault, Smith wanted to argue that Johnson was assaulted because Johnson tried to show Smith

41

# SPA-131

child pornography. To Jackson's knowledge, this was not true. Tr. 358-59. And with respect to Walsh, Smith told Jackson that if Walsh cooperated, Smith would attempt to put all the blame on Walsh and say that Walsh drove all the violence. Tr. 359-60. Jackson did not believe this was true, either. Tr. 360.

82.  Smith also attempted to reach out to witnesses he believed to be cooperating. For example, Smith speculated that Peralta was cooperating and attempted to call him. Tr. 363, 689-90; GX 462. Smith also told Peralta's associate, Quentin, that Smith was disturbed to hear that Peralta was cooperating. Tr. 690-91.

## II.  Conclusions of Law

Applying the forgoing factual findings, the Court makes the following conclusions of law:

### A. Venue

As a threshold matter, Smith challenges the propriety of venue in this district. Smith Summation, at 35. A criminal defendant has the right to be tried in the "district wherein the crime shall have been committed[.]" U.S. Const. amend. VI; *see* Fed. R. Crim. P. 18. Where an offense implicates more than one location, venue is proper "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). In general, "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003).

"Venue is proper for conspiracy charges in any district in which an overt act in furtherance of the conspiracy was committed." *United States v. Lange*, 834 F.3d 58, 70 (2d Cir. 2016) (internal quotation marks omitted). To support venue, an overt act need not be criminal and "can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Id.* Telephonic or electronic communications to or from the venue in furtherance of the conspiracy can also support venue. *Id.* The Government need only prove venue is proper by a preponderance of the evidence. *Id.* at 69.

Although venue need only be established by a preponderance of the evidence, here the Government has proved overwhelmingly that venue is proper in this judicial district. For example, ServPro, which as explained below was a victim of the alleged conspiracies, was based on the Upper West Side of Manhattan. Findings of Fact ("FoF") ¶ 43. Communications in furtherance of the conspiracy were sent to and from there, as were payments made from Vargas. At a bare minimum, it was readily foreseeable that these communications and payments would touch Manhattan, given that ServPro was based there. *See* FoF ¶ 46. In addition, Vargas credibly testified that fires ServPro signed in Manhattan would be counted against ServPro's quota pursuant to the rotation system, demonstrating the extortionate conspiracy extended to this District. FoF ¶ 47. Finally, there is evidence that, at various times, First Response chased fires in Manhattan and the Bronx. FoF ¶ 5.

B. **Extortionate Conspiracy**

One of the two counts lodged against Smith is that at some time between 2019 and June 2022 he joined in a conspiracy to commit extortion in violation of the Hobbs act. *See* Indictment (Dkt. 2) ¶ 13. "In order to prove a conspiracy in violation of 18 U.S.C. § 1951 ('the Hobbs Act'), the Government must show that two or more persons entered into an agreement to commit the substantive offense as charged." *United States v. Zhou*, 428 F.3d 361, 370 (2d Cir. 2005); *see also United States v. Clemente*, 22 F.3d 477, 480 (2d Cir.1994) ("In order to establish a Hobbs Act conspiracy, the government does not have to prove any overt act."). The substantive offense of Hobbs Act extortion, in turn, has three elements: first, that the defendant wrongfully obtained the property of another; second, that the defendant obtained this property with the victim's consent but that this consent was induced by the wrongful use or threat of force, violence or fear (including fear of violence or economic loss); and third, that as a result of these actions, interstate commerce was delayed, obstructed or affected in any way or degree. *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 400-03 (2003); *Stirone v. United States*, 361 U.S. 212, 218 (1960); *United States v. Gotti*, 459 F.3d 296, 324 (2d Cir. 2006).

"[I]ntangible property can qualify as extortable property under the Hobbs Act regardless of whether its exercise, transfer, or sale would be legal." *Gotti*, 459 F.3d at 325. Thus, extortable property can include, for example, the right to operate a business or solicit future

44

business in a particular geographic area. *See, e.g., United States v. Tropiano*, 418 F.2d 1069, 1072-75 (2d Cir. 1969) (holding that "'the right to do business' in the Milford area" was "property" within the meaning of Hobbs act); *United States v. Cain*, 671 F.3d 271, 282 (2d Cir. 2012) (affirming *Tropiano* is still good law and upholding Hobbs Act conviction where defendant used violence in an attempt to "induce his competitors to cede their right to solicit business to" the defendant).

The <u>first element</u>, requiring the consensual transfer of property, is here plainly satisfied. The property in question took one of three forms. First, Smith, acting through the Enterprise received, or attempted to obtain, direct monetary payments from all of the victims. *See* FoF ¶¶ 26, 46, 57, 61. Second, Smith, acting through the Enterprise, took business contracts from certain victims, in the form of fires that had already been signed by a company but were then transferred to another. *See* FoF ¶¶ 20-25. Third, Smith, acting through the Enterprise, took, or attempted to obtain, the right to solicit business in particular areas and at particular times from certain victims. *See* FoF ¶¶ 18-19, 22-25; *see also Tropiano*, 418 F.2d at 1072-75.

The <u>third element</u>, requiring some effect on interstate commerce, is also satisfied. ServPro, for example, is a national franchise with locations in at least New York, New Jersey and Florida. FoF ¶ 43. Further, the insurance companies making the payments were frequently

45

located out-of-state or had operations that were national in scope. FoF ¶ 5.

It is the second element, requiring that the transfer of property have been induced by the wrongful use or threat of force, violence or fear, that Smith chiefly disputes. Of course, since the charge is conspiracy, the Government does not have to prove any actual instances of such extortion but only an agreement which Smith joined to commit such extortion. But in fact the Government has proved numerous instances in which Smith and his co-conspirators confirmed their agreement by actually carrying out such extortion. Specifically, of the six specific instances in which the Government alleges that Smith and his co-conspirators carried out such extortions, namely the alleged extortions AES (McKenzie), ServPro (Vargas), EFS (Boryk), Willon Charles, iFlood, and an unnamed contractor during the "mala sagure incident," the Court finds the Government has proven beyond a reasonable doubt that the first four extortions occurred in furtherance of an agreement-to-extort entered into by Smith and his co-conspirators. Specifically, the Court concludes as follows:

a. AES

The Government has proven beyond a reasonable doubt that Smith and his co-conspirators agreed to extort McKenzie and AES in at least two respects. First, Smith and other members of the Enterprise attempted to extort McKenzie and AES by demanding that AES pay $100,000 to continue chasing fires. FoF ¶¶ 15-19. While there is no evidence as to whether AES actually made this payment, the fact that it was

46

demanded, when combined with the other evidence in the record, supports the existence of a conspiracy to extort money from AES.

Second, Smith and his co-conspirators successfully extorted AES by forcing them out of the fire chasing business, and thereby obtaining the right to chase in the areas where they were previously chasing, and by obtaining the business contracts they otherwise would have obtained. *See* FoF ¶ 18-19; *see also Tropiano*, 418 F.2d at 1072-75 (concluding the right to conduct and solicit business in a particular area constituted extortable property). Accordingly, the Court concludes that Smith and other members of the Enterprise agreed to extort AES.

In his written summation, Smith goes to great lengths to claim that AES was the aggressor in this conflict and that he was simply responding to their violence. Smith Summation, at 4-10. But even assuming *arguendo* that Smith initially was simply responding to AES's own allegedly violent tactics, that fact is of minimal relevance to the question of whether AES was itself eventually extorted. For example, the record unequivocally demonstrates that First Response was willing not only to meet AES's alleged violence, but also to exceed it. Smith admitted during his testimony that he obtained the personal addresses of AES workers, told the AES workers of that fact, and threatened to kill their families. Tr. 1235-36; GX 311A. Several witnesses who were victims of First Response's violence and intimidation testified that they had never experienced violence from AES. Tr. 830-31, 945-46. Indeed, when Smith met with detective

47

Geroulakis, Smith made the following statement regarding AES that the Court finds telling: "I'm not what they are. Like, I'm a criminal trying to work and stay home. They was just regular fucking civilians trying to be criminals." GX 1000B.

It was virtually undisputed at trial that AES stopped chasing fires after these events occurred. Smith offers no plausible alternative explanation for AES's exit, and in his summation relegates discussion of this question to a single, highly speculative footnote. Smith Summation, at 10 n.6. The Court concludes beyond a reasonable doubt that AES exited the industry as a result of violence and threats of violence perpetrated by Smith and his co-conspirators. *See* FoF § I.C.

### b. Members of Rotation System

While AES was forced out of the industry, other companies were also extorted by being forced by threats to join the rotation system that Smith created and controlled to his benefit. As detailed more fully in the Court's findings of fact, *supra*, the Government has put forward multiple kinds of evidence demonstrating Servpro and EFS were also coerced into participating in the rotation system, to their economic detriment and to the advantage of Smith and his co-conspirators.

Indeed, the very structure of the rotation system, which was designed to favor First Response and the Enterprise over other participants, supports an inference of coercion. First Response received the first fires each month, received all of the fires in

48

Staten Island, and monopolized fires that occurred at night. *See* FoF ¶¶ 22-25. It is unclear why an industry participant would voluntarily agree to such a system, let alone pay to participate in it, when it is so heavily skewed in favor of its competitor. As a result, after AES was forced out of the industry First Response was signing the majority of fires. FoF ¶ 27. While Smith disputes that he monopolized night fires and Staten Island fires, the Court finds the Government's evidence on this score totally persuasive.

Smith argues that the purpose of the rotation system was to reduce conflicts between competitors and to ensure that all chasers got a minimum number of fires each month. Smith Summation, at 16-17.[16] But the fact these were among the stated purposes of the rotation system does not respond to the skewed nature of the system. Nor can it explain or justify the evidence of threats and violence used to enforce the system, as further discussed below. Offering up these benign explanations for the rotation system is akin to a mobster calling extortion payments "protection money."

Smith also argues that the payments he received were not made in connection with the rotation system but were instead payments for Smith's fire chasing services. Smith Summation, at 18-19. The Court finds this explanation to be totally implausible. *See* FoF ¶ 26. Smith admitted at trial that Smith was receiving payments from at least five

---

[16]    As noted at trial, the fact that this might constitute an antitrust violation is entirely irrelevant to the issues before the Court here.

companies at once -- ServPro, Service Master, East Coast, Upper and Flag -- while also being paid his $118,000 salary from First Response. Tr. 1293, 1301, 1303. The notion that these payments had nothing to do with the rotation system, and Smith was just such a good chaser that it was otherwise worth it for all these companies to pay him, cannot be credited. Smith may well have described these payments as a "salary" for chasing fires, but that label cannot be allowed to obscure the economic reality that they were also payments forced on these competitors by the Smith-skewed rotation system. Indeed, Peralta testified at trial that the way a restoration company would, under duress, become part of the rotation system was "hire Tiek or one of Tiek's guys as a chaser." Tr. 684.

When testifying at trial, Smith nonetheless insisted that any fires he or his crew signed pursuant to these bonus payments were outside of the rotation system, were not counted towards the rotation, and were distributed directly by Smith. Tr. 1301-04. But the notion that fires were being allocated wholly outside of the rotation system undercuts Smith's own account of the purposes of that system -- reducing competition amongst restoration companies and evenly allocating fires between them. And even if Smith's testimony on this score were credited, that would still support a finding that rotation system members were being extorted: the exclusive power to allocate fires outside of the rotation system that Smith claims he possessed would itself have been a means for Smith to monetize his control over the rotation system, because only by paying Smith could rotation system

members increase their total number of fires. Accordingly, whether one labels the payments as fees to participate in the rotation system, as Jackson credibly testified was the case, or as compensation for Smith's chasing services, the result is the same: Smith was extorting rotation system participants to pay him in exchange for fires.

Further, even if (contrary to fact) the Court were to conclude these payments were not themselves a direct result of extortion, the Court would still find that members of the rotation were deprived of the opportunity to chase fires at night and in Staten Island as a result of threats and intimidation. *See* FoF ¶¶ 22-25. As with AES, the coerced surrender of the right to chase fires itself constitutes an act of extortion.

The simple fact is that the Government has put forward substantial evidence that violence and intimidation by Smith and his co-conspirators were used to enforce the rotation system. Jackson, who was Smith's second in command and whom the Court found to be a highly credible witness, testified that threats and intimidation would be used against competitors who initially declined to join the rotation system, and that threats and intimidation were also used to enforce the rotation system rules for those who had joined. FoF ¶¶ 27-28. Indeed, the Government presented evidence from numerous witnesses of at least six specific acts of intimidation carried out by Smith and his co-conspirators against participants in the industry, in addition to the violence against AES described above. FoF ¶¶ 11-19, 24, 28-38, 58-60. These include the threats or acts of intimidation directed at

51

Navarra, Muratore, McCormack, Johnson, A.J. and Mark from Service Master, and Rafferty.[17]

Smith argues that the Government has not put forward any evidence of physical assaults against members of the rotation system. Smith Summation, at 19-20. Aside from totally being untrue -- for example, Smith previously assaulted two Service Master chasers who signed a fire in Staten Island (Smith's territory) and  an employee of Vargas was assaulted by a rotation system member when he violated the rotation's rules, *see* FoF ¶¶ 24, 56-60 -- proof that members of the rotation were actually physically assaulted is unnecessary. The critical question is whether members of the rotation system were threatened or intimidated in furtherance of an extortionate conspiricy. As described more fully below, the Government has presented credible evidence that both ServPro and EFS were threatened by Smith. *See* FoF §§ I.F.a-b. Further, the imposition of the rotation system occurred right after First Response forced AES out of the industry through the use of violence, a fact that would no doubt have been on the mind of any industry participant approached by Smith.[18]

---

[17]     While the Government has also proven that an assault occurred at Reiss Lane, it is not clear the extent to which that assault was tied to the purposes of the conspiracy.

[18]     Indeed, when threatening both EFS and ServPro, Smith made specific reference to AES. GX 311A ("AES is not out here. Nobody -- if I'm not capitalizing, if I'm not capitalizing off it, nobody's capitalizing off it."); Tr. 884.

Further still, the evidence of specific assaults against public adjusters, even if not directly against rotation system members, is also highly relevant. Smith attempts to waive these assaults away because they did not involve specific acts of extortion. Smith Summation, at 11-12. But even assuming *arguendo* that these specific assaults were not extortionate, they nonetheless support the inference that the charged conspiracy exists. All of these assaults directly relate to the Enterprise's core purpose of dominating the fire restoration industry: McCormick and Johnson were assaulted because they refused to give fires to members of the rotation system, Muratore was assaulted because his employer kicked First Response off a fire, and Navarra was assaulted because he refused to work with First Response. *See* FoF §§ I.E.a-d. Not only does this demonstrate a willingness of the Enterprise to use violence, but the assaults also served, along with the recordings of them, to bolster Smith's and the Enterprise's reputation for violence amongst rotation system members and thereby assist in the Enterprise's extortion attempts. Indeed, the only plausible reason for Smith to have directed that multiple of these assaults be recorded is to use the recordings for intimidation. *See* FoF ¶¶ 29, 30, 33.

Finally, Smith argues that there is insufficient evidence to show that companies that remained outside of the rotation system were threatened or intimidated, which he argues is needed to show rotation system members were coerced into participating. Smith Summation, at 16-17. Aside from being a *non-sequitur*, since there could be any number

53

of reasons why Smith and his co-conspirators might choose not to threaten some competitors (such as that they were inconsequential), this argument is contrary to the evidence, for Jackson testified that threatening and intimidating companies that tried to remain outside of the rotation was a common practice of the conspirators. FoF ¶ 27. Further, assaults on public adjusters who refused to give fires to Smith and his co-conspirators support an inference that assaults would also have been carried out on other companies that attempted to take away fires from the Enterprise. *See* FoF §§ I.E.a-d. Vargas also testified that he believed that he would be unable to chase fires if he left the rotation, which supports an inference that other companies felt the same. FoF ¶¶ 44-46.

While Pereira testified that there were still some non-rotation companies that chased fires that he was not told to assault but instead to "walk away" from, Tr. 633-34, 649, this is not inconsistent with the testimony of Jackson. Jackson also acknowledged there were non-rotation companies chasing fires, but testified they would not be threatened so long as the number of fires they were signing was fairly small. Tr. 253-54. Moreover, Pereira was not an enforcer within the Enterprise and never carried out assaults, so the fact he was directed to walk away does not prove intimidation did not occur.[19]

---

[19]   For example, prior to both the Muratore and McCormick incidents, after Pereira reported back to Smith on the situation, Smith sent other members of the Enterprise to carry out the actual assaults. FoF §§ I.E.b-c.

## SPA-144

To be sure, the record contains some evidence -- beyond Smith's self-serving testimony -- that not every member of the rotation was extorted. In particular, Robert Sands, the owner of Flag, testified that he voluntarily participated in and benefited from the rotation system. Tr. 1305, 1420, 1452. But the fact that one company felt it was beneficial to participate in the rotation cannot overcome the substantial credible evidence that other companies that would and did lose business after joining the rotation joined only after they were threatened by Smith and his co-conspirators. Similarly, while there is evidence that at least three companies eventually pulled out of the rotation system (iFlood, Service Master and ASAP), *see* Tr. 701, 1277; GX 649, there is no clear evidence in the record as to when they pulled out, why they pulled out, or whether there were any negative repercussions, and so this fact alone does not prove that any and all companies were free to exit as they pleased.

Nonetheless, the Court declines to reach the question of whether each and every member of the rotation was extorted into participating. The simple fact is that there was ample evidence that at least two major competitors, ServPro and EFS, were coerced into participating in the rotation by physical and other threats, pursuant to the conspiratorial agreement amongst Smith and his co-conspirators.

Specifically, with respect to ServPro, Smith initially met with its owner, Benjamin Vargas, and laid down the rules that ServPro was not allowed to chase at night or in Staten Island. Given the reputation for violence that Smith and his co-conspirators had already

55

established, even this alone constituted an attempt at extortion. FoF ¶ 44. Then, Smith met with Vargas and demanded he begin paying Smith $1,000 per week, plus commissions, to participate in the rotation system. During this meeting, Smith made reference to threats of violence and the elimination of AES from the industry by First Response. FoF ¶¶ 45-46. Vargas testified that he was so scared after this meeting that he agreed to join the rotation out of fear of both physical violence and of the economic consequences of not joining. FoF ¶¶ 45-46.

Smith later increased the payments he required to $2,000. FoF ¶¶ 45-46. During the course of making these payments, Vargas also witnessed Smith threaten one of his chasers, who was then assaulted by an individual from another restoration company for violating the rotation system's rules, thus reinforcing Vargas's fear that leaving the rotation or not making the payments to Smith would result in violence. FoF ¶ 48. In total, Vargas paid Smith $141,000. FoF ¶ 46.

In addition, Vargas testified he was forced by Smith to hire two First Response fire chasers after Walsh shut down the company, and that he paid them a total of $25,400. FoF ¶ 49. Moreover, Vargas estimated that he lost between $500,000 to $600,000 in business income per year during the course of the rotation system. FoF ¶ 50.

Smith argues that Vargas's testimony is not credible. *See* Smith Summation, at 21-24. While there were certain aspects of Vargas's testimony that were inconsistent, the Court finds this does not undermine the core of his testimony, especially when viewed in light

56

of the evidence outlined above. Among the points of Vargas's testimony that were clear, consistent, and credible was that participating in the rotation and paying Smith the weekly payments was not financially advantageous to Vargas, but just the opposite. When pressed on this point on cross, Vargas explained he was receiving only between one to four fires a month through the rotation, even though he was paying the equivalent of a full chaser's salary. Tr. 936; *see also* Gx 362 (text message from Smith to Vargas noting that Smith "got [Vargas] 2 losses last month"). By contrast, Vargas testified that his other chasers had a quota of five fires a month and that, prior to being forced into the rotation, they would bring him five to six fires a month, substantially more than he was receiving from similarly sized payments to Smith. Tr. 937, 940. When pressed about hiring the two First Response chasers directly, Vargas agreed he was initially optimistic because Smith promised that those two chasers would only sign fires for ServPro, but once Vargas actually hired them, the chasers continued to sign fires for other companies. Tr. 940. The fact that Vargas continued to participate in the rotation system for years even though it was not profitable and Vargas was losing substantial money as a result strongly supports the inference that his participation in the rotation was not voluntary.[20]

---

[20]   Smith argues that, to the extent the Government contends Vargas was in fear of purely economic harm (as opposed to physical harm), this constitutes an impermissible constructive variance to the Indictment. Smith Summation, at 23 n.19. The Court agrees with the Government, however, that fear of economic harm is fairly encompassed within the terms of the Indictment, and in any event Smith has not

With respect to EFS, a recording from June 2020 reflects Smith making numerous vicious and violent threats to EFS's owner, Jordan Boryk, and his employees. Smith threatened to kill their children, threatened to slam one of the EFS employees on his head, reminded them that Smith was a gang member, and reminded them that First Response "really shot it out for the nighttime" with AES. FoF ¶¶ 52-53. During the conversation, Smith acknowledged, both implicitly and explicitly, that he had established rules for the industry that restricted EFS's ability to chase fires, tying those rules to threats of violence. FoF ¶¶ 54-55. Further, Jackson recalled other instances where Smith threatened EFS, and Peralta testified to one instance where Smith screamed, "go shoot Jordan." FoF ¶ 56. At the very least, the June 2020 recording establishes unequivocally that Smith extorted EFS by imposing through threats of violence limitations on their ability to chase fires. The Court also finds that the Government has proven beyond a reasonable doubt that the payments EFS began making to Smith just a few months after this meeting were similarly the result of coercion pursuant to the conspiracy between Smith and his co-conspirators.

Smith claimed the June 2020 statements were made because First Response and EFS employees were fighting, which Smith wanted to stop,

_____

shown he was prejudiced by this proof, given how closely intertwined the evidence of physical and economic harm are in this case. *See* Gov. Summation, at 5, n.7; Indictment (Dkt. 2) ¶ 13 (charging defendants with extortion by "obtaining money and property from and with the consent of another person, which consent would have been and was induced by the wrongful use of actual and threatened force, violence, and fear," without limiting "fear" to physical fear).

and because certain EFS employees had falsely told Boryk that First Response was prohibiting EFS from chasing any fires. Tr. 1230-34; Smith Summation, at 25-27. But even if this doubtful testimony is credited, the very fact that First Response chasers made these statements to EFS confirms the existence of *some* restrictions on EFS chasing fires (as well as the existence of a conspiracy to implement the same). And elsewhere during the call, Smith effectively confirmed that he was the one who made the rules for the industry, and specifically referenced the rule that night fires belonged to First Response. Thus, the fact that Smith stated that EFS did not have "to give up everything," GX 311A, in no way undermines the Court's finding that First Response placed extortionate restrictions on the fires EFS could chase.

The fact that Smith apparently funneled Walsh's construction contracts to Boryk in exchange for payments, Smith Summation at 25-26, does not undermine this conclusion. Jackson credibly testified, and Smith does not deny, that *some* payments were made by EFS to remain in the rotation system. Tr. 284-85; FoF ¶ 26. Even if some of the payments made by EFS were for other reasons, that does not change the fact that EFS made payments to participate in the rotation system under threat of violence.

c. Willon Charles

The Government argues that Willon Charles was extorted, whereas Smith argues the evidence is insufficient to prove this is the case. Jackson testified that Smith confronted Charles about money Charles

supposedly owed Smith, and because Charles was charging the home owner excessive rates, that the confrontation became heated and in the midst of it, an employee of Charles, Rafferty, entered the circle, and that at this point Smith put Rafferty in a headlock and said "I'll punch your fucking head off right now." FoF ¶¶ 58-60. Rafferty testified at trial, and largely corroborated this series of events, although he did not hear the statements made and described the assault slightly differently than Jackson.[21] As a result of this intimidation, according to Jackson, Charles agreed Smith could have the proceeds of the fire he just signed to pay off the debt. FoF ¶ 61.[22] The Court finds that the Government has proven that this constituted an instance of extortion committed pursuant to the conspiracy.

> d. Queens Village Fire

The Government argues that Smith extorted iFlood in April 2021 when it forced iFlood to hand a fire over to First Response. *See* Gov. Summation, at 18-19. However, the Court finds the Government has failed

---

[21] Smith argues that Rafferty's account of the assault differed materially from Jackson's because Rafferty said he was grabbed by the collar and had his head forced down for several seconds (rather than being put in a headlock). Smith Summation at 14-15. But this distinction (if it really is one) is without significance, because the key fact is that Smith engaged in unprompted violence against Rafferty in front of Charles (grabbing someone's neck and shoving their face to the ground is just as unacceptable and intimidating as putting them in a headlock).

[22] Smith argues that the fact the payment occurred approximately one year after the assault undermines an inference that it was made as a result of this threat. Smith Summation at 15. But the Government has put forward evidence that it is typical for it to take this amount of time for payments for fires to be made by insurance companies, and so this gap alone does not undermine the connection.

to prove beyond a reasonable doubt that iFlood was extorted on this occasion. The Government has put forward no evidence that iFlood, as opposed to McCormick, was intimidated or threatened during the day of this fire. By contrast, there is evidence that iFlood was a member of the rotation system, and the transfer of this fire from iFlood to First Response was consistent with that fact. FoF ¶ 62. In the absence of any evidence that iFlood specifically was coerced into joining the rotation system, the Court cannot conclude that I flood transferred this fire as a result of coercion.

The Government apparently does not also argue that McCormick, as opposed to iFlood, was extorted that day, but to the extent that is the Government's position, it would be unavailing. To be sure, the Government has adduced evidence that Smith was verbally aggressive towards McCormick that day, as well as evidence that just six months earlier Smith had had McCormick assaulted. *See* FoF ¶¶ 32-34, 62. These facts are relevant to the Court's overall conclusion there existed an extortion conspiracy. But unlike with respect to iFlood, there is no evidence that First Response actually obtained any money or property by denying McCormick this fire. McCormick was at the fire in his capacity as a public adjuster, and so First Response -- a restoration company -- did not obtain any business by forcing him to leave. It is conceivable that, after McCormick left, Smith was able to reassign the fire to another public adjuster, and thereby obtain some benefit. But absent any evidence to that effect in the record, the Court cannot conclude beyond a reasonable doubt that this constituted extortion.

61

*See Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 403-09 (2003) (holding defendant must have obtained some property from victim in order to be liable for Hobbs Act extortion). It is important to keep in mind, however, that Smith is not charged with substantive conspiracy but only with conspiracy to commit extortion.

### e. Mala Sangre Incident

Finally, the Government argues that the conspirators extorted an unnamed contractor using Smith's reputation for violence. Pereira was the sole witness to this incident. According to Pereira, Smith approached a contractor who apparently had just signed a fire and threatened the contractor by referencing Smith's gang name, mala sangre, which is Spanish for bad blood. By invoking this name, the contractor was apparently so frightened that he was willing to turn over the contract to Smith. *See* FoF ¶ 63.

The Court is unable to conclude beyond a reasonable doubt that this constituted an act of extortion, let alone that it was performed pursuant to the extortionate conspiracy. Pereira's testimony about this incident was extremely brief and lacked much in the way of detail. It is not clear when or where this occurred, how the contractor knew Smith's gang name, or why that name alone was sufficiently frightening to cause the contractor to hand over the contract. And even had this incident been proven, it would have had fairly minimal probative value in proving the overall existence of the charged conspiracy absent substantially more detail.

In sum, while the Government has not proven all the actual instances of extortion it claims occurred, it has proven many such, and, more importantly, has proven thereby that Smith and his co-conspirators in the Enterprise were engaged in the charged conspiracy to extort.

### C. RICO Conspiracy

"The essence of a RICO conspiracy is the existence of an *agreement* to violate RICO's substantive provisions." *United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021) (internal quotation marks omitted). "RICO conspiracy requires proof: (a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering." *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018). Specifically, Smith is here charged with entering into an agreement, at some time between 2019 and June 2022, with one or more co-conspirators to conduct the affairs of an association-in-fact enterprise through a pattern of racketeering activity. *See* Indictment (Dkt. 2) ¶¶ 1-12.

To establish such an agreement, the Government need not prove that the defendant and his co-conspirators actually conducted the affairs of an enterprise through two or more continuous and related predicate acts of racketeering. *See United States v. Arrington*, 941 F.3d 24, 36-37 (2d Cir. 2019). But proof of the actual existence of

63

such an enterprise, of the defendant's participation therein, and of the commission by the defendant and his co-conspirators of two or more continuous and related specified predicate crimes during the specified period is highly probative of the alleged conspiracy. *See White*, 7 F.4th at 99 ("[P]roof of the actual existence of a RICO enterprise -- though not necessary to convict on a conspiracy charge -- can be highly relevant to establishing an alleged RICO conspiracy."); *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009) ("Just as the evidence used to establish the enterprise and pattern elements may in particular cases coalesce, so too may the evidence used to prove those elements and a conspiratorial agreement to engage in racketeering." (internal citation and quotation marks omitted)). And that is exactly what we have here.

As noted earlier, the enterprise here charged is an association-in-fact enterprise under 18 U.S.C. § 1961(4). Such an "enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct,' proved by 'evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *United States v. Burden*, 600 F.3d 204, 214 (2d Cir. 2010) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). "The enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *White*, 7 F.4th at 99 (internal quotation marks omitted).

# SPA-154

Here, the Enterprise established by the Government's evidence at trial clearly meets this definition. The Enterprise had a clear purpose of making money by dominating the fire restoration industry. *See* FoF §§ I.C-D. The Enterprise had a cohesive structure, with Smith as the leader and Jackson as the second-in-command. FoF ¶¶ 6-8. The members would conduct regular meetings at specific locations and communicated through regular channels. FoF ¶ 9. And the Enterprise itself had continuity of existence, lasting for approximately two years during the period specified in the Indictment. *ee* FoF ¶¶ 5-9.

Focusing on First Response, Smith notes that he took actions contrary to its interests. But this shows a complete misunderstanding of the charge and the Government's proof. To begin with, as already noted above, the Enterprise extended beyond the four corners of First Response as a legal entity. To be sure, Smith exercised substantial control over First Response, and First Response was certainly a portion of the Enterprise's overall organization structure. But the evidence Smith points to, that he acted against the interests of First Response (and for his self-interest) actually shows that the RICO enterprise here charged transcended that legal entity. For example, after the owner of First Response, Walsh, seemingly in reaction to his replacement by Smith as operational head of First Response, fired all of his employees, Smith simply arranged for all the First Response chasers to work for other restoration companies while still reporting to him and while still maintaining the rotation system. *See* FoF ¶ 8.

# SPA-155

Given the above, the only real question is whether the Government has proven an agreement to conduct the affairs of the Enterprise through at least two continuous and related predicate acts of racketeering during the specified period. The Indictment specifies three kinds of predicate crimes: (1) extortion, under federal and state law; (2) mail and/or wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343; and (3) destruction or alteration of evidence in an official proceeding and witness tampering, in violation of Title 18, United States Code, Sections 1512(c)(2). *See* Indictment (Dkt. 2) ¶ 11.[23] As explained in more detail below, the Court concludes that the Government has proven that a pattern of extortionate acts and of mail and wire fraud activities were committed by the defendants in the course of their conduct of the Enterprise's affairs during the specified period, and that this was pursuant to the conspirator's agreement and plan, but the Court also concludes that

_____

[23] The Indictment also charged predicates acts of destruction or alteration of documents to obstruct an official proceeding in violation of 18 U.S.C. § 1512(c)(1) and obstruction of justice in violation of 18 U.S.C. § 1503. At the close of trial, the Court granted in part the defendant's motion pursuant to Federal Rule of Criminal Procedure 29 with respect to predicate acts of violating 18 U.S.C. § 1512(c)(1), concluding the Government had put forward insufficient evidence to support any such predicate acts. *See* Dec. 12, 2023 Order (Dkt. 322). And in their written summation, the Government declined to proceed under 18 U.S.C. § 1503, "given the substantial overlap of the conduct underlying the predicates alleged under Sections 1512(c)(2) and 1503." Gov. Summation, at 4 n.3. Accordingly, the Court only analyzes the evidence of obstruction pursuant to 18 U.S.C. § 1512(c)(2).

there is insufficient evidence that the charged conspiracy encompassed an intent to obstruct justice during the specified period.

a. Predicate Acts of Extortion.

The elements of Hobbs Act extortion have already been described above. The elements of extortion under New York Penal Law Section 155.40(2) are substantially similar to the elements of Hobbs Act extortion: to wit, that the defendant took, obtained, or withheld property by compelling or inducing the owner to deliver such property to the defendant or to a third person by intentionally instilling a fear in the owner that, if such property was not so delivered, the defendant or his accomplices would cause physical injury to that person, or damage to the property, in the future. *See* Criminal Jury Instructions 2d [NY] § 155.40(2).

For the reasons already set forth, *supra*, in Section II.B with respect to the extortion conspiracy count, the Court concludes that the Government has proven beyond a reasonable doubt that Smith and other members of the Enterprise agreed to, and in fact did, commit predicate acts of Hobbs Act extortion on numerous occasions during the specified period as part of a larger pattern of racketeering activity. The Court further concludes that the same conduct also constituted an agreement to violate New York Penal Law Section 155.40(2). Since there were more than two such predicate acts by Smith and his co-conspirators during the specified period this is sufficient to find Smith guilty of the RICO conspiracy. But, independently, he is also guilty because

of his agreement to commit acts of mail and wire fraud as part of the conduct of the Enterprise.

b. Predicate Act - Mail & Wire Fraud.

The crimes of mail and wire fraud have three elements: first, that there existed a scheme to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises; second, that the defendant knowingly and willfully participated in the scheme to defraud, with knowledge of its fraudulent nature and with a specific intent to defraud; and third, that in execution of that scheme, there was a use of the mails or a commercial interstate carrier (mail fraud) or of interstate wire communication (wire fraud). *See United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) ("The essential elements of [mail and wire fraud] are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme."). "Because the mail fraud and the wire fraud statutes use the same relevant language, [courts] analyze them the same way." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023)). "[I]t is sufficient that a defendant's scheme was intended to deprive another of property rights, even if the defendant did not physically 'obtain' any money or property by taking it from the victim." *United States v. Males*, 459 F.3d 154, 158 (2d Cir. 2006).

# SPA-158

The Government has proven beyond a reasonable doubt that members of the Enterprise conspired to, and in fact committed, mail and wire fraud by submitting, or assisting others to submit, false and fraudulent insurance claims on a continuing basis during the specified period. Those fraudulent claims, which were submitted through the interstate mails and wires, resulted in payments to insureds (and then to the Enterprise) of amounts that they were not owed pursuant to their insurance policies. Members of the Enterprise fraudulently participated in intentionally covering up or modifying conditions at properties to effectuate these fraudulent schemes, e.g., by removing illegal stoves. Finally, Smith was aware of, and agreed to, these fraudulent schemes. *See* FoF § I.G.

Smith argues that these acts of mail/wire fraud had no nexus to the charged conspiracy, because that conspiracy, in Smith's view, had at most the sole purpose of "dominat[ing] the fire restoration industry." Smith Summation, at 28 (quoting Gov. Summation, at 8). But the purpose of the RICO enterprise, as charged in the Indictment and as proven at trial, was not so limited. The first purpose of the enterprise listed in the Indictment was "[e]nriching the members and associates of the Enterprise through, among other things, extortion." Indictment (Dkt. 2) ¶ 9.a. So long as the insurance frauds fit within this broadly stated purpose, the fact the Indictment also charged that "[e]xerting control over the participants in the fire mitigation industry" was another purpose of the Enterprise, *Id.* ¶ 9.d, does not demonstrate the fraud was outside of the enterprise's scope. *See United*

69

*States v. Gershman*, 31 F.4th 80, 97-98 (2d Cir. 2022) (upholding RICO conviction where indictment alleged that the principal purpose of the enterprise was "to generate money for its members"); *United States v. Eppolito*, 543 F.3d 25, 41, 52-55 (2d Cir. 2008) (explaining that the fact the indictment alleged "purposes of the enterprise included the purchase and sale of confidential law enforcement information" "in no way suggested that the enterprise's purpose was limited to that activity" where indictment also alleged "[t]he principal purpose of the Enterprise was to generate money for its members").

Smith is also wrong that the insurance fraud was wholly unrelated to the purpose of dominating the fire restoration industry. The members of the Enterprise plainly did not want to dominate the fire restoration industry simply for its own sake, but rather to further their efforts to obtain money (especially for Smith). Dominating the fire restoration industry, including by increasing the number of fires signed by the Enterprise, was only profitable if insurance companies paid out insurance claims. FoF ¶¶ 64-65. Because the insurance frauds were a means to ensure those insurance claims were paid, these frauds directly facilitated the profits generated by the Enterprise through its dominance of the restoration industry and its extortion.[24]

---

[24]    Further still, Peralta testified that at times he and First Response used the promise that the illegal conditions would be covered up as a means of convincing home owners to hire First Response/Peralta. FoF ¶ 66.

70

Smith testified that his text messages demonstrating his awareness of these fraudulent practices were from early in his tenure at First Response, that he became uncomfortable with these practices over time, and that he directed his chasers to distance themselves from them. Tr. 1227-28. Absent independent support for the latter assertion, the Court does not credit it. And, in any case, there is no requirement that Smith actually led this portion of the conspiracy in order to be held liable for it. Rather, absent clear proof of withdrawal from the conspiracy (which is totally absent here), Smith may be held liable for any criminal acts reasonably encompassed within the agreed-to scope of the conspiracy. *See Salinas v. United States*, 522 U.S. 52, 62-63 (1997) ("A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other."); *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) ("To be convicted as a conspirator [under RICO], one must be shown to have possessed knowledge of only the general contours of the conspiracy."). In short, Smith is independently guilty of the RICO conspiracy because of the conspirators' agreement to commit a pattern of mail and wire fraud, as clearly evidenced by their continuing engagement in that fraud.

c. Predicate Acts of Obstruction of Official Proceeding.

It is a crime to "corruptly . . . otherwise obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do

71

so." 18 U.S.C. § 1512(c)(2). This crime has two elements. First, the defendant obstructed, influenced, or impeded an official proceeding. Second, the defendant acted corruptly. To demonstrate a defendant acted corruptly, the Government must show "that a defendant acted with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means." *United States v. Ng Lap Seng*, 934 F.3d 110, 142 (2d Cir. 2019)

"'[A]n official proceeding need not be pending or about to be instituted at the time of the offense....' However, the Government must prove that such a proceeding was reasonably foreseeable to the defendant." *United States v. Martinez*, 862 F.3d 223, 237 (2d Cir. 2017), *cert. granted, judgment vacated on other grounds sub. nom.*, *Rodriguez v. United States*, 139 S. Ct. 2772 (2019). "[A] grand jury proceeding is foreseeable if the defendant was aware that he was the target of an investigation." *United States v. Brooks*, 828 F. App'x 9, 11 (2d Cir. 2020) (internal quotation marks omitted).

Further, "the government must show that there was a 'nexus' between the defendant's conduct and the pending, or foreseeable, official proceeding." *Martinez*, 862 F.3d at 237. The nexus requirement is satisfied where "discretionary actions of a third person [would be] required to obstruct the judicial proceeding if it was foreseeable to [the defendant] that the third party . . . would act on the [communication] in such a way as to obstruct the judicial proceeding." *United States v. Desposito*, 704 F.3d 221, 231-32 (2d Cir. 2013) (internal quotation marks omitted).

Here, the Court finds the Government has failed to prove an obstructive intent or conspiratorial agreement to obstruct justice prior to the defendant's arrest in connection with the instant case. Specifically, while there is evidence that Smith and Jackson conspired to obstruct justice after their arrest, the Court finds there is insufficient evidence that this post-arrest conduct related back to the pre-arrest conspiracy charged in the Indictment. Accordingly, the Court concludes the Government has failed to prove beyond a reasonable doubt that the RICO conspiracy charged in the Indictment encompassed an intent and agreement to obstruct justice, since the only relevant evidence of an obstructionist intent is associated with post-Indictment activities that more likely arose in response to the conspirators' arrest than as something already contemplated by the charged conspiracy.

Members of the Enterprise learned of the federal investigation on or around November 11, 2021, and a grand jury proceeding was reasonably foreseeable from that point on. FoF ¶ 70. Upon learning this information, during a dinner at a restaurant called Baci, Smith praised Curcio -- the owner of a board up company called Cipco -- for (supposedly) not lying to the FBI. FoF ¶¶ 71, 73. Nothing about this clearly evinces an obstructive intent. Nor is there sufficient evidence to conclude Smith made threatening statements during the meeting at Toys "R" Us, or that any other aspect of the discussion evinced an obstructive intent. *See* FoF ¶¶ 74-75.

While Smith repeatedly tried to determine whether Walsh and others had spoken to the FBI or were cooperating, simply trying to learn this information, without more, is insufficient to prove beyond a reasonable doubt an agreement to obstruct justice. *See* FoF ¶¶ 76-78. This is particularly true in light of Walsh's admission that, after Smith learned Walsh had spoken to the FBI, Smith did not threaten Walsh or instruct him to lie. The Government also points to evidence that, at various times, Smith and others sought to avoid speaking on the phone, as they were afraid their conversations would be intercepted. But again, not wanting the Government listening in on your conversations cannot by itself be equated with an intent to obstruct a grand jury proceeding or federal investigation.

The closest the Government comes to demonstrating an intent to obstruct prior to Smith's arrest is Smith's voluntary meeting with detective Geroulakis. *See* FoF ¶ 73. The Government argues that during this meeting Smith made materially false or misleading statements to law enforcement when Smith stated that he had stopped the violence in the restoration industry, when in fact violence was ongoing and Smith was contributing to it. Gov. Summation, at 20. The statements Smith made during this meeting were quite vague, and the Court is unable to conclude Smith made these vague statements with the specific intent to corruptly influence the federal investigation (let alone as part of a previously-formed conspiratorial agreement to do so). *See Ng Lap Seng*, 934 F.3d at 142 (noting that "corruptly" connotes a specific-

74

intent crime requiring the Government "prove more than the general intent necessary for most crimes").

The Government argues that, even if no one instance constitutes obstruction, when viewed as a whole this series of events evinces an obstructive intent on the part of Smith and his co-conspirators. But even if true, this begs the question of whether there was a pre-existing conspiratorial agreement entered into before the Indictment issued to conduct such obstruction as part of the affairs of the Enterprise. And in fact, these events really show only that the conspirators were becoming increasingly concerned about the prospect that they were the target of a federal investigation and sought to learn more. The Court will not infer from this understandable unease that the defendants had agreed to corruptly obstruct the grand jury's investigation.

To be sure, there is clear evidence that Smith and Jackson agreed to obstruct justice after they were arrested, that is, post-Indictment. Jackson testified that, while placed in a cell with Smith, the two discussed how they would coordinate their testimony at trial and lie in court in order to obtain an acquittal. *See* FoF ¶¶ 80-81. Smith also suggested to Jackson at this time that he had accomplices on the outside who would threaten or assault Walsh if Walsh were cooperating. FoF ¶ 79. But there is no evidence tying this agreement between Smith and Jackson to any ongoing conspiracy to obstruct justice that predated their arrest. Accordingly, the Court finds that the Government has failed to prove that obstruction of justice was an object of the RICO

conspiracy charged in the Indictment. Put another way, the Court concludes that Smith is guilty of participating in a RICO conspiracy to commit extortion and fraud, but not obstruction.

## III.   Verdict

For the reasons set forth above, the Court finds the defendant guilty of Count One and Count Two charged in the Indictment in the above-captioned case. A sentencing hearing will be held on April 12, 2024 at 3 PM. Each side may submit written materials bearing on any aspect of sentencing provided their materials are submitted by no later than April 5, 2024.

SO ORDERED.

New York, NY
February 14, 2024

JED S. RAKOFF, U.S.D.J.

**SPA-166**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case      (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| Jatiek Smith | ) Case Number:  22cr352-01 (JSR) |
| | ) USM Number:  08188-510 |
| | ) Russell Capone, Esq. |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)    1 and 2 . _____
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C 1962 (d) | Racketeering Conspiracy | 6/30/2022 | 1 |
| 18 U.S.C. 1951 (a) | Extortion Conspiracy | 6/30/2022 | 2 |

The defendant is sentenced as provided in pages 2 through ____7____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

6/3/2024
Date of Imposition of Judgment

Signature of Judge

Hon. Jed S. Rakoff, U.S.D.J.
Name and Title of Judge

8/11/24
Date

# SPA-167

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT:   Jatiek Smith
CASE NUMBER:   22cr352-01 (JSR)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
On count 1: Twelve (12) years.
On count 2: Twelve (12) year, to run concurrent to each other.

☑ The court makes the following recommendations to the Bureau of Prisons:
Incarceration in a facility that can address the defendant's medical issues preferably on the east coast between New York and North Carolina.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page __3__ of __7__

DEFENDANT:   Jatiek Smith
CASE NUMBER:   22cr352-01 (JSR)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

On count 1: Three (3) years.
On count 2: Three (3) years, all terms on all counts to run concurrent to each other.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# SPA-169

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page     4     of     7

DEFENDANT: Jatiek Smith
CASE NUMBER: 22cr352-01 (JSR)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

# SPA-170

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
                      Sheet 3D — Supervised Release

Judgment—Page    5    of    7

DEFENDANT: Jatiek Smith
CASE NUMBER: 22cr352-01 (JSR)

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall participate in an out patient program approved by the United States Probation Office for substance abuse, said program may include drug testing to determine whether the defendant has reverted to the use of drugs and alcohol. The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Department. The defendant will be required to contribute to the cost of services rendered (copayment) in the amount to be determined by the Probation Officer, based on ability to pay or availability of third party payment.

2. The defendant must participate in an outpatient mental health treatment program approved by the United States Probation Office. He must continue to take any prescribed medications unless otherwise instructed by the health care provider. He must contribute to the cost of services rendered based on your ability to pay and the availability of third-party payments. The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence investigation report, to the health care provider.

3. The defendant shall provide the Probation Officer with access to any requested financial information.

4. The defendant shall not incur any new credit charges or open additional lines of credit without the approval of the Probation Officer unless the defendant is in compliance with the installment payment plan.

5. You shall not associate or interact in any way, including through social media websites, with any gang members or associates, particularly members and associates of any Bloods gang, or frequent neighborhoods (or "turf") known to be controlled by the Bloods.

6. The Court recommends the defendant be supervised in his district of residence.

# SPA-171

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page   6   of   7

DEFENDANT: Jatiek Smith
CASE NUMBER: 22cr352-01 (JSR)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 200.00 | $ 391,946.44 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| TOTALS | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT: Jatiek Smith
CASE NUMBER: 22cr352-01 (JSR)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __200.00__    due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance with ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
U.S. currency, firearms and ammunition as detailed in the Order of Forfeiture.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# SPA-173

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment IV. Searches and Seizures; Warrants

U.S.C.A. Const. Amend. IV-Search and Seizure; Warrants

## Amendment IV. Searches and Seizures; Warrants

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S.C.A. Const. Amend. IV-Search and Seizure; Warrants, USCA CONST Amend. IV-Search and Seizure; Warrants
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# SPA-174

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment V. Grand Jury; Double Jeopardy; Self-Incrimination; Due Process; Takings

U.S.C.A. Const. Amend. V

## Amendment V. Grand Jury Indictment for Capital Crimes; Double Jeopardy; Self-Incrimination; Due Process of Law; Takings without Just Compensation

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S.C.A. Const. Amend. V, USCA CONST Amend. V
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

## SPA-175

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment VI. Jury Trial for Crimes, and Procedural Rights (Refs & Annos)

U.S.C.A. Const. Amend. VI-Jury Trials

## Amendment VI. Jury trials for crimes, and procedural rights

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S.C.A. Const. Amend. VI-Jury Trials, USCA CONST Amend. VI-Jury Trials
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part II. Criminal Procedure
         Chapter 227. Sentences (Refs & Annos)
            Subchapter A. General Provisions (Refs & Annos)

18 U.S.C.A. § 3553

§ 3553. Imposition of a sentence

Effective: December 21, 2018
Currentness

**(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed--

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for--

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement--

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.[1]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

**(b) Application of guidelines in imposing a sentence.--**

**(1) In general.**--Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.

**(2) Child crimes and sexual offenses.--**

**(A)** [2] **Sentencing.**--In sentencing a defendant convicted of an offense under section 1201 involving a minor victim, an offense under section 1591, or an offense under chapter 71, 109A, 110, or 117, the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless--

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# SPA-178

§ 3553. Imposition of a sentence, 18 USCA § 3553

**(i)** the court finds that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence greater than that described;

**(ii)** the court finds that there exists a mitigating circumstance of a kind or to a degree, that--

**(I)** has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued under section 994(a) of title 28, taking account of any amendments to such sentencing guidelines or policy statements by Congress;

**(II)** has not been taken into consideration by the Sentencing Commission in formulating the guidelines; and

**(III)** should result in a sentence different from that described; or

**(iii)** the court finds, on motion of the Government, that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense and that this assistance established a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence lower than that described.

In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission, together with any amendments thereto by act of Congress. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission, together with any amendments to such guidelines or policy statements by act of Congress.

**(c) Statement of reasons for imposing a sentence**.--The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence--

**(1)** is of the kind, and within the range, described in subsection (a)(4), and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range; or

**(2)** is not of the kind, or is outside the range, described in subsection (a)(4), the specific reason for the imposition of a sentence different from that described, which reasons must also be stated with specificity in a statement of reasons form issued under section 994(w)(1)(B) of title 28, except to the extent that the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32. In the event that the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32 the court shall state that such statements were so received and that it relied upon the content of such statements.

If the court does not order restitution, or orders only partial restitution, the court shall include in the statement the reason therefor. The court shall provide a transcription or other appropriate public record of the court's statement of reasons, together with the

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# SPA-179

§ 3553. Imposition of a sentence, 18 USCA § 3553

order of judgment and commitment, to the Probation System and to the Sentencing Commission,,[3] and, if the sentence includes a term of imprisonment, to the Bureau of Prisons.

**(d) Presentence procedure for an order of notice**.--Prior to imposing an order of notice pursuant to section 3555, the court shall give notice to the defendant and the Government that it is considering imposing such an order. Upon motion of the defendant or the Government, or on its own motion, the court shall--

**(1)** permit the defendant and the Government to submit affidavits and written memoranda addressing matters relevant to the imposition of such an order;

**(2)** afford counsel an opportunity in open court to address orally the appropriateness of the imposition of such an order; and

**(3)** include in its statement of reasons pursuant to subsection (c) specific reasons underlying its determinations regarding the nature of such an order.

Upon motion of the defendant or the Government, or on its own motion, the court may in its discretion employ any additional procedures that it concludes will not unduly complicate or prolong the sentencing process.

**(e) Limited authority to impose a sentence below a statutory minimum.**--Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

**(f) Limitation on applicability of statutory minimums in certain cases.**--Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846), section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 960, 963), or section 70503 or 70506 of title 46, the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that--

**(1)** the defendant does not have--

**(A)** more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;

**(B)** a prior 3-point offense, as determined under the sentencing guidelines; and

**(C)** a prior 2-point violent offense, as determined under the sentencing guidelines;

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**(2)** the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

**(3)** the offense did not result in death or serious bodily injury to any person;

**(4)** the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

**(5)** not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

Information disclosed by a defendant under this subsection may not be used to enhance the sentence of the defendant unless the information relates to a violent offense.

**(g) Definition of violent offense.**--As used in this section, the term "violent offense" means a crime of violence, as defined in section 16, that is punishable by imprisonment.

## CREDIT(S)

(Added Pub.L. 98-473, Title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 1989; amended Pub.L. 99-570, Title I, § 1007(a), Oct. 27, 1986, 100 Stat. 3207-7; Pub.L. 99-646, §§ 8(a), 9(a), 80(a), 81(a), Nov. 10, 1986, 100 Stat. 3593, 3619; Pub.L. 100-182, §§ 3, 16(a), 17, Dec. 7, 1987, 101 Stat. 1266, 1269, 1270; Pub.L. 100-690, Title VII, § 7102, Nov. 18, 1988, 102 Stat. 4416; Pub.L. 103-322, Title VIII, § 80001(a), Title XXVIII, § 280001, Sept. 13, 1994, 108 Stat. 1985, 2095; Pub.L. 104-294, Title VI, § 601(b)(5), (6), (h), Oct. 11, 1996, 110 Stat. 3499, 3500; Pub.L. 107-273, Div. B, Title IV, § 4002(a)(8), Nov. 2, 2002, 116 Stat. 1807; Pub.L. 108-21, Title IV, § 401(a), (c), (j)(5), Apr. 30, 2003, 117 Stat. 667, 669, 673; Pub.L. 111-174, § 4, May 27, 2010, 124 Stat. 1216; Pub.L. 115-391, Title IV, § 402(a), Dec. 21, 2018, 132 Stat. 5221.)

## VALIDITY

<Mandatory aspect of subsec. (b)(1) of this section held unconstitutional by United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). >

Notes of Decisions (3371)

Footnotes

1       So in original. The period probably should be a semicolon.

2       So in original. No subpar. (B) has been enacted.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.                                                5

# SPA-181

§ 3553. Imposition of a sentence, 18 USCA § 3553

3        So in original. The second comma probably should not appear.

18 U.S.C.A. § 3553, 18 USCA § 3553
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.