# 24-1680

*To Be Argued By*:
RUSHMI BHASKARAN

# United States Court of Appeals
## For the Second Circuit

❖❖❖

UNITED STATES OF AMERICA,

*Appellee*,

—against—

JATIEK SMITH, also known as Sealed Defendant 1,

*Defendant-Appellant*,

SEQUAN JACKSON, also known as Sealed Defendant 2, ANTHONY MCGEE, also known as Sealed Defendant 3, KAHEEN SMALL, also known as Sealed Defendant 4, DAMON DORE, also known as Sealed Defendant 5, HASIM SMITH, also known as Sealed Defendant 6, RAHMIEK LACEWELL, also known as Sealed Defendant 7, MANUEL PEREIRA, also known as Sealed Defendant 8, OCTAVIO PERALTA, also known as Sealed Defendant 9, CARL WALSH,

*Defendants*.

**On Appeal From The United States District Court
For The Southern District of New York**

### BRIEF FOR THE UNITED STATES OF AMERICA

MATTHEW PODOLSKY
*Acting United States Attorney for the
Southern District of New York,
Attorney for the United States
  of America*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

RUSHMI BHASKARAN
MARGUERITE B. COLSON
ELIZABETH A. ESPINOSA
JAMES LIGTENBERG
  *Assistant United States Attorneys*,
    *Of Counsel*.

**TABLE OF CONTENTS**

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Government's Case . . . . . . . . . . . . . . . .  2

        1.  The Fire Restoration Industry . . . . . . .  3

        2.  Smith Joins First Response and Assumes Control Over Its Operations . . . . . . . . .  4

        3.  Smith's Feud With AES . . . . . . . . . . . .  5

        4.  Smith Imposes Rules on the Industry and Enforces Those Rules Through Violence . . . . . . . . . . . . . . . . . . . . . . . . .  7

        5.  Smith Extorts EFS. . . . . . . . . . . . . . . . .  8

        6.  Smith Extorts ServPro Upper West Side . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

        7.  Smith Alters the Conditions of Properties to Obtain Insurance Coverage . . . . . . .  9

        8.  Following the Indictment, Smith Threatens Witnesses and Obstructs Justice. . . . . . . . . . . . . . . . . . . . . . . . . . .  10

    B.  The Defense Case . . . . . . . . . . . . . . . . . . . .  10

    C.  Judge Rakoff's Findings of Fact and Conclusions of Law . . . . . . . . . . . . . . . . . .  11

    D.  The Sentencing . . . . . . . . . . . . . . . . . . . . . .  11

ii

PAGE

ARGUMENT:

POINT I—The District Court Properly Denied Smith's Motion to Suppress Evidence Obtained from the Border Search of Smith's Cellphone . . . . . . . .  11

  A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  12

  B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  14

    1.  The Border Search Exception . . . . . . .  15

    2.  The Good-Faith Exception. . . . . . . . . .  19

  C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  21

    1.  The Border Search of Smith's Phone Did Not Violate the Fourth Amendment . . . . . . . . . . . . . . . . . . . . . .  21

      a.  A Warrant Was Not Required to Search Smith's Phone . . . . . . . . . .  21

      b.  Reasonable Suspicion Supported the Search of Smith's Phone . . . . . . . .  25

    2.  The Good-Faith Exception Applies . . . . . . . . . . . . . . . . . . . . . . . . .  28

      a.  The Initial Border Search Falls under the Good-Faith Exception . . . . . . . . . . . . . . . . . . . .  29

iii

PAGE

      b.  Law Enforcement Acted in Good Faith by Relying on a Search Warrant Authorized by a Neutral Magistrate Judge . . . . . . . . . . . . . 31

    3.  Smith's Fifth Amendment Rights Were Not Violated When He Provided His Cellphone Passcode to Agents. . . . . . . 35

    4.  Any Purported Error Was Harmless . . . . . . . . . . . . . . . . . . . . . . . 40

POINT II—The District Court Properly Sustained Five Proposed Witnesses' Counseled Invocations of Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 42

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . 43

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    1.  Cynthia Fonseca . . . . . . . . . . . . . . . . . 45

    2.  Mike Iaducci ("Tugboat"). . . . . . . . . . . 45

    3.  Arturo Nunez ("Primo"). . . . . . . . . . . . 46

    4.  Elvin Mata . . . . . . . . . . . . . . . . . . . . . . 46

    5.  Gerardo Curcio. . . . . . . . . . . . . . . . . . . 47

iv

PAGE

POINT III—The District Court Did Not Abuse Its
Discretion in Denying Smith's Request to Re-
Appoint Counsel to Represent Him at
Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

    A.   Factual Background . . . . . . . . . . . . . . . . . .  49

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .  52

    C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  53

POINT IV—Smith's Below-Guidelines Sentence Was
Substantively Reasonable. . . . . . . . . . . . . . . . .  55

    A.   Factual Background . . . . . . . . . . . . . . . . . .  55

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .  57

    C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  58

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

## TABLE OF AUTHORITIES

*Cases*:

*Alasaad v. Mayorkas*,
    988 F.3d 8 (1st Cir. 2021). . . . . . . . . . . . . . . . *passim*

*Cady v. Dombrowski*,
    413 U.S. 433 (1973). . . . . . . . . . . . . . . . . . . . . . . . 15

*Commonwealth v. Jones*,
    117 N.E.3d 702 (Mass. 2019) . . . . . . . . . . . . . . . 37

v

PAGE

*Davis v. United States,*
    564 U.S. 229 (2011). . . . . . . . . . . . . . . . . . . . . . . . 31

*Fisher v. United States,*
    425 U.S. 391 (1976). . . . . . . . . . . . . . . . . . . . . *passim*

*Franks v. Delaware,*
    438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . . . . . . 33

*Gall v. United States,*
    552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . 57

*Herring v. United States,*
    555 U.S. 135 (2009). . . . . . . . . . . . . . . . . . . . . . . 20

*Hiibel v. Sixth Judicial Dist. Court,*
    542 U.S. 177 (2004). . . . . . . . . . . . . . . . . . . . . . . 35

*Hoffman v. United States,*
    341 U.S. 479 (1951). . . . . . . . . . . . . . . . . . . . . . . 44

*Howard v. Walker,*
    406 F.3d 114 (2d Cir. 2005) . . . . . . . . . . . . . . 44, 45

*In re Grand Jury Subpoena,*
    670 F.3d 1335 (11th Cir. 2012) . . . . . . . . . . . . . 36

*Navarette v. California,*
    572 U.S. 393 (2014). . . . . . . . . . . . . . . . . . . . . . . 17

*Ohio v. Reiner,*
    532 U.S. 17 (2001). . . . . . . . . . . . . . . . . . . . . . . . 43

*People v. Sneed,*
    230 N.E.3d 97 (Ill. 2023). . . . . . . . . . . . . . . . . . 37

vi

PAGE

*Riley v. California,*
    573 U.S. 373 (2014). . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Aigbekaen,*
    943 F.3d 713 (4th Cir. 2019) . . . . . . . . . . . . . 26, 30

*United States v. Alcius,*
    952 F.3d 83 (2d Cir. 2020) . . . . . . . . . . . . . . . . 58

*United States v. Alejandro,*
    368 F.3d 130 (2d Cir. 2004) . . . . . . . . . . . . . . . 39

*United States v. Asbury,*
    586 F.2d 973 (2d Cir. 1978) . . . . . . . . . . 16, 24, 29

*United States v. Booker,*
    543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Broxmeyer,*
    699 F.3d 265 (2d Cir. 2012) . . . . . . . . . . . . . . . 57

*United States v. Cacace,*
    796 F.3d 176 (2d Cir. 2015) . . . . . . . . . . . . . 40, 41

*United States v. Cano,*
    934 F.3d 1002 (9th Cir. 2019) . . . . . . . . . . . *passim*

*United States v. Castillo,*
    70 F.4th 894 (5th Cir. 2023). . . . . . . . . . . . . 18, 21

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) (en banc) . . . . . . . . . 60

*United States v. Clark,*
    638 F.3d 89 (2d Cir. 2011) . . . . . . . . . . . . . . . . 20

vii

PAGE

*United States v. Coreas,*
  419 F.3d 151 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 33

*United States v. Dey,*
  409 F. App'x 372 (2d Cir. 2010) . . . . . . . . . . . . . . 45

*United States v. Flores-Montano,*
  541 U.S. 149 (2004). . . . . . . . . . . . . . . . . . . *passim*

*United States v. Gavino,*
  No. 22 Cr. 136 (RPK), 2024 WL 852072 (E.D.N.Y.
  Jan. 7, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Ginsberg,*
  758 F.2d 823 (2d Cir. 1985) . . . . . . . . . . . . . . . . . 44

*United States v. Greenfield,*
  831 F.3d 106 (2d Cir. 2016) . . . . . . . . . . . . . . . . . 36

*United States v. Herron,*
  762 F. Appx. 25 (2d Cir. 2019) . . . . . . . . . . . . . . . 45

*United States v. Hooton,*
  No. 21 Cr. 105 (DAD), 2023 WL 3582029 (E.D.
  Cal. May 22, 2023) . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Irving,*
  452 F.3d 110 (2d Cir. 2006) . . . . . . . . . . . . . *passim*

*United States v. Kerr,*
  752 F.3d 206 (2d Cir. 2014) . . . . . . . . . . . . . . 52, 53

*United States v. Kolsuz,*
  890 F.3d 133 (4th Cir. 2018) . . . . . . . . . . . . *passim*

*United States v. Landesman,*
  17 F.4th 298 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 21

viii

PAGE

*United States v. Leon,*
    468 U.S. 897 (1984). . . . . . . . . . . . . . . . .  19, 20, 32

*United States v. Levy,*
    803 F.3d 120 (2d Cir. 2015) . . . . . . . . . . . . . *passim*

*United States v. Liounis,*
    639 F. App'x 731 (2d Cir. 2016) . . . . . . . . . . . . . . 53

*United States v. Mendez,*
    103 F.4th 1303 (7th Cir. 2024). . . . .  17, 19, 21, 22

*United States v. Messina,*
    806 F.3d 55 (2d Cir. 2015) . . . . . . . . . . . . . . . . 58

*United States v. Molina-Isidoro,*
    884 F.3d 287 (5th Cir. 2018) . . . . . . . . . . . . . 19, 29

*United States v. Montoya de Hernandez,*
    473 U.S. 531 (1985). . . . . . . . . . . . . . . .  16, 22, 24

*United States v. Muench,*
    694 F.2d 28 (2d Cir. 1982) . . . . . . . . . . . . . . 22, 28

*United States v. Nkongho,*
    107 F.4th 373 (4th Cir. 2024). . . . . . . . . . . . . 24, 28

*United States v. Oates,*
    560 F.2d 45 (2d Cir. 1977) . . . . . . . . . . . . . . . . 26

*United States v. Ogberaha,*
    771 F.2d 655 (2d Cir. 1985) . . . . . . . . . . . . . . . . 24

*United States v. Ramsey,*
    431 U.S. 606 (1977). . . . . . . . . . . . . . . . . . . 15, 19

ix

PAGE

*United States v. Raymonda*,
  780 F.3d 105 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 20

*United States v. Rigas*,
  583 F.3d 108 (2d Cir. 2009) . . . . . . . . . . . . . . 57, 58

*United States v. Rosa*,
  626 F.3d 56 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 19

*United States v. Santana*,
  485 F.2d 365 (2d Cir. 1973) . . . . . . . . . . . . . . . . . 26

*United States v. Scarpa*,
  913 F. 2d 993 (2d Cir. 1990) . . . . . . . . . . . . . . . . 48

*United States v. Smith*,
  967 F.3d 198 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 34

*United States v. Spencer*,
  No. 17 Cr. 259 (CRB), 2018 WL 1964588 (N.D.
  Cal. Apr. 26, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Stewart*,
  907 F.3d 677 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 44

*United States v. Sultanov*,
  No. 22 Cr. 149 (NRM), 2024 WL 3520443
  (E.D.N.Y. July 24, 2024) . . . . . . . . . . . . . . . . . . . . 31

*United States v. Thomas*,
  757 F.2d 1359 (2d Cir. 1985) . . . . . . . . . . . . . . . 32

*United States v. Tineo*,
  No. 23 Cr. 223 (DLI), 2024 WL 2862289 (E.D.N.Y.
  June 6, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

x

PAGE

*United States v. Touset*,
890 F.3d 1227 (11th Cir. 2018) . . . . . . . 18, 25, 29

*United States v. Vargas*,
961 F.3d 566 (2d Cir. 2020) . . . . . . . . . . . . . . . . 57

*United States v. Vergara*,
884 F.3d 1309 (11th Cir. 2018) . . . . . . . 19, 21, 29

*United States v. Verkhoglyad*,
516 F.3d 122 (2d Cir. 2008) . . . . . . . . . . . . . . . . 33

*United States v. Villafuerte*,
502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . 57, 59

*United States v. Wanjiku*,
919 F.3d 472 (7th Cir. 2019) . . . . . . . . . . . . . . . . 31

*United States v. Whab*,
355 F.3d 155 (2d Cir. 2004) . . . . . . . . . . . . . . . . 33

*United States v. Xiang*,
67 F.4th 895 (8th Cir. 2023) . . . . . . . . . . . . . 19, 21

*United States v. Zodhiates*,
901 F.3d 137 (2d Cir. 2018) . . . . . . . . . . . . . . 20, 30

*Whren v. United States*,
517 U.S. 806 (1996) . . . . . . . . . . . . . . . . . . . . . . . 17

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 1951(a) . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

18 U.S.C. § 1962(d) . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

xi

PAGE

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . 56

Orin S. Kerr, *Compelled Decryption and the Privilege Against Self-Incrimination*, 97 TEX. L. REV. 767 (2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-1680

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JATIEK SMITH, also known as Sealed Defendant 1,

*Defendant-Appellant,*

SEQUAN JACKSON, also known as Sealed Defendant 2,
ANTHONY MCGEE, also known as Sealed Defendant 3,
KAHEEN SMALL, also known as Sealed Defendant 4,
DAMON DORE, also known as Sealed Defendant 5,
HASIM SMITH, also known as Sealed Defendant 6,
RAHMIEK LACEWELL, also known as Sealed
Defendant 7, MANUEL PEREIRA, also known as Sealed
Defendant 8, OCTAVIO PERALTA, also known as Sealed
Defendant 9, CARL WALSH,

*Defendants.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

## Preliminary Statement

Jatiek Smith appeals from a judgment of conviction entered on June 3, 2024, in the United States District

2

Court for the Southern District of New York, following a two-week bench trial before the Honorable Jed. S. Rakoff, United States District Judge.

Indictment 23 Cr. 352 (JSR) (the "Indictment") was filed on June 23, 2022, in two counts. Count One charged Smith with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Count Two charged Smith with extortion conspiracy, in violation of 18 U.S.C. § 1951(a).

Trial commenced on November 27, 2023 and ended on December 11, 2023, on which date the District Court reserved decision. On February 14, 2024, Judge Rakoff issued a written decision setting forth findings of fact and conclusions of law and finding Smith guilty on both counts charged.

On June 3, 2024, Judge Rakoff sentenced Smith to a term of 144 months' imprisonment, to be followed by three years' supervised release, and imposed a $200 mandatory special assessment.

Smith is serving his sentence.

## Statement of Facts

### A. The Government's Case

The evidence at trial showed that, from 2019 to 2022, Smith was the leader of a violent enterprise whose members enriched themselves by extorting, intimidating, and assaulting other participants in the fire restoration industry. The evidence was overwhelming and included, among other things, the testimony of 19 witnesses (including three cooperating

3

witnesses who were members of Smith's enterprise); text messages, recordings, and videos documenting acts of violence and intimidation; financial records showing Smith's receipt of extortion payments from industry participants; intercepted phone calls obtained from wiretaps; social media evidence; and evidence obtained from searches conducted on the day of Smith's arrest (including firearms possessed in furtherance of the charged conspiracies).

### 1. The Fire Restoration Industry

The fire restoration industry refers to the businesses that repair properties damaged by fires. (SPA-91).[1] These businesses—known as fire restoration companies—provide emergency mitigation, demolition, and construction services to fire-damaged properties. (SPA-91). The industry also includes insurance adjusters, also referred to as "public adjusters." (SPA-91). A public adjuster represents the property owners

––––––––––

[1] "PSR" refers to the Presentence Report prepared by the Probation Office in connection with Smith's sentencing; "Br." refers to Smith's brief on appeal; "A-" refers to the appendix filed with that brief; "SPA-" refers to the special appendix filed with that brief; "Tr." refers to the trial transcript; "GX" refers to a Government exhibit at trial; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case quotations omit all internal quotation marks, citations, and previous alterations.

4

in their claims made against insurance companies that insure their properties. (SPA-91).

The term "chasing fires," as used in the industry, refers to a fire mitigation company's efforts to solicit business from the owner of a fire-damaged property. (SPA-91). Traditionally, there was an open market to solicit fires, with several companies competing at the scene of the fire to solicit the business of the homeowner—that is, to "sign a fire." (SPA-91).

### 2. Smith Joins First Response and Assumes Control Over Its Operations

First Response was a fire mitigation company that did business throughout New York City, including in Manhattan and the Bronx. (SPA-92). Carl Walsh, the founder and owner of First Response, hired Smith in approximately October 2019. (SPA-92). In early 2020, Smith became a manager for First Response. (SPA-92). In that role, Smith assumed responsibility for substantial aspects of First Response's operations, including its hiring decisions, supervision of "chasers" (individuals who solicited business for fire restoration companies), and the selection of public adjusters and subcontractors to use on a job. (SPA-92-93). While Walsh retained legal ownership of First Response, in practice Smith effectively controlled many aspects of the business, and he dictated policy to Walsh. (SPA-92-94). Approximately six months into his employment at First Response, Smith was understood to be its leader. (SPA-93).

Smith was a member of the Bloods, a violent street gang, and used his gang affiliation to further his

5

efforts to control the fire restoration industry. (SPA-93). Upon gaining control over hiring decisions at First Response, Smith brought in several individuals—some of whom were also Bloods—who became part of his inner circle at the company. (SPA-93). For example, Smith hired Sequan Jackson, another member of the Bloods, who became Smith's second-in-command. (SPA-93).[2] Smith also brought in two of his brothers—Hasim Smith ("Hasim") and Jayquan Smith ("Jay")—along with Anthony McGee, Eric Perez, and Kaheen Small. (SPA-93).

After taking control of First Response, Smith used violence and intimidation to dominate the fire restoration industry. (*See, e.g.*, Tr. 208-09, 663; SPA-106-07 (describing how Smith directed a Bloods gang member to assault a public adjuster who refused to sign First Response to a fire)). Smith also maintained firearms at the First Response offices, instructing crew members to use them when necessary to intimidate competitors. (Tr. 324-25).

### 3.  Smith's Feud With AES

When Smith joined First Response, its primary competitor was American Emergency Services ("AES"). (SPA-95). After Smith became a manager at First Response and hired more fire chasers for the company, tensions between the two companies began

———————

[2]  Jackson later began cooperating with the Government, and he ultimately testified at Smith's trial. (*See* SPA-129).

6

to escalate. (SPA-95). On May 4, 2020, Smith called Jackson and told him to bring a gun to the site of a fire that AES had signed. (SPA-95). At the site, Jackson gave the gun to Smith. (SPA-95). A fight ensued in which Jackson struck an AES worker with a flashlight and someone from AES fired a gun at Jackson. (SPA-95).

The next day, Smith—along with Jackson, McGee, Jay, and Perez—went to the AES warehouse and retaliated by assaulting the AES owners. (SPA-96). They then drove to an AES construction site, where Smith threatened to beat up additional AES workers. (SPA-96-97).

Smith, along with Jackson, Jay, and Hasim, later confronted an AES owner and demanded $100,000, threatening that if he did not pay the money the violence against AES would continue and AES would not be allowed to continue chasing fires. (SPA-98). As a result of Smith's threats, AES stopped chasing fires in approximately June 2020. (SPA-100).

A few months later, Smith—along with Jackson, McGee, and Small—threatened the AES owner again. (SPA-98). Smith gave McGee a gun prior to the confrontation and told him to shoot the owner in the leg if necessary. (SPA-98). At this meeting, Smith again demanded $100,000. (SPA-99). At Smith's direction, McGee threatened the owner with the gun and pistol-whipped him. (SPA-99). Smith then directed Small to throw the owner in the back of a truck against his will, but the owner was able to escape. (SPA-99).

7

### 4. Smith Imposes Rules on the Industry and Enforces Those Rules Through Violence

After forcing AES out of business, Smith imposed a set of rules—known as the "rotation system"—on the fire restoration industry. (SPA-101). The essence of the system was that each fire chaser from each participating company would be allocated one fire in consecutive, rotating order. (SPA-101). But several features of the rotation system were designed to favor Smith and his enterprise. (SPA-102). For example, fires would be allocated first to chasers from Smith's enterprise, and only after their quotas had been satisfied would fires be allocated to chasers from other participating companies; all fires that occurred at night belonged to First Response; and all fires that occurred in Staten Island belonged to First Response. (SPA-102-04). For another company to be part of the rotation system, it had to pay Smith or one of his chasers. (SPA-104). Smith also implemented a rotation system for public adjusters, under which they were required to check with First Response before hiring another restoration company. (SPA-101)

Individuals who chased fires outside of the rotation system, without paying Smith, were threatened and assaulted by Smith and his crew. (SPA-105). At Smith's direction, for example, his subordinates assaulted at least four public adjusters who had refused to follow Smith's rules. (SPA-106-11, 120-21). One of those adjusters, who was 67-years-old at the time of the assault, lost a tooth, cut his lip, and suffered a brain bleed. (SPA-107). On another occasion, Smith put an adjuster's employee in a headlock and told the

8

adjuster, "I'll punch your fucking head off right now." (SPA-121). In response to this threat, the adjuster agreed to (and ultimately did) pay Smith $15,000. (SPA-121). Smith instructed his crew members to film some of these assaults, then used the video to intimidate other competitors. (SPA-108-09).

### 5. Smith Extorts EFS

From 2020 to 2022, Smith extorted EFS—a competing fire restoration company—using violent threats. (SPA-116-20). In June 2020, Smith convened a meeting between EFS and First Response. (SPA-116). During the meeting, Smith paced around "as if he was trying to get ready to fight or intimidate someone," and made numerous threats to the EFS employees. (SPA-117-18). Smith noted that he was a longtime gang member and that he was not afraid to go back to prison for hurting the employees or their families. (SPA-117-18 ("I been gang banging for years, n****. I'll kill one of you n****s to send a message. . . . I'm willing to take the risk. I did 16 years of prison time to show I'll take that risk.")). And Smith explicitly threatened to kill the children of EFS employees, including an employee named Mike Navarro. (SPA-116-17 ("Mike, did we not get your address, Mike? And I told Mike in his face I'll kill that n****'s kid. . . . I'll kill one of your kids just to send a message.")).

In response to these threats, the owner of EFS agreed to pay Smith $1,000 per week, an amount later increased to $2,000. (SPA-120). In total, EFS paid approximately $210,000 to Smith and his crew. (SPA-120).

9

### 6.   Smith Extorts ServPro Upper West Side

Between 2020 and 2022, Smith extorted another fire restoration company, ServPro Upper West Side, through threats of violence. (SPA-112-15). Smith—accompanied by his crew members, including Elvin Mata—met with ServPro's owner, demanded to be paid weekly, and threatened to hurt the families of ServPro employees if he was not paid. (SPA-113). Terrified by this threat, the owner agreed to pay Smith $1,000 per week, an amount later increased to $2,000. (SPA-114). From 2020 to 2022, the owner paid Smith a total of $141,000. (SPA-114).

On January 14, 2021, Smith and his crew arrived at the aftermath of a large fire where ServPro was also present. (SPA-114). One of ServPro's chasers—Mike Navarro, the man whose children Smith had previously threatened to kill—signed two contracts with one owner. (SPA-115). This angered Smith, so he and a group of others confronted Navarro and "took [him] around the corner." (SPA-115). A chaser for another company in the rotation system then punched and kicked Navarro to the ground. (SPA-115). Smith then asked Navarro, "Why would you play games when you know your family is in jeopardy?" (SPA-115).

### 7.   Smith Alters the Conditions of Properties to Obtain Insurance Coverage

Smith and his subordinates also engaged in insurance fraud. (SPA-122-25). The vast majority of work performed by First Response and other fire restoration companies was paid for by insurance companies. (SPA-122). Certain conditions at properties, such as an

10

illegal stove, can render a property ineligible for coverage, meaning that First Response generally would not get paid. (SPA-123). Accordingly, when First Response —under Smith's leadership—saw an illegal condition that could interfere with an insurance claim, employees would remove that condition and conceal it from the insurance carrier. (SPA-123-24). Smith was aware of and, at least at times, involved in the covering up of illegal conditions. (SPA-124-25).

### 8. Following the Indictment, Smith Threatens Witnesses and Obstructs Justice

After Smith and Jackson were arrested (and before Jackson began cooperating), they "agreed to obstruct justice." (SPA-164). Smith told Jackson that if Carl Walsh cooperated, members of the Bloods knew where Walsh lived and would go to his house, beat him up, or threaten him. (SPA-164). Smith and Jackson also "discussed how they would coordinate their testimony at trial and lie in court in order to obtain an acquittal." (SPA-164; *see* SPA-130-31).

### B. The Defense Case

In addition to calling three witnesses and introducing several documentary exhibits, Smith testified in his own defense. (A-1597-1818). Smith disputed much of the Government's evidence, but admitted to using threats and violence to stoke fear in competitors of First Response. (A-1752-59, 1761-65).

11

### C. Judge Rakoff's Findings of Fact and Conclusions of Law

Following the bench trial, on February 14, 2024, Judge Rakoff found Smith guilty on both counts charged: racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and extortion conspiracy, in violation of 18 U.S.C. § 1951(a). (SPA-90-165). Judge Rakoff explained that ruling in a detailed opinion setting out his findings of fact and conclusions of law. (SPA-90-165).

### D. The Sentencing

On June 3, 2024, Judge Rakoff sentenced Smith to 144 months' imprisonment, followed by three years' supervised release, and imposed a $200 mandatory special assessment. (A-2184).

## ARGUMENT

### POINT I

### The District Court Properly Denied Smith's Motion to Suppress Evidence Obtained from the Border Search of Smith's Cellphone

Smith argues that Judge Rakoff erred in denying his motion to suppress evidence obtained from a border search of his cellphone. This argument is meritless. As every circuit to have considered the question has concluded, a warrant is not required to search a cellphone at the border. In any event, the Court should affirm Judge Rakoff's conclusion that the good-faith exception precludes suppression.

12

## A. Relevant Facts

On March 2, 2021, Smith flew from Newark airport to Jamaica, where he was denied entry and sent back to Newark the same day. (SPA-5). At that time, agents from the Federal Bureau of Investigation ("FBI") and Homeland Security Investigations ("HSI")—a component of the Department of Homeland Security ("DHS") —were investigating Smith for his role in the conspiracy to control the fire restoration industry through threats and violence. (SPA-5-6). HSI was also investigating Smith for laundering the proceeds of the extortion scheme. (A-381, 383). These investigations were based on statements from individuals in the fire restoration industry that First Response was using Smith to commit extortion and was laundering the proceeds. (Dkt. 168 at 2).

After learning of Smith's travel, FBI and HSI agents asked U.S. Customs and Border Protection ("CBP")—another DHS component—to search Smith pursuant to their border search authority. (SPA-6). When Smith returned to Newark, CBP agents searched his bag, where they found Smith's cellphone and $9,840 in cash (just under the $10,000 currency reporting requirement). (SPA-6; A-381). At this time, Smith was acting "very evasive." (A-381).

HSI officers then stepped in to interview Smith. (A-381, 384). They asked Smith for the cellphone's passcode, which he ultimately provided. (SPA-6; A-

13

384).[3] After receiving Smith's passcode, agents made a forensic copy of the phone. (SPA-7). The agents returned Smith's cellphone to him within approximately three hours of when they first stopped him. (*See* A-384-85).

In the following days, HSI began to review the forensic copy of the cellphone. (SPA-7). Thirty-eight days after the forensic copy was made, the Government applied for a warrant to search the forensic copy. (SPA-7). The warrant affidavit disclosed that CBP agents had created the forensic copy of the cellphone pursuant to the border search authority and that the agents had already begun their review of the contents. (SPA-7-8). The Honorable Stewart D. Aaron, United States Magistrate Judge, authorized the warrant. (SPA-8). The Government completed its review of the contents of the forensic copy after the issuance of the warrant. (SPA-8).

Approximately six months later, the Government applied for a Title III wiretap of Smith's cellphone. (SPA-8). The application for the wiretap relied in part on information obtained from the search of the forensic copy of Smith's cellphone, but also relied on additional evidence obtained from other sources, including extensive information provided by witnesses, cellphone toll

---

[3] Although Smith alleged that he was coerced into providing his passcode (SPA-6), Judge Rakoff expressly declined to resolve the parties' dispute over that allegation (*see* SPA-83).

14

records, social media warrants, and analysis of financial records. (SPA-8-9).

Smith subsequently moved to suppress both the phone search and the wiretap on the grounds that they resulted from a border search that violated his Fourth Amendment rights. (SPA-9).

On May 11, 2023, Judge Rakoff issued an opinion denying Smith's motion to suppress. (SPA-3-54). Judge Rakoff first concluded that the search of Smith's cellphone violated his Fourth Amendment rights, holding that, absent exigent circumstances, border searches of a cellphone can be conducted only after obtaining a warrant. (SPA-19). Judge Rakoff recognized that "of the five federal courts of appeals to consider the question, none has gone quite this far" (SPA-23), and that his "preferred rule" is "more protective than the approach of any circuit court to consider the question" (SPA-29).

Notwithstanding his conclusion that the search was illegal, Judge Rakoff held that the good-faith exception precluded suppression for two, independent reasons: (1) because "the agents conducting the search had an objectively reasonable basis for believing that there was legal authority binding on them that authorized such a search"; and (2) because "the Government ultimately obtained a search warrant to search the phone copy, disclosing all relevant details of the search to a neutral magistrate." (SPA-5; *see* SPA-32-44).

## B.  Applicable Law

In evaluating the denial of a motion to suppress evidence, this Court reviews a district court's factual

15

findings for clear error and its conclusions of law *de novo. United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015).

### 1.  The Border Search Exception

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and sei-zures." U.S. Const. amend. IV. Warrantless searches are *per se* unreasonable unless an exception applies. *See Cady v. Dombrowski*, 413 U.S. 433, 439 (1973). One such exception is a border search, which, "from before the adoption of the Fourth Amendment, ha[s] been considered 'reasonable' by the single fact that the person or item in question had entered our country from outside." *United States v. Ramsey*, 431 U.S. 606, 619 (1977). An airport is the functional equivalent of a border and thus a search in an airport falls within the scope of the border search authority. *See United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006).

The border search exception is a "longstanding, his-torically recognized exception to the Fourth Amend-ment's general principle that a warrant be obtained" for a search. *Ramsey*, 431 U.S. at 621. The Govern-ment's authority to search persons and effects at the border is rooted in "the long-standing right of the sov-ereign to protect itself by stopping and examining per-sons and property crossing into this country." *Id.* at 616. This principle reflects that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152

16

(2004). In addition, "[t]he expectation of privacy [is] less at the border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 539 (1985). Consequently, the "Fourth Amendment balance between the interests of the Government and the privacy right of the individual is struck much more favorably to the Government at the border." *Id.* at 540.

Under the border search exception, routine searches of an incoming traveler's person and belongings are "not subject to any requirement of reasonable suspicion, probable cause, or warrant." *Montoya de Hernandez*, 473 U.S. at 538. Indeed, border searches ordinarily "are reasonable simply by virtue of the fact that they occur at the border." *Flores-Montano,* 541 U.S. at 152-53; *see also Levy*, 803 F.3d at 122 ("When the evidence at issue derives from a border search, we recognize the Federal Government's broad plenary powers to conduct so-called 'routine' searches at the border even without reasonable suspicion that the prospective entrant has committed a crime."). "Routine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights." *Irving*, 452 F.3d at 123.

This Court has further explained that, even for non-routine border searches, no warrant is required. Rather, a non-routine border search is valid "if it is supported by reasonable suspicion." *Irving*, 452 F.3d at 124; *see also United States v. Asbury*, 586 F.2d 973, 977 (2d Cir. 1978) (affirming validity of warrantless border strip search). The reasonable suspicion standard requires "considerably less than proof of

17

wrongdoing by a preponderance of the evidence"; indeed, it requires only "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Levy*, 803 F.3d at 123. Reasonable suspicion is measured in light of the "totality of the circumstances—the whole picture," *Navarette v. California*, 572 U.S. 393, 397 (2014), and the "actual motivations of the individual officers involved . . . play no role in [the] Fourth Amendment analysis," *Whren v. United States*, 517 U.S. 806, 813 (1996).

This Court has further held that when conducting border searches, law enforcement agents are "neither expected nor required to ignore tangible or documentary evidence of a federal crime," and have "the authority to search and review a traveler's documents and other items at the border when they reasonably suspect the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties." *Levy*, 803 F.3d at 124 (holding that border search of notebook was permissible where CBP had reasonable suspicion that traveler "was engaged in a financial crime"); *see also Irving*, 452 F.3d at 123 (the validity of a border search "does not depend on whether it is prompted by a criminal investigative motive").

This Court has not yet addressed whether a search of a cellphone constitutes a routine or non-routine border search. But the "consensus" among the Courts of Appeals is that "brief, manual searches of a traveler's electronic device" are routine border searches requiring no individualized suspicion at all. *United States v. Mendez*, 103 F.4th 1303, 1307 (7th Cir. 2024); *see also*

18

*United States v. Castillo*, 70 F.4th 894, 897-98 (5th Cir. 2023) (holding that for "manual cell phone searches at the border," circuits "have uniformly held" that no warrant or reasonable suspicion is required); *Alasaad v. Mayorkas*, 988 F.3d 8, 17 (1st Cir. 2021) ("[B]asic border searches [of electronic devices] are routine searches and need not be supported by reasonable suspicion."); *United States v. Cano*, 934 F.3d 1002, 1016, 1018 (9th Cir. 2019) ("[M]anual searches of cell phones at the border are reasonable without individualized suspicion.").

The Eleventh Circuit has held that a *forensic* search of an electronic device at the border requires no individualized suspicion. *See United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018). In *Touset*, the Eleventh Circuit noted that "[t]he Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive, and neither have we." *Id.* The court distinguished cases involving "highly intrusive searches of a person's body," explaining that "[a] forensic search of an electronic device is not like a strip search or an x-ray; it does not require border agents to touch a traveler's body, to expose intimate body parts, or to use any physical force against him." *Id.* at 1234. In contrast to the Eleventh Circuit, the Fourth and Ninth Circuits have concluded that reasonable suspicion is required for forensic searches of electronic devices at the border. *See United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018); *Cano*, 934 F.3d at 1016. But no Court of Appeals has ever held that forensic searches require a warrant or probable cause.

19

In fact, routine or otherwise, searches at the border "never" require a warrant or probable cause. *Ramsey*, 431 U.S. at 619 ("There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause."). "At most, border searches require reasonable suspicion." *Mendez*, 103 F.4th at 1307. Indeed, every circuit to have addressed the question has concluded that, notwithstanding the Supreme Court's decision in *Riley v. California*, which held that a warrant is required to search a cellphone incident to a domestic arrest, *see* 573 U.S. 373, 385-403 (2014), a warrant is not required for the search of a cellphone at the border. *See Alasaad*, 988 F.3d at 16-17 ("*Riley* does not command a warrant requirement for border searches of electronic devices, nor does the logic behind *Riley* compel us to impose one"); *Kolsuz*, 890 F.3d at 142 (similar); *United States v. Molina-Isidoro*, 884 F.3d 287, 291 (5th Cir. 2018) (similar); *United States v. Xiang*, 67 F.4th 895, 900 (8th Cir. 2023) (similar); *Cano*, 934 F.3d at 1015 (similar); *United States v. Vergara*, 884 F.3d 1309, 1312-13 (11th Cir. 2018) (similar); *see also Mendez*, 103 F.4th at 1309 ("No circuit court has read *Riley* to require more than reasonable suspicion to support even the most intrusive electronics search at the border.").

## 2. The Good-Faith Exception

Even where evidence is obtained in violation of Fourth Amendment rights, "[a] violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010); *see also United States v.*

20

*Leon*, 468 U.S. 897, 906 (1984) ("Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."). The exclusionary rule's "corrective value justifies its cost when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *United States v. Raymonda*, 780 F.3d 105, 117-18 (2d Cir. 2015).

With those remedial purposes in mind, the good-faith exception to the exclusionary rule asks "whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances." *Herring v. United States*, 555 U.S. 135, 145 (2009). "[W]hen the Government acts with an objectively reasonable good-faith belief that their conduct is lawful, the exclusionary rule does not apply." *United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018).

The good-faith exception also applies to "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. The good-faith inquiry turns on "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23. "[T]he Supreme Court has strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection." *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011).

21

## C. Discussion

### 1. The Border Search of Smith's Phone Did Not Violate the Fourth Amendment

#### a. A Warrant Was Not Required to Search Smith's Phone

The District Court concluded—and Smith likewise argues—that following the Supreme Court's decision in *Riley*, the border search exception no longer justifies a warrantless search of a cellphone at the border. (Br. 23-28). But every circuit to have considered the question has disagreed. *See, e.g.*, *Alasaad*, 988 F.3d at 16-17; *Kolsuz*, 890 F.3d at 142; *Castillo*, 70 F.4th at 897-98; *Mendez*, 103 F.4th at 1309; *Xiang*, 67 F.4th at 900; *Cano*, 934 F.3d at 1015; *Vergara*, 884 F.3d at 1312-13. And this Court "may affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the [d]istrict [c]ourt." *United States v. Landesman*, 17 F.4th 298, 339 (2d Cir. 2021).

The Courts of Appeals' uniform rejection of Smith's position is well-founded. Neither *Riley* nor its logic compel the conclusion that a warrant is required for searches of electronic devices at the border. *Riley* addressed a warrantless search of a cellphone under a different exception to the warrant requirement: a search incident to arrest. *See Riley*, 573 U.S. at 385-403. It reasoned that an individual's privacy interest in their cellphone is heightened in light of the vast quantity of data that may be stored on such devices, and that the Government's interest in searching an arrestee's cellphone following an arrest is limited, as

22

such searches do not meaningfully advance the purposes of the search-incident-to-arrest exception: protecting officers and preventing the destruction of evidence. *Id.*

But the purposes of a border search, and the attending governmental and privacy interests at the border, are different than those implicated during a domestic arrest. The border search exception to the Fourth Amendment's warrant requirement is grounded in the Government's "inherent authority to protect, and . . . paramount interest in protecting, its territorial integrity." *Flores-Montano*, 541 U.S. at 153; *see also United States v. Muench*, 694 F.2d 28, 33 (2d Cir. 1982) ("The right of the United States to conduct border searches is based on its sovereign authority to protect its territorial integrity."). And an individual's privacy expectation is "less at the border than in the interior." *Montoya de Hernandez*, 473 U.S. at 539-40. Thus, at the border, the "Fourth Amendment balance between the interests of the Government and the privacy right of the individual" is flipped from what it is during a search incident to arrest—it is "struck much more favorably to the Government." *Id.*

As the Seventh Circuit observed in *Mendez*, "[w]hat is unreasonable after arrest may be perfectly reasonable at customs." *Mendez*, 103 F.4th at 1308. Indeed, *Riley* itself limited its holding to searches incident to arrest, acknowledging that "other case-specific exceptions may still justify a warrantless search of a particular phone." *Riley*, 573 U.S. at 401-02. Border searches, with the Government's "paramount interest in protecting[] its territorial integrity," are just such

23

an exception. *Flores-Montano*, 541 U.S. at 153; *see also Alasaad*, 988 F.3d at 17 ("[G]iven the volume of travelers passing through our nation's borders, warrantless electronic device searches are essential to the border search exception's purpose of ensuring that the executive branch can adequately protect the border."). Thus, *Riley* did not upend the longstanding, well-settled precedent that a warrant is not required to conduct a border search, even of a cellphone.

In concluding otherwise, the District Court improperly balanced the Fourth Amendment interests at stake at the border. Judge Rakoff concluded that the Government's interest in preventing cross-border crime and the importation of digital contraband is "relatively weak" because data can be transmitted into the country without being contained on a physical device brought across the border. (SPA-21-22). But the fact that some contraband can enter the country via the internet does not detract from the Government's interest in preventing other contraband from entering as well and from stopping cross-border crime generally. For example, an individual smuggling child pornography into the country may conclude that he can more easily avoid detection by storing that illicit material in his cellphone's photo gallery (or on another electronic device) than by leaving a digital footprint on the internet. The availability of an internet transfer does not diminish the Government's interest in stopping additional child pornography from entering the country (just like the widespread availability of narcotics in the country does not mean the Government has a "weak" interest in preventing the importation of additional narcotics).

24

Indeed, contrary to the District Court's reasoning, the Government's interest in searching cellphones at the border is exceptional, not weak. As the Fourth Circuit observed in *United States v. Nkongho*, 107 F.4th 373 (4th Cir. 2024)—a case involving a border search of a cellphone in connection with a fraud scheme—cellphone searches at the border are "critical for preventing cross-border crime and the importation of contraband," including "evidence of ongoing transnational criminal activity . . . such as communications between conspirators." *Id.* at 381; *see also Alasaad*, 988 F.3d at 19 ("[T]he government's interest in preventing crime at international borders 'is at its zenith,' . . . and it follows that a search for evidence of either contraband or a cross-border crime furthers the purposes of the border search exception to the warrant requirement.").

The District Court was also wrong to conclude that "the magnitude of the privacy invasion caused by" border searches of cellphones "dwarfs that historically posed by border searches." (SPA-18-19). This Court has already affirmed warrantless border searches in highly intrusive contexts, such as strip searches and body-cavity searches. *See Irving*, 452 F.3d at 123-24 ("[M]ore invasive searches, like strip searches, require reasonable suspicion."); *United States v. Ogberaha*, 771 F.2d 655, 658 (2d Cir. 1985) (requiring reasonable suspicion for body cavity search); *Asbury*, 586 F.2d at 976 (requiring reasonable suspicion for strip search); *see also Montoya de Hernandez*, 473 U.S. at 541-42 (requiring reasonable suspicion for detention of traveler overnight for purpose of monitored bowel movement). A faithful application of Supreme Court and Second Circuit precedent regarding border searches thus

25

compels the conclusion that, notwithstanding a traveler's significant privacy interest in their cellphones, warrantless searches of cellphones at the border are permitted to advance the Government's paramount interest in protecting its territorial integrity.

### b. Reasonable Suspicion Supported the Search of Smith's Phone

As noted above, the Courts of Appeals are divided as to whether a forensic search of an electronic device requires (1) no individualized suspicion, *see Touset*, 890 F.3d at 1233; or (2) reasonable suspicion, *see Kolsuz*, 890 F.3d at 144; *Cano*, 934 F.3d at 1016. This Court need not resolve that question here because law enforcement had ample reasonable suspicion to justify the search of Smith's phone. (*See* SPA-36 (Judge Rakoff concluding that, "even prior to the search, the Government had objectively reasonable suspicion of Smith's involvement in criminal activity")).

The reasonable suspicion standard requires only "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Levy*, 803 F.3d at 123. At the time Smith was stopped at the Newark airport, both HSI and the FBI had received information from numerous individuals that Smith was committing both extortion and money laundering. (SPA-5-6; A-381, 383; Dkt. 168 at 2, 15). Agents had already interviewed witnesses, who had described— among other things—Smith's use of phones to further his schemes. (Dkt. 168 at 2, 15). Before taking Smith's phone, the agents knew that Smith had attempted to travel to Jamaica but been denied entry. (SPA-5). They

26

also knew that Smith had a large amount of cash—just under the $10,000 currency reporting requirement— suggesting that Smith was engaged in cross-border money laundering. (SPA-6; A-381). And before searching Smith's phone, the agents saw that he was acting "very evasive." (A-381). Taken together, this information easily satisfied the reasonable suspicion standard, which is "rather lenient," *United States v. Santana*, 485 F.2d 365, 368 (2d Cir. 1973), and "not a difficult one to satisfy," *United States v. Oates*, 560 F.2d 45, 63 (2d Cir. 1977).

Smith fails to explain why this evidence was insufficient to give rise to reasonable suspicion. Instead, he relies on cases from the Ninth and Fourth Circuits for the proposition that the border search authority is limited to searches for contraband or evidence of border-related crimes, and argues that the searches of his phones fell outside that scope. (Br. 24-25). In *Cano*, the Ninth Circuit held that the border search exception authorizes warrantless searches of cellphones only to determine if the phone contains contraband. *See* 34 F.3d at 1018. In *United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019), the Fourth Circuit held that for a non-routine border search, the Government must have individualized suspicion of an offense bearing "some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband." *Id.* at 721. But neither holding is the law in this Circuit. In *Levy*, this Court held that agents conducting a border search "have the authority to search and review a traveler's documents and other items at the border when they reasonably

27

believe that a traveler is engaged in criminal activity, *even if the crime falls outside the primary scope of their official duties.*" 803 F.3d at 124 (emphasis added). Thus, notwithstanding the fact that border agents focus "primarily on contraband, dutiable merchandise, immigrant fraud, and terrorism," they are "neither expected nor required to ignore tangible or documentary evidence of a federal crime." *Id.*

Moreover, searches of cellphones at the border not only further the Government's interest in preventing entry of contraband, but also support the other border-related purposes of the border search exception, including national security concerns, unlawful immigration, and transnational crime. *Cano*'s contrary conclusion is at odds with this Court's controlling precedent in *Levy*, which rejects the proposition that border searches are limited to detecting contraband. *Levy*, 803 F.3d at 124; *see also United States v. Gavino*, No. 22 Cr. 136 (RPK), 2024 WL 852072, at *6 (E.D.N.Y. Jan. 7, 2024) (finding *Cano* unpersuasive in light of controlling precedent in *Levy*); *United States v. Tineo*, No. 23 Cr. 223 (DLI), 2024 WL 2862289, at *6 (E.D.N.Y. June 6, 2024) ("The *Cano* court apparently did not consider the urgency of curtailing ongoing crimes, such as, for example, international narcotics importation and distribution conspiracies with coconspirators within the United States[.]").

In any event, Smith is wrong to suggest that the investigation into him lacked a nexus to the purposes of the border search exception. Agents investigating Smith were part of HSI—a component of DHS specifically focused on investigating "transnational crime

28

and violations of the customs and immigration laws of the United States." Homeland Security Investigations, "What We Investigate," available at *https://www.dhs.gov/hsi/investigate* (last accessed March 13, 2025). And HSI's investigation was specifically focused on whether Smith was engaged in money laundering, including cross-border laundering of the nearly $10,000 in cash that was on his person after he attempted to enter Jamaica and was denied entry. (SPA-5-6; A-381, 383; Dkt. 168 at 2, 15). Law enforcement's investigation into Smith and the border search of his phone were therefore directly tied to the core rationale of the border search exception—the Government's paramount interest in protecting its territorial integrity and preventing cross-border crime. *See Flores-Montano*, 541 U.S. at 153; *Nkongho*, 107 F.4th at 381; *Muench*, 694 F.2d at 33.

Because law enforcement had reasonable suspicion that evidence of both extortion and money laundering would be found on Smith's phone, the border search of that phone fell well within the scope of the border search authority and did not violate the Fourth Amendment.

### 2. The Good-Faith Exception Applies

Even if this Court were to conclude that the search of Smith's phone was unlawful, the Court should—like Judge Rakoff—apply the good-faith exception to the exclusionary rule.

29

### a. The Initial Border Search Falls under the Good-Faith Exception

First, as Judge Rakoff correctly held (SPA-34-38), the Government's initial border search of Smith's phone falls under the good-faith exception. Neither the Supreme Court nor this Court has ever held that warrantless border searches of cellphones are unconstitutional. Indeed, this Court's decisions upholding the Government's "broad plenary powers" to conduct warrantless border searches strongly indicate that border searches of cellphones are permissible. *See, e.g.*, *Levy*, 803 F.3d at 124 (warrantless search of traveler's notebook permissible); *Irving*, 452 F.3d at 123-24 (warrantless search of computer diskette permissible); *Asbury*, 586 F.2d at 977 (warrantless border strip search of traveler permissible).

Moreover, at the time of the search, multiple circuits had already held that a warrant is not required for searches of cellphones at the border. *See, e.g.*, *Kolsuz*, 890 F.3d at 142 (rejecting argument that *Riley* required warrant based on probable cause for border search of cellphone); *Vergara*, 884 F.3d at 1312-13 ("Border searches have long been excepted from warrant and probable cause requirements, and the holding of *Riley* does not change this rule."); *Touset*, 890 F.3d at 1233 (holding that even a forensic search of an electronic device at the border requires no individualized suspicion); *cf. Molina-Isidoro*, 884 F.3d at 292 (observing that "it is telling that no post-*Riley* decision issued either before or after this search has required a warrant for a border search of an electronic device").

30

Consistent with the circuit cases upholding warrantless searches of cellphones at the border, CBP guidance in place at the time indicated that forensic searches of electronic devices could be conducted without a warrant based on reasonable suspicion. (A-295-306). As Judge Rakoff concluded, "a reasonable border agent could have in good faith believed that the search conducted here was expressly warranted by" this CBP directive. (SPA-35; *see also* SPA-36 n.12 (noting that the CBP guidance, "which requires reasonable suspicion for forensic searches, was *more* protective than what some courts had held to be required, and reflects an objectively reasonable attempt to apply the law in this unsettled area")).[4]

The HSI agents conducting the warrantless border search of Smith's cellphone therefore had "an objectively reasonable good-faith belief that their conduct was lawful," especially in light of their reasonable suspicion that Smith was engaged in extortion and cross-border money laundering. *Zodhiates*, 901 F.3d at 143. Under these circumstances, the exclusionary rule does not apply. *Id.*; *see also Aigbekaen*, 943 F.3d at 725 (finding warrantless border search of cellphone unlawful but applying good-faith exception because the HSI

———————

[4] Contrary to Smith's claim (Br. 30 n.4), and as discussed above (*see supra* Point I.C.1.b), the Government plainly had "reasonable suspicion of activity in violation of the laws enforced or administered by CBP" (A-299; *see* SPA-35 n.11 (noting that Title 18 of the U.S. Code is one of the "titles enforced in some capacity by CBP"—which, like HSI, is a component of DHS)).

31

agents who conducted the search "reasonably relied on an established and uniform body of precedent allowing warrantless border searches of digital devices"); *see also United States v. Wanjiku*, 919 F.3d 472, 479 (7th Cir. 2019) ("[A]gents acted in good faith when they searched the devices with reasonable suspicion to believe that a crime was being committed, at a time when no court had ever required more than reasonable suspicion for any search at the border."); *United States v. Sultanov*, No. 22 Cr. 149 (NRM), 2024 WL 3520443, at *26-28 (E.D.N.Y. July 24, 2024) (same).

Accordingly, even if the Court were to conclude that the border search of Smith's cellphone was unlawful, it should affirm under the good-faith exception. Because the agents conducted the searches based on an objectively reasonable good-faith belief that their conduct was lawful, "the harsh sanction of exclusion should not be applied[.]" *Davis v. United States*, 564 U.S. 229, 241 (2011).

### b. Law Enforcement Acted in Good Faith by Relying on a Search Warrant Authorized by a Neutral Magistrate Judge

Moreover, even assuming that law enforcement acted in bad faith by conducting the initial border search (and it did not), the good-faith exception applies to the Government's reliance on a search warrant authorized by Judge Aaron, a neutral magistrate judge. (SPA-38-44). As Judge Rakoff noted, "the core good faith exception to the exclusionary rule applies where the Government reasonably relies on a duly issued

32

search warrant, even if the warrant should never have issued." (SPA-38 (citing *Leon*, 468 U.S. at 913-18)). And here, the Government openly "disclosed the relevant circumstances of the search—including that CBP agents seized, copied, and began searching Smith's phone without a warrant at the border"—to Judge Aaron, who then authorized the warrant. (SPA-38). This Court "has previously applied the good faith exception in similar circumstances." (SPA-39).

In *United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985), for instance, DEA agents used a dog to smell directly outside a suspect's apartment to determine whether drugs were inside, and the Government applied for and obtained a search warrant for the apartment based, in large part, on this dog sniff. *Id.* at 1366. This Court held that the dog sniff was unconstitutional, that—without the dog sniff—there was insufficient probable cause, and that no search warrant should have issued. *Id.* Nevertheless, this Court held that suppression would be inappropriate because the Government brought its evidence to "a neutral and detached magistrate," who issued a warrant. *Id.* at 1368. Since "[t]he magistrate, whose duty it is to interpret the law, determined that the canine sniff could form the basis for probable cause[,] it was reasonable for the officer to rely on this determination." *Id.* Likewise, here, it was reasonable for law enforcement to rely on Judge Aaron's conclusion that the search of data from Smith's phone was permissible.

For the first time on appeal, Smith argues that the good-faith exception does not apply because the Government failed to notify Judge Aaron that "Smith did

33

not consent to the search by voluntarily providing his phone password." (Br. 32; *see* SPA-40 ("There is no suggestion that the government agents concealed any relevant facts from Magistrate Judge Aaron.")). Because Smith failed to raise this argument below, it is reviewed for plain error. *See United States v. Verkhoglyad*, 516 F.3d 122, 127-28 (2d Cir. 2008). And Smith's argument fails under any standard. As an initial matter, the Government disagrees with Smith's version of events at the border, which is based entirely on his own self-serving affidavit. (*See* A-307-10). Given Judge Rakoff's repeated conclusions that Smith's trial testimony was not credible (*see, e.g.*, SPA-97 n.1, 98 n.3, 99 n.4, 103 n.5, 106 n.8, 109 n.10, 115 n.12), this Court should afford little weight to Smith's claims.

In any event, even accepting Smith's factual representations, he has failed to make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). The affiant was not present for the border search and Smith does not identify any evidence that the affiant knew the circumstances of obtaining Smith's passcode. Moreover, Smith has failed to demonstrate, as he must, that "after setting aside the [purported] falsehoods, what remains of the warrant affidavit is insufficient to support a finding of probable cause." *United States v. Coreas*, 419 F.3d 151, 155 (2d Cir. 2005). At the very least, because Smith has failed to cite a single case in support of his argument (*see* Br. 32-33)—much less binding precedent—he cannot satisfy the plain error standard. *See United States v.*

34

*Whab*, 355 F.3d 155, 158 (2d Cir. 2004) ("For an error to be plain, it must at a minimum be clear under current law.").

Furthermore, as Judge Rakoff correctly held, the 38-day delay between the copying of Smith's phone and the obtaining of a warrant does not undermine the Government's good faith. (SPA-41-44). In *United States v. Smith*, 967 F.3d 198 (2d Cir. 2020), this Court held that an investigator's delay in applying for a warrant to search a tablet seized from the defendant violated the Fourth Amendment. The Court explained that law enforcement must act with "expediency in obtaining a search warrant to search seized evidence in order to avoid interfering with a continuing possessory interest for longer than reasonably necessary." *Id.* at 205. Here, in contrast, "Smith was not actually deprived of his use of his phone or the data stored on it, since the Government returned the original to him after it copied its contents." (SPA-42; *see also* A-384-85 (phone returned to Smith within approximately three hours)). "That makes this a different case from [this Court's] decision in *Smith*, where the police had seized a suspect's iPad, thereby depriving its owner of its use." (SPA-42). And given this significant distinction, it is not remotely clear—as in *Smith* itself—"that an objectively reasonable officer would have known that the delay [in obtaining a warrant] amounted to a violation of the Fourth Amendment." *Smith*, 967 F.3d at 213; (*see* SPA-43).

In sum, because the "good faith exception doubly applies here," "the results of [the] search (alongside

35

the subsequent wiretap) should not be suppressed." (SPA-43-44).

### 3. Smith's Fifth Amendment Rights Were Not Violated When He Provided His Cellphone Passcode to Agents

As Judge Rakoff correctly held, Smith's provision of his cellphone passcode to agents at the border did not violate his Fifth Amendment rights. (SPA-82-89).

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To qualify for the Fifth Amendment privilege, a communication must be [1] testimonial, [2] incriminating, and [3] compelled." *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 189 (2004).

In *Fisher v. United States*, the Supreme Court held that the *contents* of incriminating documents sought through a subpoena—which were created prior to the issuance of the subpoena—were not themselves testimonial, but also noted that the *act* of compliance with a subpoena could be testimonial. 425 U.S. 391, 410 (1976). Specifically, by complying with a subpoena, a defendant may "tacitly concede[ ] the existence of the papers demanded," that the papers are in the "possession or control" of the defendant, and that the produced documents are authentic. *Id.* At the same time, the *Fisher* Court acknowledged a limitation on this so-called "act of production" doctrine, finding that, on the facts of that case, the defendant's Fifth Amendment rights had not been violated because "[t]he existence and location of the papers [were] a foregone conclusion

36

and the [defendant] add[ed] little or nothing to the sum total of the Government's information by conceding that he in fact ha[d] the papers." *Id.* at 411. "Thus, because these communicative elements—(1) the existence of the documents, (2) the [defendant's] possession or control of the documents and (3) the authenticity of the documents—were a foregone conclusion, compliance with the summons became a question . . . not of testimony but of surrender." *United States v. Greenfield*, 831 F.3d 106, 115 (2d Cir. 2016). This limitation to the act-of-production protection, which has come to be known as the "foregone conclusion" doctrine, stems from the requirement that a communication not only be testimonial but also incriminating. (*See* SPA-85-86).

This Court "has not addressed how the act of production and foregone conclusion doctrines apply in the context of compelled decryption of an electronic device." (SPA-86). The Eleventh Circuit—the only federal court of appeals to rule on the question—has suggested that for the foregone conclusion doctrine to apply to the compelled decryption of a hard drive, "the Government [must] show with 'reasonable particularity' that, at the time it sought to compel the act of production, it already knew of the materials" on the electronic device. *In re Grand Jury Subpoena*, 670 F.3d 1335, 1346 (11th Cir. 2012).

As Judge Rakoff explained, however, "importing the 'reasonable particularity' requirement from the document subpoena context to the compelled decryption context in this manner is inappropriate, in that it fails to account for the differing testimonial character

37

of the act of decrypting a device." (SPA-87). "Unlike the act of responding to a subpoena, the act of physically unlocking a smartphone or providing the password does not communicate anything about what files exist on the phone, whether the files were created by the defendant, or whether the files are authentic." (SPA-87). "Rather, the testimonial significance of unlocking a cellphone or providing the password is the implied statement: 'I am the person who knows the password for this phone.'" (SPA-87). "If the defendant's ownership of the phone or his possession of the password are in doubt, compelling the defendant to decrypt the device may be an incriminating testimonial act." (SPA-87-88). "But if the Government can independently show the phone belonged to the defendant and that the defendant knew the password, the foregone conclusion doctrine applies, and the Fifth Amendment is not violated by the act of compelled decryption." (SPA-88); *see also People v. Sneed*, 230 N.E.3d 97, 118 (Ill. 2023); *Commonwealth v. Jones*, 117 N.E.3d 702, 711 (Mass. 2019); *United States v. Spencer*, No. 17 Cr. 259 (CRB), 2018 WL 1964588, at *3 (N.D. Cal. Apr. 26, 2018); Orin S. Kerr, *Compelled Decryption and the Privilege Against Self-Incrimination*, 97 TEX. L. REV. 767, 782-85 (2019).

Applying these principles here, Judge Rakoff correctly concluded that "the first two elements of the Fifth Amendment privilege—that the act of providing the password was testimonial and incriminating—are not satisfied." (SPA-83). Because "the Government knew that Smith was the owner of the phone and that Smith knew the password to unlock it" (SPA-88-89), his provision of the password "add[ed] little or nothing

38

to the sum total of the Government information by conceding" that he in fact knew the password, *Fisher*, 425 U.S. at 411. The phone was on Smith's person at the time of the stop; he never denied ownership of the phone; he "used the [phone] in front of the CBP agents before they ever asked for the password, thereby admitting his knowledge of the password"; and the agents heard him refer to the phone as "his phone." (SPA-89). Given the Government's independent knowledge that Smith knew the password, the foregone conclusion doctrine applies, and Smith's Fifth Amendment rights were not violated. (SPA-89).

Smith's arguments to the contrary lack merit. First, Smith urges the Court to apply the Eleventh Circuit's "reasonable particularity" requirement here. (Br. 37-38). But he fails to provide any explanation for why that decision is correct or to engage with Judge Rakoff's sound reasoning in any way. (*See* Br. 37-38).

Smith also repeats his argument that cellphones deserve special protection. (Br. 39-40). But the strength of a defendant's privacy interest in his cellphone has no bearing on whether his provision of a password is testimonial or incriminating.

Finally, Smith cites this Court's statement in *Greenfield* that "the Fifth Amendment privilege has been found to extend" to statements that "would furnish a link in the chain of evidence needed to prosecute the claimant," and asserts that his "eventual oral response providing his password is exactly such a link." (Br. 39). This argument misconstrues the foregone conclusion doctrine. While the privilege *can* extend to statements that "furnish a link in the chain of

39

evidence," the foregone conclusion doctrine neverthe-less applies where (as here) the act of production "adds little or nothing to the sum total of the Government's information by conceding" access to the evidence. *Fisher*, 425 U.S. at 411. Because the Government al-ready knew that Smith had the phone's password, the statement implied by his act of production—"I am the person who knows the password for this phone" (SPA-87)—was not testimonial or incriminating.

Moreover, even assuming that Smith's provision of his password was testimonial and incriminating, it was not compelled. Judge Rakoff declined to reach this issue (SPA-83), but the record makes clear that Smith voluntarily provided his passcode to the agents. Smith's argument to the contrary relies solely on his own affidavit (A-307-10), which—as noted above—this Court should afford little weight given Smith's re-peated perjury at trial. But even accepting Smith's version of events, he was not compelled to provide his passcode. Smith was not handcuffed and was not de-tained for a significant period of time, and could have persisted in his choice not to provide his passcode (Dkt. 230-2). He was also "advised he was free to contact a lawyer." (Dkt. 230-2). And while Smith was falsely told that the purpose of the search was to look for child por-nography (Dkt. 230), this Court has held that it is gen-erally permissible for law enforcement to use trickery and deception to obtain evidence without a warrant. *See United States v. Alejandro*, 368 F.3d 130, 135 (2d Cir. 2004). Accordingly, even if this Court disagrees with the District Court's ruling, it should affirm based

40

on the conclusion that Smith was not compelled to provide his passcode.[5]

### 4. Any Purported Error Was Harmless

Even assuming that Judge Rakoff erred in denying Smith's motion to suppress (and he did not), any error was harmless. "[E]vidence obtained in violation of a defendant's constitutional right [is reviewed] for harmless error." *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015). This Court will affirm the judgment if it concludes beyond a reasonable doubt that a rational trier of fact would have rendered a guilty verdict absent the alleged error. *Id.* Defendants seeking to suppress evidence on appeal "must surmount a series of hurdles: first establishing a constitutional violation, then demonstrating that the violation falls under the

––––––––––

[5] "A number of courts have found that where law enforcement has the technological capabilities to bypass a phone lock screen, the inevitable discovery doctrine applies, and evidence obtained by the subsequent search of the cell phone should not be suppressed." *United States v. Hooton*, No. 21 Cr. 105 (DAD), 2023 WL 3582029, at *3 (E.D. Cal. May 22, 2023). This Court need not reach this issue given that Smith's provision of his passcode was not testimonial, incriminating, or compelled. If the Court concludes otherwise, however, the Government should be afforded the opportunity to present evidence that law enforcement would have inevitably obtained access to Smith's phone through technological means if he had not provided the passcode.

41

ambit of the exclusionary rule, and finally showing that the erroneously admitted evidence affected the outcome of the trial. This is a heavy burden." *Id.*

Here, as Judge Rakoff's lengthy written opinion makes clear, the introduction of evidence from Smith's phone (and from the wiretap) did not affect the outcome of the trial. Even putting aside this evidence, the Government's proof—including testimony from its 19 witnesses, many of whom Judge Rakoff explicitly noted that he found credible—overwhelmingly proved that Smith was guilty of conspiring to commit racketeering and extortion. (*See* SPA-90-165). In fact, Smith effectively admitted to committing those crimes during his own testimony. (*See, e.g.*, SPA-99 n.4, 101, 106 n.8, 107 n.9, 109 & n.10, 119, 136, 138-40, 149 n.21). Because the record shows that Smith would have been found guilty even without the evidence from his phone and the wiretap, any error in denying Smith's motion to suppress was harmless. *Cacace*, 796 F.3d at 188.[6]

---

[6] To the extent the Court disagrees with this conclusion, it should—at most—remand for Judge Rakoff to explain whether he would find Smith guilty absent the cellphone and wiretap evidence, rather than vacate the judgment.

42

## POINT II

### The District Court Properly Sustained Five Proposed Witnesses' Counseled Invocations of Privilege

#### A. Relevant Facts

Smith's lengthy witness list included several associates of his enterprise. As trial progressed, the Government alerted the District Court to certain witnesses' potential criminal exposure. Smith did not question or contest that claim. (Tr. 1151-52).

When the District Court again took up the issue of Smith's defense witnesses, the Government reiterated that "quite a few" faced criminal exposure, including two individuals—Cynthia Fonseca and Elvin Mata—who lacked counsel. (Tr. 1040-42). Without objection, the Government proposed to facilitate the appointment of counsel for both witnesses. (Tr. 1488). Standby counsel asked whether the District Court intended to inquire about the witnesses' good-faith basis for invoking, adding that two attorneys had stated their clients were willing to testify on Smith's behalf regarding non-criminal matters but would face exposure because the Government did not believe them. (Tr. 1041). Standby counsel did not identify those allegedly willing witnesses or the subject matter of their purported testimony. (Tr. 1041).

Judge Rakoff deemed a detailed inquiry unnecessary, reciting the law that a witness may "invoke the Fifth Amendment if there's any link in the chain of possible prosecution" and observing that those

43

witnesses would be invoking "both as their own choice and on the advice of counsel" (Tr. 1041). Later in the trial, Judge Rakoff explained that, "given what I know about this case, in many of the situations that I already know about some of these witnesses, the potential exposure—criminal exposure would be obvious." (Tr. 1401).

Ultimately, five of Smith's witnesses—Cynthia Fonseca, Michael Iaducci, Arturo Nunez, Elvin Mata, and Gerardo Curcio—invoked their Fifth Amendment privilege against self-incrimination. Before excusing each witness, Judge Rakoff inquired whether the witness's counsel was present, asked counsel to introduce himself or herself, and then inquired of the witness whether he or she had discussed with counsel the right to remain silent if and only if answers could be used against the witness in a criminal prosecution. (Tr. 1381-89).

## B.   Applicable Law

The Fifth Amendment privilege against self-incrimination extends to "witnesses who have reasonable cause to apprehend danger from a direct answer." *Ohio v. Reiner*, 532 U.S. 17, 21 (2001). "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result"—the assessment of which requires that the trial judge "be governed as much by his personal perception of the peculiarities of the case as by the facts actually in

44

evidence." *Hoffman v. United States*, 341 U.S. 479, 486-87 (1951).

Where a defendant claims that a witness's invocation of the Fifth Amendment privilege violated his Sixth Amendment right to present a defense, the defendant "must demonstrate that he was deprived of the opportunity to present a witness who would have provided testimony that was both material and favorable to his defense," *Howard v. Walker*, 406 F.3d 114, 132 (2d Cir. 2005), "in ways not merely cumulative to the testimony of available witnesses," *United States v. Ginsberg*, 758 F.2d 823, 831 (2d Cir. 1985).

If the record makes clear the validity of a witness's Fifth Amendment invocation, a district court need not engage in a "particularized inquiry as to whether each of a witness's claims of privilege could provide evidence that would tend to incriminate him." *United States v. Stewart*, 907 F.3d 677, 684-85 (2d Cir. 2018). In that case, "[w]here the hazards of self-incrimination are readily apparent, a witness's invocation of the privilege against self-incrimination need not be tested by the rote recitation of questions that have obvious answers of which the judge is already aware." *Id.*

## C.  Discussion

Judge Rakoff was not required to make a particularized inquiry of five defense witnesses whose criminal exposure was patent from the record and who invoked their Fifth Amendment privilege on the advice of counsel. And even assuming that the District Court erred in permitting the witnesses to invoke, Smith cannot show how the testimony of those witnesses

45

would have been material or favorable to his defense. *See United States v. Herron*, 762 F. Appx. 25, 29 (2d Cir. 2019); *United States v. Dey*, 409 F. App'x 372, 374-75 (2d Cir. 2010).

### 1. Cynthia Fonseca

Smith claims that the District Court heard only that Fonseca worked as a chaser at First Response and "did not hear about Fonseca's perpetration of any criminal conduct." (Br. 46). That ignores entirely the testimony from Jackson and accompanying documentary evidence making clear that Fonseca was well-aware of the enterprise's criminal activities and helped further them. Specifically, Jackson testified that Cynthia Fonseca was in a WhatsApp message group with other members of the enterprise and, as part of her participation in that group, sent a photograph and video of a victim shortly before Smith ordered the victim to be assaulted. (Tr. 214; GX 301, 304). Smith also offers scant detail about Fonseca's testimony and fails to explain how that testimony could possibly have been material or favorable. Smith states only that "Fonseca would have offered non-cumulative testimony concerning First Response potentially helpful to Smith." (Br. 47). That sort of self-serving *ipse dixit* cannot satisfy Smith's considerable burden. *See Howard*, 406 F.3d at 132.

### 2. Mike Iaducci ("Tugboat")

Iaducci's criminal exposure was likewise clear. In his own testimony, Smith situated himself under Iaducci and suggested that he and other enterprise members took direction from Iaducci. (Tr. 1160-64).

46

More importantly, Smith ignores Government Exhibit 457, a recorded phone call in which Smith stated that "Tugboat" (*i.e.*, Iaducci) and "Primo" (*i.e.*, Arturo Nunez) were involved in the insurance fraud and asked, "Why is Tugboat and Primo and them not locked up with us?" (GX 457T). On cross-examination, Smith admitted that, in that phone call, he had been "talking . . . about how First Response tampered with a couple fires a year." (Tr. 1356). Even if Iaducci's criminal exposure were not plain from the record, Smith makes virtually no attempt to argue that Iaducci would have offered material or favorable testimony. Instead, he groups Iaducci with Fonseca and, in essence, asks this Court to take his word for it.

### 3. Arturo Nunez ("Primo")

Smith does not dispute that Nunez's criminal exposure was clear from the record. In addition to Government Exhibit 457—in which Smith himself implicates Nunez—Jackson testified that, as part of the scheme to defraud insurance companies, Nunez directed him to remove illegal conditions from homes. (Tr. 424, 496). Nor does Smith offer *any* argument that Nunez's testimony was favorable, much less material.

### 4. Elvin Mata

Far from being a victim of the enterprise (Br. 45), Mata was a willing participant in and beneficiary of Smith's rotation system. Mata was nominally on the payroll of ServPro as a chaser, but he reported to *Smith*. And as a participant in Smith's rotation system, Mata was afforded certain privileges, such as chasing fires at night. (Tr. 881, 958).

47

Relying on a sentencing letter submitted by Mata in connection with sentencing, Smith speculates that Mata's testimony would have been favorable and material. (Br. 46-47 (quoting A-2104)). Not so. Indeed, Mata's letter acknowledges that Smith imposed order on a once "very competitive business." (A-2104). Mata continues that Smith was "able to have all the guys work together." (A-2104). As a threshold matter, the record is clear as to how Smith achieved that aim— through threats of violence and extortion. More to the point, nowhere does Mata offer a competing account of the meeting where Smith threatened and extorted the ServPro owner, Benjamin Vargas. (SPA-113). Even assuming Mata could offer such an account, his testimony would not have been material, given the overwhelming evidence establishing Smith's extortion scheme. (SPA-112-22, 144).

### 5.   Gerardo Curcio

Curcio likewise faced clear criminal exposure due to his association with Smith's rotation system and his potentially false statements to the FBI. Smith acknowledges that Curcio was present for "a meeting with Smith and others discussing" a public adjuster who was assaulted at Smith's direction for failing to follow Smith's rules. (Br. 45; *see* SPA-109-11). After that meeting, federal agents visited Curcio, who falsely reported that "there was no extortion going on." (Tr. 689). Later that month, at a dinner attended by Smith and other First Response members, as well as Curcio and representatives of other companies in the industry, Smith toasted Curcio for not "lying on him."

48

(Tr. 689; SPA-162 ("Smith praised Curcio . . . for (supposedly) not lying to the FBI.")).

Smith claims that Curcio would have provided testimony that he was not extorted by Smith. (Br. 47). Such "good-act" testimony is neither relevant nor material, where the Government never claimed that every industry player was a victim of Smith's extortion scheme. *United States v. Scarpa*, 913 F. 2d 993, 1011 (2d Cir. 1990); (SPA-144 ("[T]he fact that one company felt it was beneficial to participate in the rotation cannot overcome the substantial credible evidence that other companies that would and did lose business after joining the rotation joined only after they were threatened by Smith and his co-conspirators.")).

In short, Fonseca, Iaducci, Nunez, Mata, and Curcio each had criminal exposure that was "obvious" to the District Court and obviated the need for a particularized inquiry into the basis for their invocation of the Fifth Amendment. But even if the criminal exposure of those witnesses had not been patent, Smith cannot prevail on his Sixth Amendment claim because he cannot establish that those witnesses would have offered favorable and material testimony.

49

## POINT III

## The District Court Did Not Abuse Its Discretion in Denying Smith's Request to Re-Appoint Counsel to Represent Him at Trial

### A. Factual Background

Upon his arrest in Puerto Rico in late June 2022, Smith was represented by appointed counsel, Anthony La Pinta. While pending transfer from Puerto Rico to New York, Smith wrote an uncounseled letter to Judge Rakoff asserting his desire to waive rights to file motions in order to have a speedy trial. (Dkt. 40). On August 9, 2022, La Pinta asked to be relieved as counsel, and asked that Michael Vitaliano be substituted in his place. (Dkt. 49). On September 9, 2022, Smith was arraigned and his trial, against the advice of his counsel, was scheduled for October 17, 2022. (A-271). His trial was briefly adjourned (on Smith's consent) to November 28, 2022 for Smith and certain of his co-defendants, while his remaining co-defendants elected to proceed to trial on May 1, 2023, in light of the substantial discovery and complexity of the matter. (Dkt 89).

After Smith rejected Vitaliano's advice about the dangers of proceeding to trial in a complicated case on such an expedited basis, Vitaliano requested, over Smith's objection, an adjournment of the November 28, 2022 trial date. (A-117-24). The Court then adjourned the trial to May 1, 2023—the trial date previously set for Smith's co-defendants—concluding that there was "no way that [Smith] could get a fair trial" if he proceeded to trial on November 28, 2022. (Dkt. 115 at 6; A-117-24).

50

Smith fired Vitaliano after the trial was adjourned, and Thomas Nooter (and then Jill Shellow) were appointed to represent Smith. (A-130, 133-34, 268). The May 1, 2023 trial date was adjourned to August 14, 2023 in light of health complications that arose with Nooter, who was replaced by Andrew Patel. (A-322-23). Several weeks after Patel's appointment, Shellow and Patel made an *ex parte* request to be relieved from representing Smith, forcing a delay of the trial to November 27, 2023. (A-56, 62). On July 20, 2023, the District Court appointed John Buza to represent Smith. (Dkt. 248). Buza, however, was relieved on October 23, 2023, after Smith filed motions accusing Buza of refusing to file motions that the District Court had already concluded were baseless. (Dkt. 289; SPA-67). Russell Capone was then appointed as standby counsel. (A-64).

On October 31, 2023, the District Court ordered the Government to disclose Section 3500 material for all testifying witnesses two weeks before trial. (Dkt. 297). The Government disclosed this material on November 13, 2023—thereby revealing the identities of its witnesses and their prior statements. Just one day later, on November 14, 2023—and just two weeks before the start of the trial—the defendant sought appointment of Capone (who would be Smith's seventh lawyer) as counsel and an adjournment to allow Capone to get up to speed. (A-413).

The Government objected, describing Smith's repeated cycles of firing counsel, threatening to proceed *pro se*, obtaining a new lawyer, and then firing counsel again. (Dkt. 309). The Government expressed its

51

serious concerns about Smith's history of intimidation, witness tampering, and use of contraband phones. (Dkt. 309). Given Smith's history of firing counsel, the Government explained, his eve-of-trial adjournment request was tactical and an improper effort to use his newly acquired Section 3500 material to intimidate witnesses and prevent them from testifying against him. (Dkt. 309 at 2-3). The Government further insisted on the public's right to a speedy trial, and described how its witnesses were terrified to testify and panicked by the prospect that their identities had been disclosed. (Dkt. 309 at 2-3).

The Government also addressed the discovery concerns raised in Smith's adjournment request. (Dkt. 309 at 2-4). It noted that Smith had not informed the Government that he had purportedly not received as much discovery access as the District Court ordered the prison to provide until November 14, 2023—the same day he requested the adjournment. (Dkt. 309 at 2-4). The Government further described how Smith had had access to discovery for over a year, and that he had elected to proceed *pro se* fully aware of the volume of discovery and the protective measures in place. (Dkt. 309 at 2-4).

Judge Rakoff denied Smith's request for an adjournment and appointment of counsel. (SPA-56 n.1, 78-79). Based on his firsthand observations of Smith, and after residing over his case for more than a year, Judge Rakoff concluded that Smith's request was "nothing more than a continuation of a ploy that the defendant has repeatedly used in the past to delay these proceedings, all the while expressing a desire for

52

a speedy trial." (SPA-56 n.1). "His latest request for adjournment is particularly sinister," Judge Rakoff continued, "given his history of witness intimidation and the fact that it was made just after he received sensitive 3500 material regarding cooperating witnesses." (SPA-56 n.1). Judge Rakoff further concluded —based on his extensive experience with Smith—that the request for counsel to be appointed was "nothing but gamesmanship," as Smith had "repeatedly made clear that he will not stick with any counsel who does not follow his instructions to file frivolous motions, make frivolous objections, and the like." (SPA-56 n.1; *see* SPA-66 (explaining that Smiths' erroneous views about the law were "[s]o strong . . . that they have already led to the excusing of no less than five prior attorneys for Smith in this case"); SPA-71 ("Smith has demonstrated a marked inability to work effectively with appointed counsel.")).

In order to address Smith's belated claim that he lacked sufficient access to discovery, Judge Rakoff ordered that Smith receive significant breaks before each major witness and before his jury addresses in order to review relevant materials with the aid of standby counsel. (SPA-78).

## B. Applicable Law

"When a defendant who elected to proceed *pro se* later demands an attorney, there is broad consensus that, once waived, the right to counsel is no longer unqualified." *United States v. Kerr*, 752 F.3d 206, 220 (2d Cir. 2014). "[O]nce a defendant voluntarily and intelligently waives his right to counsel and elects to proceed

53

*pro se*, the decision whether to grant or deny his post-waiver request for counsel is well within the discretion of the district court." *Id.* at 221. It is therefore "well within the court's discretion to deny a post-waiver motion for new counsel when it is made in an effort to delay or disrupt the proceedings." *Id.* A district court's denial of a post-waiver request for counsel is reviewed for abuse of discretion. *Id.*

### C. Discussion

Judge Rakoff did not abuse his discretion in denying Smith's post-waiver request for counsel. As described above, before his decision to proceed *pro se*, Smith fired or forced the withdrawal of five prior lawyers. (SPA-66). As Judge Rakoff correctly concluded, Smith's request—made on the eve of his repeatedly-delayed trial—was a transparent attempt to delay the proceedings while maintaining access to the recently disclosed Section 3500 material. (SPA-56 n.1). Because a "defendant has no right to whipsaw the district court and delay the proceedings by continually alternating his position on counsel," *Kerr*, 752 F.3d at 222, Smith's belated attempt to revoke his *pro status* and obtain an adjournment was properly denied, *see United States v. Liounis*, 639 F. App'x 731, 733–34 (2d Cir. 2016) ("We identify no abuse of discretion in the experienced trial judge's denial of such an eve-of-trial adjournment given his (1) reasonable concern that the request was a delay tactic; (2) proper consideration of hardship to eleven victim-witnesses traveling to New York for trial; and (3) appointment of standby counsel to represent Liounis fully at trial.").

54

Smith's arguments to the contrary are unavailing. First, Smith argues that the District Court erred in concluding that Smith had sought to delay the proceedings, because any delays were forced upon Smith. (Br. at 51). This argument misconstrues the record and ignores the fact that, with one exception due to a health issue that arose with one of his lawyers, it was *Smith's* repeated and misguided disagreements with counsel and his demands to replace them that caused adjournments of his trial. (*See* SPA-56 n.1, 66, 71).

Second, Smith argues that the District Court ignored that his request was motivated by his purported lack of access to discovery. (Br. 51-53). Given Smith's failure to raise this issue until two weeks before trial —the day after he received the sensitive Section 3500 material—Judge Rakoff did not abuse his discretion in concluding that this was a ploy. Moreover, Judge Rakoff had warned Smith in careful *Faretta* inquiries of the dangers and difficulties of proceeding to trial *pro se*, particularly as an incarcerated defendant, and Smith agreed to accept those challenges. (SPA-66). Smith and his counsel had already had access to discovery for over a year. (Dkt. 309 at 3-4). And the District Court made numerous accommodations to provide Smith with ample access to discovery, including by ordering the prison to provide that access (*see* Dkt. 203, 204, 209, 214) and by giving Smith time during trial to review discovery and prepare for cross-examination with the assistance of standby counsel (Dkt. 317).

Third, the District Court did not abuse its discretion in concluding that Smith sought a delay to enable

55

him to intimidate witnesses. The timing of Smith's request—immediately after receiving the sensitive Section 3500 material—was highly suspect. And the record is replete with instances of Smith's continued disrespect for the law, including his possession of multiple contraband phones in prison and his efforts to contact co-defendants (outside the presence of counsel) to dissuade them from cooperating. (Dkt. 180). While the District Court ultimately determined that the Government had not proven beyond a reasonable doubt that the racketeering conspiracy involved witness tampering, it explicitly concluded that Smith "agreed to obstruct justice" following the Indictment. (SPA-164 (Smith discussing sending Bloods gang members to Walsh's home to assault and threaten him if he cooperated)).

## POINT IV

### Smith's Below-Guidelines Sentence Was Substantively Reasonable

Smith claims that his 144-month sentence was substantively unreasonable. (Br. 54-59). This argument is meritless, as Smith's below-Guidelines sentence fell well within the wide range of permissible decisions.

### A. Factual Background

In the Presentence Report, the Probation Office calculated Smith's sentencing range as 360 to 480 months' imprisonment, and ultimately recommended a sentence of 240 months' imprisonment, emphasizing Smith's leadership role in a violent criminal enterprise and the thirteen convictions Smith had collected by

56

age 39. (PSR at 40, 48). Detailing Smith's criminal history, the report stated: "The instant offense represents this 39-y[e]ar-old defendant's 13th conviction and seventh felony conviction. The defendant's anti-social behavior has been marked by attempted petit larceny, assault, menacing, criminal sex act, attempted use of a child less than 17 years old in a sexual performance, shop lifting, criminal solicitation, reckless endangerment, conspiracy, and a drug-related offense." (PSR at 48).

At sentencing, Judge Rakoff adopted the Presentence Report, even as he made clear that he intended to give the Guidelines very little weight and would instead focus on the sentencing factors enumerated in 18 U.S.C. § 3553(a). (A-2152). To that end, Judge Rakoff devoted significant attention to the "question of disparity," looking first to the other sentences imposed in "this very case." (A-2165). Judge Rakoff rejected out-of-hand Smith's request for a sentence of 66 months' incarceration, which he noted was only slightly higher than the 60 months imposed on Smith's co-defendant and subordinate Anthony McGee. (A-2165, 2184 (finding "no comparison in terms of level of misconduct between Mr. McGee and the much more egregious role played by Mr. Smith.")).

Smith's extensive and violent criminal history also factored heavily into Judge Rakoff's sentence, together with the attendant need to protect the public from people who have "chosen a life of crime." (A-2157). Judge Rakoff observed that Smith did not have one or two prior convictions; rather, he had a "host of prior convictions," and he made use of that "criminal

57

training" to "exercise a period, a long period, of threats and violence and intimidation and anger, to place others in abject fear all for his own purposes." (A-2183). Judge Rakoff continued that "no society can tolerate that activity." (A-2183).

## B. Applicable Law

Appellate review of a challenged sentence is limited to "reasonableness." *United States v. Booker*, 543 U.S. 220, 261-64 (2005). In both its procedural and substantive aspects, reasonableness review employs a "deferential abuse-of-discretion standard," *Gall v. United States*, 552 U.S. 38, 41 (2007), which "incorporates *de novo* review of questions of law . . . and clear error review of questions of fact," *United States v. Vargas*, 961 F.3d 566, 570 (2d Cir. 2020). Thus, a district court's sentencing decision should be upheld unless it "cannot be located within the range of permissible decisions or is based on a legal error or clearly erroneous factual finding." *United States v. Villafuerte*, 502 F.3d 204, 206 (2d Cir. 2007). Appellate review for substantive reasonableness "provide[s] a backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009). A defendant arguing substantive unreasonableness "bears a heavy burden because [appellate] review of a sentence for substantive reasonableness is particularly deferential." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012).

58

This Court has recognized that in "the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances. It is therefore difficult to find that a below-Guidelines sentence is unreasonable." *United States v. Alcius*, 952 F.3d 83, 88-89 (2d Cir. 2020); *see United States v. Messina*, 806 F.3d 55, 66 (2d Cir. 2015) (the conclusion that a sentence within the Guidelines range is substantively reasonable "is warranted in the overwhelming majority of cases, and thus especially when . . . a defendant challenges a below-Guidelines sentence").

## C. Discussion

Smith's challenge to the substantive reasonableness of his below-Guidelines sentence should be rejected. The 144-month sentence imposed by Judge Rakoff—well below the Guidelines range of 360 to 480 months' imprisonment—was not "shockingly high." *Rigas*, 583 F.3d at 123.

As Judge Rakoff explained, there was ample justification for a 144-month sentence. Smith was the leader of an enterprise that both threatened and enacted grave violence. Smith repeatedly threatened violence against competitors and their families (including by threatening to murder their children). (SPA-116-17). At Smith's direction, his enterprise also carried out many acts of violence. (*See, e.g.*, SPA-107 (elderly man suffered brain bleed and hospitalization after Smith directed a subordinate to assault him); Tr. 800 (public adjuster punched in face and struck with a brick, in front of his wife and granddaughter, at

59

Smith's direction)). Smith's enterprise also maintained a cache of firearms, which they brought along to altercations and, at least on one occasion, used to pistol-whip a competitor. (Tr. 240, 325; SPA-99). And contrary to Smith's claim (Br. 58-59), he was far more culpable than his co-defendants, given that he was the undisputed leader of the enterprise, he personally delivered threats to kill children and inflict other violence, he directed the physical violence that his subordinates perpetrated, and his record was worse than those of his co-defendants. (*See* A-2165, 2184).

Given these facts, Smith's attempt to compare this case to "mob-related extortion conspiracies" involving little violence (Br. 54-56) falls flat. Those cases present entirely different factual circumstances. And even assuming that those cases are on all fours with this one (and they are not), the fact that particular sentences were imposed in those cases does not make Smith's sentence substantively unreasonable, given the wide "range of permissible decisions" available to a district court at sentencing. *Villafuerte*, 502 F.3d at 206.

Moreover, as Smith admits, his criminal history score was far higher than the defendants in the cases he cites. (Br. 58 at 13). Unlike those defendants, Smith sustained thirteen criminal convictions before age 40, along with a large number of disciplinary sanctions following his arrest in this case. (A-2179). Smith's lengthy criminal history—including convictions for sex crimes, assault, and menacing—easily justifies a 144-month sentence.

In short, this Court should give "due deference" to Judge Rakoff's "exercise of discretion," informed by his

60

"institutional advantages" and his extensive knowledge of Smith and his criminal conduct. *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc).

## CONCLUSION

### The judgment of conviction should be affirmed.

Dated:    New York, New York
          March 14, 2025

Respectfully submitted,

MATTHEW PODOLSKY,
*Acting United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
      *of America.*

RUSHMI BHASKARAN,
MARGUERITE B. COLSON,
ELIZABETH A. ESPINOSA,
JAMES LIGTENBERG,
   *Assistant United States Attorneys,*
         *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,983 words in this brief.

MATTHEW PODOLSKY,
*Acting United States Attorney for the Southern District of New York*

By: JAMES LIGTENBERG,
*Assistant United States Attorney*