# 24-1680

*To Be Argued By:*
RUSSELL CAPONE

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

SEQUAN JACKSON, AKA SEALED DEFENDANT 2, ANTHONY MCGEE, AKA SEALED DEFENDANT 3, KAHEEN SMALL, AKA SEALED DEFENDANT 4, DAMON DORE, AKA SEALED DEFENDANT 5, HASIM SMITH, AKA SEALED DEFENDANT 6, RAHMIEK LACEWELL, AKA SEALED DEFENDANT 7, MANUEL PEREIRA, AKA SEALED DEFENDANT 8, OCTAVIO PERALTA, AKA SEALED DEFENDANT 9, CARL WALSH,

*Defendants,*

JATIEK SMITH, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

RUSSELL CAPONE
COOLEY LLP
55 Hudson Yards
New York, New York 10001
(212) 479-6580

*Attorney for Defendant-Appellant*

# **TABLE OF CONTENTS**

ARGUMENT ...................................................................................................................1

I.   The District Court Erred in Declining To Suppress the Evidence Obtained from the Illegal Search of Smith's Cellphone ................................................1

    A.   The Warrantless Search of Smith's Phone and its Contents Was Unlawful ............................................................................................1

    B.   The "Good Faith Exception" Does Not Apply to the Unlawful Search of Smith's Cellphone..................................................................5

    C.   Smith's Fifth Amendment Rights Were Violated when He Was Compelled To Provide His Cellphone Passcode ....................................7

    D.   The Decision Not To Suppress the Evidence Obtained in Violation of Smith's Constitutional Rights Was Not Harmless Error .......................13

II.   Smith's Sixth Amendment Rights Were Violated by the District Court's Erroneous Decision To Allow a Majority of Smith's Defense Witnesses To Invoke their Fifth Amendment Right without a Particularized Inquiry into Their Good Faith Basis for Doing So.........................................................15

III.   The District Court Erred in Denying Smith's Request To Appoint Counsel To Represent Smith at Trial........................................................................22

IV.   The District Court Erred in Sentencing Smith to a Term of Twelve Years of Imprisonment ................................................................................................26

CONCLUSION .............................................................................................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fahy v. State of Conn.*,
375 U.S. 85 (1963)................................................................................14

*Fisher v. United States*,
425 U.S. 391 (1976).............................................................................8, 10

*In re Grand Jury Subpoena*,
670 F.3d 1335 (11th Cir. 2012) ..........................................................9, 10

*Howard v. Walker*,
406 F.3d 114 (2d Cir. 2005) ................................................................20

*Laufer v. Annucci*,
2023 WL 3948737 (E.D.N.Y. June 12, 2023)....................................21

*Norde v. Keane*,
294 F.3d 401 (2d Cir. 2002) ................................................................22

*Ohio v. Reiner*,
532 U.S. 17 (2001)...............................................................................16, 17

*Roberts v. United States*,
445 U.S. 552 (1980).............................................................................20

*Rogers v. United States*,
340 U.S. 367 (1951).............................................................................19

*United States v. Aigbekaen*,
943 F.3d 713 (4th Cir. 2019) ..............................................................2, 4

*United States v. Balsamo*,
22-CR-212-3, ECF 194 (S.D.N.Y. July 14, 2023) .............................27

*United States v. Bowe*,
698 F.2d 560 (2d Cir. 1983) ................................................................19

*United States v. Branch*,
197 F. App'x 681 (9th Cir. 2006)........................................................26

# TABLE OF AUTHORITIES
(continued)

*United States v. Cano*,
934 F.3d 1002 (9th Cir. 2019) ...................................................................1, 2, 4

*United States v. Carpenter*,
2023 WL 358794 (N.D. Ill. Jan. 23, 2023).........................................................6

*United States v. Djibo*,
151 F. Supp. 3d 297 (E.D.N.Y. 2015) ...............................................................10

*United States v. Fox*,
2024 WL 3520767 (E.D.N.Y. July 24, 2024).......................................................3

*United States v. Ganias*,
824 F.3d 199 (2d Cir. 2016) ...............................................................................3

*United States v. Hubbell*,
530 U.S. 27 (2000).................................................................................8, 9, 10

*United States v. Kourani*,
6 F.4th 345 (2d Cir. 2021) .................................................................................13

*United States v. Levy*,
803 F.3d 120 (2d Cir. 2015) ...............................................................................4

*United States v. Liounis*,
639 F. App'x 731 (2d Cir. 2016) .......................................................................22

*United States v. Mitchell*,
966 F.2d 92 (2d Cir. 1992) ...............................................................................13

*United States v. Montoya de Hernandez*,
473 U.S. 531 (1985)............................................................................................3

*United States v. Santillan*,
902 F.3d 49 (2d Cir. 2018) ...............................................................................12

*United States v. Sawyer*,
672 F. App'x 63 (2d Cir. 2016) .........................................................................26

*United States v. Schaffer*,
851 F.3d 166 (2d Cir. 2017) .............................................................................12

# TABLE OF AUTHORITIES

(continued)

*United States v. Schmidt,*
105 F.3d 82 (2d Cir. 1997) ................................................................24

*United States v. Shvartsman,*
722 F. Supp. 3d 276 (S.D.N.Y. 2024) ..............................................10

*United States v. Smith,*
660 F. Supp. 3d 210 (S.D.N.Y. 2023) ..............................................23

*United States v. Smith,*
967 F.3d 198 (2d Cir. 2020) ................................................................3

*United States v. Stewart,*
907 F.3d 677 (2d Cir. 2018) ........................................................15, 16

*United States v. Sultanov,*
742 F. Supp. 3d 258 (E.D.N.Y. 2024) ................................................3

*United States v. Valenzuela-Bernal,*
458 U.S. 858 (1982)..........................................................................20

*United States v. Zappola,*
646 F.2d 48 (2d Cir. 1981) ................................................................19

iv

Defendant-Appellant Jatiek Smith responds as follows to Appellee's arguments.

## ARGUMENT

I.  **The District Court Erred in Declining To Suppress the Evidence Obtained from the Illegal Search of Smith's Cellphone**

    A.  **The Warrantless Search of Smith's Phone and its Contents Was Unlawful**

The District Court properly found that *Riley* compels the conclusion that a warrant is required for the search of a cellphone, even at the border.  In opposition, the Government makes several arguments as to why the District Court erred.  None are persuasive.

*First*, the Government points to out-of-circuit authority to contend the District Court misapplied *Riley* when it concluded that a warrant is required to search a cellphone at the border.  Opp. at 21-22.  As the District Court properly recognized, those out-of-circuit opinions are not binding in the Second Circuit.  *See* SPA-26.

In any event, the Government mischaracterizes the out-of-circuit authority to claim incorrectly that "no Court of Appeals has ever held that forensic searches require a warrant or probable cause."  Opp. at 18; *see also id.* at 19.  As the District Court correctly observed, "it is clear that both the Ninth Circuit and the Fourth Circuit would have required a warrant for the search conducted here."  SPA-23.  In *United States v. Cano*, applying *Riley*, the Ninth Circuit held that warrantless

1

cellphone searches at the border can be justified *only* for the purpose of searching for contraband. 934 F.3d 1002, 1018 (9th Cir. 2019). An intrusive "forensic" search for evidence, not contraband, the Ninth Circuit reasoned, goes beyond the scope of a border search, which does not "include the power to search for evidence of contraband that is not present at the border" and thus requires a warrant. *Id.* at 1018. Similarly, the Fourth Circuit, again following *Riley*, held that "an intrusive and nonroutine search under the border search exception," including of a phone, can only be justified by reasonable suspicion "of an offense that bears some nexus to the border search exception's purposes" and not by the Government's "generalized interest in law enforcement and combatting crime." *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019).

*Second*, the Government incorrectly claims *Riley's* logic does not apply to cellphone searches at the border because "at the border, the 'Fourth Amendment balance between the interests of the Government and the privacy rights of the individual' is flipped from what it is during a search incident to arrest." Opp. at 22 (citing *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985)). It is true that, in the context of detaining a traveler at the border based on reasonable suspicion of smuggling contraband inside the person's body, the Supreme Court observed "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is . . . struck much more favorably to the Government" at the

2

border. But it does not follow that *no* balancing of interests is required. *Montoya*, 437 U.S. at 540. In striking the appropriate balance, where the Government's interest (and the resulting search) is *not* to prevent contraband from entering the country but instead a generalized interest in detecting crime, and considering the extraordinary privacy interests implicated by modern cellphones, a warrant should be required.[1]

*Finally*, ignoring *Riley's* directive and instead relying on the incorrect decisions of the other circuits, the Government contends the search of Smith's device was lawful because agents had "reasonable suspicion" that Smith was engaged in illegal activity. Opp. 25-28. As discussed *supra*, this Court should hold that "reasonable suspicion" (as opposed to a warrant supported by probable cause) is an insufficient standard. But even if this Court were to find reasonable suspicion were all that was required, it should adopt the more exacting requirement endorsed by the

---

[1] Of course, certain types of physical searches, such as strip or cavity searches, are highly intrusive, though also conducted very precisely to prevent contraband from crossing the border. But, as many courts in this Circuit have recognized, cellphone searches implicate different but extremely sensitive privacy concerns. *See, e.g.*, *United States v. Sultanov,* 742 F. Supp. 3d 258, 286 (E.D.N.Y. 2024) ("Until technology that can translate people's brain activity . . . meaningfully advances, reviewing the information in a person's cell phone is the best approximation government officials have for mindreading.") (cleaned up); *United States v. Fox,* 2024 WL 3520767, at *10 (E.D.N.Y. July 24, 2024). And this Court itself has previously recognized the extraordinary privacy concerns implicated by searches of electronic devices. *See United States v. Smith*, 967 F.3d 198, 208 (2d Cir. 2020); *United States v. Ganias*, 824 F.3d 199, 217 (2d Cir. 2016) (devices contain "a vast trove of personal information about the person to whom the [device] belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure").

3

Ninth and Fourth Circuits that the reasonable suspicion must be connected to a border-related crime. *See United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019); *United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019). Under this standard, the "advanced" search of Smith's cellphone would still be unconstitutional, as there was no reasonable suspicion of any offense connected to the Government's interest in preventing contraband from entering the country or threatening national security at the time Smith crossed the border.[2]

The Government claims that the reasonable suspicion standard would be met because Smith was suspected of engaging in "money laundering." Opp. at 25-28. But nothing in the record supports the notion that any supposed money laundering—an offense with which Smith was neither charged nor convicted of—implicated cross-border issues. This is particularly so given that the investigation at all times was into the local operations of competing fire mitigation companies in Brooklyn and Queens, and had no cross-border implications whatsoever. *See* A-383-385 (noting that special agents "spoke with HSI and CBP personal [sic] assigned to

---

[2] The Government incorrectly claims that this Court's holding in *United States v. Levy*, 803 F.3d 120 (2d Cir. 2015), forecloses the Court from holding here that the reasonable suspicion must have a nexus to a border-related crime. Opp. at 26. But *Levy* did not involve, and therefore did not account for, the very different privacy implications of cellphone searches, as *Levy* considered only the search of a traveler's notebook based on reasonable suspicion of involvement in financial crimes. *Id.* at 122-24. This Court should follow the logic of the Ninth and Fourth Circuits, as well as of the District Court, and not extend *Levy*'s principal to forensic cellphone reviews.

Newark's international Airport and advised them that we would like to border search" Smith as a result of an investigation into "allegedly using members of the Blood Gang to extort fire damage and restoration businesses in . . . New York City" and allegedly "laundering the proceeds of their extortion through the purchase of real estate, vehicles, and other assets," nowhere mentioning cross-border money laundering). The fact that Smith returned from a personal vacation with a large amount of cash—though still below the threshold for reporting purposes—does not, absent more, establish reasonable suspicion of an international or border-related offense.

**B.      The "Good Faith Exception" Does Not Apply to the Unlawful Search of Smith's Cellphone**

As detailed extensively in Smith's opening brief, the District Court erred in concluding that suppression of evidence from Smith's cellphone was unwarranted because the good faith exception applied. Br. at 28-36. In opposition, the Government argues that the good faith exception applies because the (i) initial search was justified by reliance on out-of-circuit authority and CBP guidance, and (ii) search warrant obtained from Magistrate Judge Aaron was sufficient. Opp. at 29-35. Both of the Government's arguments are wrong.

*First*, the initial search was not justified by caselaw or CBP guidance. For the reasons discussed above and in Smith's opening brief, the "binding judicial precedent" of *Riley* compelled law enforcement to obtain a warrant to search Smith's

5

phone. *See supra* I.A, Br. 23-29. Nor was it justified by CBP's guidance. The forensic copying of Smith's entire device for later examination by multiple law enforcement agencies was, at best, an "advanced search" under the CBP directive, which requires "reasonable suspicion of activity in violation of the laws enforced or administered by CBP, or in which there is a national security concern." A-299. As discussed above, no such reasonable suspicion existed. Even if it did, the CBP directive would still not immunize the violation of Smith's constitutional rights, because the guidance plainly conflicts with the Constitution as interpreted by the Supreme Court in *Riley*, which had been decided at the time of the search. *Supra* I.A. A federal agency cannot render its agents immune from constitutional requirements by issuing unconstitutional guidance.[3] *See, e.g.*, *United States v. Carpenter*, 2023 WL 358794, at *7 (N.D. Ill. Jan. 23, 2023) ("Executive agencies cannot use regulation to shield evidence gathered from unconstitutional searches against suppression.").

*Second*, as explained in Smith's opening brief, the later-obtained search warrant failed to disclose that Smith did not voluntarily provide his passcode. Br. at 31-35. In opposition, the Government makes several arguments, each of which fail. The Government claims Smith's arguments on the faulty affidavit are waived

---

[3] Furthermore, HSI agents–*not* CBP agents–seized and searched Smith's phone. A-381.

because they are raised "for the first time on appeal." Opp. at 33. But Smith submitted an affidavit describing the circumstances of his provision of his passcode, A-307-10, and the District Court acknowledged the factual issue, though ultimately failed to give it meaningful consideration. *See* SPA-6 ("[T]he Government more cryptically represents that 'Special Agents . . . requested Smith's passcode, which Smith eventually provided.'"). Next, the Government claims the warrant application is not deficient for omitting the circumstances under which Smith was compelled to provide his passcode because the "affiant was not present for the border search and Smith does not identify any evidence that the affiant knew the circumstances of obtaining Smith's passcode." Opp. at 33. But the affiant himself affirmed that he had relevant knowledge, and stated that the application "is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received." A-255-266. Nowhere did he disclose this did not include conferring with the government agents who did conduct the search and seizure, or that, as a result, he did not have knowledge of the relevant circumstances he purported to describe. A-255-266.

**C.** **Smith's Fifth Amendment Rights Were Violated when He Was Compelled To Provide His Cellphone Passcode**

As the Government acknowledges, the Eleventh Circuit, which is the only circuit to have considered the foregone conclusion doctrine in the context of

7

compelled decryption of an electronic device, held that for the doctrine to apply, "the Government [must] show with 'reasonable particularity' that, at the time it sought to compel the act of production, it already knew of the materials" on the device in question. Opp. at 36 (citing *In re Grand Jury Subpoena*, 670 F.3d 1335, 1346 (11th Cir. 2012)). In other words, in order for the compelled provision of a passcode to an electronic device to not be violative of an individual's Fifth Amendment rights, the Government must be able to articulate with reasonable particularity that it was aware the data it seeks was stored on the device.

The Eleventh Circuit's holding is correct and faithful to the Supreme Court's precedent in *Fisher v. United States*, 425 U.S. 391 (1976) and *United States v. Hubbell*, 530 U.S. 27 (2000). In *Fisher*, the Supreme Court held that only where "the existence and location of the papers are a foregone conclusion and the [individual] adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers . . . no constitutional rights are touched" by the act of producing the documents. *Id.* at 411 (emphasis added). In *Hubbell*, the Supreme Court distinguished *Fisher* by explaining "while in *Fisher* the government knew that the documents were in the attorneys' possession and could independently confirm their existence and authenticity through the accountants who created them, here the Government has not shown that it had any prior knowledge of either the

8

existence or whereabouts of the 13,120 pages of documents ultimately produced by respondents." *Hubbell*, 530 U.S. at 44-45.

In *In re Grand Jury Subpoena*, 670 F.3d at 1346, the Eleventh Circuit applied this rule to the Government's attempt to compel the defendant to provide the password to unlock a hard drive. The Court found that because the Government could not articulate with reasonable particularity that the documents it sought in fact existed on that hard drive, the foregone conclusion doctrine did not apply. The Government offers three reasons the Court should ignore this precedent. None are compelling.

*First*, the Government urges this Court to adopt the District Court's erroneous conclusion that it is "inappropriate" to apply the foregone conclusion's "reasonable particularity" requirement to compelled decryption of an electronic device because "[u]nlike the act of responding to a subpoena, the act of physically unlocking a smartphone or providing the password does not communicate anything about what files exist on the phone, whether the files were created by the defendant, or whether the files are authentic." Opp. at 37 (quoting SPA-87). This Court should not adopt the District Court's erroneous conclusion, which rejects the Eleventh Circuit's decision in *In re Grand Jury Subpoena* in favor of an illogical alternative. As detailed in Smith's opening brief and in the helpful submissions of amici, electronic devices store massive quantities of data that contain untold amounts of extremely

9

sensitive information about every facet of an individual's life, as well as those of his family, friends, business associates, and other acquaintances. Neither the District Court nor the Government offer any reason why devices containing vast amounts of data with extremely sensitive information should be treated differently than non-electronic storage devices that can hold massive quantities of data—a context in which the reasonable particularity requirement of the foregone conclusion doctrine has been applied.

Instead, both the Government and the District Court suggest the provision of a passcode is not testimonial because "the Government knew that Smith was the owner of the phone and that Smith knew the password to unlock it." Opp. at 37 (quoting SPA-88-89). But, as the Eleventh Circuit recognized, "[t]his argument badly misses the mark. In *Fisher*, where the analogy was born, and again in *Hubbell*, the Government never sought the 'key' or 'combination' to the [storage device] for its own sake; rather the Government sought the files being withheld, just as the Government does here." *In re Grand Jury Subpoena*, 670 F.3d at 1346; *see also United States v. Shvartsman*, 722 F. Supp. 3d 276, 317-18 (S.D.N.Y. 2024) (compelled provision of cellphone passcode during border search not subject to foregone conclusion doctrine); *United States v. Djibo*, 151 F. Supp. 3d 297, 310 (E.D.N.Y. 2015) (suppressing materials obtained from compelled provision of password at border). Put differently, were the Government interested in a warehouse

of physical file boxes, it would have to articulate with reasonable particularity that the material it seeks exists already in those files for the foregone conclusion doctrine to apply. There is no reason why the same showing should not have to be made with respect to a cellphone that houses electronic rather than physical files.

*Finally*, the Government asserts that Smith's provision of his password "was not compelled" despite the District Court not reaching this question because, it claims, "the record makes clear that Smith voluntarily provided his passcode to the agents [and] Smith's argument to the contrary relies solely on his own affidavit (A-307-10), which . . . this Court should afford little weight given Smith's repeated perjury at trial." Opp. at 39. While the District Court found the credibility of certain other witnesses to be greater than Smith's, Smith has not been charged with, much less convicted of, perjury, and the District Court made no such determination with respect to the affidavit on which Smith relied here. *See generally* SPA-90-165, SPA-82-89. To the contrary, as noted above, the District Court expressed skepticism of the Government's version of events on this point, noting that "the Government more cryptically represents that 'Special Agents . . . requested Smith's passcode, which Smith eventually provided.'" SPA-6.

What is more, at the time that he provided his password, Smith was plainly in custody. In assessing whether a statement was compelled in a custodial setting, a court should consider a variety of factors including "the interrogation's duration . . .

11

its location . . .whether the suspect volunteered for the interview . . . whether weapons were present . . . and whether officers told the suspect he was free to leave or under suspicion." *United States v. Schaffer*, 851 F.3d 166, 173-74 (2d Cir. 2017) (citation omitted). Here, when Smith landed at Newark airport, he was met by armed law enforcement officers wearing CBP uniforms. A-391. The official record of the border search of Smith notes that Smith was "detained" throughout the search. A-384. Approximately ten heavily-armed law enforcement officers were in strategic locations in his vicinity. A-392; *see also* A-385 (noting the "large presence of CBP officers standing behind [Smith]" including "several CBP officers holding . . . rifles."). The agents searched Smith's luggage and when Smith used the cellphone, the agents instructed him to put it into "airplane mode" and provide the password. A-392-393. Smith refused. *Id.*; *see also* A-384 (Smith declined CBP's request to "look at" his phone). The agents persisted, informing Smith he was obligated to provide his password pursuant to the "border search authority" and could be held without charge for as long as it took to open the phone. A-384; A-393-94.

Based on these circumstances, no "reasonable person in the defendant's position would have understood that he or she was free to leave." *United States v. Santillan*, 902 F.3d 49, 60 (2d Cir. 2018). To the contrary, the Government "affirmatively convey[ed] the message that the defendant [was] not free to leave"

12

both verbally, and through their actions based on the location, tone, and nature of the interrogation. *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992).

Even if the Court finds that these circumstances do not rise to the level of Smith being in custody, "incriminating statements made in non-custodial settings are inadmissible if the statements were not made voluntarily—that is, if the defendant's 'will was overborne.'" *United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 2021). "When such a claim is raised, it is the duty of an appellate court . . . to examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Mitchell*, 966 F.2d at 100. The totality of the circumstances here makes clear that Smith's "will was overborne" rendering his provision of his passcode compelled, not voluntary. *Id*.

While the record is sufficient for this Court to reverse on the basis that Smith's Fifth Amendment rights were violated, at minimum, the Court should remand for an evidentiary hearing on the question of whether Smith's provision of his passcode was custodial and compelled.

**D.     The Decision Not To Suppress the Evidence Obtained in Violation of Smith's Constitutional Rights Was Not Harmless Error**

The Government claims that Smith cannot show that "the erroneously admitted evidence [from his cellphone] affected the outcome of the trial" because the Government presented "testimony from its 19 witnesses, many of whom Judge Rakoff explicitly noted that he found credible [who] overwhelmingly proved that

13

Smith was guilty of conspiring to commit racketeering and extortion." Opp. at 41. Of course, the majority of the witnesses (11 out of 19) were non-substantive, and primarily offered testimony authenticating certain evidence, including the impermissibly admitted exhibits from the illegally-obtained cellphone and wiretap. A-471, 498, 518, 534-35, 557, 561-62, 565, 575-76, 587, 984-95, 1435. But even as to the cooperating and other significant witnesses, the Government's position understates how infected by the erroneously-admitted evidence the Government's case, and, as a result, the District Court's conclusions, were. In fact, the District Court heard portions of a single recording from Smith's phone at least *thirty-five times* at trial. A-633, 636-37, 639, 691, 769, 1024-26, 1102, 1104-05, 1454-5, 1677-79, 1681, 1684, 1744-45, 1753, 1756, 1762, 1796, 1810-11. And the District Court referenced that recording alone *twenty-five* times in its findings of fact and conclusions of law. SPA-94, 100-03, 116-19, 136, 141, 148. The Government's claim that the introduction of this evidence did not affect the outcome of the trial strains credulity. *See Fahy v. State of Conn.*, 375 U.S. 85, 86–87 (1963) (conviction should be vacated where "[t]he question [of] whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" is answered in the affirmative).

The Government also claims any error from the admission of Smith's cellphone was harmless because "[i]n fact, Smith effectively admitted to committing

14

those crimes during his own testimony." Opp. at 41. But as the testimony the Government cites makes clear, much of Smith's own testimony related to having to explain the evidence illegally obtained from his cellphone. *See, e.g.*, SPA-119 (discussing Smith's testimony regarding GX311A, B, F, and G, all taken from the illegally-obtained phone extraction); SPA-136 (discussing Smith testimony regarding GX311A).

**II.    Smith's Sixth Amendment Rights Were Violated by the District Court's Erroneous Decision To Allow a Majority of Smith's Defense Witnesses To Invoke their Fifth Amendment Right without a Particularized Inquiry into Their Good Faith Basis for Doing So**

As explained in Smith's opening brief, the District Court violated Smith's Sixth Amendment rights—and that violation prejudiced Smith's defense—when the District Court allowed five of Smith's eight defense witnesses to invoke their Fifth Amendment privilege against self-incrimination without making any particularized inquiry into their good-faith basis for that invocation. Br. at 40-46. In opposition, the Government makes three arguments, each of which fail.

*First,* the Government argues that the District Court did not err in accepting Smith's five defense witnesses' blanket assertion of their Fifth Amendment privilege because their "criminal exposure was patent from the record." Opp. at 44. That is neither apposite nor true, and the cases cited by the Government involve witnesses whose liability was far more evident and core to the prosecution at issue. For example, the Government cites *United States v. Stewart*, 907 F.3d 677 (2d Cir. 2018).

15

But in *Stewart*, the potential witness was a *co-defendant* in the case, and defense's entire theory of the case was that it was the potential witness, not the defendant, who was at fault for the alleged misconduct. Moreover, the government "made clear that it believed [the witness] had engaged in additional [crimes] for which he had not been charged," which was supported by evidence in the record. Even so, the district court *still* engaged in a particularized inquiry with respect to that witness's invocation by conducting an "*in camera* proceeding with only [the witness] and his counsel present to assess the viability of [the witness's] claimed privilege," only after which the district court sustained the witnesses' invocation. *Id.* at 684.

Similarly, in *Ohio v. Reiner*, the witness who sought to invoke his Fifth Amendment privilege was directly implicated in the defendant's theory of the case as being the true "culpable party." 532 U.S. 17, 18 (2001). Specifically, the defendant was charged with "involuntary manslaughter in connection with the death of his 2-month-old son," who died from "shaken baby syndrome." *Id.* The defendant's theory was that the witness, who was the family's babysitter, was responsible for the death. *Id.* The Supreme Court held that the witness had a valid Fifth Amendment privilege because she "spent extended periods of time alone with [the child] in the weeks immediately preceding the discovery of [] injuries"; was with the child "within the potential timeframe of the fatal trauma"; and the "defense's theory of the case" was that the witness "was responsible" for the death. *Id.* at 21.

16

In so holding, the Court again emphasized its obligation to test the validity of the witness' invocation of the privilege. *Id.* ("We have held that the privilege's protection extends only to witnesses who have reasonable cause to apprehend danger from a direct answer. *That inquiry is for the court*; the witness's assertion does not by itself establish the risk of incrimination.") (cleaned up).

The record here does not support a finding that Smith's witnesses had such obvious criminal exposure that could support a blanket invocation of their Fifth Amendment privilege without any particularized inquiry. For example, the Government claims in its opposition that Elvin Mata is "far from . . . a victim of the enterprise," and instead a beneficiary of the rotation system who was "afforded certain privileges, such as chasing fires at night." Opp. at 46. This is entirely inconsistent with the Government's theory of the case, which was that ServPro, the company Mata worked for, was only a part of the rotation system because of Smith's extortion. A-1084-85 (Periera testifying Mata was a ServPro chaser who had to be in the rotation because "his boss was a part of the rotation"). Indeed, the very testimony the Government cites in support of its contention that Mata had obvious criminal exposure as a rotation system beneficiary is testimony from *Vargas*, the owner of ServPro who the Government argues Smith extorted into participating in the system. Opp. at 46 (citing Tr. 881, 958). This testimony comes nowhere close to suggesting that Mata had "patent" criminal liability, as the Government claims.

17

As another example, the Government claims Gerardo Curcio "faced clear criminal exposure due to his association with Smith's rotation system and his potentially false statements to the FBI." Opp. at 47. In support of this, the Government says Curcio (i) was "present for a meeting with Smith and others discussing a public adjuster who was assaulted at Smith's direction";[4] and (ii) "falsely reported there was no extortion going on" to a federal agent, after which Curcio attended a dinner where Smith toasted Curcio for "not lying on him." *Id*. As to the first, the Government's description is misleading—there was no testimony that Curcio attended a meeting where he and Smith discussed an assault. The relevant testimony is that Curcio attended a meeting at which Smith and a public adjuster were present after which (and unbeknownst to Curcio) a decision was made to have that public adjuster slapped. A-1696-98. Nor can the Government claim that Curcio "potentially" lied to the FBI by telling the FBI that based on his experience in the industry he did not believe First Response was engaging in extortion where there is no evidence whatsoever to suggest that this was untrue from Curcio's perspective.

Moreover, even if the Government is correct that there were areas of "patent" criminal exposure for these witnesses (it is not), the District Court *still* erred in

---

[4] Testimony concerning this meeting was not even in the record at the time the Court made its decision to allow the witnesses to invoke the Fifth Amendment without a particularized inquiry and therefore could not have been a basis for the Court's decision. A-1487-88.

18

allowing the witnesses to invoke their Fifth Amendment privilege with respect to every question Smith would have asked, even where the question was not at all related to any purported liability the Government claims those witnesses had.[5] Such a blanket assertion was clearly improper, as only "questions which might elicit incriminatory answers are barred by a proper fifth amendment claim." *United States v. Bowe*, 698 F.2d 560, 566 (2d Cir. 1983); *see also United States v. Zappola*, 646 F.2d 48, 53 (2d Cir. 1981) (finding district court to have erred where it "simply accept[s] . . . [the] blanket assertion of the fifth amendment privilege . . . and [does] not undertake a particularized inquiry to determine whether the assertion was founded on a reasonable fear of prosecution as to each of the posed questions"); *Rogers v. United States*, 340 U.S. 367, 374 (1951) ("As to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a 'real danger' of further crimination.").

*Second*, the Government claims that no particularized inquiry was required because the witnesses "invoked their Fifth Amendment privilege on the advice of counsel." Opp. at 44. Yet, the Government does not cite a single case (nor has Smith found one) that stands for the proposition that a Court can outsource its responsibility

---

[5]In each instance, the District Court excused the witness after invocation as to a single question about their work at First Response or in the fire mitigation industry. A-1826-31,43.

to perform a particularized assessment to a witness's counsel. To the contrary, the caselaw makes clear that it is the duty of the Court, not the witness or defense counsel, "to determine the legitimacy of a witness' reliance upon the Fifth Amendment." *Roberts v. United States*, 445 U.S. 552, 560n.7 (1980). This is especially so where, like here, the District Court was aware that multiple attorneys for the relevant witnesses did not actually believe their client would testify to anything criminal but were only advising their client not to testify based on the Government's suggestion there could be criminal exposure. A-1487.

*Finally*, the Government claims "even assuming that the District Court erred in permitting the witnesses to invoke [their Fifth Amendment privilege]," Smith failed to demonstrate how those witnesses would have testified materially and favorably in Smith's defense. Opp. at 44-45.

Smith has met his burden for at least three reasons. *First*, the District Court's error necessarily limited the available evidence concerning the potential value of each witness's testimony. While Smith is required to make some showing of materiality, under these circumstances, he "cannot be expected to render a detailed description of [the witnesses'] lost testimony." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982). *Second*, materiality must be "evaluated in the context of the entire record." *Howard v. Walker*, 406 F.3d 114, 132 (2d Cir. 2005). Here, the missing witnesses' testimony was not only independently material, but also

20

cumulatively material because it resulted in a majority of Smith's witnesses being unable to testify. *Third*, the testimony the witnesses were expected to have provided was material because it was not cumulative of other testimony already provided in Smith's defense. *Cf. Laufer v. Annucci*, 2023 WL 3948737, at \*5-7 (E.D.N.Y. June 12, 2023) (finding witness's testimony not material because it was duplicative of testimony another witness provided).

As explained in Smith's opening brief, the defense witnesses would have offered testimony that was material and favorable to Smith. Br. at 46-49. For example, Mata's testimony would have been both material and favorable because the record suggests that Mata, who worked under Vargas and was present for some of the events that the Government portrayed as extortionate, did not believe that Servpro was being extorted. Br. at 46-47. The Government's only retort is that "nowhere does Mata offer a competing account of the meeting where Smith threatened and extorted" Vargas. Opp. at 47. That is exactly the point: Mata did not have any opportunity to offer a competing account because, after being told the Government believed he had exposure and without any particularized inquiry by the District Court, he invoked the Fifth Amendment upon the advice of counsel. This testimony was of particular importance because, as the District Court observed, "there were certain aspects of Vargas's testimony that were inconsistent," and Smith was deprived of the opportunity to introduce contrary evidence further calling into

21

question Vargas's credibility. SPA-145. Likewise, Curcio, owner of Cipco, one of three main board up companies in the industry who also had business arrangements with Jackson (A-785, 953), would have offered testimony that he did not believe that any extortion was occurring in the industry. A-1135 (Peralta testifying that Curcio told the FBI that "there was no extortion going on" at First Response). This is not, as the Government claims, merely "good act" evidence (Opp. at 48), but instead an account of First Response's non-threatening treatment of competitors based on this witness's experience that is inconsistent with the Government's case.

In sum, Smith has met his burden of showing that the District Court's failure to inquire into defense witnesses' good faith basis for invoking the Fifth Amendment was cumulative, harmful error that impacted his ability to present a defense.

## III. The District Court Erred in Denying Smith's Request To Appoint Counsel To Represent Smith at Trial

As set forth in Smith's opening brief, the District Court erred in denying Smith's request to appoint Capone as his counsel for trial—a decision that prevented counsel from assisting Smith during a critical stage of the proceeding and is therefore per se reversible. *Norde v. Keane*, 294 F.3d 401, 413 (2d Cir. 2002). The Government's arguments in opposition fail.[6]

---

[6] The Government's reliance on *United States v. Liounis*, 639 F. App'x 731 (2d Cir. 2016) is misplaced. There, the *pro se* defendant sought an adjournment to a date when "recently retained, but unidentified" counsel could "assume responsibility" for

*First*, the Government contends that Smith is to blame for the prior adjournments of trial because they resulted from his disagreements with counsel. Opp. at 54. But the Government does not deny that Smith consistently objected to any delay of trial, and that the adjournment requests from Smith's counsel were granted *over his objection*. Br. at 51; *see, e.g.*, *United States v. Smith*, 660 F. Supp. 3d 210, 215 (S.D.N.Y. 2023) (granting counsel's request to continue trial for five months over Smith's objection).

*Second*, as detailed in the opening brief, the District Court erred by failing to consider that Smith's request was motivated in part by his inability to access a voluminous amount of discovery materials, much of which Smith still had not received at the time he made his request for counsel. Br. at 51-52. In response, the Government argues that Smith and his prior counsel "had access to discovery for over a year." Opp. at 54. But by the Government's own admission, this access was limited to only a portion of the trial materials. Dkt. 309 at 4. While the Government may have de-designated certain discovery materials the day prior to Smith's request for trial counsel to be appointed, Smith had not actually received this discovery,

---

his defense, unprompted by any recent developments. *Id.* at 733. By contrast, Smith specifically requested to appoint Capone as a result of the impossibility of reviewing discovery that only became clear in the days leading up to his request. Further, *Liounis* sought an adjournment just four days before trial, rendering the *Lioiunis* court's concern about hardship to the witnesses traveling for trial far more compelling than any similar concerns here, where Smith made his request two weeks in advance of trial. *Id.*

including the Section 3500 materials for the Government's main trial witnesses, at the time he requested that Capone be appointed counsel, because of delays at the Metropolitan Detention Center ("MDC"). A-413-15. Thus, the timing of Smith's request does not suggest a "ploy."

The Government points out that the District Court had warned Smith of the difficulties of proceeding *pro se* and ordered MDC to provide Smith access to discovery.[7] Opp. at 54. While that may be so, it did not provide a sufficient basis to reject Smith's later request. This is particularly so where MDC blatantly flouted the District Court's directives to grant Smith access to discovery materials, including by not permitting him access to the computer at all on some days, and granting him access for only a few hours on other days. A-413-414. And even when Smith *was* allowed computer access, his session ended as soon as he needed to use the restroom or eat, after which he was not permitted to return to the computer room. *Id*. Moreover, as explained in Smith's opening brief, he faced additional difficulties

---

[7] The Government also suggests that giving Smith limited time during trial to review discovery and prepare for cross-examination with the assistance of standby counsel absolves any error in denying appointment of counsel. Opp. at 54. But permitting standby counsel to assist during the trial is not an adequate substitute for appointing counsel in the first place, particularly where the discovery materials are so voluminous that review would take weeks, not mere minutes before crossing a witness. *See United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997) (standby counsel's duties are "considerably more limited than the obligations of retained or appointed counsel" and standby counsel does not "play the same role that defense counsel normally would in preparing the strategy for a criminal defense").

24

reviewing discovery due to his confinement in the Special Housing Unit. Br. at 52. These circumstances—including MDC's direct contravention of the District Court's Orders—could not have been reasonably anticipated by Smith when he agreed to defend himself *pro se*, even in the face of the Court's warning about the challenges of doing so. Indeed, as soon as it became clear to Smith that MDC did not intend to grant him the computer access ordered by the District Court, Smith filed his request for appointment of counsel.[8]

*Finally*, the Government maintains that the District Court properly reasoned that Smith sought a delay to intimidate witnesses and points to the timing of Smith's request as "highly suspect." Opp. at 55. But the District Court's reasoning was based on nothing but unsubstantiated speculation about Smith's intent. This is especially so where (i) as noted above, the timing of Smith's request plainly resulted from difficulties with access to new discovery materials; and (ii) the District Court itself subsequently found that Smith did not engage in any acts of intimidation as part of the charged conspiracy. Opp. at 55; SPA-161-65. Thus, the concern over witness intimidation was an unsound basis for the District Court's decision to deny Smith's request for appointment of counsel.

---

[8] The District Court Order requiring MDC to grant Smith a minimum of seven hours of computer access per day went into effect on November 6, and Smith made his request for appointment of counsel on November 15 after three instances of being denied his court-mandated computer time. A-413-14; Dkt. 282.

25

## IV. The District Court Erred in Sentencing Smith to a Term of Twelve Years of Imprisonment

The Governments' arguments as to the reasonableness of Smith's 12-year sentence fail for three reasons.

*First*, as the Government does not dispute, a below guidelines sentence can be unreasonably high. Opp. at 58; *see also United States v. Branch*, 197 F. App'x 681, 682 (9th Cir. 2006) ("[A] sentence that is below the applicable Guidelines range still may be unreasonably high and therefore imposed in violation of law."); *United States v. Sawyer*, 672 F. App'x 63, 67 (2d Cir. 2016). In *Sawyer*, this Court considered the circumstances of the defendant's childhood, which "contributed to the commission of the offense," and vacated the imposed sentence, directing that the defendant's background "justifies not just a departure from the Guidelines, but a significant one indeed." *Id.* So too, here, Smith's sentencing submission was supported by a psychiatric evaluation by Dr. Eric Goldsmith, who concluded that Smith suffers from a mental health condition as a result of childhood trauma that directly contributed to the offense conduct in this case. A-2239.

*Second*, the Government cannot account for the disparity between Smith's sentence and those of defendants accused of similar conduct. The Government does not meaningfully distinguish Smith's conduct from that in the mob-related extortion conspiracy cases outlined in Smith's opening brief. *See* Br. 55-58. The Government brushes these cases aside as "entirely different factual[ly]," Opp. at 59, but ignores

26

the fact that nearly identical conduct in those cases has resulted in substantially longer prison time for Smith. For example, in *United States v. Esposito*, Esposito, like Smith, was convicted of being "a leader of a longstanding criminal scheme that, through acts of fraud, physical force, threats, coercion, and kickbacks extorted payments," yet Esposito (who is white) received only two years, despite an alleged over sixteen-year involvement in the extortionate scheme, while Smith (who is black) received a sentence of twelve years, six times more than Esposito. Br. at 56. Nor does the Government attempt to explain how directing or carrying out largely weaponless assaults or possessing (but not using) firearms, Opp. at 58-59, puts Smith on par at sentencing with those convicted of actual or attempted murder. Br. at 55. Instead, the Government redirects the Court to Smith's substantial criminal history to justify his disparate sentence. Opp. at 59. Not only does the Government ignore that some of the defendants in these mob-related extortion conspiracy cases *do* have extensive criminal histories, *see, e.g.*, *United States v. Balsamo*, 22-CR-212-3, ECF 194 at 8 (S.D.N.Y. July 14, 2023), but it also fails to reckon with the realities of Smith's prior criminal conduct and racial and socioeconomic status when compared to the majority white and well-financed defendants in the mob-related extortion conspiracy cases, whose criminal history often is under-reflective of their actual conduct or likelihood of recidivism. *See* Br. at 58 n.13.

27

## CONCLUSION

For the foregoing reasons, and the reasons stated in Defendant-Appellant's opening brief, this Court should vacate the District Court's conviction and sentence of Smith.

Dated:      April 18, 2025        Respectfully submitted,

*/s/ Russell Capone*

Russell Capone, Bar No. 4408324
COOLEY LLP
55 Hudson Yards
New York, NY  10001-2157
Telephone: +1 212 479 6000
Facsimile:  +1 212 479 6275
rcapone@cooley.com

*Attorney for Defendant-Appellant*
*Jatiek Smith*

28

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) and Second Circuit Local Rule 32.1(a)(4) because this brief contains **6,877 words**, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, double-spaced, Times New Roman font.

Dated:     April 18, 2025         */s/ Russell Capone*
          New York, NY          Russell Capone

                                        *Attorney for Defendant-Appellant*
                                        *Jatiek Smith*